# 19-3643(L)

**19-3623(CON)**

*To Be Argued By*:
ROBERT L. BOONE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket Nos. 19-3643(L), 19-3623(CON)

◄─◆◆◆─►

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

MERL CODE, CHRISTIAN DAWKINS,

*Defendants-Appellants*,

LAMONT EVANS, EMANUEL RICHARDSON,
also known as Book, ANTHONY BLAND, also known as Tony,

*Defendants*.

──────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA
## [REDACTED]

GEOFFREY S. BERMAN,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

ROBERT L. BOONE,
ELI J. MARK,
NOAH D. SOLOWIEJCZYK,
THOMAS MCKAY,
*Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Government's Case . . . . . . . . . . . . . . .  2

        1.  The Defendants . . . . . . . . . . . . . . . . . . .  3

        2.  The NCAA and the Universities . . . . . .  4

        3.  The Bribery of Lamont Evans. . . . . . . .  6

        4.  The Creation of Loyd, Inc.. . . . . . . . . . .  9

        5.  Code Joins the Conspiracy . . . . . . . . .  11

        6.  More Coaches Are Bribed . . . . . . . . . .  14

        7.  The Coaches Take Action . . . . . . . . . .  16

    B.  The Defense Case. . . . . . . . . . . . . . . . . . . .  17

    C.  The Verdict and Sentencing. . . . . . . . . . . .  18

ARGUMENT:

POINT I—The District Court Correctly Denied
the Defendants' Motion to Dismiss the
Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  19

    B.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . .  20

        1.  The Coaches Were Agents of the
Universities . . . . . . . . . . . . . . . . . . . . . .  20

ii

PAGE

2. The Bribes Were in Connection With
   Business of the Universities . . . . . . . 26

POINT II—Section 666 is Not Unconstitutionally
Vague As Applied to the Defendants'
Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . 32

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 33

POINT III—The District Court Correctly Precluded
the Defendants From Offering Inadmissible
Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A. Evidentiary Rulings Generally . . . . . . . . 36

B. The District Court Correctly Precluded
   Certain Testimony from Code's Family
   Members . . . . . . . . . . . . . . . . . . . . . . . . . 38

   1. Relevant Facts . . . . . . . . . . . . . . . . . . 38

   2. Applicable Law . . . . . . . . . . . . . . . . . . 40

   3. Discussion . . . . . . . . . . . . . . . . . . . . . 42

      a. Code's Alleged "Order" Was
         Correctly Precluded . . . . . . . . . . . 42

      b. Code's Statement of Belief About
         His Prior Agreement Was
         Correctly Precluded . . . . . . . . . . . 45

      c. Any Error Was Harmless . . . . . . . 48

iii

PAGE

C.  The District Court Correctly Precluded
    Testimony That Dawkins Did Not Bribe
    Certain Coaches Other Than Those
    Charged in the Conspiracy. . . . . . . . . . . . .  50

    1.  Relevant Facts . . . . . . . . . . . . . . . . . . . .  50

    2.  Applicable Law  . . . . . . . . . . . . . . . . . .  52

    3.  Discussion  . . . . . . . . . . . . . . . . . . . . . .  53

        a.  The District Court Did Not
            Abuse Its Discretion . . . . . . . . . . .  53

        b.  Any Error Was Harmless . . . . . . .  57

D.  The District Court Correctly Precluded the
    Defendants from Questioning D'Angelo
    About Certain Subjects  . . . . . . . . . . . . . . .  58

    1.  Relevant Facts . . . . . . . . . . . . . . . . . . . .  58

        a.  The Alleged FBI Misconduct . . . .  58

        b.  Judge Ramos Precludes
            Questioning About the
            Alleged FBI Misconduct . . . . . . . .  59

        c.  Judge Ramos Precludes Certain
            Questioning About FBI Agents'
            Interactions With Blazer  . . . . . . .  61

        d.  The Defendants Abandon Any
            Attempt to Question D'Angelo
            About Other Subjects . . . . . . . . . .  61

iv

PAGE

2. Discussion . . . . . . . . . . . . . . . . . . . . . . 62

E. The District Court Correctly Precluded a
Portion of a Recorded Phone Call . . . . . . . 69

1. Relevant Facts . . . . . . . . . . . . . . . . . . . . 69

2. Applicable Law . . . . . . . . . . . . . . . . . 70

3. Discussion . . . . . . . . . . . . . . . . . . . . . 71

   a. The Disputed Portion of the Call
   Was Not Admissible Under
   Rule 803(3) . . . . . . . . . . . . . . . . . 71

   b. The Disputed Portion of the Call
   Was Not Admissible Under
   Rule 807. . . . . . . . . . . . . . . . . . . 74

   c. Any Error Was Harmless . . . . . . . 76

POINT IV—The District Court Did Not Abuse Its
Discretion By Admitting Testimony About
Witnesses' Understandings of Conversations
In Which They Participated . . . . . . . . . . . . . . . 77

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 77

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . 80

C. Discussion. . . . . . . . . . . . . . . . . . . . . . . . 81

1. The District Court Did Not Abuse Its
Discretion. . . . . . . . . . . . . . . . . . . . . . 81

v

PAGE

2. Any Error Was Harmless . . . . . . . . . . 93

POINT V—The District Court Properly Instructed
the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

A. Jury Instructions Generally. . . . . . . . . . . . 94

B. The District Court Properly Instructed the
Jury Regarding Uncalled Witnesses . . . . . 95

    1. Relevant Facts . . . . . . . . . . . . . . . . . . . 95

    2. Applicable Law . . . . . . . . . . . . . . . . . 96

    3. Discussion . . . . . . . . . . . . . . . . . . . . . 97

C. The Instruction Regarding False
Exculpatory Statements Was Not
Erroneous . . . . . . . . . . . . . . . . . . . . . . . . . 100

D. The District Court Properly Declined
to Give A "Multiple Conspiracy"
Instruction . . . . . . . . . . . . . . . . . . . . . . . . 104

    1. Relevant Facts . . . . . . . . . . . . . . . . . . 104

    2. Applicable Law . . . . . . . . . . . . . . . . . 105

    3. Discussion . . . . . . . . . . . . . . . . . . . . . 106

E. The District Court Properly Instructed the
Jury on Conscious Avoidance. . . . . . . . . . 110

    1. Relevant Facts . . . . . . . . . . . . . . . . . . 110

vi

|  |  | PAGE |
|---|---|---|
| 2. | Applicable Law . . . . . . . . . . . . . . . . | 110 |
| 3. | Discussion . . . . . . . . . . . . . . . . . . . . | 111 |
| CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . | | 116 |

## TABLE OF AUTHORITIES

*Cases*:

*Chambers v. Mississippi*,
  410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . .   37

*Copeland v. Vance*,
  893 F.3d 101 (2d Cir. 2018) . . . . . . . . . . . . . . .   34

*Delaware v. Van Arsdall*,
  475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . .   36

*Fischer v. United States*,
  529 U.S. 667 (2000) . . . . . . . . . . . . . . . . . . . .  22, 27

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) . . . . . . . . . . . . . . . . . . . . .   32

*Hill v. Colorado*,
  530 U.S. 703 (2000) . . . . . . . . . . . . . . . . . . . .  32, 34

*Jones v. United States*,
  527 U.S. 373 (1999) . . . . . . . . . . . . . . . . . . . . .   94

*Kolender v. Lawson*,
  461 U.S. 352 (1983) . . . . . . . . . . . . . . . . . . . .  32, 34

*Kotteakos v. United States*,
  328 U.S. 750 (1946) . . . . . . . . . . . . . . . . .  38, 49, 50

vii

PAGE

*Kyles v. Whitley*,
    514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . 68

*Parsons v. Honeywell, Inc.*,
    929 F.2d 901 (2d Cir. 1991) . . . . . . . . . . . . . . . 75

*Rock v. Arkansas*,
    483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . 37

*Sabri v. United States*,
    541 U.S. 600 (2004) . . . . . . . . . . . . . . . . . . . *passim*

*Salinas v. United States*,
    522 U.S. 52 (1997) . . . . . . . . . . . . . . . . . . . . 22, 27

*Schering Corp. v. Pfizer Inc.*,
    189 F.3d 218 (2d Cir. 1999) . . . . . . . . . . . . . . . 71

*Shepard v. United States*,
    290 U.S. 96 (1933) . . . . . . . . . . . . . . . . . . . . 70, 71

*Skilling v. United States*,
    561 U.S. 358 (2010) . . . . . . . . . . . . . . . . . . . 32, 34

*Smith v. Duncan*,
    411 F.3d 340 (2d Cir. 2005) . . . . . . . . . . . . . . . 47

*United States ex rel. Touhy v. Regan*,
    340 U.S. 462 (1951) . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Adeniji*,
    31 F.3d 58 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 97

*United States v. Aina-Marshall*,
    336 F.3d 167 (2d Cir. 2003) . . . . . . . . . . . 111, 112

*United States v. Albertini*,
    472 U.S. 675 (1985) . . . . . . . . . . . . . . . . . . . . . 21

viii

PAGE

*United States v. Almonte,*
    956 F.2d 27 (2d Cir. 1992) . . . . . . . . . . . . . . . . .　36

*United States v. Bahna,*
    68 F.3d 19 (2d Cir. 1995) . . . . . . . . . . . . . . . . . .　99

*United States v. Bellomo,*
    176 F.3d 580 (2d Cir. 1999) . . . . . . . . . . . . . . . .　41

*United States v. Berger,*
    224 F.3d 107 (2d Cir. 2000) . . . . . . . . . . . . . . . 106

*United States v. Biaggi,*
    909 F.2d 662 (2d Cir. 1990) . . . . . . . . . . . . . . . 101

*United States v. Blum,*
    62 F.3d 63 (2d Cir. 1995) . . . . . . . . . . . . . . . 36, 38

*United States v. Bouterse,*
    765 F. App'x 463 (2d Cir. 2019) . . . . . . . . . . . . .　82

*United States v. Boyland,*
    862 F.3d 279 (2d Cir. 2017) . . . . . . . . . . . . . . . .　28

*United States v. Brann,*
    990 F.2d 98 (3d Cir. 1993) . . . . . . . . . . . . . . . . .　21

*United States v. Bravo,*
    808 F. Supp. 311 (S.D.N.Y. 1992) . . . . . . . . . . .　67

*United States v. Bravo-Fernandez,*
    828 F. Supp. 2d 441 (D. P.R. 2011) . . . . . . . . . .　25

*United States v. Bryce,*
    208 F.3d 346 (2d Cir. 1999) . . . . . . . . . . . . . 74, 76

*United States v. Bryser,*
    954 F.2d 79 (2d Cir. 1992) . . . . . . . . . . . . . . . . 105

ix

PAGE

*United States v. Caccia,*
   122 F.3d 136 (2d Cir. 1997) . . . . . .  96, 98, 99, 100

*United States v. Campos Flores,*
   945 F.3d 687 (2d Cir. 2019) . . . . . . .  80, 83, 84, 91

*United States v. Canori,*
   737 F.3d 181 (2d Cir. 2013) . . . . . . . . . . . . . . .  20

*United States v. Cardascia,*
   951 F.2d 474 (2d Cir. 1991) . . . . . . .  41, 46, 71, 72

*United States v. Carmona,*
   873 F.2d 569 (2d Cir. 1989) . . . . . . . . . . . . . . .  64

*United States v. Chambers,*
   800 F. App'x 43 (2d Cir. 2020) . . . . . . . .  28, 52, 53

*United States v. Clark,*
   45 F.3d 1247 (8th Cir. 1995) . . . . . . . . . . . . . .  102

*United States v. Coonan,*
   938 F.2d 1553 (2d Cir. 1991) . . . . . . . . . . . . . . .  64

*United States v. Coplan,*
   703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . .  40, 43

*United States v. Crowley,*
   318 F.3d 401 (2d Cir. 2003) . . . . . . . . . . . . . . .  94

*United States v. Cusimano,*
   123 F.3d 83 (2d Cir. 1997) . . . . . . . . . . . . . . .  105

*United States v. Dambelly,*
   714 F. App'x 87 (2d Cir. 2018) . . . . . . . . . . . . .  112

*United States v. Detrich,*
   865 F.2d 17 (2d Cir. 1988) . . . . . . . . . . . . .  47, 50

x

PAGE

*United States v. DeVillio*,
983 F.2d 1185 (2d Cir. 1993) . . . . . . . . . . . . . . 75

*United States v. DiMaria*,
727 F.2d 265 (2d Cir. 1984) . . . . . . . . . . . . 47, 70

*United States v. Ebbers*,
458 F.3d 110 (2d Cir. 2006) . . . . . . . . . . . . . . 97

*United States v. Edwards*,
631 F.2d 1049 (2d Cir. 1980) . . . . . . . . . . . . . . 37

*United States v. Epskamp*,
832 F.3d 154 (2d Cir. 2016) . . . . . . . . . . . . . . 20

*United States v. Farhane*,
634 F.3d 127 (2d Cir. 2011) . . . . . . . . . . 32, 48, 72

*United States v. Ferguson*,
676 F.3d 260 (2d Cir. 2011) . . . . . . 82, 86, 92, 113

*United States v. Fernandez*,
722 F.3d 1 (1st Cir. 2013). . . . . . . . . . . . 23, 25, 39

*United States v. Ferrarini*,
219 F.3d 145 (2d Cir. 2000) . . . 111, 112, 113, 115

*United States v. Fofanah*,
765 F.3d 141 (2d Cir. 2014) . . . . . . . . . . . 111, 114

*United States v. Forrester*,
60 F.3d 52 (2d Cir. 1995) . . . . . . . . . . . . . . . . 64

*United States v. Garcia*,
291 F.3d 127 (2d Cir. 2002) . . . . . . . . . . . . . . 82

*United States v. Garcia*,
413 F.3d 201 (2d Cir. 2005) . . . . . . . . . . . . *passim*

xi

PAGE

*United States v. Gaskin*,
    364 F.3d 438 (2d Cir. 2004) . . . . . . . . . . . . . 97, 98

*United States v. Goffer*,
    721 F.3d 113 (2d Cir. 2013) . . . . . . . . . . . . . . 114

*United States v. Gupta*,
    747 F.3d 111 (2d Cir. 2014) . . . . . . . . . . . . . *passim*

*United States v. Harris*,
    733 F.2d 994 (2d Cir. 1984) . . . . . . . . . . . . . . . 47

*United States v. Harwood*,
    998 F.2d 91 (2d Cir. 1993) . . . . . . . . . . . . . 41, 45

*United States v. Hines*,
    541 F.3d 833 (8th Cir. 2008) . . . . . . . . . . . . . . 23

*United States v. Holland*,
    381 F.3d 80 (2d Cir. 2005) . . . . . . . . . . . . . . . 94

*United States v. Holmes*,
    44 F.3d 1150 (2d Cir. 1995) . . . . . . . . . . . . . . . 36

*United States v. Hopkins*,
    53 F.3d 533 (2d Cir. 1995) . . . . . . . . . . . . . . 114

*United States v. Hudson*,
    491 F.3d 590 (6th Cir. 2007) . . . . . . . . . . . . . . 24

*United States v. Hughes*,
    535 F.3d 880 (8th Cir. 2008) . . . . . . . . . . . . . . 75

*United States v. Hurtado*,
    47 F.3d 577 (2d Cir. 1995) . . . . . . . . . . . . 94, 106

*United States v. Jackson*,
    345 F.3d 59 (2d Cir. 2003) . . . . . . . . . . . . . . . 81

xii

PAGE

*United States v. Jereis*,
  597 F. App'x 653 (2d Cir. 2015) . . . . . . . . . . . .  28

*United States v. Johnson*,
  529 F.3d 493 (2d Cir. 2008) . . . . . . . . . . . . . .  64

*United States v. Kaplan*,
  490 F.3d 110 (2d Cir. 2007) . . . . . . . . . . .  93, 114

*United States v. Kaziu*,
  559 F. App'x 32 (2d Cir. 2014) . . . . . . . . . . . . .  83

*United States v. Keen*,
  676 F.3d 981 (11th Cir. 2012) . . . . . . . .  21, 23, 25

*United States v. Little*,
  No. 12 Cr. 647 (PKC), 2018 WL 461238
  (S.D.N.Y. Jan. 3, 2018). . . . . . . . . . . . . . . . . . .  75

*United States v. Lupton*,
  620 F.3d 790 (7th Cir. 2010) . . . . . . . . . . . . . .  20

*United States v. Maldonado-Rivera*,
  922 F.2d 934 (2d Cir. 1990) . . . . . . . . . .  105, 106

*United States v. Marcus*,
  560 U.S. 258 (2010) . . . . . . . . . . . . . . . . . . . . .  81

*United States v. Margiotta*,
  688 F.2d 108 (2d Cir. 1982) . . . . . . . . . . . . . . .  46

*United States v. Marmolejo*,
  89 F.3d 1185 (5th Cir. 1996) . . . . . . . . . . . . . . .  28

*United States v. Mazer*,
  631 F. App'x 57 (2d Cir. 2015) . . . . . . . . . . . . .  46

xiii

PAGE

*United States v. McGowan*,
    58 F.3d 8 (2d Cir. 1995) . . . . . . . . . . . . . . . . . .  67

*United States v. Mennuti*,
    679 F.2d 1032 (2d Cir. 1982) . . . . . . . . .  55, 56, 73

*United States v. Morales*,
    474 F. App'x 30 (2d Cir. 2012) . . . . . . . . . . . . .  89

*United States v. Morgan*,
    385 F.3d 196 (2d Cir. 2004) . . . . . . . . . . . . . . .  71

*United States v. Netschi*,
    511 F. App'x 58 (2d Cir. 2013) . . . . . . . . . .  49, 76

*United States v. Ng Lap Seng*,
    934 F.3d 110 (2d Cir. 2019) . . . . . . . . . . . . *passim*

*United States v. Nichols*,
    912 F.2d 598 (2d Cir. 1990) . . . . . . . . . . . . . . .  97

*United States v. Pagan-Santini*,
    451 F.3d 258 (1st Cir. 2006). . . . . . . . . . . . . . .  75

*United States v. Phillips*,
    219 F.3d 404 (5th Cir. 2000) . . . . . . . . . . . . . .  24

*United States v. Pierce*,
    785 F.3d 832 (2d Cir. 2015) . . . . . . . . . . . . . . .  98

*United States v. Pitre*,
    960 F.2d 1112 (2d Cir. 1992) . . . . . . . . . . . . . .  41

*United States v. Quinones*,
    511 F.3d 289 (2d Cir. 2007) . . . . . . . . . . . . . . .  37

*United States v. Rahme*,
    813 F.2d 31 (2d Cir.1987). . . . . . . . . . . . . . . . .  75

xiv

PAGE

*United States v. Rea*,
   958 F.2d 1206 (2d Cir. 1992) . . . . . . 80, 86, 87, 93

*United States v. Regan*,
   103 F.3d 1072 (2d Cir. 1997) . . . . . . . . . . . . . . . 67

*United States v. Restrepo*,
   547 F. App'x 34 (2d Cir. 2013) . . . . . 106, 107, 109

*United States v. Reyes*,
   18 F.3d 65 (2d Cir. 1994) . . . . . . . . . . . . . . . 64, 66

*United States v. Roberts*,
   363 F.3d 118 (2d Cir. 2004) . . . . . . . . . . . . . . . . 34

*United States v. Robinson*,
   663 F.3d 265 (7th Cir. 2011) . . . . . . . . . . . . 27, 28

*United States v. Rollins*,
   487 F.2d 409 (2d Cir. 1973) . . . . . . . . . . . . . . . . 96

*United States v. Rooney*,
   37 F.3d 847 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 27

*United States v. Rosen*,
   716 F.3d 691 (2d Cir. 2013) . . . . . . . 28, 31, 33, 34

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003) . . . . . . . . . . . . . . . . 32

*United States v. Sager*,
   227 F.3d 1138 (9th Cir. 2000) . . . . . . . . . . . . . . 68

*United States v. Salameh*,
   152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 45

*United States v. Salazar*,
   112 F.3d 506 (Table) (2d Cir. 1997) . . . . . . . . . 82

xv

PAGE

*United States v. Sanchez,*
    103 F. App'x 422 (2d Cir. 2004) . . . . . . . . . . . .   67

*United States v. Santopietro,*
    166 F.3d 88 (2d Cir. 1999) . . . . . . . . . . . . . . . .   24

*United States v. Scarpa,*
    897 F.2d 63 (2d Cir. 1990) . . . . . . . . . . . . .   52, 53

*United States v. Scheibel,*
    870 F.2d 818 (2d Cir. 1989) . . . . . . . . . . . . . .   102

*United States v. Shoemaker,*
    746 F.3d 614 (5th Cir. 2014) . . . . . . . . . . . . . .   24

*United States v. Siddiqui,*
    699 F.3d 690 (2d Cir. 2012) . . . . . . . . . . . . . . .   38

*United States v. Skelly,*
    442 F.3d 94 (2d Cir. 2006) . . . . . . .   82, 90, 94, 101

*United States v. Sotomayor-Vasquez,*
    249 F.3d 1 (1st Cir. 2001). . . . . . . . . . . . . . . . .   20

*United States v. Sternstein,*
    596 F.2d 528 (2d Cir. 1979) . . . . . . . . . . . . . . .   54

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006) . . . . . . . . . .   36, 37, 41

*United States v. Sunia,*
    643 F. Supp. 2d 51 (D.D.C. 2009) . . . . . . . .   24, 25

*United States v. Taubman,*
    297 F.3d 161 (2d Cir. 2002) . . . . . . . . . . . . . . .   48

*United States v. Torres,*
    845 F.2d 1165 (2d Cir. 1988) . . . . . . . . . .   98, 100

xvi

PAGE

*United States v. Ulbricht*,
    858 F.3d 71 (2d Cir. 2017) . . . . . . . . . . . . . . . . .   70

*United States v. Urlacher*,
    979 F.2d 935 (2d Cir. 1992) . . . . . . . . . . . . . . .   82

*United States v. Vazquez*,
    113 F.3d 383 (2d Cir. 1997) . . . . . . .   106, 107, 108

*United States v. Vitillo*,
    490 F.3d 314 (3d Cir. 2007) . . . . . . . . . . . . .   23, 25

*United States v. Walker*,
    191 F.3d 326 (2d Cir. 1999) . . . . . . . . . .   51, 52, 53

*United States v. Whitfield*,
    590 F.3d 325 (5th Cir. 2009) . . . . . . . . . . . . . . .   29

*United States v. Williams*,
    205 F.3d 23 (2d Cir. 2000) . . . . . . . . .   53, 106, 108

*United States v. Yannotti*,
    541 F.3d 112 (2d Cir. 2008) . . . . . . . . . .   83, 86, 92

*United States v. Yu-Leung*,
    51 F.3d 1116 (2d Cir. 1995) . . . . . . . . . .   56, 64, 73

*United States v. Zayac*,
    765 F.3d 112 (2d Cir. 2014) . . . . . . . . . . . . .   49, 76

*United States v. Ziegler*,
    583 F.2d 77 (2d Cir. 1978) . . . . . . . . . . . . . . . .   43

*United States v. Zwick*,
    199 F.3d 672 (3d Cir. 1999) . . . . . . . . . . . . . . .   24

*Washington v. Texas*,
    388 U.S. 14 (1967) . . . . . . . . . . . . . . . . . . . . . . .   37

xvii

PAGE

*Statutes & Rules*:

18 U.S.C. § 666. . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Crim. P. 30(d) . . . . . . . . . . . . . . . . 94, 101

Fed. R. Evid. 103 . . . . . . . . . . . . . . . . . . . . . . . . 81

Fed. R. Evid. 104(b) . . . . . . . . . . . . . . . . . . . . 40, 43

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . 40

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . 40

Fed. R. Evid. 404(b)(1) . . . . . . . . . . . . . . . . . . . 52

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . 80

Fed. R. Evid. 803(3) . . . . . . . . . . . . . . . . . . . . . . 41

Fed. R. Evid. 807(a) . . . . . . . . . . . . . . . . . . . 71, 75

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket Nos. 19-3643, 19-3623 (CON)

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

MERL CODE, CHRISTIAN DAWKINS,

*Defendants-Appellants,*

LAMONT EVANS, EMANUEL RICHARDSON, also known
as Book, ANTHONY BLAND, also known as Tony,

*Defendants.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

Christian Dawkins and Merl Code appeal from judgments of conviction entered in the United States District Court for the Southern District of New York, following a two-week jury trial before the Honorable Edgardo Ramos, United States District Judge.

Superseding Indictment S1 17 Cr. 684 (ER) (the "Indictment") was filed on March 7, 2019, in six counts. Count One charged Dawkins and Code with conspiracy

2

to commit bribery, in violation of 18 U.S.C. §§ 371 and 666(a)(2). Count Two charged Dawkins and Code with bribery, in violation of 18 U.S.C. §§ 666(a)(2) and 2. Count Three charged Dawkins and Code with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349. Counts Four and Five charged Dawkins with honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, 1349, and 2. Count Six charged Dawkins and Code with conspiracy to commit bribery in violation of the Travel Act, in violation of 18 U.S.C. §§ 371, 1952(a)(1) and (a)(3).

Trial commenced on April 22, 2019, and ended on May 8, 2019, when the jury convicted Dawkins on Counts One and Two and Code on Count One. The defendants were acquitted of the remaining charges.

On October 3, 2019, Judge Ramos sentenced Dawkins to 1 year and 1 day of imprisonment, to be followed by 2 years of supervised release, and imposed a $200 mandatory special assessment. On October 4, 2019, Judge Ramos sentenced Code to 3 months' imprisonment, to be followed by 3 years of supervised release, and imposed a $100 mandatory special assessment.

Judge Ramos granted both defendants' motions for bail pending appeal.

## Statement of Facts

### A. The Government's Case

At trial, the Government presented overwhelming evidence that Dawkins and Code conspired to pay

3

bribes to college basketball coaches at National Colle-
giate Athletic Association ("NCAA") universities in ex-
change for those coaches' agreement to steer their
players to retain the services of Dawkins and his
sports management business upon becoming profes-
sional athletes.

The Government's evidence included video record-
ings of meetings, which had been arranged by Daw-
kins and Code, during which Dawkins and an under-
cover agent gave envelopes full of cash to several
coaches; wiretapped conversations, including conver-
sations between Dawkins and Code about the scheme,
such as a conversation in which Code warned Dawkins
that the coaches would view these meetings as "risky"
because they did not know if they were being recorded,
and conversations that revealed the steps the coaches
took to steer their players to Dawkins and his com-
pany; and testimony from two cooperating witnesses
intimately involved in the scheme.

**1. The Defendants**

Christian Dawkins was an aspiring sports man-
ager who, for several years, had worked as a "runner"
for a professional sports agency. (Tr. 178-79, 701-03).[1]

---

[1] "Br." refers to the defendants' joint brief on ap-
peal; "A." refers to the appendix filed with that brief;
"Tr." refers to the trial transcript, portions of which are
included in the defendants' appendix and the full ver-
sion of which has been submitted to this Court on a
CD-ROM; "SA" refers to the supplemental appendix
filed with this brief; and "Dkt." refers to an entry on

4

As a "runner," Dawkins was charged with recruiting athletes to become clients of the agency by developing relationships with potential professional athletes and their families. (Tr. 179, 212, 701-03). In that capacity, Dawkins developed relationships with college basketball coaches and athletic apparel company representatives. (Tr. 182-83, 338-42). In 2017, Dawkins started his own business, Loyd Inc., which was designed to offer various services to professional athletes. (Tr. 327-28, 735-36, 772).

Merl Code was a consultant to Adidas, a global sports apparel company. (Tr. 182-83). Adidas sponsored certain universities' athletic programs and high school basketball leagues. (Tr. 182-83, 390-91). Code worked to develop relationships with college basketball coaches and youth basketball players to help Adidas develop relationships with prospective professional players who might ultimately sign endorsement contracts with the company. (Tr. 358, 396-98, 400, 828). Before working for Adidas, Code held a similar position at Nike, another sports apparel company. (Tr. 364-65, 395-96).

## 2. The NCAA and the Universities

The NCAA is an organization, composed of colleges and universities, which governs intercollegiate athletic competitions. (Tr. 90, 94). The NCAA promulgates rules with which all member institutions agree

––––––––––

the District Court's docket for this case. Unless otherwise noted, case text quotations omit all internal quotations marks and alterations.

5

to comply, foremost among them the requirement that all student-athletes be and remain amateurs. (Tr. 91-93). The NCAA prohibits student-athletes and their families from receiving certain benefits, including monetary payments from outside sources such as agents and financial advisers. (Tr. 97, 1133-34). The NCAA similarly prohibits coaches from receiving monetary payments to facilitate or arrange meetings between student-athletes and agents or financial advisors. (Tr. 98, 122-34, 1133-34). Coaches were required, as a condition of their employment, to comply with all NCAA rules. (Tr. 106-07, 1136-39).[2]

Each of the universities involved in this case fulfilled its educational mission by operating intercollegiate athletics programs, including men's basketball programs. (*See, e.g.*, SA 305-09). At trial, compliance officers from relevant universities testified that their schools take steps to ensure their coaches' compliance with NCAA rules, including requiring coaches to certify that they have not received outside income that could potentially be an NCAA violation and to provide a list of any outside income they receive. (Tr. 106-12, 1139-40). An egregious violation of NCAA rules, such as accepting monetary payments from an agent or adviser, could lead to termination of a coach's employment. (Tr. 106-07, 114-15, 1140-43).

---

[2] The Government introduced employment contracts and certification forms for the coaches who were bribed. (*See, e.g.*, SA 275-80, 288, 289, 291-94, 300-01, 310-15, 321-25, 328-31, 338-39).

6

### 3. The Bribery of Lamont Evans

At trial, the Government proved that Dawkins paid thousands of dollars in bribes to Lamont Evans, an assistant men's basketball coach at the University of South Carolina who later became an associate head coach at Oklahoma State University. The Government further proved that Dawkins facilitated Evans' receipt of additional bribes from Louis Martin Blazer and Munish Sood, both of whom testified as Government witnesses at trial. In exchange, Evans agreed to influence certain student-athletes that he coached to retain the services of the bribe payors.

Blazer ran his own business management firm that primarily serviced professional athletes, as well as a registered investment advisory firm that provided investment-related services to Blazer's clients. (Tr. 176, 185-86). In 2014 after learning that he was under investigation for misappropriating client funds (Tr. 185-86), Blazer began proactively cooperating with the Government, including by posing as a business manager interested in bribing college basketball coaches (Tr. 200-06). Sood was a registered investment adviser who owned his own investment advisory firm. (Tr. 697-98). Sood was arrested for his role in the scheme and pled guilty pursuant to a cooperation agreement. (Tr. 773-76).

Dawkins and Blazer met through one of Blazer's associates in late 2015, when Dawkins was working for Andy Miller Sports ("ASM Sports"), a professional sports agency. (Tr. 206-08). Dawkins soon sought Blazer's help in bribing Evans. (Tr. 259-61). Dawkins told Blazer that he had been paying Evans for access

7

to college players, specifically a then-current University of South Carolina player named P.J. Dozier. (Tr. 261). Dawkins explained that if Blazer took over the Evans payments, Blazer could develop his own relationship with Evans that could result in Evans steering his players, including Dozier, to Blazer's business. (Tr. 261-62). At the direction of law enforcement, Blazer agreed to take over the payments for Dawkins. (Tr. 264-66).

In March 2016, Dawkins arranged for him and Blazer to meet Evans in South Carolina. (Tr. 265). Blazer invited Sood, who previously had run the investment arm of Blazer's business advisory services firm and expressed an interest in obtaining professional athletes as clients. (Tr. 255-56, 265). Sood intended to help Blazer bribe Evans in exchange for Evans steering players to Sood's investment advisory business. (Tr. 264).

During the meeting with Evans, Dawkins explained to Blazer and Sood the importance of paying college coaches in general, and Evans in particular, to further relationships with college players. (Tr. 268-89). Dawkins said, "[A]gents obviously have influence, but you gotta get the college coaches too" because "it's almost like you skipping a step if you just deal with the agents." (SA 101). Dawkins emphasized that paying Evans would not only lead to signing Dozier as a client, but also to signing "a pipeline of players like [Dozier]," as Evans would steer other players of Dozier's caliber to Blazer and Sood in exchange for continued payments. (Tr. 275). Dawkins explained that the path to securing commitments from college athletes

8

was through assistant coaches such as Evans because "the head coaches ain't willing to do it cause they're making too much money. And it's too risky." (SA 107).

As Dawkins, Blazer, and Sood drove back to Atlanta after their meeting with Evans, Dawkins explained that coaches like Evans could not get "caught" receiving bribes because "his job is on the line," and so Evans would have an incentive to "block" other athlete advisors from accessing the players under his supervision. (SA 122-23). Dawkins also detailed how much he had previously paid Evans, telling Blazer and Sood that he had given Evans $2,500 per month "for a couple months." (SA 129). Dawkins explained that he would "see [Evans] in Atlanta[,] go to the bank … Give him [$]2,500." (SA 129).

Consistent with Dawkins' plan, Blazer, acting at the direction of law enforcement, began making monthly payments to Evans soon after the March 2016 meeting. (Tr. 301). These payments continued even after Evans was hired by Oklahoma State University. (Tr. 322).

Evans followed through on his promise to connect Blazer with players he coached. On February 3, 2017, Evans arranged for Blazer to meet Jeffrey Carroll, a player Evans coached at Oklahoma State University. (Tr. 322-23). Evans introduced Blazer to Carroll "as his guy and the person that would handle [Carroll's] business advisory services when he turned pro." (Tr. 323). Evans also accepted another $2,000 bribe from Blazer and a pair of expensive headphones. (Tr. 320-23).

9

In summer 2017, Evans set up a meeting between
Sood and Dozier's mother. (Tr. 728-33). Immediately
following that meeting, Evans requested money from
Sood, and Sood sent Evans a check for $2,000.
(Tr. 733).

### 4. The Creation of Loyd, Inc.

In May 2017, Dawkins was terminated by ASM
Sports, and, shortly thereafter, decided to start his
own sports management company called Loyd, Inc.
(Tr. 327, 726-29, 772-73). To raise funding, Dawkins
contacted Sood, who agreed to help Dawkins by con-
tributing financially to Loyd, Inc. and connecting Daw-
kins with a potential investor named Jeff D'Angelo.
(Tr. 778-79, 798). Sood had met D'Angelo through
Blazer and believed he was a "[w]ealthy businessman
in real estate" who was looking to invest in sports.
(Tr. 773). In fact, D'Angelo was an undercover Federal
Bureau of Investigation ("FBI") agent working with
Blazer. (Tr. 326-27, 773).

Sood introduced Dawkins to D'Angelo at a restau-
rant in Manhattan on May 16, 2017. (Tr. 779-81).
Dawkins explained to Sood and D'Angelo his business
strategy for Loyd, Inc., which was "to represent college
players who were turning pro, helping them identify
sports agents, financial advisers, accountants, market-
ing." (Tr. 772). In return, Loyd Inc. "would receive a
portion of the fees from the service providers." (Tr.
772). Dawkins further explained how bribing college
coaches would make it easier to maintain relation-
ships with the college players they wanted as clients.
(SA 132-33, 136-38).

10

Following this meeting, Sood talked privately with Dawkins about the specific coaches with whom he had relationships and who would be willing to take bribes. (Tr. 789-94; SA 86-88). Sood "wanted a list to know how much we should be budgeting … for the number of coaches he was thinking of working with." (Tr. 791-92). Dawkins then sent Sood an email that listed the names of several college basketball coaches with whom he had a relationship. (Tr. 792-94; SA 273-74). Some of the coaches Dawkins listed were ones whom Dawkins had previously discussed bribing with Sood, including Evans. (Tr. 793-94). Sood forwarded the list to D'Angelo who also agreed to invest in Loyd, Inc. (Tr. 794-95).

To formalize their new partnership, Dawkins, Sood, and D'Angelo agreed to meet in person to sign a shareholder agreement and discuss the next steps. (Tr. 327). The meeting was held in early June 2017 on a boat docked off Manhattan, and included the following participants: Dawkins, Sood, D'Angelo, Blazer, Sood's assistant Alicia Carroll, and an undercover FBI agent named "Jill Bailey," who posed as D'Angelo's business partner. (Tr. 327, 336, 357-58, 796, 800-01). At the meeting, the group discussed the list of coaches Dawkins had sent Sood and the plan for paying coaches. Specifically, Blazer updated Dawkins on the monthly payments he and Sood had been making to Evans (approximately $4,000 a month) and suggested that the group would like to make similar arrangements with some of the coaches referenced on Dawkins' list. (SA 141-51; Tr. 349-50).

11

Dawkins advised the group that their money would be better spent paying coaches at more elite basketball programs than Oklahoma State University, where Evans coached. (SA 151-57). Dawkins mentioned bribing a coach named Emanuel "Book" Richardson from the University of Arizona, stating that while Evans is "good," he is not one of "the elite, elite, dudes … you only give the elite level dudes like a Book [Richardson], four grand a month." (SA 151, 156). Dawkins went on to discuss introducing the group to college coaches in Las Vegas in July when several coaches would be in town for an event. (SA 158-59).

At the meeting, D'Angelo gave Sood an envelope with $25,000 in cash to fund Loyd, Inc. (Tr. 355-57, 804-07). Sood later deposited that money into a bank account created for Loyd, Inc. (Tr. 807).

### 5. Code Joins the Conspiracy

Following the boat meeting, Dawkins set up meetings in Manhattan to introduce Sood, D'Angelo, and others to associates of his whom he anticipated would help Loyd, Inc. Two of those individuals were college basketball coach Book Richardson from the University of Arizona, whom Dawkins had referenced at the boat meeting, and Code, who, as noted, was a consultant for Adidas. Both meetings took place in a hotel room on June 20, 2017.

Dawkins had initially connected Sood and Richardson in March 2017, by arranging for Sood to meet Richardson in Las Vegas. (Tr. 721-22). Sood wanted to meet Richardson because he coached at a "top elite col-

12

lege program" and Sood hoped Richardson would pro-
vide access to some of his best players. (Tr. 722). Al-
though their initial meeting was relatively short, Sood
called Richardson afterwards to make his intent to
bribe him clear. (Tr. 723-26). Sood told Richardson
that he and Dawkins were "happy to be supportive in
any way we can," noting that Richardson had "a lot of
young talent coming," and that "as you get more com-
fortable with me and my team, my hope is we can con-
tinue to, you know, build a long-term relationship."
(SA 81). Richardson eagerly assured Sood that he was
willing to work with Sood and Dawkins, stating, "I'm
going to honor, I'm going to respect and I'm gonna
over-deliver and under-promise." (SA 82).

On June 20, 2017, Richardson met with Sood, his
assistant, D'Angelo and Bailey. (Tr. 819-27). Sood and
D'Angelo expressed their willingness to pay Richard-
son in exchange for him steering players to Loyd, Inc.
Specifically, D'Angelo told Richardson that their goal
was to get "kids that we can sign … long-term," and
that they were willing to pay coaches who were willing
to direct kids to retain their services because "having
a separate funding stream to assist the coaches in the
recruitment process to get kids to sign with us" was a
good investment and gave them "a little insurance on
the players." (SA 164-65). Richardson made clear that
players would defer to him in choosing their advisors.
(SA 200). At the meeting, D'Angelo gave Richardson
$5,000. (Tr. 826-27).

Code's meeting with the group immediately fol-
lowed Richardson's. (Tr. 827). At this meeting, Daw-

13

kins and Blazer joined the group of Code, Sood, his as-
sistant, D'Angelo and Bailey. (Tr. 829). At the begin-
ning of the meeting, D'Angelo made reference to the
$5,000 he had just given Richardson, stating that he
was "pretty sure [Richardson] left happy." Code re-
sponded: "He was happy." (SA 202). Sood understood
Code to be indicating his awareness that D'Angelo had
given Richardson the money. (Tr. 832).

Code went on to discuss his work experience at
Adidas and Nike. (Tr. 832). Code touted his connec-
tions at every level of basketball—youth, college, and
professional. (Tr. 182-83, 390-91, 396-97, 400, 828).
This made Code well-positioned to help direct Loyd,
Inc. on which college coaches to bribe, as Blazer ex-
plained: "[Code] would be like, [Dawkins] said, kind of
a [consigliere], … He would be able to advise us on …
what was the best way to direct moneys to get those
players to sign with us in return." (Tr. 409; *see also* Tr.
507-08).

Towards the end of the meeting, Code mentioned
several college programs that employed coaches he be-
lieved would be willing to accept bribes. (SA 237-42).
Code warned the group, however, that college coaches
are "very nervous and hesitant and reluctant to meet
new folks who aren't in the basketball space." (SA 243).
The meeting ended with D'Angelo giving Code $2,000
in an envelope, which was captured on videotape.
(Tr. 417).

14

### 6. More Coaches Are Bribed

After the June 20, 2017 meetings, Dawkins and Code arranged bribe payments for several college coaches.

First, Dawkins arranged for D'Angelo to give Richardson $15,000 to help him recruit a top player. (Tr. 822-24, 853-54; SA 70-73, 174-75, 179-80). D'Angelo and Sood met with Richardson in Sood's office in New Jersey and gave him $15,000 in cash. (Tr. 853-54).

Dawkins and Code then arranged for D'Angelo to meet nearly a dozen college basketball coaches in Las Vegas in July 2017. (Tr. 418-19). Before these meetings, Dawkins and Code discussed which coaches to introduce to D'Angelo. When Dawkins asked Code how many coaches he was willing to help D'Angelo meet, Code replied, "I mean, how many you paying me for? Cause that's the better question." (SA 56). Code warned Dawkins to instruct D'Angelo to be subtle in his approach with the coaches, stating, "don't have [D'Angelo] run off at the mouth saying, well, I'm willing to do X, Y, Z every month for you …. [D]udes gonna be like, oh no, dog, I'm cool. I'm out …. Because they don't know him, and it's too risky. They don't know if he's recording." (SA 62). Code similarly advised Sood and D'Angelo about how to approach the meetings strategically, warning that the coaches would initially be wary of accepting anything from them because they don't know them. (SA 91-93). But, Code made clear, at the right time, they should provide the coaches with "resource[s]." (SA 93).

15

Dawkins, D'Angelo and Blazer were present for the meetings in Las Vegas, the purpose of which was "to meet these coaches and start a plan with some of them to pay those coaches, and others, just to meet with the possibility that we were going to pay them at some point in time, if needed." (Tr. 419). In total, they paid cash bribes to five coaches: (1) Brad Augustine, a youth basketball coach who was helping steer a player to the University of Louisville, received $11,700; (2) Preston Murphy, an assistant basketball coach at Creighton University, received $6,000; (3) Corey Barker, an assistant basketball coach at Texas Christian University, received $6,000; (4) Anthony Bland, an assistant basketball coach at the University of Southern California, received $13,000;[3] and (5) Evans, who was by then an assistant basketball coach at Oklahoma State University, received $4,500. (Tr. 418-20).[4]

During these meetings, Dawkins made clear that in exchange for the payments, he expected the coaches to refer their players to him. For example, when meeting with Barker, Dawkins said: "We gonna be able to

––––––––––

[3] D'Angelo handed Dawkins an envelope containing $13,000 intended for Bland. Bland kept a portion of these funds and Dawkins retained a portion for himself.

[4] Dawkins and Code also arranged for Blazer and D'Angelo to meet with several other college coaches. While Dawkins held off on paying bribes to these coaches while in Las Vegas, he made it known to them that he and D'Angelo were willing to pay them in the future. (Tr. 440-64).

16

provide you with something, you know, to make sure the kids that you involved with, we get them back…. Obviously we're gonna want to have access to them." (SA 260-61). The coaches also made clear that they understood their end of the bargain. For example, Bland said that "any players I got connections with, you got them too." (SA 271).

### 7. The Coaches Take Action

After receiving these bribes, certain of the coaches began steering players to Dawkins and Loyd, Inc.

On August 30, 2017, Dawkins, Sood, and Bailey met Richardson near the University of Arizona. (Tr. 874-80). Richardson discussed, among other things, a player named Rawle Alkins he intended to steer towards Loyd, Inc. (Tr. 876-80). Richardson arranged for Dawkins, Sood, and Bailey to meet Alkins' cousin, Rodney, whom Dawkins said would influence Alkins' decision to retain Loyd Inc. (SA 247). Shortly thereafter, Dawkins, Sood, and Bailey met with Rodney, who confirmed that Richardson had attempted to steer Alkins to retain Dawkins and Sood, and assured Sood that he would recommend Loyd, Inc. to Alkins. (Tr. 880, 883).

Dawkins, Sood, and Bailey also traveled to Los Angeles to meet with Bland and others. (Tr. 883). Bland arranged for Dawkins, Sood and Bailey to meet with the father of a high school player who would be going to play for Bland at the University of Southern California. (Tr. 884). At that meeting, the group discussed, "the services we provided, how we could help them, and in return, how Tony Bland spoke highly of us."

17

(Tr. 884). At the end of the meeting, Bailey gave Dawkins $4,000 to give to the player's father. (Tr. 884). Dawkins, Sood and Bailey then met with Bland at a restaurant. (Tr. 885). At that meeting, Dawkins stated that he and Bland had discussed that it would be more "clean" for the "resources" to go directly to the players' parents, rather than through the coaches. (SA 250).

Shortly after the meetings in Arizona and Los Angeles, Dawkins and Code were arrested.

## B.   The Defense Case

In addition to extensive cross-examination of Government witnesses, the defense put on an affirmative case consisting of wiretapped recordings (Tr. 1183, 1212), and Dawkins' testimony (Tr. 1214-1343). Dawkins claimed, among other things, that he never tried to influence Evans with a bribe, but only gave him money to give to Dozier on behalf of ASM Sports (Tr. 1229-31); that he did not believe it made sense to bribe college coaches because they did not have much influence over their players (Tr. 1239); and that he believed D'Angelo's plan to bribe college coaches was "idiotic" and tried to talk him out of it (Tr. 1248, 1285-86).

While Dawkins acknowledged that the videotapes showed him and D'Angelo meeting with college coaches in Las Vegas and giving them money, Dawkins claimed that this was an elaborate plan by Dawkins and Code to "save [D'Angelo] from himself." (Tr. 1302). That is, Dawkins claimed to have arranged in advance with the coaches for them to accept the money, but then give it back to Dawkins so that he could invest it in his business. (Tr. 1302). For example,

18

Dawkins claimed that after one coach accepted the money on videotape, Dawkins and the coach went downstairs and met in a bathroom stall (no longer on videotape, of course), so that the coach could give Dawkins the money back. (Tr. 1304-05).

## C. The Verdict and Sentencing

On May 8, 2019, the jury convicted Dawkins and Code on Count One and Dawkins on Count Two. The jury acquitted the defendants of the remaining charges.

On October 3, 2019, Judge Ramos sentenced Dawkins principally to 1 year and 1 day of imprisonment. Judge Ramos imposed an enhancement for obstruction of justice based on Dawkins' false trial testimony. (SA 343-44). On October 4, 2019, Judge Ramos sentenced Code principally to 3 months' imprisonment. Neither defendant challenges any aspect of his sentence on appeal.

## A R G U M E N T

### POINT I

### The District Court Correctly Denied the Defendants' Motion to Dismiss the Indictment

Dawkins and Code were convicted of conspiring to commit federal funds bribery, in violation of 18 U.S.C.

2847055, Page37 of 135

§§ 371 and 666, and Dawkins was convicted of a sub-
stantive violation of 18 U.S.C. § 666 (Section 666).[5]
Dawkins and Code argue that the District Court erred
by denying their motion to dismiss these counts, be-
cause (1) the bribed coaches were not "agents" of their
respective universities, and (2) the bribes were not
connected to a "business or transaction" of the relevant
universities. (Br. 36-49).[6] Judge Ramos correctly re-
jected these claims, finding that each contradicts the
plain text of the statute. (SPA 20-22). This Court
should do the same.

## A. Applicable Law

Section 666 proscribes *quid pro quo* bribery involv-
ing entities receiving federal funding. *See United
States v. Ng Lap Seng*, 934 F.3d 110, 132 (2d Cir.
2019). Specifically, Section 666 makes it a crime to
give, offer or agree to give anything of value to any per-
son "with the intent to influence or reward an agent of

---

[5] These counts were numbered Count One and
Count Four in the original indictment, but were re-
numbered as Count One and Count Two in the opera-
tive Indictment.

[6] The defendants do not challenge the jury instruc-
tions regarding Section 666. Nor do they argue that
the Indictment was facially inadequate—nor could
they, given that it tracks the statute. Rather, they ap-
pear to claim that, if their preferred reading of Section
666 is correct, the evidence adduced at trial was insuf-
ficient as a matter of law. (Br. 36).

20

an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(2); *see also id.* § 666(b) (entity in question must receive $10,000 in federal funding in any one-year period).

This Court conducts *de novo* review of questions of statutory interpretation and the denial of a motion to dismiss an indictment. *See United States v. Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016); *United States v. Canori*, 737 F.3d 181, 182 (2d Cir. 2013).

## B. Discussion

### 1. The Coaches Were Agents of the Universities

Dawkins and Code first contend that the District Court "applied an erroneously expansive interpretation of 'agent' " under Section 666. (Br. 38). They are wrong.

The term "agent" is defined as "a person authorized to act on behalf of another person or a government and, *in the case of an organization* or government, includes a servant or *employee* and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1) (emphasis added). This definition of "agent" is "expansive." *United States v. Sotomayor-Vasquez*, 249 F.3d 1, 8 (1st Cir. 2001). It is broader than the common law understanding of agency, *see United States v. Lupton*, 620 F.3d 790, 800-01 (7th Cir. 2010), and includes "an

21

employee of any level from the lowest clerk to the high-est administrator," *United States v. Brann*, 990 F.2d 98, 101 (3d Cir. 1993). Here, the Indictment ade-quately alleged that the bribed coaches were "agents" of the universities (SA 5-6, 17-18, 20), and the fact that they were employees of the universities was not in dis-pute at trial (SA 276-80, 288, 290-95, 316-18, 325-32). The coaches thus fit comfortably within the statutory definition of "agent," as the District Court correctly found. (SPA 20-21).

The defendants cannot seriously contest that the coaches were "agents" under the statute's plain terms. Instead, they argue that the statutory definition must be narrowed because, otherwise, the law's purpose of protecting the integrity of federal funds would be di-vorced from its sweep. (Br. 39). Although their pre-ferred definition is unclear, it appears to include a re-quirement that the "agent" have "access to or influence over federal funds." (Br. 42).

This construction has no basis in the text of the statute, and fails for that reason alone. *See United States v. Albertini*, 472 U.S. 675, 680 (1985) ("Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory lan-guage."). As the Eleventh Circuit observed in rejecting the same argument, "[n]owhere does the statutory text either mention or imply an additional qualifying re-quirement that the person be authorized to act specif-ically with respect to the entity's funds." *United States v. Keen*, 676 F.3d 981, 989-90 (11th Cir. 2012). More-over, both the Supreme Court and this Court have re-peatedly rejected attempts to limit the scope of Section

22

666 through such extra-textual requirements. *See, e.g.*, *Sabri v. United States*, 541 U.S. 600, 606-07 (2004); *Fischer v. United States*, 529 U.S. 667, 677-79 (2000); *Salinas v. United States*, 522 U.S. 52, 57-59 (1997); *Ng Lap Seng*, 934 F.3d at 124, 133.

The Supreme Court has also rejected substantially the same argument the defendants make about the law's purpose. In *Sabri*, the defendant argued that Section 666 was unconstitutional because it fails to require proof of any connection between a bribe and some federal money. 541 U.S. at 604. The Court rejected the claim, explaining that such a nexus was not required for the law to serve its intended purpose:

> It is true … that not every bribe or kickback offered or paid to agents of governments covered by § 666(b) will be traceably skimmed from specific federal payments, or show up in the guise of a quid pro quo for some dereliction in spending a federal grant. But this possibility portends no enforcement beyond the scope of federal interest, for the reason that corruption does not have to be that limited to affect the federal interest. Money is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value. Liquidity is not a financial term for nothing; money can be drained off here because a federal grant is pouring in there. And officials are not any the

23

> less threatening to the objects behind fed-
> eral spending just because they may ac-
> cept general retainers. It is certainly
> enough that the statutes condition the of-
> fense on a threshold amount of federal
> dollars defining the federal interest, such
> as that provided here.

*Id.* at 605-06.

Consistent with *Sabri* and the statute's text, sev-
eral courts of appeals have rejected the argument that
Section 666 requires that an "agent" be specifically au-
thorized to act with respect to an entity's federal funds.
The First Circuit explained that "[e]ven if the officials
accepting bribes do not have the ability to control the
expenditure of an entity's funds, it cannot be denied
that their fraudulent conduct poses a threat to the in-
tegrity of the entity, which in turn poses a threat to
the federal funds entrusted to that entity." *United
States v. Fernandez*, 722 F.3d 1, 11 (1st Cir. 2013). The
Eleventh Circuit reached the same conclusion, holding
that narrowing the scope of "agent" in the manner sug-
gested by the defendants would be "inconsistent not
only with the expansive, unqualified language that
Congress has elected to use, but also with Congress'
clear objective of ensuring the integrity of entities re-
ceiving substantial sums of federal funds." *Keen*, 676
F.3d at 991. *See also United States v. Hines*, 541 F.3d
833, 835-36 (8th Cir. 2008) (rejecting claim that Sec-
tion 666 could not apply to defendant because "he was
not entrusted with the disbursements of any money");
*United States v. Vitillo*, 490 F.3d 314, 323 (3d Cir.
2007) (rejecting independent contractors' claim that

24

they were not agents because they had no control over federal funds); *United States v. Hudson*, 491 F.3d 590, 595 (6th Cir. 2007) (same).

Dawkins and Code rely on *United States v. Phillips*, 219 F.3d 404 (5th Cir. 2000) and *United States v. Sunia*, 643 F. Supp. 2d 51 (D.D.C. 2009). (Br. 39-42). Neither case is persuasive.

In *Phillips*, the defendant was a tax assessor for a local Louisiana parish, which received federal benefits, but his salary was not paid or set by the parish, the parish had no "power, authority, or control" over his duties, and his activities were supervised by a state board. 219 F.3d at 412. The Fifth Circuit held that the defendant could not be an "agent" of the parish, because "he was not authorized to act on behalf of the parish with respect to the funds" and his "actions did not and could not have threatened the integrity of federal funds or programs." *Id.* at 413. In so holding, the Fifth Circuit relied in part on the notion that Section 666 requires a "nexus or connection between a bribe or kickback and the expenditure of federal funds." *Id.* at 414; *see id.* at 413-14 & nn. 14, 15, 16 (citing *United States v. Zwick*, 199 F.3d 672, 686-87 (3d Cir. 1999) and *United States v. Santopietro*, 166 F.3d 88, 93 (2d Cir. 1999)). But the Supreme Court subsequently held to the contrary, and in doing so specifically abrogated several of the cases that *Phillips* cited for that proposition. *See Sabri*, 541 U.S. at 604, 606-07 (abrogating *Zwick* and *Santopietro*). The Fifth Circuit has since recognized that *Phillips* "rests on doubtful foundations" and narrowed it to its particular facts. *United States v. Shoemaker*, 746 F.3d 614, 622 n.7 (5th Cir.

25

2014). Numerous other courts have rejected *Phillips*. *See, e.g.*, *Fernandez*, 722 F.3d at 11; *Keen*, 676 F.3d at 990; *Vitillo*, 490 F.3d at 323. *Phillips* is also factually distinguishable, as there is no dispute here that the coaches were employees of the universities, quite unlike the tax assessor in *Phillips*.[7]

In *Sunia*, the defendants were former employees of the legislative branch of the American Samoa government, but only the executive branch received federal funds. 643 F. Supp. 2d at 62. The Government argued that the defendants were "agents" of the "government" of American Samoa. *Id.* The district court rejected that reading, construing the definition of "government agency" in Section 666(d)(2) to require that the federal funds be held by the specific branch of government for which the defendants worked. *Id.* at 63. The district court also found that its construction of the statute was consistent with the requirement stated in *Phillips* that there be "some nexus between the criminal conduct and the agency receiving federal assistance for § 666 to apply." *Id.* at 64. *Sunia*'s reliance on *Phillips* is misplaced, for the reasons stated above. And even assuming that *Sunia*'s convoluted reading of Section 666(d)(2) is good law, *but see United States v. Bravo-*

_____

[7] The defendants claim, without record evidence, that the coaches "were employed by a division of their organization that operates autonomously from the division that receives federal funding." (Br. 42). But the coaches were employed by universities that received the requisite federal funding. (SA 340-41). Nothing more is required under Section 666.

26

*Fernandez*, 828 F. Supp. 2d 441, 454 (D. P.R. 2011), it is readily distinguishable, because this case involves Section 666(d)(1) and whether the defendants are agents of an organization, not a government agency.

### 2. The Bribes Were in Connection With Business of the Universities

Dawkins and Code next argue that the District Court "applied an erroneously expansive interpretation of 'business or transaction'" under Section 666. (Br. 43). Again, their arguments are meritless.

Section 666 criminalizes bribery "in connection with any business, transaction, or series of transactions" of an entity receiving a threshold amount of federal funds. Here, the Government alleged and proved that the bribes were paid in connection with some "business" of the universities, namely, the operation of basketball programs. (*See* SA 6, 18, 21; Tr. 1611 (instructing jury that the "business" in question is the "operation and administration of the university's men's basketball program"). Judge Ramos accordingly rejected the defendants' motion to dismiss. (SPA 21-22).

Judge Ramos' decision is consistent with the plain text of the statute. Section 666 prohibits bribery in connection with "*any*" business or transaction of the relevant entity. "Nowhere does [Section 666] place any definitional limits on the business or transactions to be influenced—beyond requiring them to be 'of' the organization receiving more than $10,000 in federal funding and to have a 'value of $5,000 or more.'" *Ng Lap Seng*, 934 F.3d at 133. And Congress' use of the

27

word "any" counsels against imposing a "narrowing construction" on the "business or transaction clause." *Salinas*, 522 U.S. at 57.

The defendants argue, without citing precedent, that the term "business" must be "limited to its ordinary meaning of commercial activity." (Br. 48). This argument "contradicts the express statutory text." *United States v. Robinson*, 663 F.3d 265, 274 (7th Cir. 2011). As the Seventh Circuit explained in rejecting the same argument, the term "business" carries different meanings, including "a person's regular occupation," "an activity that someone is engaged in," or the "practice of making one's living by engaging in commerce." *Id.* at 274 n.4 (quoting New Oxford American Dictionary 237 (3d ed. 2010)). Because the statute refers to the "business" of entities including "government" entities, using business "in the commercial sense of the word" would make little sense, and "would have the effect of excluding bribes paid to influence agents of state and local governments." *Id.* at 274. That would be contrary to the statute's purpose of addressing bribery involving state and local governments accepting federal funds. *See United States v. Rooney*, 37 F.3d 847, 851 (2d Cir. 1994). It would also be inconsistent with the repeated rejection of similar attempts to narrow the broad text of Section 666. *See, e.g.*, *Sabri*, 541 U.S. at 606-07; *Fischer*, 529 U.S. at 677-79; *Salinas*, 522 U.S. at 57-59; *Ng Lap Seng*, 934 F.3d at 133 (citing *Robinson* favorably to reject a different narrowing argument).

As the defendants acknowledge (Br. 37), the purpose of Section 666 is to protect federal funds. *Sabri*,

28

541 U.S. at 606. "Bribes paid to influence the intangible, noncommercial business of a federally funded organization threaten to undermine the integrity of those organizations no less than bribes paid to influence a discrete commercial-like transaction." *Robinson*, 663 F.3d at 275; *see Sabri*, 541 U.S. at 601 ("Money is fungible."). Courts have thus regularly applied Section 666 to bribes paid in connection with noncommercial "business" of the relevant entity. *See, e.g.*, *Robinson*, 663 F.3d at 267 (law enforcement activities of a police department); *United States v. Marmolejo*, 89 F.3d 1185, 1193 (5th Cir. 1996) (housing and safekeeping of federal prisoners). Indeed, where the bribe recipient is a public official, the "business" of the relevant entity will often qualify as non-commercial (even if the bribe payor's interest is commercial, as is the case here). *See, e.g.*, *United States v. Chambers*, 800 F. App'x 43, 45 (2d Cir. 2020) (bribe to police officer in connection with issuance of gun licenses); *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017) (bribe to legislator to secure licenses and approvals); *United States v. Jereis*, 597 F. App'x 653, 654 (2d Cir. 2015) (bribe to city councilwoman in connection with her support for development project); *United States v. Rosen*, 716 F.3d 691, 701 (2d Cir. 2013) (bribes to legislators in connection with their votes or support for grants). The defendants' reading would upend the well-settled application of Section 666 to such cases.

The defendants make several additional arguments, each of which rests on a misapprehension of the charges against them. First, they assert that Section 666 "is designed to prosecute bribe schemes that offend

29

our expectation that the agents of federally funded organizations are carrying out *their duties* without corrupt influence" and claim that "[t]his template simply does not fit [their] conduct." (Br. 45). They do not explain how this is so, however. And even if it were required that an agent violate his employment duties to be guilty of bribery – though it is not – here the Government alleged and then proved that the bribed coaches did violate the duties of their employment when they accepted bribes in exchange for steering their players to Dawkins' business. (SA 2, 6-7; Tr. 114-15, 1140-43). This case is thus unlike *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009), in which the defendants were judges who accepted bribes in connection with judicial rulings. There, although the judges were "agents" of the state administrative office of courts, which received federal funding, their role as "agents" of that office was entirely non-judicial, and thus their separate judicial actions did not implicate their duties as "agents" of that office. *Id.* at 344-46.

Next, the defendants contend that because the universities were not "in the business of recommending financial advisors to basketball players," the coaches' actions in doing so were not "connected" to any "business" of the universities. (Br. 46). But the Government alleged and proved that part of the universities' "business" included operating intercollegiate athletics programs. (SA 6, 18, 21). A coach's role in such a program is not limited to calling plays on court. The coaches were obligated to ensure that their programs complied with NCAA rules, and their employment agreements and certification forms they signed as part of their employment set forth this and other duties, which clearly

30

prohibited coaches from accepting money from outside advisors to influence student-athletes. (*See, e.g.*, Tr. 106-07, 1136-39; SA 275-80, 288, 289, 291-94, 300-01, 310-15, 321-25, 328-31, 338-39). The Government further alleged and proved that, like any educator, coaches were expected to advise their student-athletes, including about off-court decisions like selecting an agent. (*See, e.g.*, SA 2 (indictment alleging that coaches' role included "guiding [their] student-athletes through the process of selecting agents and other advisors when they prepared to leave college"); Tr. 1136; SA 327, 335). Some universities had specific education programs to help student-athletes select agents without jeopardizing their eligibility (Tr. 129-30), required agents to register with the university so the university could better manage and oversee any interactions with student-athletes (Tr. 1134-35), and required coaches to inform the compliance office if they became aware of contact between a student-athlete and athlete advisor (Tr. 1136). Thus, advising student-athletes and managing their interactions with outside advisors was very much a part of the athletics program, as Judge Ramos found. (SPA 21) (finding a "clear connection" between the universities' "business" and the charged bribery scheme).

Finally, the defendants argue that Section 666 should not be construed to criminalize violations of an "organization's private rules, professional guidelines, or human resources manual." (Br. 48). But no matter how many times the defendants suggest otherwise, they were not charged with violating NCAA rules, as the District Court specifically instructed the jury. (Tr.

31

1630-31).[8] They were charged with accepting bribes, and "it has always been as plain as a pikestaff that bribes" are criminal. *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013). It is therefore not the case that the Government's theory means that "all federally funded entities are always broadly 'in the business' of employing agents that do not accept bribes." (Br. 47-48).

Judge Ramos did not err by denying the defendants' motion to dismiss the indictment.

## POINT II

### Section 666 is Not Unconstitutionally Vague As Applied to the Defendants' Conduct

The defendants contend that Section 666's prohibition of bribery is unconstitutionally vague as applied to their conduct. (Br. 50-56). This argument is meritless, as Judge Ramos correctly found. (SPA 25).

––––––––––

[8] It would thus be immaterial if it were true, as the defendants assert, that "the Government did not produce any evidence showing that recommending certain financial advisors … violated any NCAA rules." (Br. 49). In any event, the Government did allege and prove that a coach's acceptance of money in exchange for steering players to certain advisors is a violation of NCAA rules. (SA 7; Tr. 98, 122, 1133-34).

32

### A. Applicable Law

"[T]he void-for-vagueness doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Skilling v. United States*, 561 U.S. 358, 412 (2010). To determine whether a statute is unconstitutionally vague, the Supreme Court has established a two-part test requiring "that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

To meet these requirements, the statute need not define the offense with "mathematical certainty," *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972), but must provide only "minimal guidelines to govern law enforcement," *Kolender*, 461 U.S. at 358. Any concerns about fair notice are "ameliorated" in those cases where the statute "contains a scienter requirement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

Where, as here, "the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' *i.e.*, in light of the specific facts of the case at hand and not with regard to the statute's facial validity." *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) (en banc).

This Court reviews a void-for-vagueness challenge *de novo. See United States v. Farhane*, 634 F.3d 127, 134 (2d Cir. 2011).

## B. Discussion

This Court has "uniformly rejected vagueness challenges" to bribery convictions under Section 666. *Ng Lap Seng*, 934 F.3d at 135; *see id.* at 135 n.26 (collecting cases). The defendants' challenge fares no better.

Section 666 prohibits corruptly giving anything of value to any person with intent to influence or reward an agent of certain entities in connection with any business or transaction of such an entity having a value of $5,000 or more. 18 U.S.C. § 666(a)(2). That is, it prohibits *quid pro quo* bribery involving certain entities, *see Ng Lap Seng*, 934 F.3d at 132, and "it has always been as plain as a pikestaff that bribes and kickbacks are prohibited," *Rosen*, 716 F.3d at 700. The language of the statute is thus adequate to alert a reasonable person to the illegality of the defendants' conduct here and avoid arbitrary enforcement of the law.

The evidence proved that the defendants conspired with Sood to pay, and Dawkins paid, tens of thousands of dollars to multiple college basketball coaches in order for them to steer student-athletes to retain the defendants' business. The defendants can hardly claim that they lacked notice that such payments were things "of value," 18 U.S.C. § 666(a)(2); that the universities' "business" included operating intercollegiate athletics programs, *id.*; or that, as employees, the coaches were "agents" of these organizations, *id.*

Sood testified that he understood that he and the defendants were violating the law by paying coaches in exchange for steering players to their business. (Tr.

34

695-97). In these circumstances, the defendants cannot claim that a reasonable "ordinary" person would not have the same awareness. *See Kolender*, 461 U.S. at 357 (reviewing vagueness challenge with reference to whether "ordinary people can understand what conduct is prohibited"); *Copeland v. Vance*, 893 F.3d 101, 114 (2d Cir. 2018) (noting that whether "ordinary person" has sufficient notice of prohibited conduct is "objective inquiry").

Further, as Sood and Blazer both testified, and as the recordings of the defendants' own statements reflected, the defendants intended to pay coaches as part of a *quid pro quo*: they discussed on multiple occasions specific payments for particular students the coaches would steer to them. (Tr. 275, 352, 409, 424-25, 430-31, 1111). The defendants' knowledge of the unlawful nature of their conduct was also evident from their efforts to conceal it from law enforcement. (*See, e.g.*, SA 67-69).

The defendants' awareness that these payments were unlawful was amply supported by the trial evidence, and reflected in the jury's verdict that they had the specific intent to bribe. (Tr. 1608-14, 1621). This finding of specific intent "eliminates the possibility that [they were] prosecuted for bribery without fair notice." *Rosen*, 716 F.3d at 700; *see also Skilling*, 561 U.S. at 412 (statute's *mens rea* requirement "blunts any notice concern"); *Hill*, 530 U.S. at 732; *United States v. Roberts*, 363 F.3d 118, 123 (2d Cir. 2004) ("Because the statute at issue here contains a scienter requirement, … the defendants' vagueness challenge must be met

35

with some measure of skepticism, at least with regard to the 'fair notice' prong of *Kolender*.").

In urging a contrary conclusion, the defendants resort to arguments about the purpose of Section 666, and their view that there is an insufficient nexus between the charged conduct and the purpose of protecting federal funds. (Br. 52-53, 56). But, as noted, the Supreme Court has held that there is no requirement of a nexus between the bribe and some federal money, and has explained that this does not render the statute unconstitutional because money is fungible and Congress appropriately chose to protect the integrity of federal funds by criminalizing bribery in connection with the business of an entity receiving sufficient federal funds. *Sabri*, 541 U.S. at 606-07.

The defendants also rely on testimony from a compliance officer who stated that he would not have considered an "NCAA rule violation to be a federal crime." (Tr. 137; *see* Br. 55). But this testimony is irrelevant, because the defendants were not charged with NCAA rules violations, as the District Court specifically instructed the jury. (Tr. 1630-31). They were charged with bribery. Their vagueness challenge should be rejected.

## POINT III

## The District Court Correctly Precluded the Defendants From Offering Inadmissible Evidence

The defendants challenge several of the District Court's evidentiary rulings, which they claim had the "aggregate effect" of preventing them from presenting

36

"a complete defense." (Br. 60-61). To the contrary, the District Court did not abuse its discretion by precluding the defendants from distracting the jury with inadmissible evidence unrelated to the issues properly before it, and any error in the District Court's evidentiary rulings was harmless.

## A. Evidentiary Rulings Generally

"Whether rooted in the Due Process Clause of the Fifth Amendment or in the Compulsory Process Clause of the Sixth Amendment, the Constitution guarantees criminal defendants the right to present a defense." *United States v. Blum*, 62 F.3d 63, 67 (2d Cir. 1995). "The right to present a defense, however, does not give criminal defendants carte blanche to circumvent the rules of evidence." *United States v. Almonte*, 956 F.2d 27, 30 (2d Cir. 1992). Trial judges thus retain "wide latitude" to impose "reasonable limits" to guard against "confusion of the issues" or "interrogation that is … only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Given that wide latitude, this Court reviews evidentiary decisions for abuse of discretion, even where the defendant attempts to cast his argument as a violation of his right to present a defense. *See, e.g.*, *United States v. Stewart*, 433 F.3d 273, 310-311 (2d Cir. 2006); *Blum*, 62 F.3d at 67; *United States v. Holmes*, 44 F.3d 1150, 1157 (2d Cir. 1995). The precedents cited by the defendants involving unconstitutional infringements on the right to present a defense typically involve state evidentiary rules which, even if otherwise correctly ap-

37

plied, were arbitrary and thus in violation of the constitution. *See, e.g.*, *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (state evidentiary rule that "arbitrarily excludes material portions of [defendant's] testimony"); *Chambers v. Mississippi*, 410 U.S. 284, 296, 302 (1973) (state evidentiary rule that "bears little present relationship to the realities of the criminal process" and narrow hearsay exception that was "applied mechanistically to defeat the ends of justice"); *Washington v. Texas*, 388 U.S. 14, 22 (1967) ("arbitrary [state rule] that prevent[s] whole categories of defense witnesses from testifying on the basis of a priori categories that presume them unworthy of belief"). Here, the defendants make no attempt to explain how any of the Federal Rules of Evidence at issue were "arbitrary or disproportionate to the purposes they are designed to serve." *Rock*, 483 U.S. at 55-56. They simply argue that the District Court erred in its application of these rules. These are garden-variety evidentiary claims, subject to abuse of discretion review.

A trial court acts within its discretion when it imposes restrictions on the defense that are "not arbitrary or disproportionate to purposes designed to accommodate legitimate interests in the trial process." *Stewart*, 433 F.3d at 311; *see also United States v. Quinones*, 511 F.3d 289, 307-08 (2d Cir. 2007) (noting that evidentiary ruling must be "arbitrary and irrational" to constitute abuse of discretion); *United States v. Edwards*, 631 F.2d 1049, 1051 (2d Cir. 1980) ("The general rule is that absent a clear abuse of discretion, the district court has broad discretion to exclude evidence that is irrelevant or cumulative.").

38

Even when an evidentiary ruling is "manifestly erroneous," the defendant is not entitled to a new trial if the error was harmless. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012). A non-constitutional evidentiary error is harmless if this Court determines "with fair assurance" that the jury's judgment "was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see also Blum*, 62 F.3d at 68 (applying *Kotteakos* standard to preclusion of defense evidence). Where defense evidence has been improperly excluded, this Court considers such factors as:

> (1) the importance of … unrebutted assertions to the government's case; (2) whether the excluded material was cumulative; (3) the presence or absence of evidence corroborating or contradicting the government's case on the factual questions at issue; (4) the extent to which the defendant was otherwise permitted to advance the defense; and (5) the overall strength of the prosecution's case.

*United States v. Gupta*, 747 F.3d 111, 133-34 (2d Cir. 2014).

## B. The District Court Correctly Precluded Certain Testimony from Code's Family Members

### 1. Relevant Facts

Near the end of Government's case-in-chief, Code notified the Government that he intended to call two family members, Blondell Tutweiller and Warren

39

Broughton. He proffered that each would testify to cer-
tain statements Code made during or after phone calls
he made in July 2017. (A. 346-50). In particular, he
sought to elicit that (1) these witnesses "overheard
four to six telephone calls during which Mr. Code ex-
plicitly instructed individuals, 'Do not accept money
from these people'"; (2) after the calls Code told
Broughton that the calls Broughton overheard were
with coaches, and "Code explained that he was getting
paid a consulting fee for facilitating introductions be-
tween college coaches and a sports management group
in Las Vegas"; and (3) after the calls Code told Tut-
weiller "that he was arranging meetings for certain as-
sistant basketball coaches." (A. 347). Notably, the two
witnesses were not a party to and did not listen into
Code's calls; Code did not inform the witnesses or oth-
erwise proffer which particular coaches he was speak-
ing to when his conversations were overheard; and
Code did not seek to call as witnesses any of the
coaches to whom he was supposedly speaking.

The Government moved to preclude this testimony.
(Dkt. 228). The Government argued that the wit-
nesses' testimony about Code's purported explanation
of his business relationship with Dawkins and descrip-
tion of the phone calls he had made were inadmissible
hearsay. (*Id.* at 1-2). Further, while the Government
agreed that "orders" are, in the ordinary course, not
hearsay, the Government argued that whatever sup-
posed "orders" the witnesses heard Code give were ir-
relevant unless accompanied by the admission of
Code's inadmissible hearsay statements about to
whom he was speaking. (*Id.* at 2). In particular, the

40

Government noted that there had been numerous conversations admitted in evidence during which Code had told co-conspirators to pay some coaches but not others, and to only pay some coaches at particular times. (*Id.* at 2 n.1).

The District Court precluded the proffered testimony "for substantially the reasons set forth in the government's letter." (Tr. 1171).

### 2. Applicable Law

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b). When faced with a question of conditional relevance, the court must "examine all the evidence in the case and decide whether the jury could reasonably find the conditional fact by a preponderance of the evidence." *United States v. Coplan*, 703 F.3d 46, 81 (2d Cir. 2012).

Even if proffered evidence is relevant, it may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

"Generally, a statement made by a person while not testifying at the current trial, offered by that person to prove the truth of the matter asserted in his statement, is hearsay." *Gupta*, 747 F.3d at 131 (citing Fed.

41

R. Evid. 801(a)-(c)). "Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay." *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999). "Hearsay generally is inadmissible if it does not fall within an exception provided by Rule 803 or 804." *Gupta*, 747 F.3d at 131.

Rule 803 provides an exception for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed …." Fed. R. Evid. 803(3). To satisfy Rule 803(3), "the statement must face forward, rather than backward." *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993). This restriction is necessary to prevent this exception from "swallowing the hearsay rule." *United States v. Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991).

As noted, evidentiary rulings are reviewed for abuse of discretion. *See* Part III.A. Review of a district court's ruling under Rule 403 is particularly deferential, and will be overturned only where "there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally." *Stewart*, 590 F.3d at 133; *see also United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) ("[W]here the issues of both the probative value and possible prejudicial effect … are presented to the district court when it makes its decision to admit such evidence, a mechanical recitation of the Rule 403 analysis is not required.").

42

### 3. Discussion

#### a. Code's Alleged "Order" Was Correctly Precluded

The testimony that Code was overheard saying "[d]o not accept money from these people" was not relevant, and was properly excluded on that basis and under Rule 403. As noted, the witnesses were not participants to the phone calls at issue and could not hear both sides of the calls. They were thus unaware to whom Code was speaking, except for Code's later statements to the effect that he had been arranging meetings for coaches. (A. 347). These later statements were obviously hearsay, and Code does not argue otherwise. The relevance of Code's alleged "orders" is thus conditioned on other facts – such as the identity of the persons receiving the orders and the "people" to whom he was referring – that were not established by admissible evidence.

If, for example, Code had been speaking to a friend, and telling that friend not to accept loans from questionable lenders, the statement "do not accept money from these people" would obviously not be relevant. Code's argument proceeds from the premise that his statements were "evidence showing that he explicitly instructed the college coaches that he sent to the Vegas meetings *not* to accept money from Dawkins, Blazer, and [D'Angelo]." (Br. 63). But, as proffered, neither witness heard Code mention the words "college," "coaches," "Vegas," "Dawkins," "Blazer," or "D'Angelo," during the call. (A. 347). The relevance of these calls is thus entirely dependent on Code's later, inadmissible

43

statements to the effect that he was speaking to coaches. But for the evidence to be relevant, such a conditional fact must be established by evidence in the record. *See Coplan*, 703 F.3d at 81; *see also United States v. Ziegler*, 583 F.2d 77, 80-81 (2d Cir. 1978); Fed. R. Evid. 104(b), Advisory Comm. Notes to 1972 Proposed Rules. The proffered, inadmissible hearsay is not sufficient. And while there was some non-hearsay proffered that might suggest that Code's conversations were in some way related to the Vegas meetings, such as the proffer that he was overheard discussing room numbers, this was plainly insufficient to meet Code's burden of establishing the conditional facts by a preponderance of the evidence. Tellingly, Code did not introduce any other evidence that might have supported the inference that he was speaking to relevant coaches and referring to Dawkins, Blazer and D'Angelo, such as phone records showing to whom he was speaking, testimony from the coaches to whom he was allegedly speaking, or his own testimony. Instead, he sought to introduce these self-serving statements solely through the uncorroborated testimony of his family members, which was lacking in context.

Moreover, even if Code did establish that he was talking to "coaches" generally, that would not have made the alleged commands relevant. Obviously, if "these people" referred to individuals other than Dawkins, Blazer or D'Angelo, the commands were not relevant. And the identity of the "coaches" to whom Code was speaking was also important. The evidence at trial showed that Dawkins, Blazer and D'Angelo met with multiple coaches in Las Vegas, some of whom they bribed and some of whom they did not. (Tr. 440-64).

44

One such coach was a youth basketball coach, and it was not the Government's theory that it was criminal to bribe such a coach. (Tr. 418-19, 437-38). Furthermore, the Government introduced evidence that Code was cautious about direct payments from his new business partners and that Code only wanted to pay coaches when they needed assistance with a particular player in the future, and not to generally place them on retainer, making his statements – if made to particular coaches – fully consistent with the Government's theory of the case. (Tr. 1111; SA 60-62, 91-93).

Because the relevance of Code's alleged commands depended on conditional facts not in evidence, this testimony was not admissible. In any event, Judge Ramos did not abuse his substantial discretion by finding that any relevance was outweighed by the risk of confusion or unfair prejudice. (Tr. 1171; *see* Dkt. 228 at 2 (Government arguing that evidence should be precluded on these grounds)). Given the lack of context for these statements, their admission would undoubtedly have risked considerable juror confusion, and left jurors free to speculate as to the identities of the participants and the balance of the conversations. Moreover, Code would assuredly have sought to argue – as he does on appeal – that these statements were in fact with the coaches relevant to the charged conduct, thus working an end-run to the hearsay rule prohibiting Code's out-of-court statements on that subject. The Government would have been left unable to effectively cross-examine the witnesses about such statements, without opening the door to Code's hearsay. Under the circum-

45

stances, it was not a "clear abuse of discretion" to preclude the proffered testimony. *United States v. Salameh*, 152 F.3d 88, 122 (2d Cir. 1998).

### b. Code's Statement of Belief About His Prior Agreement Was Correctly Precluded

Code also contends that his explanation to Broughton of his "consulting agreement with LOYD Management" was admissible under the hearsay exception for "state of mind" evidence set forth in Rule 803(3). (Br. 69). Judge Ramos correctly ruled otherwise, and certainly did not abuse his discretion by precluding the testimony. (Tr. 1171).

To satisfy Rule 803(3), "the statement must face forward, rather than backward." *Harwood*, 998 F.2d at 98. When Code allegedly said, on some unidentified date in July 2017, that "he was getting paid a consulting fee for facilitating introductions between college coaches and a sports management group in Las Vegas" (A. 347), he was describing the nature of an agreement that he had previously made. Despite Code's assertions to the contrary (Br. 71-72), the nature of the agreement previously struck by Dawkins, Code and others was the key issue at trial: It was the charged conspiracy. Code was thus making a backward-looking statement of his "belief" about that prior agreement – *i.e.*, that it was more limited in scope – in order to prove the fact believed.

On several occasions, this Court has found that statements describing some prior agreement (or lack

46

thereof) are not admissible under Rule 803(3). In *Cardascia*, 951 F.2d at 488, the defendant's resignation letter from his employment at a bank expressed disagreement with decisions made by his co-defendant in making certain loans related to a charged fraud. This Court found that the letter was a "statement of memory or belief" offered to prove the defendant's prior disagreement and thus his lack of criminal intent. *Id*. In *United States v. Margiotta*, 688 F.2d 108, 136 (2d Cir. 1982), the Government sought to introduce testimony from a witness, who had spoken with his father after the father met with the defendant, in which the witness would say that the father told him "an agreement had been reached" relating to a bribery scheme. This statement was not admissible under Rule 803(3), because it was offered to prove that the defendant "had engaged in a past act, the formation of an unlawful secret agreement." *Id*.

Here, too, Code sought to introduce a statement characterizing his prior agreement, in the guise of his later stated "belief" about that agreement. But the purpose of this evidence was to "prove the fact … believed." To permit Code to shoehorn this statement into the state-of-mind exception would allow the exception to "swallow[] the hearsay rule" by "allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." *Cardascia*, 951 F.2d at 487. *See also United States v. Mazer*, 631 F. App'x 57, 64 (2d Cir. 2015) (affirming preclusion of testimony where defendant improperly attempted to "shoehorn" testimony into the state of mind exception, when in fact it was being offered not to prove any belief then

47

held but to establish the non-criminal nature of a prior business relationship).

The cases cited by Code are not to the contrary. (Br. 70). In *United States v. DiMaria*, 727 F.2d 265, 270 (2d Cir. 1984), a defendant charged with unlawful possession of stolen cigarettes stated to approaching agents, "I thought you guys were just investigating white collar crime; what are you doing here? I only came here to get some cigarettes real cheap." This Court found that the statement was improperly excluded because, to the extent it evinced an intent to possess bootleg cigarettes not stolen cigarettes, the statement negated the defendant's "present intent" to commit the charged crime at the very moment he was engaging in the alleged conduct. *Id.* at 270-71. Similarly, in *United States v. Harris*, 733 F.2d 994, 1004-06 (2d Cir. 1984), the defendant's statement to his parole officer during the charged conspiracy that he believed the undercover agent was a government agent would have negated his present intent to enter into a conspiracy.[9] Here, by contrast, while Code's alleged statement fell within the time period of the charged conspiracy, the Government did not allege that any of Code's actions on that particular date were in furtherance of the conspiracy. Rather, the key date with regard to his state

_____

[9] Code's remaining cases are instances in which the statement was not offered for the truth of the matter asserted, but as circumstantial evidence of the defendant's state of mind. *See Smith v. Duncan*, 411 F.3d 340, 346 n.4 (2d Cir. 2005); *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988).

48

of mind was several weeks earlier at the June 20, 2017 meeting. The statement was therefore not one of "present intent," but was backward-looking in nature. *See Farhane*, 634 F.3d at 172-74 (Raggi, J., concurring) (noting that even statements made during period of conspiracy may not meet contemporaneity requirement); *United States v. Taubman*, 297 F.3d 161, 164-65 (2d Cir. 2002) (statement about meeting that already happened not relevant to defendant's state of mind when the meeting occurred).

Judge Ramos did not abuse his discretion by precluding the proffered testimony.

### c.  Any Error Was Harmless

Finally, any alleged error in precluding the testimony of Code's family members was harmless.

With respect to Code's statement of belief about the nature of his agreement, there was ample other evidence in the record from which he could argue his desired inference. The jury was presented—through recorded calls and Dawkins' testimony—with evidence that Code did not want to pay *certain* college coaches, a fact not seriously in dispute in trial, and that he was getting paid to facilitate meetings with coaches that his partners would subsequently bribe. (Tr. 1111; SA 56, 60-62, 91-93). His alleged statement that "he was getting paid a consulting fee for facilitating introductions between college coaches and a sports management group in Las Vegas" (A. 347) would thus have added nothing to the evidence at trial. And because such evidence was already in the record, Code had an

49

ample factual basis to argue that he lacked the requisite intent because he believed he was only getting paid to make introductions and did not want to bribe any coaches. *See United States v. Zayac*, 765 F.3d 112, 119 (2d Cir. 2014) (exclusion of testimony offered to show defendant's state of mind was harmless because the defense could make the same argument from other evidence in the record); *Gupta*, 747 F.3d at 135 (same); *United States v. Netschi*, 511 F. App'x 58, 62 (2d Cir. 2013) (same).

Furthermore, both categories of precluded testimony carried negligible probative value. As noted, the testimony about the alleged "orders" given by Code was so devoid of context as to be irrelevant; but even if the testimony met the threshold of relevance, the absence of context so diminished the probative value of the testimony as to make clear that its admission could not have substantially swayed the jury's verdict. The same is true of the testimony about Code's statement of belief, which, as noted, added little to nothing to the record.

Finally, there was overwhelming evidence of Code's guilt, including of his fraudulent intent, based on the recordings of meetings and phone calls in which he participated, such as the recording in which he asked Dawkins "how many [coaches] you paying me for," and recordings in which he warned his co-conspirators about the risks of their plan. (*See, e.g.*, SA 56, 62, 91-93). Thus, this Court can find "with fair assurance" that the jury's judgment "was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 765.

50

### C. The District Court Correctly Precluded Testimony That Dawkins Did Not Bribe Certain Coaches Other Than Those Charged in the Conspiracy

#### 1. Relevant Facts

Before trial, Dawkins indicated that he had subpoenaed two men's basketball coaches, Arizona head coach Sean Miller and Louisiana State University head coach Will Wade, and proffered that he intended to call both coaches to testify about how much influence they have over their student-athletes and that Dawkins did not bribe them. (Dkt. 189 at 17). He also indicated that he sought to play certain recorded calls with both coaches. (*Id.*). The Government moved to preclude evidence about Dawkins' dealings with these coaches, because such evidence constituted impermissible "good act" evidence, and even were there a marginal non-propensity purpose for such evidence, the absence of criminal conduct in Dawkins' relationships with coaches that he was not alleged to have bribed was irrelevant and inadmissible under Rules 402 and 403. (*Id.* at 17-20).

At the final pretrial conference, Dawkins further argued that he had evidence that those "two head coaches … are engaged in systemic cheating at the highest level," including that Miller was paying players and that Dawkins "had knowledge of it." (A. 75-77). Dawkins argued that this showed the influence the head coaches had over their players, and thus was relevant to show that Dawkins would not have bribed the assistant coaches who had less influence. (A. 76-77).

The District Court found that the proffered testimony was irrelevant, explaining:

> Whether defendants had relationships with basketball coaches, including head coaches, who they did not bribe, is irrelevant to both the issues of whether defendants bribed the coaches they are alleged to have bribed and whether they intended to do so. To hold otherwise would be to suggest that if a criminal defendant conducted himself properly in some cases, he lacked intent when he failed to do so. But nobody only does things properly or improperly.

(A. 79 (citing *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999)). The District Court noted its decision was "subject to being revisited depending on how the evidence at trial plays out." (A. 79).[10]

During trial, after a recording was played wherein Dawkins recounted a conversation about Miller paying an elite student-athlete (Tr. 351), Dawkins sought reconsideration of the prior ruling and offered to file a letter brief (Tr. 387). The Government opposed and sought the opportunity to respond in writing. (Tr. 387). The District Court stated that "I'm not going to stop

---

[10] The District Court did not "quash[ ] Dawkins' subpoenas." (Br. 73). Rather, it precluded the proffered testimony, subject to revision at a later point in time, and Dawkins remained free to call these witnesses for a proper purpose.

52

Mr. Haney from putting in a motion if he wants to put in a motion," but noted that the recording at issue had been previously produced to the defense and the District Court, and the District Court's initial ruling was "based on that knowledge and that understanding" and therefore "nothing has changed." (Tr. 387-88). Nonetheless, the District Court invited Dawkins to make a motion to more fully set forth his position (Tr. 388), but Dawkins declined to do so.

Dawkins ultimately testified about his relationship with Miller, and that he did not bribe Miller. (Tr. 1429). Dawkins did not testify about his relationship with Wade. Dawkins also affirmed on cross-examination that he had made previous recorded statements explaining how head coaches, in contrast to assistant coaches, are not willing to take money, because "they're making too much money. And it's too risky." (Tr. 1473; *see also* SA 107).

## 2. Applicable Law

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Under this rule, "a defendant may not seek to establish his innocence through proof of the absence of criminal acts on specific occasions." *Chambers*, 800 F. App'x at 46 (quoting *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990)). "The reasoning behind this rule is straightforward: A single occurrence of lawful conduct is 'simply irrelevant' to other occurrences of unlawful conduct." *Id.* (quoting *Walker*, 191 F.3d at 336).

53

## 3. Discussion

### a. The District Court Did Not Abuse Its Discretion

The District Court did not abuse its discretion by precluding the proffered testimony of Miller and Wade. Dawkins argues that the fact that he "did not pay Miller or Wade … made it more likely that he did not intend to bribe *any* coach, including those named in the Indictment." (Br. 74). This is a classic propensity argument, as the District Court correctly found. (A. 79).

This Court has routinely rejected similar efforts to introduce evidence that a defendant engaged in legal, honest conduct on some occasions to establish that he did not have the intent to commit charged offenses involving bribery or fraud on other occasions. For example, in *Walker*, 191 F.3d at 336, this Court affirmed the district court's refusal to allow a defendant accused of preparing false asylum applications to admit evidence of truthful applications he had submitted, because whether he "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent." *See also Chambers*, 800 F. App'x at 46 (affirming refusal to permit evidence that defendant was running a legitimate law practice to establish his lack of intent to commit bribery); *Scarpa*, 897 F.2d at 70 (rejecting argument that lack of incriminating statements on recording "tends to disprove the government's theory"); *United States v. Williams*, 205 F.3d 23, 34 (2d Cir.

54

2000) (excluding on relevance grounds evidence of de-
fendant's prior trips to Jamaica in which he did not
engage in drug activity).[11]

Dawkins attempts to avoid this precedent by argu-
ing that the evidence was admissible to show that it
would not have "made sense" for him to bribe assistant
coaches, because "the head coach would have been the
logically more influential person to bribe." (Br. 73-74).
But Dawkins himself made clear why that is not so,
when he explained during a recorded conversation
that head coaches, in contrast to assistant coaches, are
not willing to take money, because "they're making too
much money. And it's too risky." (SA 107). As defense
counsel made clear below, the true purpose of this tes-
timony was to distract the jury by introducing evi-
dence that Miller and Wade were "engaged in systemic
cheating at the highest level." (A. 75).

––––––––––

[11] *United States v. Sternstein*, 596 F.2d 528 (2d Cir.
1979), upon which Dawkins relies (Br. 75), is not to the
contrary. In *Sternstein*, this Court reversed a district
court's decision to deny the defendant, a tax preparer
accused of submitting fraudulent returns, discovery of
a report that might have shown that the defendant
made errors in returns unrelated to those charged in
the indictment, which would have bolstered his claim
that the charged errors were the product of careless-
ness or inadvertence. *Id*. at 529-31. Dawkins does not
and could not similarly claim that his failure to bribe
Wade and Miller shows that his bribery of other
coaches was the product of carelessness.

55

On appeal, Dawkins offers two brand new theories of admissibility. First, he argues that he sought to present this testimony to demonstrate that he did not need to bribe coaches because he had "pre-existing relationships with elite head basketball coaches [which] allow[ed] him to secure business deals with top NBA prospects without paying coaches." (Br. 73). Dawkins never made this argument below, choosing instead to press a different theory of relevance; the District Court thus had no occasion to consider the argument, and it is therefore waived (or at least forfeited). *See, e.g.*, *United States v. Mennuti*, 679 F.2d 1032, 1036 (2d Cir. 1982) ("The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, ... and where the party has had ample opportunity to make the point in the trial court in a timely manner, ... waiver will bar raising the issue on appeal."). In any event, this proposed purpose is plainly refuted by Dawkins' own testimony wherein he did not contend that he had ever secured any "business deals with top NBA prospects" through his connections to Miller and Wade. (*See, e.g.,* Tr. 1505 (Dawkins admitting he "never actually had a client of [his] own")). Regardless, whether or not he had obtained or could obtain business deals with potential clients through his relationships with Miller and Wade is irrelevant to evidence that Dawkins offered payments to other assistant coaches in exchange for them steering student-athletes to him. As the District Court noted, "nobody only does things properly or improperly." (A. 79).

56

Second, Dawkins claims, only as to Miller, that his testimony was relevant to impeach certain evidence offered by the Government, namely (i) Blazer's testimony regarding a recording wherein he suggested that he and Dawkins were contemplating bribing coaches such as Richardson or Miller; and (ii) an email from Dawkins to Sood in which Miller is included in a list of coaches. Dawkins argues that Miller's testimony that "no such bribes were paid or contemplated" would have "rebutted the Government's inference" from this evidence. (Br. 77-78). Dawkins did not present these arguments below, either, and they are therefore waived. *See Mennuti*, 679 F.2d at 1036. Moreover, as noted, the District Court's initial ruling on Miller's testimony was "subject to being revisited depending on how the evidence at trial plays out." (A. 79). If in fact Dawkins believed that evidence subsequently admitted warranted revision of that tentative ruling, it was incumbent upon him to raise such an argument. *See United States v. Yu-Leung*, 51 F.3d 1116, 1121 (2d Cir. 1995). But he declined to do so, even when the District Court invited him to. (Tr. 387-88). In any event, the argument is a red herring, because the Government did not argue that Dawkins bribed or took any steps to bribe Miller and did not dispute Dawkins' testimony that he did not bribe Miller. Nor could Miller's testimony shed any light on whether Dawkins "contemplated" bribing Miller during conversations to which Miller was not a party.

### b.    Any Error Was Harmless

Even if the District Court abused its discretion by precluding this testimony, any such error was harmless given the overwhelming evidence that Dawkins was guilty of bribing the charged assistant coaches. That evidence included Dawkins providing cash payments to coaches in video recordings, and discussions on tape—including between Dawkins and the very coaches that he was bribing—about which players these coaches would steer to Dawkins in exchange for the bribes. (*See, e.g.*, SA 260-61, 266-71).

Furthermore, the evidence also included a recording in which Dawkins explained how head coaches, in contrast to assistant coaches, are not willing to take money, because "they're making too much money. And it's too risky." (SA 107). Thus, the admission of testimony that Dawkins did not bribe certain head coaches was not inconsistent with the Government's proof and would have added little to Dawkins' defense.

Finally, Dawkins ultimately took the stand and testified that he had a relationship with Miller but did not bribe him (Tr. 1429), and the Government never disputed that contention. Dawkins then argued in summation that he had "no reason" to bribe Richardson, because Miller was paying his players. (Tr. 1776).[12] Thus, Dawkins introduced other, undisputed

---

[12] The fact that Dawkins did not even bother to testify about his relationship with Wade shows the irrelevance of that testimony and the harmlessness of precluding it.

58

evidence of the fact he now seeks to admit, and made the very same arguments to the jury that he claimed below that he wished to make. The jury still convicted him, demonstrating the harmlessness of any error.

## D. The District Court Correctly Precluded the Defendants from Questioning D'Angelo About Certain Subjects

### 1. Relevant Facts

#### a. The Alleged FBI Misconduct

Before trial, the Government disclosed alleged misconduct by several FBI agents who were involved in this investigation. (A. 334).

59

### b.     Judge Ramos Precludes Questioning About the Alleged FBI Misconduct

Defense counsel subsequently made a request, pursuant to the requirements set forth in *United States ex rel. Touhy v. Regan*, 340 U.S. 462 (1951), to call eight FBI agents to testify

(A. 338). The defense also sought to call a ninth FBI agent,

(A. 339). The defendants subsequently served subpoenas for four FBI agents:

The Government moved to preclude evidence related to the alleged FBI misconduct, arguing that it

_____

60



The District Court granted the Government's motion, finding:



61

(SA 33-34).

### c. Judge Ramos Precludes Certain Questioning About FBI Agents' Interactions With Blazer

During trial, Code informed the Government that he planned to call the four subpoenaed FBI agents to testify "about their interactions with Mr. Blazer and their instructions to him as to how he was to operate as a cooperating criminal." (A. 351). The Government moved to preclude the proffered questioning under Rules 401 and 403. (A. 352).

After hearing argument, the District Court precluded the proffered questioning, finding that it was not relevant. (Tr. 931-32). He further noted that Blazer "was cross-examined vigorously with respect to his role as an undercover" and therefore "any additional testimony along those lines would be cumulative." (Tr. 932). On appeal, the defendants do not appear to contest the District Court's ruling on this topic.

### d. The Defendants Abandon Any Attempt to Question D'Angelo About Other Subjects

During the course of argument about the foregoing subjects, the defendants suggested another topic about which they might seek to question D'Angelo: his alleged "opinion" that as of June 26 "no agreement had been reached with Mr. Code." (Tr. 919). Defense counsel apparently based its assertion that D'Angelo held

62

such an opinion on a statement he made during a recorded conversation. (Tr. 917-18).[14] After hearing argument, Judge Ramos stated that "you're overreading the transcript to a certain extent because he doesn't say that there was no agreement reached." (Tr. 929). In any event, Judge Ramos indicated his initial view that "[e]ven if Mr. D'Angelo would take the stand I don't think he would be allowed or I would allow him to testify as to whether or not Mr. D'Angelo believed that an agreement had been reached." (Tr. 929).

In response Code stated that "depending on what we do in the defense case, for example, we may seek to revisit this ruling with another argument." (Tr. 930). Judge Ramos responded: "Absolutely. A lot of things can happen during the course of the trial that can cause me to revisit any of these evidentiary decisions." (Tr. 930). The defendants did not seek to revisit this issue, nor did they seek to call D'Angelo in their defense case to testify about this issue or any other. Instead, as discussed further below, they sought to argue that as a result D'Angelo was not available to them (Tr. 935) and requested a jury instruction along those lines.

## 2. Discussion

The defendants argue that the District Court precluded them from "calling UC-1 as a witness at trial."

_____

[14] The defendants apparently emailed a letter motion to the District Court on this subject, but it was never docketed or provided to the Government. (Tr. 922-23).

63

(Br. 78). That is not correct. As described above, the District Court only precluded the defendants from eliciting testimony from D'Angelo about certain subjects. On appeal, the defendants describe four topics they wished to explore with D'Angelo. But only one of these was a topic about which Judge Ramos had precluded them from inquiring—the alleged FBI misconduct. This decision was not an abuse of discretion. With respect to the other three topics now raised, there is simply no decision of the District Court to review, and in any event the defendants waived any claim of error by not pressing these arguments below and instead making the strategic choice not to call D'Angelo in the defense case. And even if not waived, each of these arguments is meritless.

*First*, Code argues that he should have been permitted to examine D'Angelo about why he paid money to Code during the June 20, 2017 meeting, and speculates that D'Angelo "would have been able to testify to the jury that the money was paid for Code's attendance alone," and not for "future services." (Br. 80). As an initial matter, this speculation about what D'Angelo would have said on this point is baseless.[15] More importantly, Judge Ramos never denied Code the opportunity to call D'Angelo to testify on this issue. While Judge Ramos stated his initial view that such testimony would be improper, he made clear that this view

––––––––––

[15] Indeed, when Code suggested as much below, Judge Ramos made clear that Code was misinterpreting the recorded statement on which he based this assertion. (Tr. 929).

64

was subject to revision, and Code indicated that he
may indeed seek to revisit the issue during the defense
case. (Tr. 929-30). He never did so. Instead, the defend-
ants made the strategic decision not to call D'Angelo
as a witness, but to instead seek a missing witness
charge. (Tr. 935, A. 251-52; *see* Part V.B). This argu-
ment is therefore waived. *See Yu-Leung*, 51 F.3d at
1121-22; *see also United States v. Coonan*, 938 F.2d
1553, 1561 (2d Cir. 1991) (noting that where a defend-
ant "is attempting to evade the consequences of an un-
successful tactical decision," appellate review is
waived); *cf. United States v. Carmona*, 873 F.2d 569,
574 (2d Cir. 1989) (defendant's failure to call witness
that defendant had right to call waives any challenge
to admission of his statements at sentencing hearing).

Even if Judge Ramos' tentative view on this subject
were considered a final ruling, it would not have been
an abuse of discretion to preclude inquiry about D'An-
gelo's unexpressed subjective intent as to why he pro-
vided money to Code. (*See* Br. 80). D'Angelo was not a
participant in the crime; he was an undercover agent,
and "[t]he agent's state of mind as the investigation
progressed is ordinarily of little or no relevance to the
question of the defendant['s] guilt." *United States v.
Johnson,* 529 F.3d 493, 501 (2d Cir. 2008); *see also
United States v. Forrester*, 60 F.3d 52, 61 (2d Cir.
1995); *United States v. Reyes*, 18 F.3d 65, 71 (2d Cir.
1994).[16] While Code's intent and that of his co-con-
spirators was relevant, the unexpressed intent of

_____

[16] While an undercover agent who personally par-
ticipated in a transaction often may testify about his

65

D'Angelo, an undercover agent playing a role, who legally could not have been a member of the conspiracy, was irrelevant as to whether a conspiracy existed.

*Second*, Code argues it was error to deny him an opportunity to call D'Angelo in order to "refute" Sood's testimony about D'Angelo's payment to Code. (Br. 80). Code never raised this argument in the District Court, either, and it is thus waived for the same reasons. Moreover, Sood did not testify about D'Angelo's intent, but rather was asked for his understanding of "what, if anything, Mr. Code was going to receive in exchange for his assistance," and stated that Code would "receive a retainer, a monthly fee." (A. 200). D'Angelo's unexpressed view of *his* intent was not only irrelevant, but could not have impeached Sood's testimony about *Sood's* understanding of the arrangement.

*Third*, Dawkins argues that it was error to preclude D'Angelo's testimony regarding his supposed "coercive and repeated insistence that Dawkins pay bribes to coaches." (Br. 80-81). But Dawkins did not call D'Angelo to testify on this ground, nor did the District Court prevent him from doing so. The argument is therefore waived for the same reasons. Furthermore, to the extent Dawkins argues he should have been permitted to ask D'Angelo why he supposedly encouraged Dawkins to pay bribes, such evidence about

––––––––––

understanding of the meaning of particular statements, *see* Part IV, that is distinct from whether the agent's own intent in taking certain actions is relevant.

66

the motivation for D'Angelo's actions would be irrelevant. *See, e.g., Reyes*, 18 F.3d at 71. To the extent Dawkins argues that he wanted D'Angelo to testify about what he said to Dawkins in the course of the investigation, such testimony would have been entirely cumulative, because all of D'Angelo's interactions with Dawkins were recorded and Dawkins himself testified about D'Angelo's perceived pushiness. (A. 335-36; Tr. 1296, 1338). Such evidence would also have been irrelevant to any valid defense, because, as Judge Ramos correctly found, Dawkins did not testify that he was entrapped, but rather claimed that he "hustled the agents." (Tr. 1400). For similar reasons, any error in not admitting testimony on this subject would be harmless.

*Finally*, the defendants argue it was error for the District Court to preclude them from calling D'Angelo "in order to discredit and impeach the Government's case" through evidence of his alleged misconduct. (Br. 81).

(SA 33-34). Because D'Angelo was not a witness (and the Government did not rely upon any of his statements for the truth of the matter asserted, consistent with the Court's instruction requested by the defense (Tr. 765)), there was no cause to impeach his credibility. Furthermore, all of D'Angelo's interactions with the defendants were recorded. (A. 335-36).

67

The defendants argue that because of D'Angelo's significant role in the investigation, his "integrity and credibility" were "firmly at issue for the jury." (Br. 81). But this Court has "made clear that a district court need not allow impeachment of even a 'central figure' whose out-of-court statements were not admitted for their truth." *United States v. Regan,* 103 F.3d 1072, 1083 (2d Cir. 1997). Thus, in *Regan*, this Court affirmed the district court's preclusion of evidence intended to impeach two witnesses who "inspired the investigation." *Id.* at 1075, 1083. *See also United States v. McGowan*, 58 F.3d 8, 15 (2d Cir. 1995) (affirming preclusion of impeachment evidence regarding "central figure" because he did not testify and his credibility was therefore "irrelevant"); *United States v. Sanchez*, 103 F. App'x 422, 429 (2d Cir. 2004) (affirming preclusion of impeachment of cooperating witness who did not testify and whose recorded statements were not admitted for their truth).

The cases cited by the defendants are inapposite. While there is no dispute that evidence bearing on the credibility of a Government witness must be disclosed (Br. 82), there is no claim of a discovery violation here. Nor could there be, in light of the extensive disclosures made by the Government and described herein. *Contrast United States v. Bravo*, 808 F. Supp. 311 (S.D.N.Y. 1992) (granting new trial because the Government failed to disclose misconduct by investigating agents).

While in some instances "information tending to impugn the integrity of a law enforcement operation"

68

may be relevant (Br. 83), in this case the alleged misconduct did not undermine the quality of any evidence offered at trial. ████████████████████████

████████████████████████████████████████

████████████████ (SA 33-34). As noted, D'Angelo's meetings with the defendants were recorded, and the defendants stipulated to the authenticity of those recordings. This case is thus a far cry from one where, for example, the misconduct related to the handling of evidence, *see Kyles v. Whitley*, 514 U.S. 419, 446 n.15 (1995), or one in which a testifying agent is asked about his failure to obtain certain types of probative evidence, *see United States v. Sager*, 227 F.3d 1138, 1143 (9th Cir. 2000). Therefore, any collateral FBI misconduct would not affect the weight to be given the evidence obtained during the investigation. As such, the evidence of alleged misconduct was not relevant, as Judge Ramos correctly found, and even if that finding were an abuse of discretion any error would be harmless for substantially the same reasons.

In sum, the defendants' various and shifting argument are meritless. Judge Ramos acted well within his discretion by preventing the defendants from attempting to turn their trial into a trial of D'Angelo for alleged misconduct that had no relevance to their guilt or innocence.

69

### E.   The District Court Correctly Precluded a Portion of a Recorded Phone Call

#### 1.   Relevant Facts

During trial, the defendants informed the Government that they sought to admit certain wiretap recordings during the cross-examination of Sood. As relevant here, Code sought to introduce, under Rule 803(3), a portion of an August 8, 2017 call between Code and Sood (the "Call"). During the Call, Code recounted a prior conversation he purportedly had with Dawkins regarding D'Angelo. The Government moved to preclude the portion of the call in which Code, recounting that prior conversation, said: "I said, Christian look … you're not paying my guys." (SA 36; *see also* A. 362).

After hearing argument, the District Court granted the Government's motion, finding:

> I'm going to grant the government's motion to exclude the portion of the call in which Mr. Code recalls a past conversation he had with Mr. Dawkins. I find that Mr. Code's statements do not fall under the state-of-mind exception to hearsay and Rule 803.3. That rule specifically excludes from its scope statements of memory to prove the fact remembered. The statements at issue here plainly fall within this category to my mind. Mr. Code is recalling a past statement that he made and offering the fact that he made the statement for its truth….

70

> [S]tatements of memory face backwards,
> not forward.

(Tr. 809-10) (citing *Shepard v. United States*, 290 U.S. 96 (1933) and *United States v. DiMaria*, 727 F.2d 265 (2d Cr. 1984)).

Code thereafter filed a letter seeking reconsideration and to admit the disputed portion of the Call under the residual hearsay exception set forth in Rule 807. (A. 354). After hearing additional argument, Judge Ramos ruled that the disputed portion of the Call was not admissible under the residual exception. (Tr. 1089-90). In so ruling, Judge Ramos noted that the residual exception is used "very rarely and only in exceptional circumstances," and observed that the recorded conversation was not "the only source of the conversation," as Code could testify. (Tr. 1089).

## 2. Applicable Law

As set forth above, Rule 803(3) provides that the "state of mind" exception to the hearsay rule does not include "a statement of memory or belief to prove the fact remembered or believed." *See* Part III.B.2.

Federal Rule of Evidence 807 provides a "residual exception" to the hearsay rule, which is to be used "very rarely, and only in exceptional circumstances." *United States v. Ulbricht*, 858 F.3d 71, 123 (2d Cir. 2017). It provides that a statement is not excluded by the rule against hearsay if "(1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on

71

the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a); *see United States v. Morgan*, 385 F.3d 196, 208 (2d Cir. 2004). The requirement that the statement be trustworthy seeks to "minimize" the four classic hearsay dangers: "(1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 232-33 (2d Cir. 1999).

### 3.  Discussion

#### a.  The Disputed Portion of the Call Was Not Admissible Under Rule 803(3)

As Judge Ramos explained, during the disputed portion of the Call, "Mr. Code is recalling a past statement that he made and offering the fact that he made the statement for its truth." (Tr. 810). Judge Ramos correctly found that this was "plainly" a "statement[] of memory to prove the fact remembered" and thus was barred by the express terms of Rule 803(3), as well as binding precedents from the Supreme Court and this Court. (Tr. 809-10). *See Shepard*, 290 U.S. at 104-05 (statement inadmissible where it was not offered "to prove [declarant's] present thoughts and feelings" but "as proof of an act committed," and distinguishing statements of intention from "declarations of memory, pointing backwards to the past"); *Cardascia*, 951 F.2d at 488 (excluding "statement of memory or belief" offered to prove declarant's prior disagreement and thus lack of criminal intent).

72

Code protests that he was not seeking to offer the statement for its truth, but rather to offer "an exculpatory glimpse into [his] state of mind on the date of August 8, 2017." (Br. 87). But Judge Ramos saw right through that argument when it was made below, finding that the clear purpose of offering Code's description of his prior conversation with Dawkins was to prove the fact that he had indeed made the statement to Dawkins on some prior date. (Tr. 810). That conclusion is supported by the date of the Call: Code was not actually attempting to introduce the Call to show his *present* state of mind or subsequent action in conformity therewith, because the Call was *after* the Las Vegas meetings at which the coaches were paid. As such, his statements on the Call did not show his contemporaneous state of mind on a relevant date. *See Farhane*, 634 F.3d at 172-74 (2d Cir. 2011) (Raggi, J., concurring). Rather, as Judge Ramos correctly recognized, Code was seeking to introduce the truth of the assertion that, on a date *prior* to the meetings in question, he had told Dawkins "you're not paying my guys." (Tr. 810). Dawkins cannot simply invoke the magic words "state of mind" to justify the admission of such obvious hearsay. *See Cardascia*, 951 F.2d at 487 (contrary result would allow the state of mind exception to "swallow[] the hearsay rule").

It was not an abuse of discretion for Judge Ramos, who was steeped in the intricacies of the case by this point in the trial, to recognize the purpose for which

73

this statement was being offered and exclude it as hearsay.[17]

——————

[17] On appeal, Code also argues that he should have been permitted to introduce an earlier portion of the Call in which he states: "[w]hen everything you do is about throwing money at it, you are not gonna win, … And more times or not you gonna be taken for your money and folks aren't going to be able to deliver." (Br. 87). Code argues that these statements were not being offered for the truth of the matter asserted and/or were admissible to show his state of mind. (Br. 87). But Code did not make this argument below. Rather, the Government's objection focused on Code's prior statement to Dawkins "you're not gonna pay my guys" (SA 36-37), and Judge Ramos' ruling specifically addressed "the portion of the call in which Mr. Code recalls a past conversation he had with Mr. Dawkins." (Tr. 809). Indeed, after confirming that Judge Ramos was willing to revisit his ruling, Code submitted an additional letter on this issue which, again, focused on the "you're not gonna pay my guys" statement. (A. 356). Code never sought, in the alternative, to admit only the limited portion of the call quoted above. By failing to make this argument below, and instead strategically pressing for the admission of a much larger swath of the call (including the only statement that was actually in dispute), Code waived this claim. *See Yu–Leung*, 51 F.3d at 1121-22; *Mennuti*, 679 F.2d at 1036. In any event, any error in failing to admit this limited portion of the call would be harmless for the reasons set forth below.

### b.  The Disputed Portion of the Call Was Not Admissible Under Rule 807

Judge Ramos did not abuse his discretion by finding that this is not the "very rare" or "exceptional" statement requiring admission under Rule 807. (Tr. 1089-90). The disputed portion of the Call failed to meet at least two requirements of Rule 807.

*First*, Code's statement to Sood about his prior statement to Dawkins was not sufficiently trustworthy.[18] At the time of the Call, Code had a motive to falsely suggest to Sood that he did not need to pay coaches. Just a few weeks before the Call, Code and Sood had entered into a separate consulting agreement, under which one of Sood's entities would pay Code if Code referred Sood professional basketball players as financial advisory clients. (Tr. 937-39). Code thus had every incentive to lead Sood to believe that Code was capable of referring Sood business without resorting to bribery of college coaches. And it is not mere speculation that Code might have sought to defraud his business partners: He argued in his summation that he was seeking to do so and that he said things "to convince them of his value." (Tr. 1820-21, 1826).

This case is thus a far cry from *United States v. Bryce*, 208 F.3d 346, 350 (2d Cir. 1999), in which the

---

[18] Code's description of a conversation he had allegedly had weeks earlier is also subject to concerns regarding faulty memory and faulty narration.

out-of-court statements were deemed trustworthy because they incriminated the declarant. *See also United States v. Rahme*, 813 F.2d 31, 37 (2d Cir.1987) (trustworthiness indicated in part by fact that portion that inculpated defendant was against declarant's penal interest). Here, by contrast, the statements were self-serving, and thus not trustworthy. *See, e.g.*, *United States v. Pagan-Santini*, 451 F.3d 258, 264 (1st Cir. 2006). Moreover, there was no corroboration that Code in fact made the prior statement to Dawkins, a factor that must be considered under Rule 807 and which further undermines the trustworthiness of the evidence. Fed. R. Evid. 807(b); *see also United States v. DeVillio*, 983 F.2d 1185, 1190 (2d Cir. 1993).

*Second*, the statement Code sought to admit was decidedly not the most probative evidence of his claim that he had told Dawkins not to pay the coaches in Las Vegas, as Judge Ramos properly recognized. (Tr. 1089). To satisfy Rule 807, the evidence in question must be "more probative on the point for which it is offered *than any other evidence* that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(b) (emphasis added). Although he had no obligation to do so, Code had the right to testify, and thus could have obtained testimony far more probative on the point. *See United States v. Little*, No. 12 Cr. 647 (PKC), 2018 WL 461238, at *2 (S.D.N.Y. Jan. 3, 2018) (defendant could have testified about fact at issue); *see also United States v. Hughes*, 535 F.3d 880, 882 (8th Cir. 2008) (no necessity where declarant defendant testified); *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 908 (2d Cir. 1991) (evidence not most probative available where declarant was available to testify). This is

another reason why this case is quite unlike *Bryce*, in which the declarant was unable to testify. 208 F.3d at 351. Furthermore, Dawkins also testified, giving Code the opportunity to ask Dawkins whether Code had, in fact, made that prior statement to him, and Dawkins did provide testimony along those lines. (*See, e.g.*, Tr. 1294, 1302, 1425, 1441).

### c.      Any Error Was Harmless

Any error in excluding the disputed portion of the Call was harmless because the jury was still presented evidence—through other recorded calls and Dawkins' testimony—that Code had purportedly instructed Dawkins not to pay the coaches in Las Vegas. (*See, e.g.*, Tr. 1294 (Dawkins' testimony that Code had told him that Code was not "going to introduce [D'Angelo] to anybody who—no coach that would take money"), 1302, 1425, 1441; SA 45-48). This gave Code a factual basis to make the same arguments to the jury irrespective of the Call, which he in fact did. (Tr. 1824 ("Merl Code told [Sood] on a phone call after June 20 not to pay coaches.")). *See Zayac*, 765 F.3d at 119; *Gupta*, 747 F.3d at 135; *Netschi*, 511 F. App'x at 62.

Furthermore, there was overwhelming evidence of Code's guilt, including from Sood who explained that the crux of what Code wanted to do was not pay all coaches but to strategically pay coaches when it made the most sense. (*See, e.g.* Tr. 1111 (Code "said not to pay all coaches, just be strategic, coaches that could be helpful"); SA 60-61). This Court can thus conclude with

fair assurance that the jury's verdict was not substantially swayed by the exclusion of the disputed portion of the Call.

## POINT IV

### The District Court Did Not Abuse Its Discretion By Admitting Testimony About Witnesses' Understandings of Conversations In Which They Participated

The defendants argue that the District Court erred by allowing Blazer and Sood to testify to their understanding of statements made by the defendants in certain recorded conversations. (Br. 94). But Blazer and Sood personally participated in each of the conversations at issue and were thus uniquely positioned to provide helpful insight into the meanings of these conversations, which were often disjointed and contained jargon and short-hand references that made them otherwise difficult to follow. Judge Ramos did not abuse his discretion by admitting this testimony, and any error was harmless.

### A.  Relevant Facts

During trial, the Government introduced numerous audio and video recordings of conversations that Blazer and/or Sood (and others) had with Dawkins and/or Code. Many of these conversations involved several speakers and were disjointed or otherwise difficult to follow. Many of the conversations also included jargon, abbreviations, or references specific to basketball or the charged scheme. As such, the Gov-

78

ernment asked Blazer and Sood to explain certain aspects of these conversations, including what they meant when they said certain things, and what they understood other speakers, including the defendants, to have meant. Blazer and Sood were only asked such questions about conversations in which they personally participated.

Blazer's testimony began on April 23, 2019. (Tr. 173). During the first two days of his testimony, he was asked several questions of this nature, with the defense objecting in some instances but not others. (*See, e.g.*, Tr. 218-19 (objecting), 261 (not), 262 (objecting), 365 (not)). At the end of the day on April 24, the defense expressed an intent to object to such questioning going forward, and Code submitted a letter that evening setting forth his objection to any testimony regarding what Code "meant …, knew, believed, or intended at any point in time." (A. 343).

The next morning, on April 25, after hearing further argument, Judge Ramos ruled that the testimony given by Blazer thus far, and subsequent testimony of the same nature, was proper. Judge Ramos noted that Blazer had already offered testimony "concerning *his understanding of* various conversations." (Tr. 383 (emphasis added)). After reciting Rule 701, Judge Ramos explained:

> [H]ere, clearly, Mr. Blazer is testifying with respect to subjects that are rationally based on his perception. These are conversations in which he took part. And, as with any industry, the sports industry, the … collegiate athletic industry has

79

> particular terms and notions that are
> readily known to individuals that operate
> within that industry, perhaps not so well
> known to folks outside of that industry.
> And so it is appropriate for him to testify
> concerning particular concepts or words
> or phrases or individuals that are men-
> tioned in connection with the recorded
> conversations.

(Tr. 384). Judge Ramos further noted that, as the case
progressed and the jury learned more about the case,
it would be less necessary to elicit such explanations
from the witnesses. (Tr. 384).

Defense counsel further argued that Blazer should
not be permitted to testify as to what the defendants
meant or were thinking (as distinct from interpreting
specialized language). (Tr. 385). Judge Ramos stated
that he understood the distinction, and made clear
that "to the extent that a comment is simply ambigu-
ous, I think Mr. Blazer can be asked what was your
understanding of what that meant." (Tr. 385). As
Judge Ramos explained:

> [O]bviously these are individuals that are
> having a conversation. They seem to be
> understanding each other. There's an un-
> derstanding about what's being said and
> if it's ambiguous Mr. Blazer can be asked:
> What was your understanding? What
> was going on through your head as you
> responded to that comment?

(Tr. 385-86). Sood subsequently gave testimony of the same nature. After defense counsel objected, Judge Ramos found that Sood could also testify about his understanding of conversations in which he personally participated. (Tr. 830-31).

## B. Applicable Law

A lay witness may offer opinion testimony where such testimony is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

Under Rule 701(a), a rational perception is one involving first-hand knowledge or observation. *See United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992). This ensures that the jury is provided with "an accurate reproduction of the event at issue." *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005). Because "an insight into an event" is often "uniquely available to an eyewitness," the rule "recognizes the common sense behind the saying that, sometimes, 'you had to be there.'" *Id.* at 212.

Rule 701(b)'s helpfulness requirement protects against the admission of "opinions which would merely tell the jury what result to reach." *United States v. Campos Flores*, 945 F.3d 687, 706 (2d Cir. 2019). That is, an opinion is unlikely to be "helpful" if the jury is "in as good a position as the witness to draw the inference" provided by the opinion testimony. *Rea*, 958 F.2d at 1216. But lay witness testimony that gives the jury

81

an "accurate reproduction" of the events as observed by the witness and focuses on factors that the jury does not possess, such as "what the words and actions witnessed conveyed about the relative relationships of the participants," is admissible under Rule 701. *Garcia*, 413 F.3d at 214. And opinion testimony is "not inadmissible simply because it embraces an ultimate issue to be decided by the trier of fact." *Id.* at 210.

As noted, evidentiary rulings are reviewed for abuse of discretion, subject to harmless error review. *See* Part III.A. Where a party fails to make a timely objection to the admission of evidence, its admission is reviewed for plain error. *See* Fed. R. Evid. 103; *United States v. Jackson*, 345 F.3d 59, 64-65 (2d Cir. 2003). To establish plain error, the defendant must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010).

## C. Discussion

### 1. The District Court Did Not Abuse Its Discretion

Judge Ramos did not abuse his discretion by admitting testimony from Blazer and Sood about their understanding of conversations in which they personally participated. Their testimony was based on their rational perception, namely, their personal participation

82

in the conversations at issue, as well as their familiarity with the individuals involved in the conversations and their direct participation in the scheme. As Judge Ramos explained, the testimony was also helpful to the jury because many of the recorded conversations were filled with disjointed and, at times, unclear language, as well as terminology specific to the college athletics. (Tr. 383-84).

It is well settled that a witness to such a conversation may testify about his understanding of it. For example, in *United States v. Urlacher*, 979 F.2d 935, 939 (2d Cir. 1992), this Court affirmed the admission of a cooperating witness's testimony interpreting the defendant's comments during taped conversations because the witness, "as a participant in the conversations, had first hand knowledge of the conversations," and his testimony "was helpful to the jury's understanding of the often confusing and disjointed discussions on the tapes." *See also United States v. Bouterse*, 765 F. App'x 463, 468 (2d Cir. 2019); *United States v. Skelly*, 442 F.3d 94, 100 (2d Cir. 2006); *United States v. Salazar*, 112 F.3d 506 (Table) at *1 (2d Cir. 1997).

Furthermore, as Judge Ramos recognized, such testimony is not restricted to deciphering coded language. Where a proper foundation is laid, a lay witness may state his understanding of what another party to the conversation meant, even if that may suggest an "indirect … opinion about what [the defendant] knew." *United States v. Garcia*, 291 F.3d 127, 141 (2d Cir. 2002). For example, in *United States v. Ferguson*, 676 F.3d 260, 293-94 (2d Cir. 2011), this Court affirmed the admission of lay opinion testimony from two witnesses

83

about what they understood the defendant to mean by certain statements. While the statements were not "drug code," the witnesses were able to provide helpful context based on their personal perception of the statements, and the technical nature of some of the accounting terms involved. *Id.* at 294 & n. 42. Similarly, in *United States v. Flores*, 945 F.3d 687, 709-10 (2d Cir. 2019), this Court affirmed the admission of lay opinion testimony about what an agent understood the defendant to mean, where one statement was opaque and the other "might have had different meanings, depending on the speaker's tone, facial expression, or gestures." And this Court has explained that such lay opinion testimony is particularly appropriate where the "witness derives his opinion solely from insider perceptions of a conspiracy" because he can "share his perspective as to aspects of the scheme about which he has gained knowledge." *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008); *see also United States v. Kaziu*, 559 F. App'x 32, 38 (2d Cir. 2014).

The testimony permitted by Judge Ramos was consistent with the foregoing precedent. The testimony of Blazer and Sood was based on their personal participation in the conversations, as well as their experience with the defendants and insider involvement in the scheme, and was helpful to the jury, because of the disjointed nature of the conversations and the technical nature of some of the terms involved.

Dawkins and Code argue, as a general matter, that Blazer and Sood should not have been permitted to give such testimony because, they assert, "neither witness knew [Dawkins] well" and "neither witness knew

84

[Code] at all." (Br. 95). Thus, they were "no better equipped than the jury to interpret the meaning of other witness's [sic] statements." (Br. 96). Neither argument is persuasive.

Despite the defendants' suggestions to the contrary, Blazer and Sood had ample foundation for their testimony. As noted, in each instance the witnesses were testifying about conversations in which they personally participated. As Blazer explained, he was able to bring unique insight to bear on the meaning of certain statements during these conversations based not just on his review of a transcript or an audio recording, but based on "hearing and seeing everything that was going on in the room." (Tr. 510). This Court's precedents recognize the common sense proposition that "an insight into an event" is often "uniquely available to an eyewitness," because "sometimes, 'you had to be there.'" *Garcia*, 413 F.3d at 212. That is, even a recording cannot capture the atmosphere in a room, an individual's body language, or other subtle factors, as the defendants themselves argued in closing. (Tr. 1777-78 ("[T]ranscripts don't provide you with the context of the sarcasm and the laughter and the humor, what these guys are really thinking."). *See Flores*, 945 F.3d at 709.

Moreover, the basis for Blazer's and Sood's testimony was not only their participation in the conversations at issue. They had extensive dealings with the defendants and background familiarity with the subjects being discussed, based on their direct participation in the scheme.

85

By June 20, 2017, the date of two of the three conversations that the defendants specifically challenge on appeal (*see* Br. 100-06),[19] Blazer had known Dawkins for nearly two years (Tr. 208), and Sood had known Dawkins for well over a year (Tr. 264-65). More than a year earlier, in March 2016, Blazer, Sood and Dawkins had driven together from Atlanta, Georgia to Columbia, South Carolina and back, in order to meet with and bribe Evans. (Tr. 264-65). They subsequently communicated on numerous occasions by phone, email, and in person about their scheme to bribe college coaches. (*See, e.g.*, Tr. 324-28, 710-19, 721-26, 735-36, 779-95). While Blazer and Sood had not met Code in person before June 20, 2017, Dawkins had spoken with Sood about Code in advance of their meeting, telling Sood that Code "could make introductions to both coaches and players." (Tr. 828).[20]  And the June 20, 2017 meeting with Code was no mere passing encounter. It was a lengthy meeting, during which Code explained his prior work experience (Tr. 832), discussed the role companies like Adidas can play in recruiting players to certain universities (Tr. 390-93), gave Blazer and Sood advice about particular college

---

[19] The third was a conversation with Dawkins on December 31, 2015. (*See* Br. 105 (quoting A. 104-05)). By that time, Blazer had known Dawkins for approximately three months. (Tr. 208-09).

[20] Prior to the meeting, Blazer understood that Code "was an employee at Adidas" and "had tremendous connections with a lot of the college coaches and grass roots coaches." (Tr. 358).

86

coaches to bribe (Tr. 411-13), and accepted money from D'Angelo (Tr. 417).

That is not all. By the time Blazer and Sood testified in 2019 about their understanding of these prior conversations, they had each had extensive business dealings with Dawkins and/or Code. Dawkins and Blazer traveled to Las Vegas and met with nearly a dozen coaches together. (Tr. 418-20). Dawkins and Sood also met with coaches together in Arizona and California. (Tr. 874-88). Sood had multiple phone conversations with Dawkins and Code relating to the scheme. (SA 38-40, 89-94; Tr. 837-39, 852-53, 860, 868). Code and Sood also went into business together, resulting in additional interactions between them. (Tr. 937-39).

Moreover, as this Court has explained, lay opinion testimony is more likely to be helpful to the jury when based on "such factors as the defendant's history or job experience." *Rea*, 958 F.2d at 1216. Here, Blazer and Sood each brought to bear their experience in the relevant field and their extensive dealings with the defendants. *See Ferguson*, 676 F.3d at 294; *Yannotti*, 541 F.3d at 126. Blazer ran a business management firm that primarily serviced professional athletes. (Tr. 176). Blazer also had over a decade of experience in making illicit payments to college athletes to induce them to retain his services. (Tr. 176, 190-91). Sood ran the investment advisory arm of Blazer's firm, handling the accounts of several professional athletes. (Tr. 185-86, 255, 698-99). Blazer and Sood each had extensive discussions with Dawkins about college basketball generally, and their scheme to bribe coaches specifically.

(Tr. 268-300, 335-57, 772, 781-86, 789-94, 947; SA 273-74).[21] Thus, as Judge Ramos specifically found, it was helpful to the jury for a witness with such experience to testify about conversations that include particular terms and concepts unique to college athletics. (Tr. 384).

At bottom, the defendants' argument about how well Blazer and Sood knew them is a factual dispute, which bears on whether their testimony was rationally based on their perceptions. *See Rea*, 958 F.2d at 1216-17 (Rule 701's first precondition, that an opinion be based on witness's own perceptions, is "principally factual"). Judge Ramos, who was steeped in the intricacies of the trial and had heard all the recordings in question, found that this precondition was satisfied, observing that the individuals involved "seemed to be

---

[21] The defendants argue that Blazer and Sood had no experience with college basketball prior to their participation in the scheme. (Br. 99). But the relevant field need not be drawn that narrowly; their extensive experience in other areas of sports management was relevant. Moreover, as noted, Blazer and Sood gained extensive knowledge of college basketball *through* the scheme and from the defendants, which helped to inform their understanding of conversations about the subject, particularly because those conversations were with the very same defendants who provided them with such knowledge.

understanding each other." (Tr. 385; *see also* Tr. 831). That finding was not clearly erroneous.[22]

Dawkins and Code specifically object to three pieces of testimony. (Br. 100-06). Each was proper under the foregoing precedent and in light of the foregoing foundation.

*First*, the defendants object to testimony from Blazer, which they characterize as stating that "Code 'agreed' to work with LOYD and was paid for 'future services' on June 20, 2017." (Br. 100). On direct examination, after Blazer had described the June 20 meeting, Blazer was asked: "How did that meeting end?" (Tr. 365). He responded: "That meeting ended with the idea that Merl was – Merl was willing to work with us. Jeff, the undercover agent, gave Merl, I think, $2,000, and Merl agreed to set up some of the meetings with college coaches." (Tr. 365). Defense counsel did not object to this testimony (and, at this point, had not yet

---

[22] Moreover, it bears noting that the defendants were not shy about eliciting similar testimony from Blazer and Sood, as well as Dawkins when he testified. For example, defense counsel asked Sood to testify that Dawkins was joking in a particular call and to interpret Dawkins' statements on that call. (Tr. 1010-11; *see also* Tr. 1017-20 (similar)). Defense counsel did the same with Blazer. (*See, e.g.*, Tr. 608-09). And when Dawkins testified, he set forth his understanding of things that Sood, D'Angelo and Code had said. (*See, e.g.*, Tr. 1255 (Sood), 1290-91 (D'Angelo), 1294 (Code)).

filed their letter objecting to such testimony gener-
ally).[23]

This testimony was proper, and its admission was
certainly not an abuse of discretion or plain error.
Blazer was not asked about what Code knew, thought,
or intended, or even to interpret any particular state-
ment. He was asked "[h]ow did the meeting end?" Alt-
hough Blazer answered that Code "agreed to set up
some of the meetings with college coaches" (Tr. 365),
that was not improper speculation about the
knowledge or intent of another. It was simply a plain
language statement of Blazer's understanding of the
conclusion of the meeting, based on the inferences he
drew from the totality of the statements and actions of
the participants in the meeting. This is exactly the sort
of testimony contemplated by Rule 701. *See Garcia*,
413 F.3d at 211 (recognizing that "eyewitnesses some-
times find it difficult to describe the appearance or re-
lationship of persons, the atmosphere of a place, or the
value of an object by reference only to objective facts,

_____

[23] To the contrary, defense counsel repeatedly elic-
ited testimony on this subject during cross-examina-
tion, asking such questions as "whether or not Mr.
Code was paid for coming to the meeting or for some-
thing else entirely?" (Tr. 508) and "your testimony was
that your understanding was that $2,000 was for fu-
ture services" (Tr. 530). To the extent Blazer's subse-
quent answers on cross were improper—though they
were not—any error was invited. *See United States v.
Morales*, 474 F. App'x 30, 33 (2d Cir. 2012) (improper
opinion elicited on cross-examination is invited error).

90

the law permits such witnesses to testify to their personal perceptions in the form of inferences or conclusory opinions"). And where, as here, such testimony is given in response to a proper question and follows more particularized testimony about the basis for such an inference, it is not improper. *See Skelly*, 442 F.3d at 100.

*Second*, the defendants object to testimony from Sood, which they characterize as testimony that "Code 'knew' that UC-1 paid Emanuel Richardson $5,000." (Br. 103). During his direct testimony, Sood was first asked about his June 20 meeting with Richardson, at which D'Angelo paid Richardson $5,000. (Tr. 816, 826-27). Sood was then asked about the meeting with Code that followed shortly thereafter, for which Sood was also present. (Tr. 827-29). After a recording of the meeting was played, the following exchange occurred:

> Q: Mr. D'Angelo said, "I'm pretty sure he left happy, so …" and then Mr. Code responded, "He was happy." What did you understand that exchange to be referring to?

> A: That Emanuel Richardson – Jeff D'Angelo had given Emanuel Richardson $5,000 and that Code was aware of it and agreed.

(Tr. 832). Code objected to this testimony. (Tr. 830-31).

The admission of this testimony was proper and certainly not an abuse of discretion. Sood was asked about a cryptic exchange, in which D'Angelo and Code referred to Richardson by pronoun. Having personally

91

participated in the conversation (as well as the prior meeting), and thus experienced the "atmosphere" in the room and the tone and body language with which the statements were made, Sood was uniquely positioned to provide insight into whether Code's statement that "he was happy" evinced Code's knowledge and approval (or lack thereof) of what had transpired. *See Flores*, 945 F.3d at 709; *Garcia*, 413 F.3d at 211. Moreover, the basis for Sood's understanding need not have been limited to the things he knew and observed at the time Code made the statement; Sood had an extensive course of dealing with Code after he made the statement as part of their scheme, which informed Sood's understanding of whether Code had known about the Richardson payment.

*Third*, the defendants object to testimony from Blazer about his understanding of why Dawkins was paying Evans and handing those payments off to Blazer and Sood. (Br. 105). On direct, Blazer was asked about a recorded conversation between him and Dawkins on December 31, 2015. (Tr. 259). Blazer testified at length about the substance of that conversation, including that Blazer and Dawkins discussed having Blazer take over payments that Dawkins was making to Evans. (Tr. 259-61). Blazer was then asked about his understanding of why Dawkins had been paying Evans. (Tr. 261). Defense counsel did not object (and had not yet filed their letter generally objecting to lay opinion testimony). Blazer explained that he understood Dawkins to be paying Evans so that his players would be referred to Dawkins' agency. (Tr. 261). Blazer was then asked for his understanding of "why Dawkins was going to stop paying and was giving you

92

an opportunity to sort of pick up where he left off?" (Tr. 262). Defense counsel objected to "foundation," but did not provide further explanation. (Tr. 262). The objection was overruled, and Blazer answered: "My understanding was that [Dawkins] thought that it would be a good opportunity for me on the business end … to build a relationship with this coach so that, in addition to the coach sending players to him on the representation end as agent, that I would now have a relationship with the coach so he could send PJ Dozier and [other players] my way for business and financial advisory services." (Tr. 262).

The admission of this testimony was proper, and certainly not an abuse of discretion or plain error. Blazer was a party to a lengthy conversation, in which he and Dawkins discussed a corrupt agreement to bribe college coaches. He was not asked to interpret any particular word or statement specifically, but rather to testify, based on the totality of the conversation – as well as their extensive dealings with one another before and after that conversation – about the nature of their arrangement. This was helpful testimony from someone with unique insight into the transaction at issue. *See Ferguson*, 676 F.3d at 294; *Yannotti*, 541 F.3d at 126.

In sum, Judge Ramos did not abuse his substantial discretion by admitting such testimony generally. And the specific examples the defendants raise on appeal are no exception.

93

## 2. Any Error Was Harmless

Any error in admitting the challenged testimony was harmless. Notably, the Government's summation did not rely on any testimony in which Blazer or Sood described his understanding of what the defendants meant during these conversations. Instead, the Government focused on the recordings and argued the inferences available therefrom. (*See, e.g.*, Tr. 1695-96, 1697-98, 1700, 1703-04, 1707-08, 1711, 1712, 1727, 1750-51). *Compare Rea*, 958 F.2d at 1221 (improper lay opinion harmless where government did not rely on it in closing), *with United States v. Kaplan*, 490 F.3d 110, 123 (2d Cir. 2007) (improper lay opinion not harmless where government relied on it in opening, closing and rebuttal). Moreover, the defendants aggressively cross-examined Blazer about the foundation for his testimony. (*See, e.g.*, Tr. 509-11, 532-33). And when pressed, Blazer made clear that he was not purporting to opine on what the defendants meant by certain things, but only what he understood them to mean, stating "My understanding was my understanding. I cannot speak for someone else." (Tr. 593). There is thus no risk that the jury misunderstood the import of his testimony. In addition, given that the recordings were in evidence, the defendants had every opportunity to cross-examine the witnesses and argue to the jury that the statements in question did not in fact mean what the witnesses understood them to mean. This, coupled with the overwhelming evidence of the defendants' guilt and the jury's evident rejection of Dawkins' patently false testimony, makes clear that the challenged testimony did not substantially sway the jury's verdict.

94

## POINT V

## The District Court Properly Instructed the Jury

The defendants challenge several aspects of the jury instructions. (Br. 107-30). Each argument is meritless.

### A. Jury Instructions Generally

"A conviction will not be overturned for refusal to give a requested charge unless that requested instruction is legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge." *United States v. Holland*, 381 F.3d 80, 84 (2d Cir. 2005). The district court's determination that there was no foundation for a requested instruction is reviewed for abuse of discretion. *United States v. Hurtado*, 47 F.3d 577, 585 (2d Cir. 1995).

A party who has an objection to the charge given by the district court must "inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). " '[A] request for an instruction before the jury retires' does not preserve 'an objection to the instruction actually given by the court.' " *United States v. Crowley*, 318 F.3d 401, 412 (2d Cir. 2003) (quoting *Jones v. United States*, 527 U.S. 373, 388 (1999)). Where the defendant "failed to raise a specific objection to the omission of the necessary … language from the charge," this Court reviews the alleged failure for plain error. *Skelly*, 442 F.3d at 99.

95

## B. The District Court Properly Instructed the Jury Regarding Uncalled Witnesses

The defendants argue that the District Court erred by declining to give an "adverse inference" instruction regarding the Government's "failure to produce UC-1 during trial" (Br. 109), and that the instruction given regarding uncalled witnesses was erroneous (Br. 113). These arguments are meritless. D'Angelo was equally available to both parties, and the uncalled witness instruction given was consistent with this Court's precedent.

### 1. Relevant Facts

As described above, Judge Ramos precluded the defendants from eliciting certain inadmissible testimony from D'Angelo. Judge Ramos never precluded the defendants from calling D'Angelo about *any* subject, however. They remained free to call him for any proper purpose, but ultimately declined to do so. *See* Part III.D.1.

At the charge conference, defense counsel did not object to the District Court's proposal to give a standard instruction regarding "uncalled witnesses," but asked the District Court to also include an "adverse inference" instruction with regard to the fact that D'Angelo did not testify. (A. 251-52). After defense counsel claimed that they had "tried a number of times to compel the testimony of Mr. D'Angelo" and had "been unable to do so," the Government observed that D'Angelo was available to testify, but that the District Court had simply ruled that the testimony the defendants sought from him was inadmissible. (A. 251-52). The District

96

Court declined to include an "adverse inference" instruction. (A. 252). It thus instructed the jury:

> There are several persons whose names you may have heard during the course of the trial but did not appear to testify. I instruct you that each party has an equal opportunity, or lack of opportunity, to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way. You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witness or producing any testimony.

(Tr. 1661).

### 2. Applicable Law

A missing witness instruction "permits the jury to draw an adverse inference against a party failing to call a witness when the witness's testimony would be material and the witness is peculiarly within the control of that party." *United States v. Caccia*, 122 F.3d 136, 138 (2d Cir. 1997). The assessment of whether a witness is peculiarly within a party's control "depend[s] … on all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility." *United States v. Rollins*, 487 F.2d 409, 412 (2d Cir. 1973).

97

This Court affords district judges "considerable discretion" in deciding whether to give a missing witness instruction, *United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004), and reviews a refusal to do so for abuse of discretion and actual prejudice, *see United States v. Ebbers*, 458 F.3d 110, 124 (2d Cir. 2006). The failure to give such an instruction "rarely warrants reversal." *United States v. Adeniji*, 31 F.3d 58, 65 (2d Cir. 1994).

### 3. Discussion

The defendants first argue that they were entitled to an "adverse inference" instruction based on the Government's decision not to call D'Angelo as a witness. (Br. 108). This argument fails for two related reasons.

*First*, a so-called "missing witness" instruction is appropriate only where the witness in question is peculiarly in the control of one party. Here, D'Angelo was available to be called by the defendants as a witness, as the Government repeatedly made clear. (Tr. 243, 899, 905). Of course, the Government objected to the defendants eliciting inadmissible testimony from D'Angelo, and successfully moved to preclude questioning about certain subjects. *See* Part III.D. But the District Court's evidentiary rulings did not make him unavailable to give any *proper* testimony. Because the Government "expressly offered" to make D'Angelo available as a defense witness, but the defendants chose not to call him, he was equally available to both sides. *See United States v. Nichols*, 912 F.2d 598, 602 (2d Cir. 1990) (no missing witness instruction required where government expressly offered to make law enforcement witnesses available as defense witnesses);

98

*see also Caccia*, 122 F.3d at 137 (informant who was available for subpoena by either side but refused to be interviewed by the defendant was "not so peculiarly within the Government's control as to require" a missing witness instruction); *United States v. Pierce*, 785 F.3d 832, 843 (2d Cir. 2015) (same for cooperating witness to whom defendant could have issued a subpoena).[24]

*Second*, a missing witness charge is appropriate only where "the witness's testimony would be material." *Caccia*, 122 F.3d at 138; *see also United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988). As Judge Ramos correctly held, the testimony the defendants sought to elicit from D'Angelo was inadmissible. D'Angelo's presence at trial simply was not necessary, as all of the relevant conversations were recorded, there was no dispute about the authenticity of the recordings, and any testimony D'Angelo gave about the meetings in question would have been cumulative of Blazer's and Sood's testimony. *See Torres*, 845 F.2d at 1169 ("No instruction is necessary where the unpresented testimony would be merely cumulative."). Thus, even

---

[24] Indeed, the failure of the defense to call D'Angelo, despite their repeated and shifting arguments about why they wished to do so, as well as their subsequent push for a missing witness instruction, indicates that their stated intent to call D'Angelo was mere gamesmanship. *See Gaskin*, 364 F.3d at 463 (noting "aura of gamesmanship" that "frequently accompanies requests for missing witness charges"); *Torres*, 845 F.2d at 1170.

99

if D'Angelo were deemed to be peculiarly within the Government's control, a missing witness instruction still would be unwarranted. Judge Ramos did not abuse his discretion by declining to give the instruction under these circumstances.

The defendants next argue that the "uncalled witnesses" instruction given "misstated the facts and the law." (Br. 113). They are wrong on both counts.

Judge Ramos' instruction accurately stated the facts. He told the jury that "each party had an equal opportunity, or lack of opportunity, to call any of these witnesses." (Tr. 1661). That was true. D'Angelo was available to testify. (Tr. 243, 899, 905). That the defendants only sought to elicit inadmissible testimony from D'Angelo does not mean they did not have an equal opportunity to call him as a witness.

Judge Ramos' instructions accurately stated the law. The district court has discretion to "(1) give no instruction and leave the entire subject to summations, (2) instruct the jury that no unfavorable inference may be drawn against either side, or (3) instruct the jury that an adverse inference may be drawn against either or both sides." *Caccia*, 122 F.3d at 139. Judge Ramos appropriately chose the second option. *See United States v. Bahna*, 68 F.3d 19, 22 (2d Cir. 1995) (approving this option); *see also Caccia*, 122 F.3d at 139 (suggesting that the third option may be inappropriate). This was not an abuse of discretion.

Finally, any error with respect to the missing or uncalled witness charge was harmless. All of D'Angelo's interactions with the defendants were recorded, and

100

therefore "the absence of [his] testimonial recollection of these conversations could not have prejudiced the defendant." *Caccia*, 122 F.3d at 139. Furthermore, the defendants were permitted to comment extensively in summations on the Government's failure to call D'Angelo and to argue that the jury should draw a negative inference against the government. (Tr. 1768, 1809, 1819-20, 1834).[25] *See Torres*, 845 F.2d at 1170-71 (no reversible error in failure to give missing witness instruction where "the judge permitted defense counsel to argue the inference themselves in summation").

## C. The Instruction Regarding False Exculpatory Statements Was Not Erroneous

With respect to "false exculpatory" statements, Judge Ramos instructed the jury:

> You have heard testimony that a defendant made a statement in which he claimed that his conduct was consistent with innocence and not with guilt. The government claims that these statements in which the defendant attempted to exculpate himself are false. If you find that the defendant gave a false statement in order to divert suspicion from himself, you may infer that the defendant believed that he was guilty. You may not,

_____

[25] Judge Ramos sustained an objection to just two of numerous such arguments, but did not order the arguments stricken. (Tr. 1772, 1842).

101

however, infer on the basis of this alone that the defendant is, in fact, guilty of the crimes for which he is charged. Whether or not the evidence as to a defendant's statements shows that the defendant believed that he was guilty, and the significance, if any, to be attached to any such evidence, are matters for you, the jury, to decide.

(Tr. 1672). At the charge conference, the defendants stated that they "would object to the false exculpatory statements instruction," but they offered no basis for the objection and no specific exception to its language. (Tr. 1397).

On appeal, the defendants argue that the instruction improperly insinuates that Dawkins' testimony was false (Br. 118-20) and that the instruction was not supported by an adequate factual predicate (Br. 121-22). Neither argument is preserved. *See* Fed. R. Crim. P. 30(d); *Skelly*, 442 F.3d at 99; *United States v. Biaggi*, 909 F.2d 662, 697 (2d Cir. 1990). And neither has merit under any standard of review.

*First*, the instruction given by Judge Ramos did not in fact refer to Dawkins' testimony, either directly or indirectly. To the contrary, the plain wording of the charge was directed at pretrial statements. It began: "You have heard testimony that a defendant made a statement in which he claimed that his conduct was consistent with innocence and not with guilt." (Tr. 1672). "[T]estimony that a defendant made a statement" plainly refers to testimony about a *prior* statement. It would be a strange circumlocution to use such

102

language to describe the defendant's statements during his testimony, particularly when one defendant testified but the other did not. The instruction continued: "The government claims that *these statements* in which the defendant attempted to exculpate himself are false." (Tr. 1672 (emphasis added)). By referring to the statements, not the testimony, the instruction again referred to prior statements. It continued: "If you find that the defendant gave a false statement in order to divert suspicion from himself, you may infer that the defendant believed that he was guilty." (Tr. 1672). Statements made to "divert suspicion" plainly refer to pretrial statements, not to statements a defendant makes after he is already charged and standing trial. The defendants are thus incorrect to claim that the District Court "directed the jury's attention to [Dawkins'] trial testimony and suggested that it was false, or at least contained false claims of innocence." (Br. 119).[26]

———————

[26] Even in *United States v. Clark*, 45 F.3d 1247, 1251 (8th Cir. 1995), where the court expressed concern that the false exculpatory instruction was not clearly limited to pretrial statements, the court found any error to be harmless, in light of the instruction that the defendant's trial testimony should be judged in the same fashion as that of other witnesses. Judge Ramos gave that instruction here, too (Tr. 1661), as well as the instruction that the jury may not infer guilt based on a false exculpatory alone (Tr. 1672). *See United States v. Scheibel*, 870 F.2d 818, 822 (2d Cir.

103

*Second*, there was ample factual predicate for the charge. The defendants argue that the Government cited Dawkins' testimony as the sole predicate. (Br. 122). This argument misreads the Government's position below. Referring to the false exculpatory charge, the Government argued: "I think that became necessary, clearly, through Mr. Dawkins' testimony." (A. 253). That statement referred to the fact that Dawkins had testified *about* numerous pretrial statements that could be considered false exculpatories and the defense had offered exhibits including such statements through Dawkins' testimony. For example, he testified about a statement Code made to him on a recorded call that "We're just gonna take these fools' money," which Dawkins interpreted to be a statement "[t]hat we weren't going to introduce [D'Angelo] to anybody who – no coach that would take money." (Tr. 1294). Similarly, the defense introduced a recorded conversation, and Dawkins then testified that his statement to D'Angelo on the call that "I don't want you to go down that path" was him telling D'Angelo not to pay coaches. (Tr. 1277-78). It was not error – plain or otherwise – for Judge Ramos to give this instruction.

_____

1989). Thus, even if the instructions were not sufficiently clear – though they were – any error was harmless, and certainly not plain.

### D. The District Court Properly Declined to Give A "Multiple Conspiracy" Instruction

#### 1. Relevant Facts

Code asked the District Court to include a "multiple conspiracy" instruction, arguing that the evidence at trial showed there were "a number of different actors, all of whom seem to have separate agreements." (A. 254). In particular, Code requested that the instructions make clear that "it's only the agreement to commit the crimes as set forth in the indictment to form the basis of the conspiracy charge," and emphasized that the jury "needs to understand that the government must prove the precise agreement that's set forth in the indictment." (A. 255).

The District Court denied the defendants' request for a multiple conspiracy instruction, finding:

> I don't think that the facts, as I understand them, warrant the multiple conspiracy instruction. Certainly there are conversations between various coconspirators, discussing whether it would be smart to pursue certain goals and how to pursue those goals. But, generally speaking, the conspiracy that's alleged in the indictment is what has come out here.

(A. 256).

During his instructions, Judge Ramos repeatedly emphasized, as Code had requested, that the Government had to prove the specific agreement charged in Count One. He explained that the conspiracy charged

105

was "to give and offer bribes and gratuities to … certain men's college basketball coaches." (Tr. 1602; *see also* Tr. 1615). Explaining the elements of conspiracy, he repeatedly referred to "the conspiracy charged." (Tr. 1617-18, 1620, 1622). He defined the unlawful object of the conspiracy as "paying bribes and illegal gratuities to men's college basketball coaches." (Tr. 1618; *see also* Tr. 1621). And he read the specific overt acts alleged in Count One, each of which of course related to the charged conspiracy. (Tr. 1623-25).

## 2.  Applicable Law

Although a "defendant is entitled, upon proper request, to an instruction submitting to the jury any defense theory for which there is a foundation in the evidence," *United States v. Bryser*, 954 F.2d 79, 87 (2d Cir. 1992), "if only one conspiracy has been alleged and proved the defendants are not entitled to a multiple conspiracy charge," *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990). "[I]n order to secure a reversal for a failure to give a requested multiple-conspiracy charge, a defendant must show both that there was evidence of separate networks operating independently of each other and that he suffered substantial prejudice resulting from the failure to give the requested charge." *Id.* at 962-63; *see also United States v. Cusimano*, 123 F.3d 83, 89 (2d Cir. 1997) (to establish prejudice, defendant must show that "the evidence in support of the conspiracy or conspiracies in which he did not participate prejudiced the case against him with respect to the conspiracy to which he was a party").

106

"A refusal to give a multiple conspiracy charge does not prejudice [a] defendant where there was ample proof before the jury for it to find beyond a reasonable doubt that [the] defendant was a member of the conspiracy charged in the indictment." *United States v. Vazquez*, 113 F.3d 383, 386 (2d Cir. 1997); *see also United States v. Restrepo*, 547 F. App'x 34, 40 (2d Cir. 2013) (instructions adequate where they stress that jury must find defendant guilty of the single conspiracy charged).

To prove a single conspiracy, the Government need show only that the defendant "agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000). "A single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations." *United States v. Williams*, 205 F.3d 23, 33 (2d Cir. 2000). Co-conspirators need not have agreed on all the details of the conspiracy, so long as they agreed on "the essential nature of the plan," nor must the goals of all the participants be "congruent …, so long as their goals are not at cross-purposes." *Maldonado-Rivera*, 922 F.2d at 963.

### 3. Discussion

The District Court did not abuse its discretion when it found no basis for a multiple conspiracy charge. *See Hurtado*, 47 F.3d at 585. Nor can the defendants show substantial prejudice, as there was ample proof that they were members of the charged conspiracy and the instructions repeatedly emphasized

107

that the jury could only find guilt based on the charged conspiracy. *See Vazquez*, 113 F.3d at 386; *Restrepo*, 547 F. App'x at 40.

The defendants argue that there was evidence of "many different agreements" that warranted a multiple conspiracy charge. (Br. 125). But the District Court considered and correctly rejected this argument below. (A. 254-56). None of the supposed different agreements renders that finding an abuse of discretion.

First, the defendants argue that the Government "needlessly injected claims that related to *United States v. Gatto*" and that the jury may have convicted them for this agreement instead of the one charged. (Br. 125-26).[27] But the evidence regarding *Gatto* was only introduced in the defense case when Dawkins chose to testify, and it was made clear that Dawkins had already been convicted in that separate case and was appealing. (Tr. 1232-34). The Government likewise referred to this conduct as "an entirely separate scheme" in its summation. (Tr. 1693). Moreover, there was never any suggestion in this trial that the jury could convict the defendants for the conduct at issue in *Gatto* – paying players or their families, as opposed to

---

[27] In *Gatto*, Dawkins and Code were separately tried and convicted of wire fraud conspiracy and wire fraud in connection with a separate scheme to pay the families of high school basketball players so they would attend and obtain college athletic scholarships from Adidas-sponsored universities under false pretenses. *See United States v. Gatto*, 17 Cr. 686 (LAK).

108

coaches. (*See, e.g.*, Tr. 1824). To the contrary, one of the primary defenses, to which Dawkins testified and which the defendants argued in summations, was that they had no problem paying players or their families in order to obtain their business, but believed paying bribes to coaches was an "idiotic" business model. (*See, e.g.*, Tr. 1248, 1340, 1462, 1788).

Second, the defendants contend that the evidence regarding Blazer and Sood paying Evans, which occurred before they had met Code, was a separate conspiracy. (Br. 126). But that was part of the charged conspiracy, as Judge Ramos correctly found. (A. 254, 256). Indeed, the meeting at which that arrangement was made was an overt act alleged in the Indictment. (SA 18; Tr. 1623). The evidence at trial showed that Dawkins had introduced Sood and Blazer to Evans for the purpose of bribing Evans, and Dawkins admitted in a tape recorded conversation that he had paid Evans even before then. (Tr. 268-89; SA 101, 107, 122-23, 129). Code also stated in a recorded call that he was aware that Dawkins had paid Evans in the past so that Evans would steer one of his players to Dawkins. (SA 39). Thus not only was there ample evidence that Dawkins had been involved in this aspect of the conspiracy himself, but there was also ample evidence that Code was aware of these prior activities at the time he chose to join the ongoing conspiracy. The mere fact that bribes were paid before Code joined the conspiracy does not transform a single conspiracy into multiple conspiracies. *See Williams*, 205 F.3d at 33; *Vasquez*, 113 F.3d at 387.

109

Third, the defendants observe that Sood and Code had an agreement "regarding current NBA players." (Br. 126). But the testimony was clear that this was a separate referral agreement relating to professional basketball players (Tr. 938-39; SA 272), and thus had nothing to do with the charged conspiracy to bribe college basketball coaches. Moreover, there was no evidence or argument that this separate agreement was a *criminal* agreement.

Finally, the defendants contend that Dawkins' testimony that he had agreed with certain coaches to "hustle D'Angelo out of the Vegas 'bribe' money" and Dawkins' and Code's purported agreement that they were going to "take these fools money," *i.e.*, hustle D'Angelo, warranted a multiple conspiracy charge. (Br. 126). But these purported agreements were introduced by the defendants as their defense to the charged conspiracy. There was no suggestion from the evidence, the testimony, the jury instructions, or the parties' summations that if the jury found that Dawkins and Code had agreed to steal D'Angelo's money this would constitute grounds for conviction. The jury was told the opposite during the summations. (*See, e.g.*, Tr. 1765, 1769, 1782-84, 1794, 1799).

In sum, the purpose of the multiple conspiracy charge is to prevent the "spill over effect of permitting testimony regarding one conspiracy to prejudice the mind of the jury against the defendant who is not part of that conspiracy but another." *Restrepo*, 547 F. App'x at 40. Here, there was no risk of such prejudice, particularly given that the District Court specifically instructed the jury regarding the nature of the charged

110

conspiracy and emphasized that the jury could only convict based on the charged conspiracy. (Tr. 1602, 1615-25).

### E. The District Court Properly Instructed the Jury on Conscious Avoidance

#### 1. Relevant Facts

At trial, the Government sought the inclusion of a conscious avoidance charge, based in part on Code's statements during a recorded conversation, described below. (Tr. 1386-87). Despite acknowledging the conversation identified by the Government, Code objected to the charge. (Tr. 1387). The District Court ultimately instructed the jury on conscious avoidance, the language of which instruction Code does not contest on appeal. (Tr. 1654-55).[28]

#### 2. Applicable Law

A conscious avoidance charge is proper where the defendant has asserted "the lack of some specific aspect of knowledge required for conviction" and there is "an appropriate factual predicate for the charge, *i.e.*, the evidence is such that a rational juror may reach

─────────────

[28] As the defendants' joint brief acknowledges, the conscious avoidance charge was directed at Code's knowledge. (Br. 127). Dawkins does not appear to challenge this instruction on appeal—nor could he, given that the Government only argued conscious avoidance with respect to Code. (Tr. 1755).

111

the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Fofanah*, 765 F.3d 141, 144 (2d Cir. 2014).

Where, as here, the defendant challenges the factual predicate for a conscious avoidance instruction, the claim "is little more than a challenge to the sufficiency of the evidence to support a conscious avoidance conviction." *United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003). The defendant therefore bears the "heavy burden" of a sufficiency challenge, wherein this Court "review[s] all the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *Id.*

Any error in giving a conscious avoidance instruction is harmless "if the jury was charged on actual knowledge and there was overwhelming evidence to support a finding that the defendant instead possessed *actual* knowledge of the fact at issue." *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000).

## 3. Discussion

Code argues on appeal that there was no factual predicate for the conscious avoidance charge because there was no evidence that he "engaged in affirmative conduct to avoid acquiring knowledge about a certain fact or circumstance." (Br. 129).[29] He is wrong. There

--------

[29] Code is incorrect that "affirmative conduct" is required by this Court's precedent. *See Fofanah*, 765

112

was ample evidence supporting the conscious avoidance instruction.

Most notably, after the June 20, 2017 meeting at which Richardson received a $5,000 bribe, Code and Dawkins spoke by phone. During this call, Dawkins told Code that he believed Richardson had received $5,000 at the meeting. (SA 42). Code then told Dawkins that although he had spoken to Richardson immediately after the meeting, Code had affirmatively avoided asking Richardson if he had received money at the meeting, despite Code's suspicion that he had. Specifically, Code stated: "[W]e didn't discuss numbers, because I'm not even sure if he wanted me to know…. But he would have told me if I'd have asked, but I didn't ask." (SA 42-43).

That call makes clear that Code was aware of a high probability that Richardson had been paid, but specifically declined to ask a question – which he believed Richardson would have answered – about that fact. Put differently, he "*decided* not to learn the key fact," *Aina-Marshall*, 336 F.3d at 171, or "intentionally avoided confirming the fact," *Ferrarini*, 219 F.3d at 154. Based on this evidence alone, there was a sufficient factual predicate for the charge.

---

F.3d at 149-51 (Leval, J., concurring); *United States v. Dambelly*, 714 F. App'x 87, 88-89 (2d Cir. 2018). But the Government met even that elevated requirement here.

113

But there was more. The Government presented evidence that Code had taken steps to conceal his actions and the payments themselves, and that Code was aware of red flags. *See Ferguson*, 676 F.3d at 278 ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance."). For example, on the same day Richardson was paid, Code received a cash payment from D'Angelo for his role in facilitating the meetings with the coaches the group planned to bribe. (Tr. 417). Code also raised concerns with Dawkins about dealing with D'Angelo and Bailey, stating that he and Dawkins needed to "protect ourselves man," that they needed to be "extra cautious" and that Dawkins' new business partners "aint cutting me no checks for shit. They gonna pay you and you gonna pay me." (SA 67-68). Code's statements demonstrated that he was aware he was not involved in a legitimate business transaction, and thus did not want to be paid in any form that was traceable.

Code also contends that it is improper to proceed on alternative theories of actual knowledge and conscious avoidance. (Br. 128 (citing *Ferrarini*, 219 F.3d at 157)). That is not correct, as this Court has explained:

> Although we noted in *Ferrarini* that evidence sufficient to find actual knowledge does not necessarily establish a factual predicate for conscious avoidance, 219 F.3d at 157, we have held that a conscious avoidance charge is "not inappropriate merely because the Government has primarily attempted to prove that the defendant had actual knowledge, while

114

urging in the alternative that if the de-
fendant lacked such knowledge it was
only because he had studiously sought to
avoid knowing what was plain," *United
States v. Hopkins*, 53 F.3d 533, 542 (2d
Cir. 1995). So long as the Government
can establish a factual predicate for con-
scious avoidance, it is free to argue alter-
native theories of conscious avoidance
and actual knowledge.

*United States v. Kaplan*, 490 F.3d 110, 128 n.7 (2d Cir.
2007); *see also Fofanah*, 765 F.3d at 150-54 (Leval, J.,
concurring). Here, there was a factual predicate for the
conscious avoidance charge, and the Government ap-
propriately argued in the alternative. (Tr. 1755-56).[30]

----

[30] Code suggests that the Government's summa-
tion incorrectly described the law. (Br. 129-30). He is
wrong. The relevant passage began by quoting sub-
stantially verbatim from the District Court's instruc-
tions, the accuracy of which is not challenged on ap-
peal. (*Compare* Tr. 1654-55, *with* Tr. 1755). The Gov-
ernment then argued that, based on all the suspicious
facts of which he was aware, Code "would have had to
deliberately close his eyes to what otherwise would
have been obvious" to avoid knowledge of the bribes.
(Tr. 1755-56). That is consistent with this Court's prec-
edent. *See, e.g.*, *United States v. Goffer*, 721 F.3d 113,
128 & n.11 (2d Cir. 2013). In any event, even if the
Government's statement was imprecise – though it
was not – any such error was harmless. The Govern-

Finally, any error in giving the conscious avoidance instruction was harmless in light of the overwhelming evidence of Code's actual knowledge. *See Ferrarini*, 219 F.3d at 154. Contrary to Code's claim, that evidence did not consist solely of "Code's comment that 'Book' Richardson was 'happy.'" (Br. 130). That was certainly strong evidence of his actual knowledge. But there was far more.

Code was captured during a recorded conversation stating that he knew Dawkins had previously given Evans money so that Evans would steer a particular student athlete to Dawkins. (SA 39). Dawkins told Code that he believed Richardson had received $5,000 at the meeting. (SA 42). At the June 20, 2017 meeting, Code and the group spoke openly about paying bribes to college basketball coaches, with Code listing programs whose coaches would be willing to accept bribes, but warning that they would be "nervous". (SA 227-28, 237-43). Code made other statements in advance of the Las Vegas meetings demonstrating he understood the plan was to make bribe payments to college basketball coaches, and that he wanted them to do it strategically. (SA 60-61). And Sood similarly testified that Code had sought to be strategic as to which coaches to

---

ment explicitly referred the jury to Judge Ramos' instructions (Tr. 1755), which were provided to the jury (Tr. 1598), and Judge Ramos instructed the jury that if any attorney had stated the law differently, his instructions were controlling (Tr. 1599).

116

pay. (Tr. 1111). Thus, any error in giving this instruction was harmless.

## CONCLUSION

**The judgments of conviction should be affirmed.**

Dated:     New York, New York
           May 19, 2020

Respectfully submitted,

GEOFFREY S. BERMAN,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*

ROBERT L. BOONE,
ELI J. MARK,
NOAH D. SOLOWIEJCZYK,
THOMAS MCKAY,
  *Assistant United States Attorneys,*
    *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 27,817 words in this brief.

GEOFFREY S. BERMAN,
*United States Attorney for the*
*Southern District of New York*

By: THOMAS MCKAY,
*Assistant United States Attorney*