# 19-3643(L)

**19-3623(CON)**

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket Nos. 19-3643(L), 19-3623(CON)

◀▸▸▸▸▶

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

MERL CODE, CHRISTIAN DAWKINS,

*Defendants-Appellants,*

LAMONT EVANS, EMANUEL RICHARDSON,
also known as Book, ANTHONY BLAND, also known as Tony,

*Defendants.*

───────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

───────────

**SUPPLEMENTAL APPENDIX
VOLUME II OF II
(Pages SA-161 to SA-344)
[REDACTED]**

───────────

GEOFFREY S. BERMAN,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

**TABLE OF CONTENTS**

PAGE

Superseding Indictment S1 17 Cr. 684 (ER) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-1

Opinion & Order Dated April 21, 2019 [Sealed] . . . . . . . . . . . . . . . . . . . . . . . . SA-32

Letter Motion Dated April 28, 2019 [Sealed] . . . . . . . . . . . . . . . . . . . . . . . . . SA-35

GX-23T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-38

GX-103T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-41

GX-109T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-44

GX-113T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-54

GX-116T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-59

GX-122T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-65

GX-144T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-70

GX-201T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-78

GX-203T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-84

GX-301T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-89

GX-501AT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-95

GX-501CT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-103

GX-501DT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-119

GX-501ET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-128

GX-506DT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-131

GX-506FT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-135

GX-508AT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-139

PAGE

GX-509B1T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-161

GX-509B2T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-190

GX-509B3T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-199

GX-510A1T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-201

GX-510A2T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-217

GX-510B2T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-231

GX-518AT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-245

GX-521AT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-248

GX-523T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-258

GX-524T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-264

GX-641. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-272

GX-655. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-273

GX-702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-275

GX-706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-276

GX-904. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-287

GX-1001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-289

GX-1004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-291

GX-1006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-300

Excerpt of GX-1101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-302

GX-1103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-310

GX-1104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-316

GX-1105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-321

PAGE

GX-1106. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-322

GX-1203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-323

GX-1206. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-325

GX-1207. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-338

GX-1901. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-340

Excerpt of Dawkins Sentencing Transcript (Oct. 3, 2019) . . . . . . . . . . . . . . . . SA-342

**SA-161**

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3
     ----------------------------x
 4                                :
     UNITED STATES OF AMERICA     :
 5                                :
     v.                           :      S1 17 Cr. 684 (ER)
 6                                :
     CHRISTIAN DAWKINS and        :
 7   MERL CODE,                   :
                                  :
 8            Defendants.         :
                                  :
 9   ----------------------------X

10

11

12

13

14                    Recorded Conversation

15

16

17
                      Date:  June 20, 2017
18                    Time:  10:07 a.m.
                      Participants:  Jill Bailey
19                                   Jeff D'Angelo
                                     Munish Sood
20                                   Christian Dawkins
                                     Emmanuel "Book" Richardson
21

22

23
                      (U/I) - UNINTELLIGIBLE
24                    (PH)  - PHONETIC SPELLING

25
```

GOVERNMENT
EXHIBIT
509B1T
S1 17 Cr. 684 (ER)

```
                                                                      1
 1   SOOD:          (U/I) met Coach and we were talking to

 2                  Laurie (PH) at that time.  So, we built --

 3                  you know, we started talking.  We stayed in

 4                  touch and then I -- you know, he's aware --

 5                  obviously he's very close to Christian.

 6                  They have a great relationship.

 7   D'ANGELO:      Yeah, Christian was telling me.

 8   SOOD:          And then I -- we filled him in on what this

 9                  new paradigm is, this new thing we're

10                  building collectively under Loyd Management.

11                  Christian, Jeff's part of it.  He helped

12                  fund it.  And really, we started three weeks

13                  ago?  Something like that, right?

14   D'ANGELO:      Yeah.  (U/I).

15   SOOD:          And part of our model is to focus on working

16                  with coaches at the college level.  We think

17                  and we believe that -- that's the best way

18                  to build long-term relationships with

19                  athletes.  We like basketball.  That's our

20                  primary focus.  And when we sat down with

21                  Christian, we said who's your top two, three

22                  guys that he'd wanted us to start kind of

23                  building and growing with.  And guess who

24                  was first?

25   RICHARDSON:    Yeah.
```

```
 1   SOOD:          So, that's what's bringing us here together.

 2                  Jeff, you wanna add -- you guys wanna add,

 3                  feel free.  If not, you know, we're just

 4                  talking.  There's no -- there's no specific

 5                  agenda.  But the goal is to get you to a

 6                  place where you're comfortable with us like

 7                  you are with Christian.

 8   RICHARDSON:    Gotcha.

 9   SOOD:          And how we can help you continue to recruit,

10                  whether it's for Arizona, or I know -- I

11                  also know that you have a relationship with

12                  these kids.  Whether they end up in Arizona,

13                  sometimes -- sometimes they don't.

14   RICHARDSON:    Yeah.

15   SOOD:          But you work with them and their families.

16                  We wanna be part of it.

17   RICHARDSON:    Gotcha.

18   SOOD:          How we can help.  Let us know.

19   RICHARDSON:    Gotcha.

20   D'ANGELO:      Yeah, so we -- so, we essentially funded

21                  Christian.  Funded his -- we funded him for,

22                  you know, the foreseeable future.  But he --

23                  I guess it was kind of mutual.  You know, we

24                  kind of reached out to him, he reached out

25                  to us.  And the same model is just kind of
```

1           what Munish was saying, you know, our angle,

2           really, is looking at getting the kids that

3           we can sign with us long-term.  Projected

4           professional players.  You know, obviously,

5           you can identify talent very early.  You

6           know, you guys are with the kids all the

7           time.  You know, you spend more time with

8           them probably than anyone.  At certain --

9           I'm sure at a certain point in time, you

10          guys must take over as more of their -- that

11          you're the voice that they're hearing all

12          the time.  So, anything that we can do to

13          assist that resource-wise, help you out, you

14          know.  Like I said, part of funding

15          Christian is also funding, you know,

16          whatever.  Like coaches that, you know, want

17          to direct players to our firm.  I just spoke

18          to Christian on the phone about -- you know,

19          just kind of being very direct.  And that's

20          kind of what -- that's kind of what we're

21          looking to do.  So, ideally, we'd just like

22          to get a feel for if you're comfortable,

23          just kind of -- you go over who you got

24          coming out now, but then I know Christian

25          was saying you already got, I think, the

```
 1                  number one project --
 2  RICHARDSON:     (U/I).
 3  D'ANGELO:       -- yeah, you got him already lined up for
 4                  next year.  And you just -- who do you think
 5                  you have next year and in future years that
 6                  will be okay with this system, you know?
 7                  And that we have to, you know, just kind of
 8                  take care of them, you know, and then just
 9                  kind of get them to come sign with us at the
10                  end of the day.  Obviously, look, we
11                  understand there's a risk.  Nothing's
12                  guaranteed, but I think this model with
13                  funding Christian's business and then also
14                  having a separate funding stream to assist
15                  the coaches in the recruitment process to
16                  get kids to sign with us I think is a good
17                  way to kinda invest your money.  Have a
18                  little insurance on the players.  And look,
19                  we don't get every one, so be it.  But I
20                  think we'll get more than we lose, and I
21                  think at the end of the day we'll be up
22                  versus down.
23  SOOD:           And I think Coach, the other thing is, you
24                  know Christian.  I think you know me a
25                  little bit.  Part of this is to also help
```

**SA-166**

5

| | | |
|---|---|---|
| 1 | | these kids.  Do right by them, right? |
| 2 | | Because -- |
| 3 | RICHARDSON: | It's what we talked about. |
| 4 | SOOD: | Right, what we talked about.  We're gonna do |
| 5 | | right by them through our process.  All the |
| 6 | | money in the world is not gonna make it work |
| 7 | | because once a kid is disappointed, you're |
| 8 | | gonna hear about it and you know, you're not |
| 9 | | gonna risk your reputation for more than one |
| 10 | | kid if it doesn't work.  So, good news here |
| 11 | | is, this team, we're all on the same page. |
| 12 | | Our goal is, one, to build a business where |
| 13 | | the kids and their parents are happy.  And |
| 14 | | we're maximizing what they want.  And I do |
| 15 | | believe Christian now, with some leadership |
| 16 | | from us, you know, we'll keep him grounded, |
| 17 | | we'll keep him focused, and -- |
| 18 | RICHARDSON: | He needs it. |
| 19 | SOOD: | -- and he is a hustler. |
| 20 | RICHARDSON: | He works. |
| 21 | SOOD: | I mean that kid is --- I say kid 'cause he's |
| 22 | | still a kid. |
| 23 | RICHARDSON: | He is. |
| 24 | SOOD: | He is a hustler, I mean he's nonstop.  So, |
| 25 | | we wanna -- we want him to do that.  And let |

```
                                                                6
 1                        us worry about running the business.  And as
 2                        Jeff said, if we need to be somewhere, we'll
 3                        be there.  Part of the strategy is also for
 4                        Jeff, Joe (PH), whoever else we want,
 5                        including us as well -- we'll be, we'll work
 6                        with you.  Like, you know, we were talking
 7                        (U/I) downstairs, when should we go down to
 8                        Arizona and maybe meet a couple of these
 9                        kids, right?  Because you're right.  You
10                        want to start the process as soon as
11                        possible so that -- so during the season, if
12                        you see them once or twice, they'll remember
13                        you (U/I).
14   BAILEY:              Exactly.
15   RICHARDSON:          They're comfortable.
16   SOOD:                It's a level of comfort.
17   RICHARDSON:          It's a level of trust, right?  Yeah.
18   BAILEY:              That's huge.
19   SOOD:                So, we just -- again, we don't want -- we're
20                        not doing this to protect (PH) people.  We
21                        want them focused.  We think this model
22                        works with a select group of clients and
23                        relationships.  So, you will help guide us
24                        both from an economic perspective, what you
25                        need and how you need it.  And then two,
```

| | | |
|---|---|---|
| 1 | | also from a relationship perspective.  Hey, |
| 2 | | you guys should come to Madison Square |
| 3 | | Garden because we're gonna be up for a |
| 4 | | tournament.  Come say hello to so and so. |
| 5 | | All right, so we -- we're putting you in |
| 6 | | that position to help determine how we can |
| 7 | | help you grow. |
| 8 | RICHARDSON: | Because the love and affection that I have |
| 9 | | for Christian, and like, -- so, we hit it |
| 10 | | off in Vegas. |
| 11 | SOOD: | (U/I). |
| 12 | RICHARDSON: | Well, partly because I think a lot -- I |
| 13 | | think so many times we look at time and |
| 14 | | money as equating.  That's the biggest |
| 15 | | disrespect you can ever -- time, there's no |
| 16 | | price on time.  So, like, first and |
| 17 | | foremost, I want to thank you four for |
| 18 | | spending some time with me.  Because you |
| 19 | | guys could be doing anything that you want, |
| 20 | | and you're hanging out with an overweight |
| 21 | | coach.  So, one, you know I appreciate that. |
| 22 | | Two, my goal isn't just to make sure that if |
| 23 | | we go to the Garden you meet them at the |
| 24 | | Garden.  My goal is to make sure that they |
| 25 | | know who you are.  My goal is to make sure |

| | | |
|---|---|---|
| 1 | | that they look at you guys as family as they |
| 2 | | look at me because that's how it works. |
| 3 | BAILEY: | Mm-hmm. |
| 4 | RICHARDSON: | And, we're not gonna get 10 guys because I - |
| 5 | | - I don't want you to have 10 guys.  I'm |
| 6 | | just telling you because 10 guys, that's |
| 7 | | gonna be a headache.  Having 10 pretty women |
| 8 | | at one time is a headache.  No disrespect to |
| 9 | | two pretty women, but my point is having 10 |
| 10 | | of them, the maintenance of it because -- |
| 11 | UF: | It's too much. |
| 12 | RICHARDSON: | -- it's way too much. |
| 13 | UF: | Mm-hmm. |
| 14 | RICHARDSON: | And unfortunately, they are kids.  So what |
| 15 | | you do for one -- you did something for |
| 16 | | Jeff, didn't you? |
| 17 | BAILEY: | Yeah. |
| 18 | RICHARDSON: | But they see it and you're like, it wasn't |
| 19 | | like that.  My goal is to make sure that you |
| 20 | | -- like, Deandre Ayton should be the number |
| 21 | | one overall pick in the draft.  It's not |
| 22 | | about well, hey, we're gonna be one of |
| 23 | | three.  Excuse my expression, fuck that. |
| 24 | | Deandre, this is what you're doing.  Because |
| 25 | | my problem before -- and this is, you know, |

**SA-170**

```
 1                    as I said to Christian, I wanna -- I try to
 2                    empower kids and say hey, it's one of three.
 3                    And all I did -- I made the process worse
 4                    because they came to me with the
 5                    understanding, hey Uncle Book, what should I
 6                    do.  And I'm like, well, you know, you gotta
 7                    look at it from this point, and you have to
 8                    make an educated decision.  And they're
 9                    looking at me like, I can't make the
10                    decision (PH).  You've done everything for
11                    me aside from wipe my ass.  Now you want me
12                    to make the biggest decision of my life?
13                    So, like, Derek Williams, a kid who was
14                    drafted number two overall by the Minnesota
15                    Timberwolves.  I went to Minnesota.  He
16                    bought a Maserati.  I said, take it back.
17                    He said, well I'm not taking it back.  I
18                    keyed his car.  I said, take this shit back
19                    because you're in Minnesota, you're a
20                    California kid.  But as I said to myself,
21                    wait up.  I thought back.  I allowed him to
22                    pick his agent.  His agent then said you're
23                    gonna -- he's not wrong, I'm wrong.
24  BAILEY:          Yeah.
25  RICHARDSON:      So, from this point on, like, I'm steadfast
```

10

1            in terms of this is what you're doing and if
2            you're not doing it, then I need to know
3            what's going on.  Because when you give them
4            three to four options, it makes it -- I'm
5            just telling you.  They look like men, but
6            they're kids.

7  BAILEY:    Yeah.  They're still -- the mentality -- I
8            mean, they're young.  They can't make those
9            decisions.

10 RICHARDSON: They can't -- they want to make those
11            decisions based on how pretty was the person
12            in front of me.

13 BAILEY:    Mm-hmm.

14 RICHARDSON: I'm telling you.  Did that guy have on Creed
15            cologne?  I like Creed.  Oh shit, I'm going
16            with him.  I'm -- I've heard it.  And so,
17            when -- as you recruit 'em they become your
18            own.  So, hey, it's Uncle Book.  Uncle Book,
19            what are we doin'?

20 BAILEY:    I'm sure they rely heavily on your opinion,
21            and what, what they should do next.

22 RICHARDSON: And the parents, they don't know either.
23            And part of the problem, the parents, they
24            hear from so many different people.  Hey,
25            your son's one and done and he should get

```
 1                          this, and he should get that.  And I'm like
 2                          -- I told Deandre's mom, I said, whatever
 3                          you think someone's telling you, tell them
 4                          to show it to you in cash.  They're not
 5                          doing that.  Like, this is the process.
 6                          This isn't my first or last rodeo.  Your son
 7                          isn't the only lottery pick I've ever had.
 8                          And I told her, when you have -- you know,
 9                          when you go to McDonald's there's a dollar
10                          menu.  So, I don't know if he's a Big Mac or
11                          a cheeseburger yet.  He hasn't gotten one
12                          rebound, blocked one shot, scored a goal.
13                          My goal is to make sure that you guys get
14                          'em understanding like, okay, I'm not gonna
15                          have to fuckin' lose my mind dealing with
16                          them.  Because at that point, what do you
17                          need me for?
18 BAILEY:        Exactly.
19 RICHARDSON:    The goal is like -- again and like I told
20                          Christian, get on campus, he's getting Rawle
21                          Alkins.  Like, I'm telling you.  He's
22                          getting Rawle Alkins.  The, like, there's no
23                          ifs, ands about that.  I've already talked
24                          with mom, I've talked with his cousin.
25                          Christian this, like -- it got to the point
```

12

1             Christian was like damn, Book.  Hey you're

2             doing this.  Hey, Rawle, go get a steak.

3             Hey, sit, sit Uncle Christian down, you go

4             do this, because the goal is to make sure

5             that when you get them, they're ready to

6             work.  But they also -- there's an

7             understanding that there's a level of

8             responsibility.

9  BAILEY:          Mm-hmm.

10  RICHARDSON:      You -- I'm trying to take the risk out of

11             the room because, guess what, I'm with them

12             all the time.  And if you get 'em and then

13             it's like, well Book, you didn't see that,

14             then what's my worth?  I'm not -- I'm not

15             gonna sell you a bad business -- a Bentley

16             (PH).  I'm not.  I'd much rather tell you

17             guys well go to the Jag dealer and get --

18             you know, go get the Jag because this one's

19             messed up.  But at the end of the day, like,

20             I'm telling -- like, you're gonna get Rawle.

21             That's a fact.  Allonzo Trier like, he's

22             only now like, hey, I want the new Dodge --

23             what is this thing.  It's a new car, it's

24             like 70-grand.  I said, you want a $70,000

25             American car that's not a Cadillac?  And you

**SA-174**

```
 1                   want --

 2  SOOD:            An American car?

 3  RICHARDSON:      It's a Charger.  It's something.  And he's

 4                   like, Unc, but it's an American made car.  I

 5                   said Allonzo, next year at this time you're

 6                   not gonna want that car.  So, what are we

 7                   gonna put down?  I said again, you're not

 8                   looking at it like that.  And in eight

 9                   months, your mind's gonna change when you

10                   really see some money in front of you.

11  UM:              Right.

12  RICHARDSON:      Now if you're willing to say this is the car

13                   that you want, that's the conversation that

14                   I'm having with those guys, by the way, so

15                   when you get them, they're not like, aw man,

16                   the new Bugatti came out.  I can't fuckin'

17                   afford a Bugatti, my man (PH).  That's

18                   music.  Those guys that ride -- they don't

19                   have it.  So, that understanding, like, when

20                   you get a guy, like, I'm telling you.

21                   You're gonna get Rawle Alkins, he's gonna be

22                   a first rounder.  Allonzo Trier, he should

23                   get, if Christian wants him.  And Deandre

24                   Ayton.  That's what we're working on now.

25                   You know, like 2019 we have a kid, like I
```

**SA-175**

```
 1                        said, coming on campus.  He's a down-low

 2                        American, one of the best point guards in

 3                        the country, Jahvon Quinerly.  We get him,

 4                        you know, you're gonna get Nazi Reid, who's

 5                        top 10 in the country.  Look, those are the

 6                        things that I wanna make sure because I've

 7                        done this for too long.  I've played too

 8                        many games.  Hey, you should talk to three

 9                        people.  No, you shouldn't.

10  BAILEY:             But we appreciate that honesty.  We

11                        appreciate what you're saying.

12  RICHARDSON:         Yeah.  You don't marry three -- like, I know

13                        for a fact there's never a time.  Listen, if

14                        you two, I'm dating both you guys, you know

15                        -- you know I'm dating you and I'm gonna

16                        pick one.  You guys are saying fuck you, fat

17                        boy.  It doesn't work like that.

18  BAILEY:             Mm-hmm.

19  RICHARDSON:         So, why should I let it work like that in

20                        business?  Why should I -- why should I

21                        allow the risk and say, that kid, he is so

22                        like naïve, he has no idea.  He's gonna deal

23                        with a shark, and that guy's gonna flip him

24                        and then it's like, oh well, Naz I'm sorry.

25                        He was flipped.  Look, he -- you let him go
```

| | | |
|---|---|---|
| 1 | | into the shark tank.  Like, that's the one |
| 2 | | thing I've learned, I'm no longer doing |
| 3 | | that.  When there's a kid that I've |
| 4 | | personally recruited and that I personally |
| 5 | | have a relationship, it's not about well, |
| 6 | | hey guys, I'm gonna let him talk to Duffy |
| 7 | | (PH).  No, I'm not.  And it's no disrespect |
| 8 | | to Bill because if he helps put a kid in |
| 9 | | Arizona, no problem.  Bill, if you wanna |
| 10 | | (PH) get him.  But if I have to do the -- if |
| 11 | | I gotta do the leg work, if I have to do the |
| 12 | | recruiting, I'm not -- I'm not doing that. |
| 13 | BAILEY: | Yeah. |
| 14 | D'ANGELO: | Yeah, that does make sense. |
| 15 | RICHARDSON: | And if we can do this partnership, you guys |
| 16 | | what you did -- you guys just gave me 10 |
| 17 | | years of my career.  I'm just telling you |
| 18 | | that. |
| 19 | D'ANGELO: | Perfect. |
| 20 | D'ANGELO: | And that -- and honestly, that's what we |
| 21 | | want.  That's what we want. |
| 22 | BAILEY: | Exactly. |
| 23 | D'ANGELO: | You know, and that was part of the other |
| 24 | | (U/I) with the system, the more successful - |
| 25 | | - I think we can help the -- you guys be |

                                                                    16

1                      more successful with what you just said,

2                      it's gonna extend your career longevity.

3                      And then people are gonna see that.  Hey,

4                      this guy's been around, he's there, he's

5                      always successful and, and then -- and then

6                      it just gets that much easier down the road.

7                      So, we -- yeah, I mean, we're definitely

8                      prepared to, you know, do something

9                      immediate.  Just -- and I was talking to

10                     Christian, you know, let me know what you

11                     think, you know, because I -- you just

12                     rattled off, I think, five kids that are --

13   RICHARDSON:       My bad.

14   D'ANGELO:         Which is great.  No, and that's -- I think -

15                     - and I think that's -- I think, like,

16                     that's the ideal number to start with.  I

17                     think that's a great number to start with

18                     'cause maybe we don't get all five.  Maybe

19                     we get two, maybe we get all five.  But I

20                     think that's a good number to start with.

21                     I'm 100 percent on board with, you know,

22                     meeting 'em, you know, and even the Garden -

23                     - we'll come down, and I'll come to Arizona.

24                     If you guys are gonna be in Vegas, we can

25                     come out 'cause sometimes they -- sometimes

**SA-178**

17

```
 1                    it'd feel a little more like, you know, you

 2                    go to them.  They don't always have to

 3                    travel, you know?  And when they're there,

 4                    they're busy.  I'm sure their time is very

 5                    micromanaged to the point where you're like,

 6                    okay, this is film time, this is practice

 7                    time, this is gym time, this is -- so, if

 8                    you're there experiencing their world,

 9                    experiencing what they go through.  'Cause

10                    I'm sure everyone sees these college

11                    basketball kid that they know they're going

12                    in the pros and, you know, it's a level of

13                    well, life's just easy for 'em.  Well, it

14                    probably wasn't that easy -- probably wasn't

15                    that easy to get there.  Not everyone's that

16                    good.  And then to stay that good.  I mean

17                    like I was never an athlete, but just coming

18                    from the military to like -- 'cause someone

19                    always wants your job.  So, these kids deal

20                    with that probably every day.  And you're

21                    out every day trying to recruit a kid to

22                    take a kid's job.

23  RICHARDSON:       That's how we make 'em tough (PH).

24  D'ANGELO:         So, I mean, I think like you said, to go out

25                    there, to show 'em that we understand what
```

```
 1                     they're going through, you know, and it's

 2                     hard.  I think we'll go a long way and you

 3                     know, you wanna talk, you know, what you

 4                     think is reasonable or a good, you know,

 5                     number or framework for, you know, five kids

 6                     or so over the next two years.  You know,

 7                     let me know and we'll work on something

 8                     right now.  We'll just kinda put it in

 9                     motion.

10  RICHARDSON:        What helps I think, when you guys do your

11                     research, you know, because I want all of us

12                     to be able to say, okay, this makes sense.

13                     Book, I hear what you're saying, I hear what

14                     Christian's saying, but I'm not sure.

15                     Because I think at that point the checks and

16                     balances it keeps everyone on their toes.

17  BAILEY:            Yeah.

18  RICHARDSON:        Because I know like, perfect example.  Like,

19                     Jahvon Quinerly, he's coming on campus this

20                     weekend.  So, you know, I'm dealing with a

21                     guy who says, hey, Book, it's 20 to get it

22                     done.  And I'm like fuck, okay.  So, this is

23                     what I tell the kid.  If you commit, I'll

24                     give you five grand.  The national letter of

25                     intent is November.  I'll give you another
```

```
 1                          five grand.  And now, I work it that way

 2                          because there's other situations where I'm

 3                          not willing to deal with where guys says,

 4                          hey Book, it's 250.  I'm like -- I'm not --

 5                          again, first of all, I've always said, where

 6                          do I get it, where do you put it?

 7   D'ANGELO:      Right.

 8   BAILEY:        Mm-hmm.

 9   RICHARDSON:    Because you can't put it under your

10                          mattress.

11   BAILEY:        Exactly.

12   RICHARDSON:    And then you start dealing with the -- I

13                          call them the alphabet boys.  Not the NCAA,

14                          the DEA, the CIA, that -- because now,

15                          you're bringing --

16   D'ANGELO:      Attention.

17   RICHARDSON:    -- like you don't have a bank account.

18   D'ANGELO:      -- bringing attention.

19   BAILEY:        Yeah.

20   RICHARDSON:    And by the way --

21   D'ANGELO:      How you paying taxes, where'd you get it,

22                          how --

23   BAILEY:        Yeah.

24   RICHARDSON:    Where'd you get it?  By the way, you just

25                          went and bought a -- you want and bought a
```

| | | |
|---|---|---|
| 1 | | brand-new Range Rover, cash.  Really? |
| 2 | SOOD: | You can't do that. |
| 3 | RICHARDSON: | But they don't -- again, they don't know. |
| 4 | | Life imitates art.  So, again, a lot of |
| 5 | | their fashion sense is based on what Jay-Z |
| 6 | | says. |
| 7 | BAILEY: | Mm-hmm. |
| 8 | D'ANGELO: | Yeah. |
| 9 | RICHARDSON: | It's based on what they see on television. |
| 10 | | That's truly what it is, you know?  That's |
| 11 | | truly what it is.  So, it's -- again, it's |
| 12 | | my job to make sure that with all that being |
| 13 | | said, trimming the fat, because there's |
| 14 | | certain deals that I just -- I don't want to |
| 15 | | get into.  And knowing, like, oh, well I got |
| 16 | | some people that's gonna take care of me.  I |
| 17 | | don't want you guys dealing with it because |
| 18 | | the return on investment, it -- we have to |
| 19 | | stay solid. |
| 20 | D'ANGELO: | And I'm glad you're saying that 'cause I |
| 21 | | think there are some kids that, right, |
| 22 | | either you said they ask for something |
| 23 | | outrageous and you know that's a red flag. |
| 24 | | Because that's gonna bring -- |
| 25 | BAILEY: | That's gonna lead to problems (PH). |

**SA-182**

```
 1  D'ANGELO:      -- attention.  Yeah, it's gonna bring

 2                 attention.  I don't need that, you know?

 3                 And which is great because --

 4  BAILEY:        It's good that you can see that.

 5  D'ANGELO:      Yeah, so we don't have to worry.

 6  RICHARDSON:    Especially dealing with them for a very long

 7                 time.  Like I said, I've had 12 McDonalds

 8                 All Americans now and the elite of the

 9                 elite.  And for the -- you know, the

10                 majority of them, you wanna do something.

11                 But it's truly what you're comfortable

12                 doing.

13  BAILEY:        Mm-hmm.

14  RICHARDSON:    You know, truly what you're comfortable

15                 doing.  I had a McDonalds All American.  His

16                 mom, she went to the Bentley dealer on the -

17                 - you know, I knew this was the biggest

18                 mistake.  She took a picture and said, this

19                 is what we're doing.  And I'm like, she's

20                 got me by the balls because I've committed

21                 to her --

22  BAILEY:        Yeah.

23  RICHARDSON:    -- and she has no control over her son.  So,

24                 that's one of those deals like when Chris

25                 said, hey Book, are you recruiting such and
```

```
 1                    such?  Nope.  And then you guys may have an

 2                    in with someone.  At that point I'll revisit

 3                    it, but I'm just not willing to --

 4   BAILEY:          There's a risk factor.  Yeah.

 5   RICHARDSON:      It's just not worth it.  Especially, the

 6                    return on it.  I've always said like, when

 7                    you get some -- again, if you can stay

 8                    solid, again, you get a single gig, and like

 9                    I said, I brought him over and he gets to

10                    second, now he's on second base, no out.

11                    Oh, shit I have a double.  He came in, now

12                    guess what, somebody's on second, now I hit

13                    a homerun.  We just got three runs.  We

14                    manufactured the runs, versus dealing with a

15                    kid that everyone is dealing with.  And now

16                    what he's doing, he's -- it's a bidding

17                    process.  You're gonna lose.

18   BAILEY:          Mm-hmm.

19   RICHARDSON:      You're gonna lose and what's gonna happen,

20                    someone's gonna come in at the end and drop

21                    a ton of money on him.  And you're gonna say

22                    well what happened, Book?  Well, because we

23                    didn't communicate and the college coach was

24                    self-centered and egotistical, thought he

25                    could do it instead of -- hey guys, I need
```

1    help.  Guys, we gotta stop.  Because at that

2    -- I'm just telling you.  I've seen it from

3    every single aspect and I'm tired of losing.

4    Because what I did was, I took money out of

5    my TIAA-CREF and I would just take care of

6    everything and it's like, that's the dumbest

7    shit you can do.  But oh, well I don't trust

8    anyone.  Christian, for as young as he is,

9    he said, Book can I talk to you just for a

10    second.  He said, you gotta be the dumbest

11    motherfucker in the country.  I said, you

12    talking' to me?  He said, yes, respectfully,

13    I'm talking to you.  He said, well, why

14    would you do that.  Well, Christian, you

15    gotta understand trust.  He said, so you're

16    gonna go broke.  He said, you make a quarter

17    of a million dollars a year and you're

18    broke.  You don't smoke.  You don't drink.

19    You don't have an affair you're paying for.

20    And you don't shop.  He said, you fuckin'

21    shop off the rack.  And I was more offended

22    about shopping off the rack because I think

23    I'm a pretty cool dresser.  And I'm like,

24    fuck you, Christian.  But what he did was he

25    -- he made me think about it.  Like okay,

1       you're recruiting a kid, and then by the

2       way, when you recruit the kid, you allow him

3       -- you give him the freedom to pick his own

4       guy.  He said, Book, where have you been all

5       my life.  He said, I wish I was a pimp and

6       you were a prostitute.  You'd make me

7       millions.  But as he said that I was like, I

8       never thought of it like that.  I thought,

9       okay well, I'm Uncle Book.  I'm supposed to

10      take care of the kids, I'm supposed to help

11      'em, and then, you know, he might figure it

12      out.  And it doesn't work like that.  The

13      first kid I ever had that like I totally

14      went was Kemba Walker.  I had him in AAU.  I

15      mean, like, to this day, he calls me Dad.

16      And it's uncomfortable for me because his

17      dad's around and it's like, come on Kemba,

18      just -- he's like nah, you're like my dad.

19      So, with that being said, guess what?  He

20      asked me, hey, can you help with the agent

21      process.  Okay, let's get three guys, four

22      guys, let's sit down with them.  You

23      serious, Book?  Jim Calhoun, and you're

24      going with Jeff Schwartz.  And seven years

25      later, you know, like if I ever need

25

1    anything.  Hey Kemba, I need -- Kemba, I
2    need $7,500.  Okay, I'll send it to you.
3    But I started saying, wait up.  I'm asking
4    him for $7,500 to give back to him, and I
5    should have been the guy that said this is -
6    - you're going with this financial advisor
7    and you're going with that agent.  And by
8    the way, negotiating this contract.  But I'm
9    the, you know, I'm the nice guy -- oh, I'm
10   the naïve guy that's like wait up.  This
11   doesn't make sense.  Until Christian said
12   that, I took offense to it because I'm like,
13   no my heart's in a great place.  And he
14   said, I understand your heart's in a great
15   place.  He said, but what about Rondae
16   Hollis-Jefferson who loves you?  You allowed
17   him to pick Jeff Schwartz.  And when he --
18   when he met with him you weren't there.  He
19   said, you know how stupid that is?  He said,
20   you trust Jeff Schwartz?  I said, yeah why
21   wouldn't I?  He said, come on, Book.  The
22   kid, after he signed, about two months
23   later, he was like, I don't like Jeff
24   Schwartz -- I don't like Mike George
25   because, you know, he tried to have sex with

```
 1                    a girl that I'm trying' to have sex with.  I

 2                    swear like I can't make this up.

 3   D'ANGELO:        That's great (PH).

 4   RICHARDSON:      But with that being said, that's my fault

 5                    because I allowed him to do it.  And Jeff

 6                    like, I didn't -- I didn't think anything

 7                    like, you know, hey I did my job.  He came

 8                    to Arizona, two years, man.  We won 67

 9                    games.  He's a first round draft pick.  He

10                    bought his mom a house.  I'm a good guy.

11                    No, you're not.  You didn't -- I didn't help

12                    him.  Like, I didn't help Stanley Johnson,

13                    who's a fucking drunk right now, who's

14                    dealing with ugly women.  I didn't help him

15                    because I allowed him to make a decision

16                    based on what was -- what he thought was

17                    best for him, and he has no idea what's --

18   BAILEY:          He doesn't know what's best for him.

19   D'ANGELO:        Yeah, he's not ready yet.

20   RICHARDSON:      Yeah, like he still has an umbilical cord --

21   BAILEY:          Yeah.

22   RICHARDSON:      -- that's attached to me and I don't want to

23                    cut it.  That's the problem.  So, again,

24                    making them understand like, okay this is

25                    what you're doing, this is why I'm telling
```

```
 1                        you you're doing it.  And you know --

 2   BAILEY:              You come with all the experience.  I mean,

 3                        you know, this is the first time for them.

 4                        This is the first time for a player to --

 5   RICHARDSON:          Yeah.  It's their first rodeo.

 6   BAILEY:              And this is all clearly not your first

 7                        rodeo.  You come with all the experience.

 8   RICHARDSON:          A little bit, yeah.

 9   D'ANGELO:            So, what do you think -- so, what do you

10                        wanna -- do you wanna do every six months,

11                        once a year?  Like, what do you think's a

12                        good number to work with?

13   RICHARDSON:          It's funny because I'm -- this is my first

14                        rodeo.  So, this is very uncharted for me.

15                        And I've kind of taken pride, foolish pride,

16                        doing it the way I'm doing it, which doesn't

17                        work.

18   D'ANGELO:            Right.

19   SOOD:                I mean, you can think about it, right?  I

20                        mean, you just -- you guys should exchange

21                        numbers, we can all exchange -- well, you

22                        have our number (U/I).

23   RICHARDSON:          Yeah, yeah.

24   SOOD:                Jeff, (U/I) he doesn't.

25   D'ANGELO:            Yeah, we'll definitely exchange numbers but
```

**SA-189**

```
 1                        yeah, you -- I mean, 'cause I said talk to
 2                        Christian.  Like I said, I -- you mentioned
 3                        already you got -- you know, the one kid's
 4                        probably gonna need five, and then he's
 5                        gonna need another five, signing bonus.
 6   RICHARDSON:          In November.
 7   D'ANGELO:            November.  So, you know, look, I'm prepared
 8                        to help with that now.
 9   SOOD:                I think you should -- right that's fair, but
10                        when you see this kid tomorrow at campus you
11                        can tell him, look, you've got him done.
12                        He's good.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**SA-190**

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3
    ---------------------------x
4                              :
    UNITED STATES OF AMERICA    :
5                              :
    v.                          :    S1 17 Cr. 684 (ER)
6                              :
    CHRISTIAN DAWKINS and       :
7   MERL CODE,                  :
                               :
8           Defendants.         :
                               :
9   ---------------------------X

10

11

12

13

14                   Recorded Conversation

15

16

17
                     Date:  June 20, 2017
18                   Time:  10:07 a.m.
                     Participants:  Jill Bailey
19                                  Jeff D'Angelo
                                    Munish Sood
20                                  Christian Dawkins
                                    Emmanuel "Book" Richardson
21

22

23

24              (U/I) - UNINTELLIGIBLE
                (PH)  - PHONETIC SPELLING
25
```

<div style="border:2px solid black; background:yellow; text-align:center">

**GOVERNMENT**
**EXHIBIT**
**509B2T**
S1 17 Cr. 684 (ER)

</div>

```
 1  RICHARDSON:     So, Jeff, think about this.  Rawle Alkins as
 2                  a freshman last year, he -- his high school
 3                  coach had his transcript.  He needed one
 4                  transcript to graduate.  It's ingenious.
 5                  Initially, I was mad at his high school
 6                  coach, but I would say it's ingenious.  He
 7                  said, Book, I need $40,000 to get this on
 8                  his transcript.  If he does not get this
 9                  class, he's gonna be a partial qualifier.
10                  He's not gonna have 16 credits to graduate.
11                  What he did to the kid was, he told the kid
12                  that he was an 8th grader instead of a
13                  freshman.  So, the kid is thinking', oh I
14                  got four years to play, he's got three years
15                  to play.  His grades are locked in.  That's
16                  what I'm saying.  Like, I can be as pissed
17                  at the coach as I want.  So, long story
18                  short, I said okay.  You need 40 grand for
19                  that class.  He said, yes, Book because it's
20                  not just me doing it.  I gotta take care of
21                  some people.  I said, fuck you I'm not doing
22                  it.  Tried to play poker and one week turned
23                  into a month, and I said, oh shit.  I tried
24                  to get someone else to get him a summer
25                  school course.  Couldn't do it because what
```

2

| 1 | | he had was a seal.  He had the school seal, |
|---|---|---|

1              he had was a seal.  He had the school seal,

2              and the great thing about the seal that he

3              had, the school, and Bishop Ford closed down

4              in Brooklyn, so you can't investigate.  You

5              can't investigate.  So, when the NCAA says I

6              need to see the coursework and all -- the

7              school's closed.

8 BAILEY:      Closed down.

9 RICHARDSON:   School's closed.  That's his receipt and

10             that's it.  So, each year you're gonna deal

11             with a situation.  Maybe not that extreme,

12             but it gets extreme.  So, each year you're

13             trying to figure out, okay, this is what I

14             had to do for Rawle.  Now, they're -- his

15             return on investment, his cousin moved to

16             Tucson, which I'm highly against.  Just so

17             you guys know, if we're ever dealing with a

18             kid, I never want their parents or anyone to

19             move there.  If you're one and done you do

20             not need -- like, there's a level of comfort

21             you need, but you don't need to be overly

22             comfortable.  You don't need anyone living

23             there.  That means you don't trust us.

24 D'ANGELO:    That's right.

25 BAILEY:      Mm-hmm.

```
                                                              3
 1   RICHARDSON:    Because if this -- like, I'm going -- by the
 2                  way, I want them out.  I want them out.  So,
 3                  again, a level of desperation, I let his
 4                  cousin move out there.  So, I told his
 5                  cousin, I'll give you two grand a month to
 6                  make sure that he works.  But he brought
 7                  him, his wife, and his child.  Wrong move.
 8   D'ANGELO:      Yeah.
 9   RICHARDSON:    So, now that's at two grand a month.  So,
10                  Christian's like, Book are you serious?  And
11                  I'm like, damn.  I've let the cat out the
12                  bag, so now I'm trying to reel back and he's
13                  like no.  He said, tell it to me, and I said
14                  okay.  I give him two grand a month, he
15                  works.  He said, is it like an allowance?  I
16                  said, no what I usually do, I just try to
17                  stagger it.  He works and you know, I'll
18                  give him $1,500 cash and then I'll come back
19                  and give him $500 this week to offset that.
20                  And he said well, are you controlling what
21                  he's doing?  That's like -- Christian and I
22                  got really close over Solomon Hill, maybe
23                  six years ago.  But you know, this time
24                  Christian was like, look, I'm just telling
25                  you that makes no sense what you're doing.
```

**SA-194**

```
 1                    I said, well here's the one thing: if

 2                    anything happens, it's their word against

 3                    mine.  And when it's cash, you know, I don't

 4                    know what they're talking about.  But his

 5                    point to me was, each year there's a

 6                    situation that you're going to deal with.

 7                    Now whether you wanna deal with it going --

 8                    if I had the chance to do it all over again,

 9                    I wouldn't have done it.

10  D'ANGELO:        Right.

11  RICHARDSON:      But Rawle Alkins is such a great kid, the

12                    emotion of it, I got caught up.  And I felt

13                    that the kid was being done an injustice and

14                    a disservice because what -- the high school

15                    coach again, it was ingenious, but when you

16                    bamboozle everyone and that kid didn't get

17                    any of the 40, that's the problem I have.

18  BAILEY:          Mm-hmm.

19  RICHARDSON:      Because his mom still, she's gotta get

20                    places.  And that was my whole point.  If I

21                    do something for you guys, I wanna make sure

22                    that mom, she's at every game.  So, she's

23                    not fuckin with us.

24  BAILEY:          Mm-hmm.

25  RICHARDSON:      'Cause I've always said this.  When you give
```

```
 1                    someone something ahead of time and say, hey

 2                    you book the tickets, you do -- now they're

 3                    not calling you two days ahead to say, oh

 4                    Book you're not gonna believe it.  I never

 5                    booked this flight.  Only thing that's left

 6                    is first class and it's $1,500 one way.

 7                    What?  So, the season's going on.  I'm like,

 8                    just do it.  So, I had "just do it" moments

 9                    for the last seven years and that's not

10                    benefited me.

11   BAILEY:          Yeah.

12   RICHARDSON:      You know?  So, again, is it something

13                    different each year?  It is.  Like I said,

14                    $40,000 to do that was totally extreme.  If

15                    I had the chance to do it all over again, I

16                    would not do it.  I'd try to barter

17                    something.  I'd give blood.  I'd give semen,

18                    something.

19   D'ANGELO:        Yeah.

20   RICHARDSON:      But that just goes to show you that it

21                    becomes irrational.  And even, you know, for

22                    me.  Knowing what I know now, I'd never do

23                    that again.

24   D'ANGELO:        I think we're saying kinda the same thing

25                    based on what you just said.  So, I think
```

| | | |
|---|---|---|
| 1 | | it's just mainly, you know, we can provide - |
| 2 | | - I can provide you with, you know, a pot of |
| 3 | | money each year for you.  And then you do |
| 4 | | what you have to do, but it -- you know, I |
| 5 | | don't -- 'cause that's kind of what it |
| 6 | | sounds like. |
| 7 | BAILEY: | You know best how to care of the situation. |
| 8 | D'ANGELO: | And you're gonna have guys come in, |
| 9 | | everything's gonna be different.  So, we put |
| 10 | | you up -- gotta get you in a situation where |
| 11 | | it's comfortable.  Where it's, you know, x |
| 12 | | amount a month or just whatever that just -- |
| 13 | | so, you always know what you have to work |
| 14 | | with.  And then look, as different extremes |
| 15 | | come in, you know, more kids, bigger |
| 16 | | recruitment class, we can always |
| 17 | | renegotiate, we can always meet.  But that's |
| 18 | | where I think -- I think the main thing is |
| 19 | | to set you up with the resources, you know, |
| 20 | | essentially a sum of money, whatever the |
| 21 | | best place -- best do, it's for you.  And |
| 22 | | then, you know, whatever you do, you do, and |
| 23 | | we'll go from there, if that makes sense. |
| 24 | RICHARDSON: | I love that, but I want to take it a step |
| 25 | | further.  You know, each kid, you know, I |

```
 1                    want you guys to look on whether it's ESPN,

 2                    whatever recruiting service and you say,

 3                    okay who are we getting?  What are we doing?

 4    D'ANGELO:       And the only thing I would -- yeah, and I'm

 5                    glad you brought that up.  The only thing

 6                    we'd like to do and like I said, whether

 7                    it's here or whether it's out there, you

 8                    know, anyone that we're dealing with that,

 9                    you know, we'd like to meet them at some

10                    point in time earlier on in the recruitment

11                    process.  I think is good two-fold.  I think

12                    it helps you maybe explain some stuff.  It

13                    also helps the kid know long-term, oh --

14    RICHARDSON:     Assuming that --

15    D'ANGELO:       -- I've seen that guy.  I've seen that guy.

16                    I've seen that guy.  I know them.  Oh, I get

17                    it.  This makes sense, okay, I'm good.

18    BAILEY:         Mm-hmm.

19    RICHARDSON:     Yeah, good 'cause that's where I'm at.

20                    Like, the explaining in fuckin' June this --

21                    it just doesn't work because they're saying,

22                    Book I don't know these guys.

23    BAILEY:         Exactly.

24    D'ANGELO:       Right.  So, as soon as it -- right, and I

25                    think that's the best way to --
```

8

1   RICHARDSON:    As soon as they commit, it's a phone call.

2                  Or if I can't, can you guys Facetime?

3   BAILEY:        Exactly.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SA-199**

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3
     ---------------------------x
 4                               :
     UNITED STATES OF AMERICA    :
 5                               :
     v.                          :      S1 17 Cr. 684 (ER)
 6                               :
     CHRISTIAN DAWKINS and       :
 7   MERL CODE,                  :
                                 :
 8            Defendants.        :
                                 :
 9   ---------------------------X

10

11

12

13

14                    Recorded Conversation

15

16

17

18                    Date:  June 20, 2017
                      Time:  10:07 a.m.
19                    Participants:  Jill Bailey
                                     Jeff D'Angelo
20                                   Munish Sood
                                     Christian Dawkins
21                                   Emmanuel "Book" Richardson

22

23
                      (U/I) - UNINTELLIGIBLE
24                    (PH)  - PHONETIC SPELLING

25
```

GOVERNMENT
EXHIBIT
509B3T
S1 17 Cr. 684 (ER)

**SA-200**

1

```
 1  RICHARDSON:    Great, because it should -- because I know
 2                 this as we talked coming upstairs with
 3                 Isaiah Washington, that's the only way
 4                 you're gonna get to know them one on one.
 5                 That's -- when I'm there, they're always
 6                 gonna defer to me.  If a question is asked,
 7                 they're gonna look at me.  And I'm like --
 8                 that's what they know.  And until we teach
 9                 them that, hey, this is business,
10                 understanding business, and we're trying to
11                 do this, you know, we're trying to gain
12                 generational wealth.  Because they hear
13                 about what being rich is.  Like Deandre
14                 Ayton, he should be good enough to have
15                 generation wealth.  Rawle Alkins should be
16                 good -- should be just good enough where he
17                 can start thinking about generational wealth
18                 if he does it right.  Allonzo Trier.  Like
19                 those guys should be thinking along those
20                 terms.
21  BAILEY:        Mm-hmm.
22  RICHARDSON:    And if you can do that.  Let's say you get
23                 three out of the five.  Shit, man.  Those
24                 are great numbers.
25  D'ANGELO:      It's good odds.
```

**SA-201**

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 2

 3
   ---------------------------x
 4                             :
   UNITED STATES OF AMERICA    :
 5                             :
   v.                          :    S1 17 Cr. 684 (ER)
 6                             :
   CHRISTIAN DAWKINS and       :
 7   MERL CODE,                 :
                               :
 8          Defendants.        :
                               :
 9   ---------------------------X

10

11

12

13

14              Recorded Conversation

15

16
              Date: June 20, 2017
17              Participants:  Munish Sood
                             Marty Blazer
18                             Jill Bailey
                             Christian Dawkins
19                             Merl Code
                             Jeff D'Angelo
20                             Alicia Carroll

21

22
              (U/I) - UNINTELLIGIBLE
23              (PH)  - PHONETIC SPELLING

24

25
```

<div style="border:2px solid black; background:yellow">

**GOVERNMENT
EXHIBIT
510A1T**

S1 17 Cr. 684 (ER)

</div>

```
 1   DAWKINS:      So I wanted everybody in the same room,
 2                 obviously you had the meeting earlier with
 3                 umm Book, how'd that go with everybody, he's
 4                 an interesting guy (U/I)
 5   D'ANGELO:     Yeah it went good, it went good, it was just
 6                 us --
 7   DAWKINS:      Okay.
 8   D'ANGELO:     It went good, yeah.  He was umm -- I think
 9                 you guys, he was down with you first when I
10                 came down and then -
11   SOOD:         Yeah.  He was here.
12   D'ANGELO:     40 minutes or so?
13   BAILEY:       Yeah.
14   D'ANGELO:     Yeah.  He was out by 11:15 to catch the car
15                 service to the airport.  I think -- I'm
16                 pretty sure he left happy so.
17   DAWKINS:      Okay.
18   CODE:         He did.
19   DAWKINS:      Yeah, yeah.  Merl was supposed to --
20   BAILEY:       Yeah, I couldn't (U/I), but okay.
21   CODE:         He was happy.
22   DAWKINS:      Yeah.  So I wanted to -- obviously Book's at
23                 a high level school and with Merl-- the
24                 reason why I thought it was important for us
25                 all to be in the same room is because when
```

| | | |
|---|---|---|
| 1 | | we first met, I was trying to explain to you |
| 2 | | a little bit how basketball starts first at |
| 3 | | the grassroots level, right, so you have |
| 4 | | grass roots and then you have (U/I), and |
| 5 | | everybody knows about the NBA. Umm There's |
| 6 | | very few people who have access or the |
| 7 | | leverage and influence at all three levels. |
| 8 | | Some people are coming at center one, but |
| 9 | | not the other one, and I want to explain you |
| 10 | | with Merl, with him with Adidas, obviously |
| 11 | | Adidas is a billion dollar company that is |
| 12 | | involved in umm all three levels, you know |
| 13 | | what I'm saying. And Merl can tell you a |
| 14 | | little bit more about his background from |
| 15 | | working at Nike first. And you ever hear -- |
| 16 | | any of you've heard about the EYBL? Are you |
| 17 | | all familiar with that at all? So EYBL is |
| 18 | | like the -- |
| 19 | CODE: | Why would they have heard of it? |
| 20 | DAWKINS: | Yeah, I know. I know. But it's been (U/I). |
| 21 | | With EYBL it's essentially like the elite |
| 22 | | youth basketball so it's -- |
| 23 | CODE: | It's the NBA of grassroots basketball. |
| 24 | DAWKINS: | Right. |
| 25 | D'ANGELO: | Okay. |

```
 1  DAKWINS:      And Nike runs it and Merl was a part of

 2                starting it at Nike and then Adidas

 3                basically hired him away from Nike a couple

 4                years -- two years ago now?

 5  CODE:         Two years.

 6  DAWKINS:      Two years ago and essentially he has a

 7                position within all three levels.  So I'll

 8                let Merl kind of give you a little bit more

 9                background on the Nike and the transition

10                and how he's doing at Adidas.  And then I'll

11                circle back basically and how I think we can

12                all tie everything together basically.

13  BLAZER:       Clemson guy.

14  CODE:         I am a Clemson guy, yes.

15  DAWKINS:      You remember him when he played basketball?

16  BLAZER:       Yeah, I know a lot of people from Clemson.

17  DAWKINS:      Yeah.  He -- everyone always talks about how

18                good Merl was at basketball.

19  CODE:         Stop hating, it was a long time ago

20  DAWKINS:      Yeah, it's so funny to me.

21  CODE:         So thank you for having me. Thank you guys

22                for having me.  I'm grateful for it.  So I

23                spent about 14 years at Nike.  Started off

24                as a consultant actually in the Chicago

25                office, in the regional office.  And my job
```

```
 1                  initially was to make sure NBA guys in the
 2                  central region had shoes.  That was the job.
 3                  And I was fortunate enough to be able to
 4                  elevate and gain some experience and
 5                  knowledge in various avenues, so started
 6                  negotiating actual shoe deals after about
 7                  four or five years.  And then left the NBA
 8                  side and moved to Oregon to the corporate
 9                  headquarters and spent too much time at
10                  Oregon.  I'm not an Oregon fan.  But my job
11                  at that point in time was overseeing all the
12                  grassroots functions.  So we started the
13                  EYBL, which basically gave us access to the
14                  higher end kids across the country.  So we
15                  could have them in one venue in various
16                  cities for recruiting purposes.  I can now
17                  have touch points with all of these top-
18                  ranked kids across the country four, five,
19                  six times a year in a league setting.  So I
20                  get to see them play.  Not just in
21                  individual settings and those of you are
22                  kind of in the basketball space know there's
23                  a big difference between throwing a bunch of
24                  random kids together and just letting them
25                  play in a camp setting versus them having a
```

**SA-206**

1        team, to play in a team structure.  So you

2        get to see them in both elements and really

3        get a chance to evaluate them at a different

4        level.  The fortunate part for me was coming

5        from the NBA side, I had a lot of president,

6        GM, director of player personnel umm

7        relationships from my nine years at Nike on

8        the NBA side.  So that was -- I was able to

9        transition those relationships into the

10       grassroots sector so now those guys want to

11       know who are the next up and coming kids.

12       The rules are such now that the NBA guys

13       can't be in gyms, can't watch high school

14       kids play.  So they need access and

15       information about who some of these up and

16       coming kids are.  They only get to see them

17       a couple times a year in USA basketball type

18       settings.  So that was the portion of the

19       piece for me in terms of my transition from

20       pro into the graduates' sector.  So even

21       though I took a step down in terms of level

22       of basketball, I took a step up from being

23       manager to a director and then to a Senior

24       director.  And then Adidas offered me the

25       opportunity to play in the NBA space, the

1            college space, and the grassroots space,
2            which is what I thought I should have been
3            doing anyway, not just being siloed.  So I
4            made a transition.  Christian and I have a
5            longstanding relationship.  I consider
6            myself a quasi-mentor to him.  I've helped
7            him in building his NBA portfolio in terms
8            of having access to people within team
9            organizations who are decision makers
10           because those are guys who I have 15-year
11           relationships with.  So it's helped him.
12           We've also done a lot of work together in
13           terms of some of those up and coming kids I
14           was mentioning to you.  Adidas has a, a
15           similar format to the EYBL.  It's called the
16           Gauntlet, so it's the NBA version of
17           grassroots basketball under the Adidas
18           umbrella.  So there are shoe wars in terms
19           of the Under Armour sector has a group has a
20           league called the Association.  So we all
21           have our own leagues with our own kids and
22           we're trying to keep our kids obviously to
23           see them grow and develop but hopefully be
24           able to sign them as they become pros.
25           That's the ultimate objective.  Now, in

```
 1                    between that, you're trying to push those

 2                    kids to your affiliated schools.  For

 3                    instance, Indiana, Kansas, Arizona State,

 4                    Miami are all Adidas schools.  So if I could

 5                    have those kids in my umbrella at the

 6                    grassroots level, and I can now funnel those

 7                    kids to my sponsor schools, I win at the

 8                    grassroot level.  My colleges win and then

 9                    hopefully I can sign them as pros.  So you

10                    get a -- that's a quick synopsis of kind of

11                    how it works.

12   BLAZER:          Do you have anything to do with the

13                    sponsored schools, like who sponsors?

14   CODE:            So that's -- that comes out of kind of the

15                    licensing and apparel groups-

16   BLAZER:          Right.

17   CODE:            But we have a lot of interaction with those

18                    coaches about kids that are playing in our

19                    sector that they want access to.  Sometimes

20                    they need a lot of help recruiting.

21   BLAZER:          Right

22   CODE:            And sometimes we have kids that aren't

23                    necessarily under our umbrella.

24   BLAZER:          Those are just the major or --

25   CODE:            Yeah.  You know, for those mid-tier, Tulsa
```

**SA-209**

```
 1                    is one of our schools.

 2   BLAZER:          Okay.

 3   CODE:            We're not going to do a whole lot to help

 4                    Tulsa.

 5   BLAZER:          Right.

 6   CODE:            I mean I hate to say that but it's the

 7                    truth.

 8   BLAZER:          Right

 9   CODE:            Or East Carolina, you know, the smaller

10                    schools that are mid-tier schools.  They're

11                    not going to recruit the elevated kids.

12   BLAZER:          Yeah.

13   CODE:            And so there's not going to be a lot of

14                    resources from a company standpoint that

15                    we'll put into helping them recruit.

16   BLAZER:          Okay.

17   CODE:            Because if we lose East Carolina.

18   BLAZER:          Yeah.

19   CODE:            So what.

20   BLAZER:          Yeah.

21   CODE:            You lose Kansas or Indiana, it's a big deal.

22   BLAZER:          Well you're actively trying to gain some of

23                    Nike's --

24   CODE:            Absolutely, yes.

25   BLAZER:          And Under Armour.
```

```
 1   CODE:        Because Under Armour is active in space.
 2                Nike is active in space and we need to be
 3                more active.
 4   BLAZER:      Right, right.
 5   DAWKINS:     So I think -- I mean there was a deal.  I
 6                don't know if you --- well I think I told
 7                you about it, Munish --- the Brian Bowen
 8                deal with Louisville, which was, I don't
 9                know, a week or two ago.  I mean it was as
10                simple as -- obviously I had a good
11                affiliation with the kid.  Merl had good
12                affiliation with the brand.  Louisville is
13                what -- probably the top team you guys have.
14   CODE:        Kansas and Louisville are the top two teams.
15   DAWKINS:     Yeah, Kansas and Louisville.  And it just
16                was a good -- it made sense.  It got done in
17                what, two, three days.  It was very simple
18                and everybody won.  And those are the kind
19                of things where I'm saying -- I was telling
20                you, Jeff and I told you Munish.  If we have
21                someone like Merl on our team who one, you
22                know, the NBA relationships because like you
23                said, the NBA people can't see their players
24                as much as they want to, and also two, they
25                don't know who's the guys around the
```

1        players.  So obviously with Merl having that

2        kind of information, he is extremely

3        valuable.  In the college sector with the

4        majors – if if Adidas is cutting a check to

5        Bill Self or Rick Pitino, what did we say,

6        Rick gets paid, like two or three million,

7        something like that.  Trust me, he can,

8        Merl's his friend.  Because at the end of

9        the day, that's a lot of money that those

10       schools pay those kind of coaches to, to,

11       you know, wear their shoes.  Just the bottom

12       line.  And the grassroots sector we're

13       involved with kids that's 10th, 11th grade

14       and I just came back from Minnesota to see

15       the number one incoming 10th grader in the

16       country.  I mean just having access to

17       Adidas and being able to kind of control the

18       whole process early, I think that if we have

19       the college coaches, if we had myself (U/I)

20       relationships all across the board, and we

21       got Merl in the shoe company sector, because

22       Nike is not going to help us.  I mean me and

23       Merl really got close because -- the guy who

24       is like Merl's equivalent at Nike.  He's

25       like the anti-Christ (U/I), seriously --

| | | |
|---|---|---|
| 1 | CODE: | He he had it out for me when I left. |
| 2 | DAWKINS: | Right. |
| 3 | BLAZER: | Who is he now? |
| 4 | CODE: | (U/I).  He's the -- he's actually the -- I |
| 5 | | don't know what his title is. |
| 6 | D'ANGELO: | Was he just not happy you left or he was |
| 7 | | (U/I) |
| 8 | CODE: | So he's a control freak.  And so what |
| 9 | | happened was because as I mentioned to you, |
| 10 | | I was in a silo.  I had left the pro side |
| 11 | | and gone to grassroots. |
| 12 | D'ANGELO: | Yeah. |
| 13 | CODE: | And we always had this back and forth |
| 14 | | because I always had college coaches and NBA |
| 15 | | guys calling me wanting to have dialogue |
| 16 | | about these particular kids.  Well, he |
| 17 | | wanted to be the buffer, not me.  So it's |
| 18 | | almost a jealousy kind of deal where you're |
| 19 | | trying to promote yourself.  It was always |
| 20 | | that kind of stuff going on.  This, and |
| 21 | | after 14 years, I just had enough.  And I |
| 22 | | said, you know what, I'm out.  Well, the |
| 23 | | minute I said I was out, I became his public |
| 24 | | enemy number one under the Nike umbrella. |
| 25 | | Right? Because he made it -- he made it very |

1           clear that anybody affiliated with me is not

2           to have anything to do with Nike. Right?

3           Yeah, but he doesn't have the juice.

4           Because again, the relationships in our

5           space are the relationships in our space.

6           He doesn't control that and most people

7           don't like him anyway. Right? So what I had

8           was – and it actually backfired.  Because I

9           had more of those teams on the Nike side

10          calling and saying "hey, would you be

11          interested in having us come over with you

12          because I don't like him.  I don't like what

13          they're doing."  Can we -- so it really

14          helped us in terms of relationships that we

15          have now and we still have people calling me

16          all the time on the Nike side wanting to be

17          a part of what I'm doing.  Not necessarily

18          from a brand perspective, but because I

19          treated them fairly and I did everything. In

20          our space, which you find is -- it's a

21          manipulative game.  Shoe companies really

22          take advantage of the guys who run these

23          organizations.  And I'll give you an

24          example.  We ask them or require those guys

25          to go out and recruit the best kids in their

**SA-214**

```
 1                      markets or their bordering states.  You can
 2                      only have three per the rules in terms of
 3                      bordering state kids.  We give em 30, 40
 4                      grand, right.  They have to travel, feed,
 5                      clothe.  They got to do all that stuff for
 6                      those kids five, six times a year.  That
 7                      money doesn't stretch that far.  So these
 8                      guys are washing cars.  They're selling hot
 9                      dogs.  They're doing anything they can to
10                      fundraise and then you're being treated --
11                      mistreated.  You know what I'm saying?  At
12                      the same time, they have star-studded
13                      players and then the companies come in and
14                      snatch those kids from them and build a
15                      rapport and relationship and those guys get
16                      nothing.  When those kids turn pro, they
17                      actually almost alienate those kids from
18                      going back to help their own programs.  So
19                      it's a really weird kind of dynamic.  A lot
20                      of those guys are getting frustrated and
21                      flustered and want to do something where
22                      somebody is trying to help them.  So I'm
23                      trying to help those guys throw camps and
24                      make money -- put some money in their
25                      pockets so it's not a big stress on them.
```

**SA-215**

| | | |
|---|---|---|
| 1 | | I've had guys whose marriages have been in |
| 2 | | jeopardy because they're spending their own |
| 3 | | money trying to take care of these kids. |
| 4 | D'ANGELO: | These are these are college coaches. |
| 5 | DAWKINS: | AAU. Grassroots coaches |
| 6 | CODE: | These are AAU coaches or called travel team |
| 7 | | coaches. |
| 8 | D'ANGELO: | Right. |
| 9 | CODE: | AAU is kind of a business entity unto |
| 10 | | itself. |
| 11 | D'ANGELO: | Okay.  So a travel team coach. |
| 12 | CODE: | I know I'm kind of giving you a crash course |
| 13 | | in some of this stuff, but so yeah, these |
| 14 | | travel team guys typically some of them have |
| 15 | | jobs, some of them don't.  Some of them are, |
| 16 | | you know, street guys -- |
| 17 | D'ANGELO: | Right. |
| 18 | CODE: | -- to be honest with you.  Some of them make |
| 19 | | their money in unscrupulous ways.  But they |
| 20 | | are trying to help some kids in some sense. |
| 21 | | Or they're trying to promote themselves as |
| 22 | | being a guru in the in the space.  One or |
| 23 | | the other, right.  And our job is kind of to |
| 24 | | weave through minutia and figure out who is |
| 25 | | the influential circle around this |

```
1              particular kid.  And that might change from
2              week to week because you have split
3              households.  You have a mom who lives in
4              California and a dad who's in New York, and
5              the kid spends the winter months in school
6              with mom, but during the summer, he's with
7              dad.  So who's really controlling the kid in
8              the situation?  And it -- again, it varies.
9              The AAU coach -- we've had issues, for
10             instance, where an AAU coach and a mom were
11             dating and the dad lives in another state
12             and then they break up and then the high
13             school coach and the mom start dating.  I
14             mean this -- it's a mess.  But it's our job
15             to kind of weave through the foolishness.
16             Right?
17
18
19
20
21
22
23
24
25
```

**SA-217**

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3
   --------------------------x
 4                           :
   UNITED STATES OF AMERICA   :
 5                           :
   v.                        :       S1 17 Cr. 684 (ER)
 6                           :
   CHRISTIAN DAWKINS and      :
 7 MERL CODE,                 :
                             :
 8        Defendants.        :
                             :
 9 --------------------------X

10

11

12

13

14                    Recorded Conversation

15

16
                 Date: June 20, 2017
17               Participants:  Munish Sood
                                Marty Blazer
18                              Jill Bailey
                                Christian Dawkins
19                              Merl Code
                                Jeff D'Angelo
20                              Alicia Carroll

21

22
                 (U/I) - UNINTELLIGIBLE
23               (PH)  - PHONETIC SPELLING

24

25
```

GOVERNMENT
EXHIBIT
510A2T
S1 17 Cr. 684 (ER)

**SA-218**

1

```
 1   BLAZER:      Yeah.  But my question, Merl is the is the,
 2                is the, is kind of a sweet spot for you with
 3                the relationship, with the strength and
 4                relationship on the, on the grass roots side
 5                where you're sponsoring AAU or is it more
 6                the sponsored schools that you're --
 7   CODE:        From a corporate perspective or me
 8                personally?
 9   BLAZER:      From you personally, or both.
10   CODE:        I don't know if I have a --
11   BLAZER:      Cause you lose them, but if they go if they
12                go to one of your -- like you got a kid,
13                doesn't go, sponsored AAU team
14   CODE:        And he doesn't go to sponsored Nike school.
15   BLAZER:      (U/I).  Right, yeah.
16   CODE:        That makes sense.  So I think and I'll
17                probably leave this to Christian to, to, to,
18                to expound upon my point because I wouldn't
19                talk (U/I) --
20   BLAZER:      I know that's where you're going.
21   CODE:        -- myself, but I would say, and one of the
22                things I always -- one of the reasons I've
23                been successful with families and kids is
24                because I don't really care where they go to
25                school.  Certainly, I would like for them to
```

```
 1                    go to my sponsored schools but I don't

 2                    really care.  The objective for me is once

 3                    they turn pro, try to get them back.

 4  BLAZER:           Right.

 5  CODE:             Right.  So, and I always let them know that

 6                    in the recruiting process.  Hey, listen, if

 7                    that's where the kid wants to go to school,

 8                    he's got to enjoy his college experience

 9                    from a playing perspective.  You only get

10                    one chance to play in college.  I made my

11                    own decision.  Nobody forced me to go.  You

12                    should have the same option. Right. So if I

13                    push you to a school and then you don't like

14                    the coach or the coach gets fired or you

15                    suffer a bunch of injuries and you never

16                    fulfill your dream as a player, who you

17                    pointing the figure at?  Because I made you

18                    go there to that particular school.  I don't

19                    want to be in that situation.  So I'd rather

20                    the kid make his own decision and keep me

21                    abreast of it and then I can activate

22                    Christian and say, hey, he's going to this

23                    school.  Let's just make sure we stay on top

24                    of him.

25  BLAZER:           Right.
```

| | | |
|---|---|---|
| 1 | CODE: | Because college coaches have agent |
| 2 | | relationships, assistant coaches, whoever |
| 3 | | recruited him.  Head coaches have |
| 4 | | relationships.  So there's a tug of war |
| 5 | | going on even if you send a kid to a |
| 6 | | particular school.  Even within the same |
| 7 | | brands.  I mean these AAU guys sometimes |
| 8 | | sell their kids to a particular school with |
| 9 | | the thought of getting them back and then an |
| 10 | | assistant coach or college coach will take |
| 11 | | that same kid and put 'em with his people. |
| 12 | BLAZER: | Right. |
| 13 | CODE: | And the AAU coach gets cut out. |
| 14 | BLAZER: | Yeah. |
| 15 | CODE: | So, and then the AAU coach vows to never |
| 16 | | send another kid to that school.  You know, |
| 17 | | so you have -- |
| 18 | BLAZER: | It's not hard to close that loop though. |
| 19 | | That's what - that's what that's that's |
| 20 | | what's what I think. That's what I think |
| 21 | DAWKINS: | I think too as well.  Kind of as Merl was |
| 22 | | saying too.  I think you asked a good |
| 23 | | question. |
| 24 | BLAZER: | You're on to it though. |
| 25 | DAWKINS: | Well I think Marty just cause ok so Merl's |

```
 1                    at Adidas, obviously, I (U/I) Nike or Under
 2                    Armour.  But that's not to say that like,
 3                    for instance, Book, at Arizona, Nike what
 4                    top flight program.
 5   CODE:            (U/I) he's my brother.
 6   DAWKINS:         Yeah.  Like we're all close.
 7   CODE:            He was coaching here with the Gauchos
 8                    program when we first met.  He wasn't even a
 9                    college coach.
10   DAWKINS:         And you sponsored him, right?
11   CODE:            I sponsored him.
12   DAWKINS:         With Nike.
13   CODE:            When I was at Nike.  So we got back really
14                    15 years and he was a nobody.  He was coming
15                    off playing at  Marist and was running
16                    around chasing kids in the city because he
17                    wanted to build a good team.  Now, he's been
18                    with -- at -- he's never been at Adidas
19                    schools, always been at Nike.  He was at
20                    Xavier and now he's at Arizona.  And so --
21                    but that doesn't change our relationship.
22   BAILEY:          (U/I)
23   DAWKINS:         And that's the biggest thing (U/I)
24   CODE:            So that's what I was saying to you earlier.
25                    The brands, yeah okay, sounds good.  But
```

| | | |
|---|---|---|
| 1 | | really it's the people behind the scenes who |
| 2 | | are running the show those relationships |
| 3 | | mean everything -- |
| 4 | BLAZER: | You've got relationships like that. |
| 5 | DAWKINS: | They key is for us to use. |
| 6 | BLAZER: | Sponsored and non-sponsored, it's -- your |
| 7 | | reach is probably - |
| 8 | CODE: | Reach is -- I've been fortunate.  I'm really |
| 9 | | blessed to have had the experience at the |
| 10 | | pro level and then dive down into the |
| 11 | | college and grassroots sector to have those |
| 12 | | relationships. |
| 13 | BAILEY: | Um-huh. |
| 14 | DAWKINS: | And I I think I was trying to explain to |
| 15 | | ya'll, I think that the key for us with Merl |
| 16 | | is to essentially use his relationships and |
| 17 | | Adidas's branded influence to help grow the |
| 18 | | overall business.  Because, for instance -- |
| 19 | CODE: | Let me get with -- I don't mean to cut you |
| 20 | | off. I just helped his Daddy get a job. |
| 21 | DAWKINS: | Right. |
| 22 | CODE: | My college -- my assistant coach in college |
| 23 | | became the head coach at Cleveland State |
| 24 | | which is a Nike school.  I called him and |
| 25 | | said I'm going to get your dad the job. |

**SA-223**

```
 1   DAWKINS:         Um-hum.

 2   CODE:            He hired his dad a week later.  So it's a

 3                    Nike school.  I'm helping a Nike school.

 4                    No, I'm not.  I'm helping his dad and my

 5                    former coach in college.  So if I ever need

 6                    to go back and need something from his dad

 7                    or from my -- because of the relationship --

 8   BAILEY:          The relationships are there.

 9   CODE:            There you go,

10   BAILEY:          Exactly.

11   CODE:            I didn't mean to cut you off.

12   DAWKINS:         Yeah, but what I was trying to explain to

13                    him -- I don't want you to get, you know,

14                    just Adidas -- like obviously we all love

15                    Adidas, but we really use Adidas to -- to

16                    continue to grow the overall business and I

17                    remember Jeff you asking about what

18                    particular kid can Merl influence or bring

19                    in.  That would be, that would be limiting -

20                    - we were just -- okay, we gonna pinpoint

21                    the best kid (U/I) Tyrod Taylor, and he

22                    doesn't play basketball.  Let's just say he

23                    was saying we're going to pinpoint Tyrod

24                    Taylor.  To me like that's thinking small

25                    because if we can control or give all the
```

```
 1                      kids at the grassroots level who Merl is
 2                      sponsoring -- if we can't get the kids, then
 3                      that's our own fault.  It is what it is.  I
 4                      don't see at that point ya got -- the
 5                      biggest thing in this business is access.
 6                      Most people don't have access and the
 7                      information to get the deals done.  So if
 8                      you have access and you have the information
 9                      and you got someone that's co-signing you,
10                      it's pretty tough to lose at that point as
11                      long as you have the resources.
12   CODE:              He called me yesterday -- was it yesterday,
13                      two days ago?
14   DAWKINS:           Yeah. (U/I)
15   CODE:              He called, he called me yesterday and said
16                      hey, can you see who the Knicks are going to
17                      draft at 44.  I said yeah, hold on.  Called
18                      the Knicks.  Hey, what are you guys going to
19                      do at 44.  I think we're going to trade the
20                      pick.  So I hit him back.  You know, but
21                      they wouldn't tell me that if I didn't have
22                      a relationship with them.
23   BAILEY:            Exactly.
24   CODE:              Right. They said we might not.  We're trying
25                      to.  Okay.  Well, at least you know.  So
```

```
 1                    maybe kids on the kid's, maybe he's not,
 2                    because if they trade a pick.  Who knows?
 3                    But he's got the information.  That's the --
 4                    the biggest thing about our space is just
 5                    having access to the information.
 6   DAWKINS:         Cause the team isn't going to just tell me
 7                    (U/I)
 8   CODE:            They've got to trust me that I'm not going
 9                    to go to the Phoenix Suns or to the Lakers
10                    and share what they're doing.
11   DAWKINS:         And they're not going to tell me because I
12                    can go share that with someone to get to --
13                    to weaken their draft. So I can help my
14                    client at the end of the day.  So I have to
15                    have somebody who is in the middle who they
16                    can ya know tell the real information.
17   BLAZER:          But you've got, you've got that kind of
18                    reach on the grass roots level --
19   CODE:            Yes.
20   BLAZER:          -- and on the collegiate level --
21   CODE:            Yes.
22   BLAZER:          -- where, where these -- where they are
23                    going from --
24   CODE:            Yes.
25   BLAZER:          -- grass roots to college, college to NBA.
```

9

```
 1              And that's --
 2  JEFF:       Because it looks like ultimately what I see
 3              is you want, you want the kids to sign with
 4              us -- with you.
 5  DAWKINS:    Um-hum.
 6  JEFF:       The earlier you can get to them, obviously
 7              the better chance you got and I guess -- but
 8              then if you get to them early it's well how
 9              do you manage them from the time you get to
10              them --
11  CODE:       Yeah.
12  JEFF:       -- to the time they get drafted?
13  CODE:       And that's a great question because there's
14              no one single formula to answer that.
15  JEFF:       So I think what we're trying to do -- and to
16              me, like obviously Book was here.  I think
17              he was like -- I think he seemed to think it
18              could work (U/I)
19  BLAZER:     Do you think that's a good approach? Do you
20              think that's the right time?
21  CODE:       I do, think, I think having the gambit
22              covered in terms of relationships at each
23              level is important to the overall success.
24              But I also think just to  manage you guys'
25              expectations and I want to get back to you
```

```
 1                    saying how do we can't -- like you can't say

 2                    this is how we manage kids who --

 3   BAILEY:          Everyone is kind of different.  Exactly

 4   CODE:            -- are 13 years old to 18 years old or 19

 5                    and he's ready to turn pro.  You're going to

 6                    have some situations -- in this business,

 7                    and I we laugh about it all the time.  I

 8                    said, Christian, "I'm surprised there aren't

 9                    more murders in our space."

10   DAWKINS:         There really should be.

11   CODE:            I mean literally because people do the most

12                    ridiculous stuff ever and it's -- you know,

13                    you give me a hundred grand.  I love you.

14                    We're going to do this together.  You give

15                    me 200 grand.  I take it and screw you.

16   BAILEY:          Yeah.

17   CODE:            And there's no recourse because you weren't

18                    supposed to give me the hundred grand

19                    anyway.  Right.  So --

20   BAILEY:          So what are you going to do about it?

21   CODE:            Nothing.  Right.

22   BAILEY:          Yes.

23   CODE:            And that's why I said, you die where I'm

24                    from.

25                             (OVERLAY TALKING)
```

```
 1   CODE:          (Laughter) You've got to go.

 2   DAWKINS:       I think that, I think that Merl probably

 3                  helps me out more than anything is just

 4                  saving money honestly.  Yesterday, I walk in

 5                  and I called Merl because this guy kept

 6                  blowing me up.  And he's got a pretty good

 7                  kid.

 8   CODE:          He's got a really good kid.

 9   DAWKINS:       And I said he's a fucking dude.  He can have

10                  number one pick.  I said "listen, Merl, what

11                  do you think about this particular guy?"  He

12                  goes "well, I wouldn't give him anything.

13                  He's a scumbag."  And that just saved me

14                  probably $100,000 for no reason.

15   CODE:          He's pretty shitty. And I know that he's a

16                  piece of shit because I've dealt with him

17                  for years.  Don't fool with him.  So let's

18                  figure out a way to get around him.

19   DAWKINS:       Right

20   CODE:          And figure out who the kid's really talking

21                  to and so that's what I've been on the phone

22                  trying to find out who those people are

23                  today, so he can go around these guys.

24   DAWKINS:       That's what we were supposed to talk about

25                  when we were uhh (U/I).
```

**SA-229**

```
 1   CODE:        Right.

 2   DAWKINS:     Yeah, we didn't do that (U/I).

 3   CODE:        (U/I)

 4   BLAZER:      I just think the best point of entry where

 5                you maximize the -- you know, your, your

 6                relationship and the potential

 7                profitability.  That's what it's all about,

 8                right?  I mean it's about trying to, you

 9                know --

10   SOOD:        ROI.

11   BLAZER:      Right, ROI.  Insert yourself at a, at a

12                position where, you know, support in however

13                we need to but just at a point where you're

14                going to maximize the, the potential.

15   DAWKINS:     Well, I think also Jeff to answer your

16                question.  And this is, this is why to me,

17                the value of being involved with young guys

18                is important.  And I say this openly:  Brian

19                Bowen got me Justin Patton this year.  I

20                don't know if Brian Bowen is going to be a

21                pro.  He probably will be.  If he doesn't,

22                at the end of the day, because all the

23                coaches was coming to me for his for his

24                recruitment, I was able to get a kid that's

25                going to be a top 15 pick in two days
```

```
1                    because I said listen, this is your list and
2                    his list was Arizona, who had a lottery
3                    pick, Michigan State, had a guy who was
4                    supposed to be a lottery, went back to
5                    school. NC State had a lottery pick.
6                    Creighton. Umm this is the original list.
7                    And then Texas.  Now, he ended up going to a
8                    school not on that list, but that's (U/I).
9    CODE:           [Laughter]
10   DAWKINS:        But all those schools had a guy who was a
11                   top 15 pick and I waslike, listen, whoever
12                   gets me the guy is gonna have the best
13                   chance to be put in a position to to get the
14                   kid. I mean, it just was the bottom line.
15                   Now, in a -- some stuff ended up happening
16                   with Creighton at the end that messed stuff
17                   up -- but being involved with the young guy
18                   is what gave me access to a guy in college
19                   which gave me access to a guy who's gonna be
20                   an NBA player, basically.
21
22
23
24
25
```

**SA-231**

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
2

3
------------------------------x
4                              :
UNITED STATES OF AMERICA      :
5                              :
v.                             :        S1 17 Cr. 684 (ER)
6                              :
CHRISTIAN DAWKINS and         :
7  MERL CODE,                  :
                               :
8          Defendants.         :
                               :
9  ------------------------------X

10

11

12

13

14                    Recorded Conversation

15

16

17

18          Date:  June 20, 2017
            Participants:  Jeff D'Angelo
19                         Marty Blazer
                           Christian Dawkins
20                         Merl Code
                           Alicia Carroll
21                         Jill Bailey
                           Jesus Mesa
22

23

24          (U/I) - UNINTELLIGIBLE
            (PH)  - PHONETIC SPELLING

25

**GOVERNMENT
EXHIBIT
510B2T**
S1 17 Cr. 684 (ER)

**SA-232**

1

| | | |
|---|---|---|
| 1 | D'ANGELO: | Yeah.  So basically, what you said I think |
| 2 | | kind of what I kind of see going is, you |
| 3 | | know, however we -- however you want to kind |
| 4 | | of structure your end, it would be identify |
| 5 | | the kid early, AAU.  I mean for me this |
| 6 | | makes me feel the most comfortable, identify |
| 7 | | the kid early at AAU.  Ultimately, we get |
| 8 | | him to a college that is an Adidas school or |
| 9 | | it's a school that -- |
| 10 | CODE: | I wouldn't even worry about that part. |
| 11 | D'ANGELO: | But -- |
| 12 | BLAZER: | But that can be one of the focuses.  So -- |
| 13 | | because that closes the loop. |
| 14 | D'ANGELO: | Or it doesn't have to be an Adidas school, |
| 15 | | but it has to be -- |
| 16 | DAWKINS: | To get to a college that we have a (U/I). |
| 17 | CODE: | A college that we have a relationship with. |
| 18 | BLAZER: | Okay. |
| 19 | D'ANGELO: | Yes. |
| 20 | CODE: | Not necessarily an Adidas school. |
| 21 | BLAZER: | Okay. |
| 22 | D'ANGELO: | Either or. |
| 23 | CODE: | Right.  So just a school that we have some |
| 24 | | influence or relationships with. |
| 25 | D'ANGELO: | Either or.  So, I would feel -- |

**SA-233**

| | | |
|---|---|---|
| 1 | CODE: | Okay. |
| 2 | D'ANGELO: | -- if we have the kid at AAU, he goes to one |
| 3 | | of those -- a school of influence, let's say |
| 4 | | it like that. |
| 5 | CODE: | Okay. |
| 6 | D'ANGELO: | A school of influence that we have influence |
| 7 | | over.  And then, you know -- |
| 8 | BLAZER: | And help the powers that be to get -- |
| 9 | D'ANGELO: | And then ultimately, we kind of think that |
| 10 | | that -- that that kid's going to, you know, |
| 11 | | end up signing with us at the end and a home |
| 12 | | run -- |
| 13 | CODE: | Yes. |
| 14 | D'ANGELO: | -- is he comes back, he comes back to you. |
| 15 | | Now, to have influence at these schools, you |
| 16 | | know, we're obviously kind of in a situation |
| 17 | | similar to, you know, meeting with a -- |
| 18 | | meeting with a coach, so I don't know if |
| 19 | | you're in a position to either make |
| 20 | | introductions to those schools.  If you |
| 21 | | already have the relationship.  If the |
| 22 | | relationship needs to be strengthened.  I |
| 23 | | mean 'cause that -- I think that's kind of |
| 24 | | the (U/I). |
| 25 | CODE: | Yeah, (U/I).  Targeting what schools we're |

**SA-234**

```
 1                    discussing, and certainly nobody has

 2                    relationships at every school.

 3   D'ANGELO:        Right.

 4   CODE:            Right?  And then there'll be some that are

 5                    stronger than others.  And so, figuring out

 6                    what schools make the most sense in terms

 7                    of, you know, his reach, my reach.  And then

 8                    again, what makes the most sense for us from

 9                    an identification end point because, yeah, I

10                    can -- I mean he does as much identifying as

11                    I do.  My value not only is identifying

12                    them, my value really is in, again, the

13                    influential circle and the people around

14                    them because I spend so much time around

15                    those kids.

16   D'ANGELO:        (U/I) yeah.

17   BLAZER:          Yes.  (U/I).

18   CODE:            And who's really running the show.

19   BLAZER:          Perfect.

20   CODE:            And if I don't know, I have enough people

21                    around me to find out.

22   BLAZER:          Right.

23   D'ANGELO:        To find out.

24   BAILEY:          Yeah.

25   CODE:            Right.  So that's -- my value's really more
```

```
 1                    in getting in the end tail of the
 2                    information from the space along with the
 3                    relationships.  So -- but I agree with you.
 4                    I think the, again, the thought process is
 5                    accurate in terms of how you're viewing this
 6                    structurally.  So, I'm -- listen, I think
 7                    what we'll try to do is make sure that we
 8                    are minimizing the exposure to failure,
 9                    right?  So, like just not throwing stuff to
10                    the wind, and making sure we're being
11                    strategic about what we're doing.
12    BLAZER:         Can I paint the picture real quick?
13    D'ANGELO:       Yeah.
14    BLAZER:         Is that --
15    D'ANGELO:       (U/I) clean up.
16    BLAZER:         -- you get -- I mean you get -- you're in
17                    the right situation, right, Christian?  And
18                    the kids, you know, Arizona's not a bad
19                    school to go to, right?  So --
20    DAWKINS:        (U/I).
21    BLAZER:         -- you got the relationship with Christian
22                    and Merl to identify that kid early, early-
23                    early.  Arizona's one school that the kid's
24                    entertaining.  We help with -- help Book,
25                    whatever.  The kid goes to Arizona, you got
```

**SA-236**

```
1                      the relationship there.  You got the

2                      relationship with Merl and Christian with

3                      them, where do you think that -- when that

4                      kid's one and done, where do you think he's

5                      going?

6   DAWKINS:           It'd be pretty hard for us not to do (U/I) -

7                      -

8   CODE:              It's hard not -- we (U/I) --

9   BLAZER:            That's (U/I).

10  [OVERLAPPING VOICES]

11  CODE:              (U/I).

12  BLAZER:            Yes.

13  D'ANGELO:          Yeah, I mean that's -- that is kind of what

14                     --

15  [OVERLAPPING VOICES]

16  BLAZER:            Right.  That's what I'm saying.  But --

17  SOOD:              But this kid Bowen --

18  BLAZER:            That's what I'm saying.  You -- so

19                     grassroots are here, next level's here.  And

20                     then once it comes back out, you -- there is

21                     -- you -- that is sealed so tight, right?

22                     How could it --

23  DAWKINS:           And then again, if I'm the one talking to

24                     (U/I) or a sneaker company to sign with, why

25                     wouldn't they sign with Adidas?
```

**SA-237**

| | | |
|---|---|---|
| 1 | BLAZER: | Exactly. |
| 2 | D'ANGELO: | Why wouldn't -- |
| 3 | DAWKINS: | So then at that point -- at that point, |
| 4 | | (U/I) with Merl at Adidas, (U/I) with us and |
| 5 | | what we're doing is (U/I) the college |
| 6 | | coaches.  You got control over the whole |
| 7 | | business. |
| 8 | D'ANGELO: | And I hate to be using Book as the example |
| 9 | | here because I don't -- you know, (U/I) talk |
| 10 | | about his business, but you guys are all so |
| 11 | | close to him, so, you know?  But that's kind |
| 12 | | of the model I see.  Like I think, you know, |
| 13 | | anyone that's AAU -- |
| 14 | CODE: | (U/I). |
| 15 | D'ANGELO: | -- that goes over to him. |
| 16 | CODE: | (U/I). |
| 17 | SOOD: | Huh? |
| 18 | D'ANGELO: | You know -- |
| 19 | BLAZER: | (U/I). |
| 20 | D'ANGELO: | -- we're good. |
| 21 | CODE: | Yeah. |
| 22 | D'ANGELO: | So, if we have them, because we have 10 -- |
| 23 | CODE: | (U/I). |
| 24 | D'ANGELO: | -- other programs. |
| 25 | BLAZER: | That's it. |

**SA-238**

| | | |
|---|---|---|
| 1 | D'ANGELO: | Ten other coaches like that, like that model |
| 2 | | we give them the resources that they need to |
| 3 | | do whatever they need to do to be successful |
| 4 | | to make that kid successful to then |
| 5 | | influence that kid back to our company, I |
| 6 | | think that's the best way.  You're not going |
| 7 | | to get them all, but if we identify them |
| 8 | | early, then we send -- and we send them to a |
| 9 | | place where we have influence over, you |
| 10 | | know, I can (U/I) I guess (U/I) what the |
| 11 | | real question is if, you know, if you can |
| 12 | | help with some of those -- |
| 13 | CODE: | Absolutely. |
| 14 | D'ANGELO: | -- relationships.  Say I'll put you with |
| 15 | | this coach.  I'll put you (U/I) -- you know, |
| 16 | | whether it's -- you have your own, you have |
| 17 | | your own, you want to do it together.  But I |
| 18 | | think that's kind of the best way. |
| 19 | CODE: | Well, we talked to truly the other day.  So, |
| 20 | | we will -- I mean he's got enough |
| 21 | | relationships without me and I have enough |
| 22 | | without him, but if we're doing it together, |
| 23 | | (U/I) -- |
| 24 | DAWKINS: | (U/I). |
| 25 | BAILEY: | Yeah. |

```
 1  CODE:           -- you know, helping each other out.

 2  DAWKINS:        I think we do it together because it would

 3                  strengthen us.

 4  CODE:           No, no, that's what I'm saying (U/I).

 5  BAILEY:         Yeah.

 6  BLAZER:         I'm intrigued by the Adidas sponsor schools

 7                  too.  I think that's strong.

 8  CODE:           Yeah.  And again, we're working on some and

 9                  --

10  BLAZER:         Yeah.

11  CODE:           And he's -- we've got -- but again, I want -

12                  - I don't want to harp on it enough for you

13                  to guys understand.  We have enough

14                  relationships even at Nike schools --

15  BLAZER:         (U/I).

16  CODE:           -- across the board.  Like even at the high

17                  school level, you know what I'm saying?

18                  There's a -- the number one player in the

19                  country in the '19 class is a kid that plays

20                  for a Nike program.  Well, the guy that runs

21                  the program is one of my best friends.  So,

22                  he's already like, hey, what are we doing

23                  with this kid?  So, I'm saying, all right,

24                  Christian, you need to start (U/I) with the

25                  process with the kid now.
```

**SA-240**

```
 1  D'ANGELO:      Right.

 2  CODE:          You know, so that's the kind of stuff that's

 3                 already taking place.  And so, we just need

 4                 to make sure we're taking advantage of those

 5                 relationships.

 6  D'ANGELO:      Yeah, at the grass root, and then (U/I) I

 7                 guess.  So, what kind of schools do you -- I

 8                 mean do you (U/I), hey, I think these are

 9                 like -- if you had to rattle off five or so

10                 schools now that you think are kind of --

11                 this is where we should start and let's see

12                 how that goes.

13  CODE:          Yeah, I think we -- I think obviously --

14                 well, Arizona's certainly one of the prime

15                 times.

16  D'ANGELO:      Right.  So, they're like the example.

17                 That's (U/I) --

18  CODE:          There's a --

19  D'ANGELO:      So, we want --

20  CODE:          That's a huge get.

21  D'ANGELO:      We want 10 schools like that.

22  CODE:          Arizona.  But you're not going to get 10

23                 Arizona's.

24  D'ANGELO:      We're not going to get 10.

25  CODE:          Right?
```

```
 1  D'ANGELO:       Right.   Well, no (U/I) --

 2  [OVERLAPPING VOICES]

 3  D'ANGELO:       But that's a home run.

 4  CODE:           There's already all of this -- there's

 5                  already this kind of stuff going on at some

 6                  of the other schools, right?  So --

 7  D'ANGELO:       Right.

 8  CODE:           So, Arizona's a huge get because, again, it

 9                  is considered one of the Blue Blood

10                  programs.  But I think Indiana is another

11                  school that, one, is under our umbrella, but

12                  also has enough cache to bringing in the

13                  caliber players that we may have some

14                  interest in.

15  D'ANGELO:       Okay.

16  CODE:           I think potentially a Florida State, you

17                  know, could be an opportunity to do some

18                  things or try.  Maybe.  There are some

19                  existing relationships there too.

20  D'ANGELO:       Sure.

21  CODE:           But, again, you don't know until you ask and

22                  try.  Kansas concerns me as it does

23                  Christian because there's -- those

24                  relationships are blatant and very tough to

25                  overcome.
```

**SA-242**

| | | |
|---|---|---|
| 1 | D'ANGELO: | Sure. |
| 2 | CODE: | Even though it's one of our schools. |
| 3 | BLAZER: | Kansas. |
| 4 | CODE: | Alabama is a school where I think we could |
| 5 | | have some influence.  They're bringing in -- |
| 6 | | their basketball program is on the rise. |
| 7 | D'ANGELO: | Sure.  Yeah.  (U/I). |
| 8 | CODE: | So, they have probably a top five recruit |
| 9 | | class in the country this year, and so |
| 10 | | that's the school that we need to activate. |
| 11 | | He's already involved with it -- with some |
| 12 | | kids there.  I'm -- well, again, one of my |
| 13 | | best friends is an assistant coach there, |
| 14 | | and he'll do whatever we need him to do.  So |
| 15 | | -- and that's a Nike school.  But the |
| 16 | | relationship is a good relationship. |
| 17 | BAILEY: | Yeah.  Sounds like the relationship's |
| 18 | | stronger with (U/I). |
| 19 | D'ANGELO: | And then (U/I) -- |
| 20 | CODE: | I spent more time -- and I've been at -- |
| 21 | | I've been at Adidas two years to be honest |
| 22 | | with you.  I've been at -- I was at Nike for |
| 23 | | 14 years. |
| 24 | BAILEY: | Yeah. |
| 25 | D'ANGELO: | Yeah. |

```
 1   CODE:         So certainly, those relationships are

 2                 lasting.

 3   BAILEY:       (U/I).

 4   D'ANGELO:     Are lasting, yeah.  And it -- so then -- and

 5                 then what's the best way, like what's the

 6                 best method to do the intros?  Is it

 7                 actually going to that school or is it to --

 8                 or is it to try to meet them in a setting

 9                 where there's a basketball camp (U/I)?

10   CODE:         Well, I think we need to prep them in terms

11                 of what the --

12   D'ANGELO:     I agree.

13   CODE:         -- ask or what they're requiring.

14   BAILEY:       Yeah.

15   CODE:         What are they -- what are the expectations -

16                 -

17   BAILEY:       Yeah.

18   CODE:         -- in terms of what we are expecting of them

19                 as coaches.  And I think somebody that's in

20                 the space, like I -- what you find about --

21                 find out about a lot of college coaches is

22                 they're very nervous and hesitant and

23                 reluctant to meet new folks who aren't in

24                 the basketball space.  Because there's so

25                 much stuff that goes on and these guys are a
```

1          snapped finger away from not having a job.

**SA-245**

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3
      ---------------------------x
 4                                :
      UNITED STATES OF AMERICA     :
 5                                 :
      v.                           :      S1 17 Cr. 684 (ER)
 6                                 :
      CHRISTIAN DAWKINS and        :
 7    MERL CODE,                   :
                                   :
 8              Defendants.        :
                                   :
 9    ---------------------------X

10

11

12

13

14                    Recorded Conversation

15

16

17
                      Date:  August 30, 2017
18                    Participants:  Munish Sood
                                     Jill Bailey
19                                   Christian Dawkins
                                     Emmanuel "Book" Richardson
20

21

22

23              (U/I) - UNINTELLIGIBLE
                (PH)  - PHONETIC SPELLING
24

25
```

<div style="border:2px solid black; background:yellow;">

**GOVERNMENT
EXHIBIT
518AT**

S1 17 Cr. 684 (ER)

</div>

| | | |
|---|---|---|
| 1 | SOOD: | So is everybody coming here or they're going |
| 2 | | there (U/I)? |
| 3 | DAWKINS: | So Rodney, Rodney, (U/I) going to have to |
| 4 | | come up here (U/I) I was with him last |
| 5 | | night.  Rawle (PH) showed me the girl that |
| 6 | | he was (U/I) and he said Sean wanted to |
| 7 | | suspend him, I'm like, he should've been |
| 8 | | trying to promote you, bro. |
| 9 | RICHARDSON: | Yeah. |
| 10 | DAWKINS: | Because how -- I'm like why was she the one |
| 11 | | to do it, she clearly (U/I). |
| 12 | RICHARDSON: | No, she did she did charity. |
| 13 | DAWKINS: | Yeah, she had to. |
| 14 | RICHARDSON: | Nah, she thought he was the Ronald McDonald |
| 15 | | (U/I). |
| 16 | DAWKINS: | Exactly. |
| 17 | RICHARDSON: | I'm like, look, why was she (U/I) talk to |
| 18 | | you (U/I), but he, Rodney's going to come |
| 19 | | over here 2:30. |
| 20 | SOOD: | Who is? |
| 21 | DAWKINS: | Rodney, which is Rawle's like older cousin. |
| 22 | SOOD: | Okay. |
| 23 | DAWKINS: | So Rawle (U/I) -- excuse me, Rodney is a |
| 24 | | good guy, but he has -- |
| 25 | BAILEY: | This is his cousin, Rawle's cousin? |

**SA-247**

                                                                    2

```
 1   DAWKINS:       He's not a business person all the way yet.

 2                  Like when y'all meet with him you're gonna

 3                  be like, man, I would hire him right on the

 4                  spot.  His first impression is pretty (U/I),

 5                  wouldn't you say?

 6   RICHARDSON:    Awesome.

 7   DAWKINS:       Speaks well, nice looking guy, articulate.

 8                  But his (U/I) is poor.

 9   BAILEY:        And he's managing Rawle?

10   DAWKINS:       If that's what you wanna call it, I mean --

11   SOOD:          But he decides --

12   BAILEY:        Lack of a better term.

13   DAWKINS:       He can bring it to the table, Rawle

14                  ultimately is --

15   [TALKING TO SERVER/ORDERING FOOD]

16   DAWKINS:       So now I'm a tell you -- Rawle will have a

17                  big part of his decision.  I think Rodney,

18                  Rodney will have some influence as well, as

19                  long as we don't have to deal with the mom,

20                  I think we'll be fine.

21

22

23

24

25
```

**SA-248**

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
 2

 3
    ---------------------------x
 4                              :
    UNITED STATES OF AMERICA    :
 5                              :
    v.                          :      S1 17 Cr. 684 (ER)
 6                              :
    CHRISTIAN DAWKINS and       :
 7   MERL CODE,                  :
                                :
 8             Defendants.      :
                                :
 9   ---------------------------X

10

11

12

13

14                      Recorded Conversation

15

16

17
                       Date:  August 31, 2017
18                      Participants:  Munish Sood
                                       Jill Bailey
19                                      Tony Bland
                                       Christian Dawkins
20                                      Unidentified Male

21

22

23              (U/I) - UNINTELLIGIBLE
                (PH)  - PHONETIC SPELLING
24

25
```

GOVERNMENT
EXHIBIT
521AT
S1 17 Cr. 684 (ER)

**SA-249**

<pre>
                                                                    1

 1   SOOD:          (U/I) seen everything and done everything,

 2                  (U/I) dollars (U/I).  (U/I) three years ago.

 3                  It started (U/I).  Now it's primarily

 4                  basketball.

 5   BLAND:         Okay.

 6   SOOD:          (U/I).  But (U/I) take it, we work with --

 7                  we met with -- yesterday --

 8   BAILEY:        Taeshon Cherry's father.  Yeah.

 9   SOOD:          Taeshon's dad.

10   BLAND:         (U/I).

11   BAILEY:        Yeah.

12   SOOD:          (U/I) here.  So someone like him we'll go

13                  (U/I) gonna be --

14   BLAND:         Yeah, yeah.

15   SOOD:          -- (U/I).  So now then, when he's in

16                  college, (U/I) financial (U/I), (U/I).

17   [TALKING TO SERVER]

18   SOOD:          (U/I) everything else.  So when he's ready

19                  to make that next step -- take that next

20                  step -- (U/I) with him, it's gonna be a very

21                  smooth transition.

22   BLAND:         I think that's great, yeah.  Yeah.

23   SOOD:          All we want to do is have him play

24                  basketball.  (U/I) enough (U/I) over time,

25                  then we'll handle (U/I).  That's how we
</pre>

```
 1              operate.

 2   BLAND:     Okay.

 3   SOOD:      (U/I) back to (U/I), we've been working with

 4              (U/I) a couple of years.  I (U/I) first one,

 5              and it's worked out well.

 6   DAWKINS:   Yeah, I think, like (U/I) USC (U/I) players.

 7              Because (U/I) could be better next week

 8              (U/I).  But the goal for us (U/I) San Diego

 9              (PH) and shit, bottom line.  So, one of the

10              things that me and Tony were discussing, and

11              I think this is important, (U/I) this

12              situation (U/I) value out here.  So, I guess

13              one of the reasons why he (U/I) --

14   BAILEY:    Yeah.

15   DAWKINS:   -- because all the resources (U/I) whatever

16              the case may be, it's as clean as possible

17              because (U/I).

18   BAILEY:    Sorry, say that again.

19   DAWKINS:   It's as clean as possible to go directly to

20              them.

21   BAILEY:    To the parents?

22   DAWKINS:   Yeah, yeah.  (U/I).

23   BAILEY:    Instead of going to Tony.  Okay.  Okay.  I

24              got it.

25   BLAND:     I'm -- my part of the job can be to get the
```

**SA-251**

| | | |
|---|---|---|
| 1 | | parents and to introduce them to Christian |
| 2 | | and say, hey, I trust him.  This is -- can |
| 3 | | vouch for him and even you guys. |
| 4 | BAILEY: | Okay. |
| 5 | BLAND: | And some guys, like Cherry, I can say, this |
| 6 | | is what you're doing.  But other guys, like |
| 7 | | you said, you gotta -- |
| 8 | BAILEY: | Kind of coax them (PH). |
| 9 | BLAND: | -- (U/I) get in, you kinda gotta -- you |
| 10 | | gotta weasel (PH) and push them that way |
| 11 | | before it's too late, so this is what |
| 12 | | they're doing.  You know what I'm saying? |
| 13 | BAILEY: | Yeah, yeah.  Okay. |
| 14 | BLAND: | So, majority of the guys is gonna be, this |
| 15 | | is what you're doing.  But some of them, you |
| 16 | | know, because you get the guys a different |
| 17 | | way, whenever you get them, you know, |
| 18 | | different situations.  You know? |
| 19 | DAWKINS: | That's what I was trying to explain to him, |
| 20 | | there's no way in this business that says |
| 21 | | this is how we gonna do business. |
| 22 | BLAND: | Right, there's no way. |
| 23 | DAWKINS: | There's no way.  There's too -- |
| 24 | BLAND: | There's so many limitations. |
| 25 | BAILEY: | I'm sure with everybody, yeah. |

```
 1  [OVERLAPPING VOICES]

 2  DAWKINS:        -- situation is different.

 3  SOOD:           (U/I) --

 4  BLAND:          Yeah.

 5  SOOD:           (U/I).  Well, that means we want to (U/I)

 6                  long-term, right?  And we're all working

 7                  hard.

 8  BLAND:          Yeah.

 9  SOOD:           So if the business is gonna change, they way

10                  we do things is gonna change, (U/I)

11                  chemistry which you guys already had, (U/I)

12                  grow with you.  You want (U/I) do what I

13                  need and send them off (PH).

14  BLAND:          No question.

15  SOOD:           Because this could -- this man is running

16                  around and we're different than (U/I)

17                  structure, (U/I) with the business or out

18                  (PH) with the business, it needs to grow.

19  BLAND:          Yeah.

20  SOOD:           And the challenging part that we're having

21                  is (U/I) know about it, once you get them,

22                  they're a client and you have another class

23                  coming.

24  BLAND:          Yeah.

25  SOOD:           So once you have them, you also have to
```

```
 1                    service them because they all want to feel
 2                    like they're the only guy you have.
 3  BLAND:            No doubt about it.
 4  SOOD:             Right?  And having -- (U/I) having you (U/I)
 5                    program really (U/I) program, we'll have
 6                    that relationship where we're gonna be able
 7                    to (U/I) and just (U/I).
 8  BAILEY:           And he can call us up, hey -- hey, Munish,
 9                    (U/I) this is what I got.
10  BLAND:            Well, I definitely want to call you up, so.
11  [OVERLAPPING VOICES]
12  BLAND:            She's a little cuter so I gotta joke in.
13                    Nah, I --
14  [OVERLAPPING VOICES]
15  BLAND:            No, I mean, everything you're saying is
16                    exactly what I'm looking for.  And because
17                    it come from Christian, who I trust, you
18                    know, because obviously, this is -- we have
19                    a couple opportunities where you've got us a
20                    gold mine over here.  So, we've had this
21                    opportunity before, but it's not been this
22                    clean.  And from a guy that I'm really --
23  BAILEY:           That you trust.
24  BLAND:            -- that I trust.
25  BAILEY:           Exactly.
```

**SA-254**

| | | |
|---|---|---|
| 1 | BLAND: | You know? |
| 2 | BAILEY: | Yeah. |
| 3 | BLAND: | So, you know, everything through him -- |
| 4 | BAILEY: | And that's why he's valuable to us too, |
| 5 | | because he has a whole network of people |
| 6 | | that trust him. |
| 7 | BLAND: | Yeah. Oh, yeah. |
| 8 | BAILEY: | You know, and that's -- |
| 9 | BLAND: | A whole network, that's for sure. |
| 10 | BAILEY: | -- this whole thing with working -- |
| 11 | | everybody brings something to the table. |
| 12 | BLAND: | Yes. |
| 13 | BAILEY: | That's very valuable, for people to really |
| 14 | | trust Christian. |
| 15 | BLAND: | And from my perspective, where I stand, I |
| 16 | | definitely can get the players. That -- I |
| 17 | | mean, right? (U/I) can get the players. |
| 18 | | And I can get you more of the players. And |
| 19 | | I can put them in the lap of you guys. I |
| 20 | | could put you on the phone with -- you'd be |
| 21 | | great for moms. |
| 22 | BAILEY: | Yeah. |
| 23 | BLAND: | You know, I'll put you on the phone with the |
| 24 | | moms and you know, we can do this whole |
| 25 | | thing. As long as I'm here it's gonna |

**SA-255**

| | | |
|---|---|---|
| 1 | | happen.  Wherever I am.  I was at San Diego |
| 2 | | State and (U/I), I coached (U/I). |
| 3 | SOOD: | I was gonna ask you, what's your game (PH)? |
| 4 | | You've been here now, two or three years? |
| 5 | BLAND: | Four.  It's a stick situation because I've |
| 6 | | had job offers, but in order to take a job |
| 7 | | where I'm gonna get paid that much less to |
| 8 | | start over, it's hard for me.  You know? |
| 9 | BAILEY: | Mm-hmm. |
| 10 | SOOD: | Do you want to be a head coach?  Is that |
| 11 | | what (U/I)? |
| 12 | BLAND: | Yeah, eventually I'll be a head coach.  But |
| 13 | | I wanna wait for the right program to open |
| 14 | | up.  You know?  I don't wanna go to a -- |
| 15 | | (U/I) program when I'm associate head coach |
| 16 | | at the -- at USC. |
| 17 | BAILEY: | Yeah. |
| 18 | SOOD: | (U/I) program (U/I). |
| 19 | BLAND: | So I'll just wait for something good to open |
| 20 | | -- I'm in no hurry. |
| 21 | BAILEY: | I was gonna say, if you're not in rush, then |
| 22 | | what's the big deal anyway? |
| 23 | BLAND: | Just (U/I) -- just signed a five-year deal |
| 24 | | here.  So it's secure -- job security is |
| 25 | | here -- |

**SA-256**

| | | |
|---|---|---|
| 1 | SOOD: | You should be a client. |
| 2 | DAWKINS: | (U/I) you know, so (U/I) investments for |
| 3 | | you, Tony. |
| 4 | BLAND: | Hey, I'll take it. We could definitely |
| 5 | | talk. We can definitely talk about that. |
| 6 | SOOD: | Quite frankly, I have couple coaches as |
| 7 | | clients, (U/I). |
| 8 | BLAND: | Yeah. |
| 9 | BAILEY: | Mm-hmm. |
| 10 | SOOD: | (U/I) talk with Peter (PH) right now, we |
| 11 | | don't care. Because when you talk to that |
| 12 | | other (U/I) program or different program, |
| 13 | | say, hey, we have -- you know, the coach is |
| 14 | | our client. |
| 15 | BLAND: | Yeah. |
| 16 | SOOD: | That's (U/I). |
| 17 | BLAND: | (U/I). |
| 18 | SOOD: | That also helps with the parents (U/I) build |
| 19 | | there. |
| 20 | BLAND: | Yes. |
| 21 | SOOD: | All right, good. (U/I) know, you guys. We |
| 22 | | (U/I) head coach (U/I), Raymond (PH). |
| 23 | BLAND: | Yeah. |
| 24 | SOOD: | So, to us, that's important. I just -- |
| 25 | | we're trying to -- we have our own umbrella. |

```
 1                    We just want to (U/I) one umbrella.

 2  BAILEY:          (U/I).

 3  SOOD:            It's good chemistry.  We don't approach

 4                   anybody else.  There isn't some big (U/I)

 5                   saying, you know, you gotta bring this much

 6                   (U/I).  We'll (U/I) how much we want to do;

 7                   how much we can do.  If we can't do it,

 8                   we'll let you (U/I) people know.  And we

 9                   enjoy doing it together.

10  BLAND:           Yeah, I like it.  That's great.  I like it.

11  SOOD:            (U/I).

12  DAWKINS:         I think that -- and Tony, honest to God, I

13                   trust your opinion.  I mean, obviously, Tony

14                   you've got a lot of (U/I) whatever.

15                   Infrastructure, obviously you know Jeff.

16                   And this is his (U/I).

17  BAILEY:          Mm-hmm.

18  DAWKINS:         What would you say, just, okay, you know

19                   Jill and Marty --

20

21

22

23

24

25
```

**SA-258**

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3
   ---------------------------x
 4                             :
   UNITED STATES OF AMERICA    :
 5                             :
   v.                          :     S1 17 Cr. 684 (ER)
 6                             :
   CHRISTIAN DAWKINS and       :
 7 MERL CODE,                  :
                               :
 8           Defendants.       :
                               :
 9 ---------------------------X

10

11

12

13

14                    Recorded Conversation

15

16

17

18              Date: July 28, 2017
                Participants:  Corey Barker
                               Christian Dawkins
19                             Marty Blazer
                               Jeff D'Angelo
20

21

22

23              (U/I) - UNINTELLIGIBLE
                (PH)  - PHONETIC SPELLING
24

25
```

GOVERNMENT
EXHIBIT
523T
S1 17 Cr. 684 (ER)

```
1    [1:41:24]

2    DAWKINS:        Corey, Marty.  (U/I).

3    BARKER:         Hi, Jeff.

4    JEFF:           How you doing?  Jeff, nice to meet you.

5    BARKER:         Corey, nice to meet you.

6    DAWKINS:        So, I'll make this (U/I).  I gotta get

7                    running.

8    JEFF:           You gotta go.

9    DAWKINS:        So, Corey, is at TCU, you can tell him a

10                   little bit, a synopsis of your background

11                   before we go into the business stuff and

12                   everything like that.

13   BARKER:         It's Texas Christian University.  (U/I) is

14                   my first cousin (U/I) Kentucky.

15   DAWKINS:        He's one of the guys I was saying was a

16                   projected Top-10 pick.

17   BARKER:         Yeah, projected Top-10 pick.  (U/I) top

18                   (U/I) national (U/I) of the country coming

19                   (U/I) in America, in the world, coming in.

20                   (U/I) the Top-7 pick (U/I).

21   DAWKINS:        Who's the kid with (U/I)?

22   BARKER:         (U/I) Williams (PH).

23   DAWKINS:        Yeah, he's like projected second round

24                   (U/I).

25   BARKER:         Projected second round.  Vladimir (PH),
```

**SA-260**

```
 1                   another kid on our team we got with 12 (U/I)

 2                   he's projected -- I mean, I (U/I) they like

 3                   him (U/I).

 4  [1:42:30]

 5  ---------

 6  [1:42:44]

 7  DAWKINS:        So, it's like, the whole system we kind of

 8                   put together, Corey, obviously, you're gonna

 9                   need resources to get shit done.

10  BARKER:         Right.

11  DAWKINS:        You in the big shit now in Texas (U/I).

12  BARKER:         Right.

13  DAWKINS:        We gonna be able to provide you something,

14                   you know, to make sure the kids that you

15                   involved with, we get them back.

16  BARKER:         Right.

17  DAWKINS:        And also, there's a kid named RJ Hampton who

18                   we need to make sure is good because this

19                   motherfucker could be an all-star one day.

20                   So we have those kids coming from TCU, or

21                   wherever you are.

22  BARKER:         Right.

23  DAWKINS:        Because the thing that want -- is important

24                   for us to make sure you understand is, we

25                   want to make sure you're supported whether
```

**SA-261**

3

```
 1                        you're at TCU or you're or Duke or wherever.
 2                        Wherever you go.  And, we gonna have young
 3                        kids who we could probably put there and
 4                        there could be kids that you already have
 5                        kids, TCU listen.  Obviously, we're gonna
 6                        want to have access to them.  And the
 7                        biggest thing is just, you know, you go down
 8                        to supervise everything because we can't be
 9                        here every day.
10  BARKER:          No question.
11  DAWKINS:         You know?
12  [1:43:45]
13  ---------
14  [1:44:07]
15  DAWKINS:         I don't know if you guys have any questions
16                        about anything.  I think him on a monthly
17                        basis logistically.  He's in Texas, so it's
18                        a little bit -- we're all over the place.
19                        But we probably have to figure out some time
20                        to meet to be able to, you know, get
21                        everything together, get our resources
22                        together.
23  [1:44:21]
24  ---------
25  [1:45:46]
```

**SA-262**

| | | |
|---|---|---|
| 1 | DAWKINS: | Yeah.  So that's the thing, like, we want to |
| 2 | | make sure we got a good, stable program that |
| 3 | | we're involved with on our end, send this |
| 4 | | guys to (U/I).  And also, we could also get |
| 5 | | to the point of, if you don't want to go to |
| 6 | | TCU, we've got access -- if you don't want |
| 7 | | to stay at TCU (U/I), we got access to other |
| 8 | | programs (U/I) because of your situation, we |
| 9 | | (U/I).  If it makes sense for everybody. |
| 10 | D'ANGELO: | I'm (U/I). |
| 11 | BLAZER: | Yeah, that's a really good point. |
| 12 | DAWKINS: | Yeah. |
| 13 | BARKER: | Like, that's another thing I was gonna talk |
| 14 | | to you about, I've had like tons of people |
| 15 | | reach out to me in the last six months. |
| 16 | | (U/I) do know my career's going the right |
| 17 | | direction.  I'm getting stuff done.  (U/I) |
| 18 | | the way I represent.  I don't know. |
| 19 | DAWKINS: | Mm-hmm. |
| 20 | BARKER: | (U/I) you know how I roll.  I can get shit |
| 21 | | done.  I don't deal with -- a lot of these |
| 22 | | dudes, I want to keep it like that.  I don't |
| 23 | | deal with a lot of people.  I want to keep |
| 24 | | it like that.  So, like I told him, if I can |
| 25 | | just get a set group to him or whoever I |

```
 1                        roll with, that's who I'm gonna for the

 2                        whole time in the biz.

 3  [1:46:38]

 4  ---------

 5  [1:48:18]

 6  DAWKINS:      We -- let's talk with him in the morning.

 7                        I'm going to Houston anyway.  (U/I) just

 8                        make sure he's back in.  And then, we'll

 9                        talk about logistically how we do everything

10                        on a monthly basis and (U/I).

11  D'ANGELO:     Yeah.  We could do -- we could – Texas, New

12                        York, Miami, we'll figure it out.

13  DAWKINS:      Yeah.

14  D'ANGELO:     (U/I) gonna get (U/I).  He's gonna come

15                        through.

16  DAWKINS:      Okay.  Do you have the six (U/I)?

17  D'ANGELO:     I've got six, yeah.

18  [1:48:47]

19

20

21

22

23

24

25
```

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3
    ---------------------------x
 4                              :
    UNITED STATES OF AMERICA    :
 5                              :
    v.                          :      S1 17 Cr. 684 (ER)
 6                              :
    CHRISTIAN DAWKINS and       :
 7  MERL CODE,                  :
                                :
 8            Defendants.       :
                                :
 9  ---------------------------X

10

11

12

13

14                    Recorded Conversation

15

16

17
                      Date: July 28, 2017
18                    Participants:  Tony Bland
                                     Christian Dawkins
19                                   Marty Blazer
                                     Jeff D'Angelo
20

21

22

23              (U/I) - UNINTELLIGIBLE
                (PH)  - PHONETIC SPELLING
24

25
```

GOVERNMENT
EXHIBIT
524T
S1 17 Cr. 684 (ER)

```
                                                              1

 1   [0:27:24]

 2   BLAND:        So I trust this dude with everything.  Like,

 3                 any player I have, anything -- like he'll

 4                 tell you, throughout the years, any

 5                 connection, good enough or not, if I can

 6                 control that, it's coming.

 7   BLAZER:       Great.

 8   BLAND:        For sure.

 9   BLAZER:       That's great.

10   BLAND:        For sure.  He speaks very highly of you

11                 guys.  And whatever it is that I have

12                 control over, that's coming through USC, I'm

13                 gonna have something to do with it.

14   BLAZER:       That's great.

15   BLAND:        You know, and (U/I) I have some guys that I

16                 bring in that I can just say, this is what

17                 you're fucking doing.  And there's other

18                 guys who we'll have to work a little harder

19                 for, but we'll still have a heavy influence

20                 on what they do.  You know, but this

21                 motherfucker, he's the closer.  I don't know

22                 how you do it.  I don't --

23   (OVERLAPPING VOICES)

24   BLAND:        You do some freaky shit or something.

25   BLAZER:       Yeah, but he does it, right?
```

```
 1  BLAND:          I think he do some freaky shit.

 2  BLAZER:         Yeah.

 3  (OVERLAPPING VOICES)

 4  BLAZER:         I've been trying to figure that out.

 5  [0:28:11]

 6  ---------

 7  [0:30:11]

 8  BLAND:          I mean, it's like the number one player in

 9                  the country called us.

10  BLAZER:         Yeah.

11  BLAND:          He's like, hey --

12  DAWKINS:        That's the kid I was telling you about that

13                  I thought was the best player -- I mean, you

14                  tell me --

15  BLAND:          In the world.

16  DAWKINS:        He's definitely Top 5, since Lebron, for

17                  sure.  I think he's probably the best talent

18                  to come through high school basketball since

19                  --

20  BLAND:          Lebron.

21  DAWKINS:        -- Lebron.

22  D'ANGELO:       He's there right now?

23  DAWKINS:        He was there (U/I) today, right?

24  BLAND:          Yesterday and today.

25  DAWKINS:        Official visit.
```

**SA-267**

```
 1  BLAND:         Official visit.

 2  DAWKINS:       So, he's a good chance.  (U/I).

 3  BLAND:         (U/I) says its good.

 4  D'ANGELO:      What's his name?

 5  DAWKINS:       Marvin Bagley.

 6  [0:30:38]

 7  ---------

 8  [0:31:07]

 9  DAWKINS:       I mean, Marvin's the number one pick this

10                 year, don't you think?

11  BLAND:         He'll be the number one pick this year.

12  DAWKINS:       As a fucking tenth, eleventh …

13  BLAZER:        And he's from LA, right?

14  BLAND:         He's from Phoenix, moved to LA for high

15                 school.

16  BLAZER:        Okay.  So he's from -- he's --

17  BLAND:         Yeah, yeah, yeah.

18  BLAZER:        He's not leaving LA.

19  BLAND:         His high school in LA.  His mom love it

20                 there.

21  BLAZER:        Yeah.

22  BLAND:         They're not going anywhere.

23  BLAZER:        Yeah.

24  BLAND:         They don't want (U/I).

25  DAWKINS:       So if we can just help with (U/I). Duke. And
```

**SA-268**

```
 1                     obviously like we gotta do stuff today.  But
 2                     it may be (U/I) if Marvin calls, like, fuck,
 3                     we gotta (U/I) --
 4  BLAZER:            Do it.
 5  BLAND:             Hey if we calling Marvin, I'm flying you up
 6                     for example ASAP.
 7  BLAZER:            Yeah, yeah.
 8  BLAND:             That's (U/I) you know --
 9  BLAZER:            Okay.
10  DAWKINS:           Ain't nothing to talk about.
11  BLAND:             Ain't nothing to talk about.
12  BLAZER:            Nothing to talk about.  Yup.
13  DAWKINS:           If we actually just have Marvin, we're good.
14  BLAZER:            Right.  Yup.
15  DAWKINS:           We don't need nobody else.
16  BLAND:             (U/I) --
17  D'ANGELO:          And he's in what, eleventh grade?
18  DAWKINS:           He's (U/I) going to go up to college (U/I).
19  BLAZER:            Yeah.
20  DAWKINS:           He's getting his classwork in order to go to
21                     college now, 'cause like high school is a
22                     waste of (U/I) time.
23  D'ANGELO:          So we -- we could be -- we could be at USC
24                     in September or next year?
25  DAWKINS:           Yeah. He could be in the draft -- he could
```

**SA-269**

5

1                    be in this September draft.

2    BLAZER:         Yeah, '18.

3    DAWKINS:        (U/I) --

4    D'ANGELO:       Are we going to meet him (U/I) out there?

5    (OVERLAPPING VOICES)

6    BLAND:          If he's at USC, you can -- you will meet him

7                    (U/I) first day on campus.  This is the type

8                    of dude that, you get him, everybody will

9                    follow.

10   BLAZER:         Yup.

11   BLAND:          You'll have to be like (U/I).

12   BLAZER:         Yup, yup.  Yeah.

13   DAWKINS:        Yeah, (U/I) --

14   BLAZER:         Yeah, right.  Yup.

15   [OVERLAPPING VOICES]

16   BLAZER:         Right.

17   BLAND:          You all will have to hire a couple

18                   underlings.  Like, yeah, you take care of

19                   the fucking late first-rounders.

20   BLAZER:         Right, yeah.

21   BLAND:          You know?

22   [0:32:25]

23   ---------

24   [0:36:57]

25   DAWKINS:        So what we probably have to do is, you're

**SA-270**

```
 1                        not doing a monthly basis, obviously.

 2   D'ANGELO:            Well it depend -- you -- so (U/I) ever on

 3                        the East Coast for (U/I)?

 4   BLAND:               I'm on East Coast recruiting.

 5   D'ANGELO:            Every once a month?  Once every two months?

 6   BLAND:               Once every two months, something like that.

 7   BLAZER:              Yeah, maybe then once (U/I).

 8   (OVERLAPPING VOICES)

 9   D'ANGELO:            Even maybe do once every two months, if that

10                        will work.  So maybe we (U/I) East Coast,

11                        you figure it out (U/I).  And then, the ones

12                        you're not, we can come out.

13   DAWKINS:             Because, I mean, you gotta take care of

14                        (U/I).  You gotta take care of (U/I).  Gotta

15                        take care of, you know, whoever else is

16                        coming through.  So it may not -- (U/I) --

17   D'ANGELO:            The question is do we have (U/I) a number or

18                        --

19   DAWKINS:             What I was about to say, I think that what

20                        we do is try to -- I don't think we have

21                        (U/I) it's going to be on an as-needed

22                        basis, basically.

23   [0:37:43]

24   ---------

25   [0:40:14]
```

1    BLAND:         This dude's got all my players, man.  And

2                   any players I got connections with, you got

3                   them too.  I got my hands on about three or

4                   four programs to where I can get them in the

5                   door at all them.

6    (OVERLAPPING VOICES)

7    [0:40:24]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



July 22, 2017

Mr. Merl Code
Parkwest Energy, LLC

Dear Merl:

We are delighted to have you as a colleague at Princeton Advisory Wealth Management, LLC ("PAWM") and our affiliated firms. Per our discussions I am very excited to have you as part of our team as we seek to grow our professional athlete asset management business. I believe your experience and guidance will provide the firm the leadership we currently need to build on our current success working with professional athletes and coaches who are seeking attractive long-term investment solutions.

For your time and consulting services to PAWM, the company agrees to the following economic arrangement. Parkwest Energy, LLC will be entitled to receive, 40% of the net Management Fees from any client directly introduced by you or your firm that becomes a client of PAWM. Also, you will be eligible for up to 20% of management fees when you refer other consultants or advisors that provide introduction to clients to the firm. Parkwest Energy LLC will be entitled to receive fees as long as the investor/client remains with PAWM and fees are paid and distributed within 15 days of receipt.

We look forward to working with you and building a successful firm that will provide the need of professional athletes and their families.

Sincerely,

Munish Sood
CEO & CIO
Princeton Advisory Group, Inc.

GOVERNMENT
EXHIBIT
641
S1 17 Cr. 684 (ER)

CONFIDENTIAL AND PROPRIETARY INFORMATION

**SA-273**

---------- Forwarded message ----------
From: **Christian Vaughn-Dawkins** <loydmgmt@gmail.com>
Date: Wednesday, May 31, 2017
Subject: Coaches
To: msood2@gmail.com

These are my main guys

Arizona
Sean Miller (future hall of fame), Emmanuel Book Richardson (superstar)

Louisville
Rick Pitino, Kenny Johnson (superstar), Jordan Fair

Michigan St
Tom Izzo, Dwayne Stephens, Dane Fife

Michigan
Saddi Washington

Cleveland St
Dennis Felton, Lou Dawkins

Texas
Mike Morrell (very effective, will be a head coach someday)

LSU
Will Wade, Greg Heir (superstars)

Depaul
Dave Leito, Shane Heirman (superstar)

Creighton
Greg McDermott, Preston Murphy (superstar)

USC
Tony Bland (superstar)

Alabama
Antoine Pettway, Yasir Rosemond (really good recruiters)

Western Kentucky

GOVERNMENT
EXHIBIT
655
S1 17 Cr. 684 (ER)

CONFIDENTIAL AND PROPRIETARY INFORMATION

**SA-274**

Shammond Williams (will be a head coach someday)

NC State
Kevin Keatts (will be a superstar head coach)

UNLV
Marvin Menzies (will be a superstar head coach)

Miami
Chris Caputo (will be a head coach soon)

Illinois
Jamal Walker

Other guys I'm friendly with but they have affiliations to other people: Tony Stubblefield - Oregon, Dave Grace - UCLA, Tony Barbee - Kentucky, Anthony Coleman - Arizona State, Amir Abdur Rahim - Texas A&M, Kyle Neptune - Villanova, Leonard Hamilton - Florida State.

**SA-275**

By SIGNING AND DATING this form, you certify that you have reported through the appropriate individuals on your campus to your chief executive officer any knowledge of violations of NCAA legislation involving your institution.

| Last Name | First Name | Department | Signature | Date |
|---|---|---|---|---|
| Onyepunuka | Jessica | Marketing / Production | | |
| Richardson | Chad | Marketing / Production | | 8/17/2016 |
| | | Marketing / Production | | |
| Eskenazi | Jose | Marketing-New Media | | 8/12/16 |
| Noakes | Carey | Marketing-New Media | | 8/9/16 |
| Bahar | Martin | Men's Basketball | | 8/16/16 |
| Rados | Lauren | Men's Basketball | | 8/22/16 |
| Bland | Tony | Men's Basketball | | |
| Capko | Chris | Men's Basketball | | 8/22/16 |
| Enfield | Andy | Men's Basketball | Andy Enfield | 8/15/16 |
| Hart | Jason | Men's Basketball | | 8/16/16 |
| Swets | Michael | Men's Basketball | | 8/22/16 |
| Silverstein | Justin | Men's Golf | | 8/10/16 |
| Zambri | Chris | Men's Golf | | 8/18/16 |
| Gelbart | Jamie | Men's Tennis | NO LONGER WORKING HERE | |
| Kwinta | Kris | Men's Tennis | | 8/22/16 |
| Smith | Peter | Men's Tennis | | 8/22/16 |
| Hollenbeck | Todd | Men's Volleyball | | 8/15/16 |
| Nygaard | Jeff | Men's Volleyball | | 8/8/16 |
| Sato | Gary | Men's Volleyball | | 8/8/16 |
| Juliani | Maria | Mentor Program | Maria Juliani | 8/9/16 |

CONFIDENTIAL

GOVERNMENT EXHIBIT 702
S1 17 Cr. 684 (ER)

### UNIVERSITY OF SOUTHERN CALIFORNIA
### ASSISTANT COACH CONTRACT
(Men's Basketball)

This Employment Agreement ("Agreement") is made as of April 1, 2017, between the University of Southern California (the "University") and TONY BLAND ("Employee"), and it cancels and replaces any and all prior employment agreements between these two parties.

### ARTICLE I - PURPOSE AND TERM

The University will employ Employee as Assistant Coach of the University's intercollegiate men's basketball team ("Team"), under the terms and conditions set forth in this Agreement. Employee agrees to accept employment in this position and agrees to devote faithfully and diligently Employee's complete effort to performance of the duties of this position. The term of employment shall commence on April 1, 2017, and end on March 31, 2019 (the "Expiration Date"), unless sooner terminated as hereinafter provided in this Agreement.

At the expiration of the term of this Agreement, both parties understand and agree that Employee's employment with the University is at an end, and that there are no understandings or obligations to continue that employment. If Employee's employment is to continue after the Expiration Date of this Agreement, that will occur only if there is a new written agreement to that effect. If for any reason Employee remains an employee of the University following the term of this Agreement without a new written agreement, such employment will be day-to-day, and terminate at the will of either party.

### ARTICLE II - POSITION

#### 2.01. General Duties and Responsibilities of Employee.

Employee agrees to undertake and perform properly, efficiently, to the best of Employee's ability and consonant with the standards of the University, all duties and responsibilities attendant to the position of Assistant Coach of the Team. Said duties include assisting the Head Coach in carrying out all of the Head Coach's duties and responsibilities, such as recruiting; team administration; public relations; coaching and team discipline; developing a successful program that attracts spectators' interest and attendance, public support through donations and endowments, media coverage, and that generates substantial revenue for the University Athletic Department; and performing such other duties as may be assigned by the Head Coach.

Without limiting the foregoing, Employee shall be responsible for the following duties and responsibilities:

- As appointed by your Head Coach, be responsible for monitoring specific compliance issues/areas (e.g., recruiting contacts, initial eligibility, CARA, amateurism)

203709-1

1

GOVERNMENT
EXHIBIT
706
S1 17 Cr. 684 (ER)

USC-BLAND00001106

CONFIDENTIAL

- Regularly evaluate your assigned areas of compliance to ensure that you are adequately monitoring your area(s) and that all responsibilities are being executed in an accurate and timely manner
- Regularly provide feedback to the Head Coach concerning your issue(s)/area(s) of compliance and the program's overall compliance environment in order to ensure that the monitoring systems are functioning properly
- Ensure that you receive adequate and ongoing compliance training (at least quarterly)
- Be aware of and follow the proper procedures for reporting, including Athletic Compliance ("Athletic Compliance"), actual and potential NCAA, conference and institutional rules ("rules") violations
- Immediately notify the Vice President of Athletic Compliance when concerns or red flags occur related to potential rules violations
- Report any awareness of a student-athlete, prospective student-athlete or staff member having contact (e.g., electronic correspondence, telephones calls, in-person contact) with an agent, other than the staff member's own agent (e.g., sports agent, marketing agent or financial advisor to athletes) or their employees to the Head Coach and Vice President of Athletic Compliance

Employee further agrees to abide by and comply with the constitution, bylaws and interpretations of the National Collegiate Athletic Association ("NCAA") and all NCAA, Pacific-12 Conference ("Pac-12"), as well as University rules and regulations relating to the conduct and administration of the program for the Team, including recruiting rules, as now constituted or as any of the same may be amended during the term hereof.

Employee agrees to report immediately any violation or potential violation of NCAA, Pac-12 or University rules by Employee, University employees, students or other persons associated with the University to the Athletic Director, Sport Administrator and the Vice President for Athletic Compliance. Employee agrees to adhere to, respect, and follow the academic standards and requirements of the University in regard to the recruiting and eligibility of prospective and current student-athletes for the Team program. All academic standards, requirements and policies of the University shall also be observed by Employee and members of Employee's staff, including other assistant coaches, and shall not be compromised or violated at any time.

Finally, Employee further agrees to abide by, comply with and report immediately any violation or potential violation of laws or University rules and regulations relating to the conduct of Employee, staff and members of the Team, University employees, students or other persons associated with the University or Team, including, without limitation: (i) any criminal laws or statutes, whether or not prosecuted, including criminal laws and University rules and policies on sexual assault and sexual harassment; (ii) Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. (Title IX); and (iii) any act of moral turpitude or conduct that substantially offends public decency or morality or brings Employee or University into public disrepute, contempt, scandal or ridicule, as reasonably determined by the Athletic Director (including but limited to, acts that may or may not rise to the level warranting criminal prosecution). All reports required hereunder shall be made to the Athletic Director, Sport Administrator, and the Vice President for Athletic Compliance, except for Title IX-related reports, which shall be made to the Title IX Coordinator.

2

263709-1

CONFIDENTIAL

USC-BLAND00001107

### 2.02. Reporting Relationship.

Employee shall report to the Head Coach of the Team, or to such other person as may be designated from time to time by the Athletic Director of the University as Employee's reporting superior.

### ARTICLE III - COMPENSATION

#### 3.01. Base Salary.

The base salary paid by the University to Employee for services and satisfactory performance of the terms and conditions of this Agreement shall be at the annual rate of Two Hundred Eighty-Five Thousand Dollars ($285,000) for the period from April 1, 2017 through March 31, 2018; and which amount shall increase to Three Hundred Thousand Dollars ($300,000) for the period from April 1, 2018 through the Expiration Date: such amounts to be payable in monthly installments by the University to Employee during the term of this Agreement.

#### 3.02. Deductions and Withholding.

All payments from the University are subject to normal deductions and withholding for state, local, and federal taxes and for any retirement or other benefits to which Employee is entitled or in which Employee participates, and are subject to the terms and conditions of Article IV hereof concerning termination of this Agreement. Employee shall have no right to any compensation not expressly set forth in this Agreement.

#### 3.03. Fringe Benefits.

a. Standard University Fringe Benefits. Employee and the University acknowledge and agree that it is the common practice in the coaching field for a head coach to allow assistant coaches reasonable time off during the non-playing and non-recruiting seasons, and that Employee shall be provided with reasonable time off in accordance with this industry practice. Based on the foregoing, Employee understands and agrees that Employee shall not receive paid vacation time off as provided under the standard University fringe benefits package appropriate to a full-time employee at Employee's level. However, Employee shall be entitled to all other standard University fringe benefits pursuant to the terms of the benefit plans as they may be modified from time to time.

b. Automobile. The University, as additional compensation to Employee, shall make arrangements for and provide to Employee on a loan basis one (1) automobile for Employee's use during the term of this Agreement, such automobile to be selected by the University. Employee shall be responsible for gasoline expenses, repairs and maintenance, and appropriate liability and comprehensive automobile insurance to cover Employee in the use and operation of said vehicle during the term of this Agreement.

3

203709-1

CONFIDENTIAL

USC-BLAND00001108

#### 3.04. Commercial Endorsements.

Employee shall not, during the term of this Agreement, enter into any agreements to endorse products or services without the prior written consent of the Athletic Director. Employee shall, upon executing this Agreement, provide the University with a list of Employee's present product and service endorsements, so that the University may ascertain if any of them conflicts with product or service endorsement(s) entered into or substantially negotiated by the University. The intent of this provision is to ensure that no individual endorsements by a University coach or official conflicts with endorsement arrangements made or actively being negotiated by the University, and that no University coach endorses products or services which the University deems improper to associate with its name and reputation. Nothing in this section shall be deemed to interfere with any endorsement arrangement Employee may be party to as of the date of execution of this Agreement.

#### 3.05. Disclosure of Outside Income.

Employee shall report annually in writing to the President of the University through the Athletic Director, on or before May 1 of each year, all athletically-related income from sources outside the University including, but not limited to, income from annuities, sports camps, housing benefits, complimentary ticket sales, television and radio programs and endorsement or consultation contracts with athletic shoe or apparel or equipment manufacturers or sellers, and the University shall have reasonable access to all records of Employee necessary to verify such report. As of the effective date of this Agreement, Employee's outside sources and amounts of athletically-related income are set forth in Appendix A, attached hereto, which list shall be updated promptly to reflect any changes and in no event less frequently than annually.

### ARTICLE IV - TERMINATION

#### 4.01. Termination by Either Party With or Without Cause.

Employee acknowledges that this Agreement and the employment relationship may be terminated at any time, with or without "cause," as defined below, at the option of either the University or Employee, in accordance with the terms of this Agreement. Employee further acknowledges that neither any policy or procedures manual, or faculty or staff handbook, nor any course of conduct, practice, award, commendation, promotion, transfer, or length of service, creates any express or implied contract modifying this Section 4.01 or this Agreement.

#### 4.02. Termination by University for Cause.

As set forth in Section 4.01, the University shall have the right to terminate this Agreement for cause prior to its normal expiration on the Expiration Date. The term "for cause" shall include, but not be limited to, the following:

    a.    failure to perform any of the duties outlined in Section 2.01 of this Agreement;

    b.    any conduct of Employee in violation of any criminal statute or statute pertaining to

4

203709-1

CONFIDENTIAL

moral turpitude;

    c.    any improper conduct that, in the University's sole judgment, reflects adversely on the University or its athletic programs;

    d.    a significant or repetitive violation, as determined in the sole judgment of the University, committed by Employee of any law, rule, regulation, constitutional provision, bylaw or interpretation of the University, the Pac-12 Conference, or the NCAA, which violation may, in the sole judgment of the University, reflect adversely upon the University or its athletic program, including any significant or repetitive violation which may result in the University being placed on probation by the Pac-12 Conference or the NCAA and including any violation which may have occurred during prior employment of Employee at another NCAA member institution;

    e.    a significant or repetitive violation, as determined in the sole judgment of the University, of any law, rule, regulation, constitutional provision, bylaw or interpretation of the University, the Pac-12 Conference, or the NCAA, committed by a member of the Team's coaching staff or any other person under Employee's supervision and direction, including student-athletes in the Team's program, where the University, commensurate with NCAA Bylaw 11.1.2.1, determines Employee has failed to promote an atmosphere of compliance and / or has failed to properly monitor the activities of such persons, and which violation may, in the sole judgment of the University, reflect adversely upon the University or its athletic program, including any significant or repetitive violation which may result in the University being placed on probation by the Pac-12 Conference or the NCAA and including any violation which may have occurred during prior employment of Employee at another NCAA member institution;

    f.    failure to abide by, comply with and report immediately any violation or potential violation of laws or University rules and regulations relating to the conduct of Employee, staff and members of the Team, University employees, students or other persons associated with the University or Team, including, without limitation: (i) any criminal laws or statutes, whether or not prosecuted, including criminal laws and University rules and policies on sexual assault and sexual harassment; (ii) Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. (Title IX); and (iii) any act of moral turpitude or conduct that substantially offends public decency or morality or brings Employee or the University into public disrepute, contempt, scandal or ridicule, as reasonably determined by the Athletic Director (including but limited to, acts that may or may not rise to the level warranting criminal prosecution); and any failure to report the same to the Athletic Director, Sport Administrator, and the Vice President for Athletic Compliance, or to the Title IX Coordinator (in the case of Title IX-related reports);

    g.    failure by Employee to report promptly to the Athletic Director, Sport Administrator and the Vice President for Athletic Compliance any violations known to Employee of any law rule, regulation, constitutional provision, bylaw or interpretation of the University, the Pac-12 Conference, or the NCAA by Employee, University employees, students or other persons associated with the University;

    h.    conduct of Employee seriously prejudicial to the best interests of the University or its athletic program or which violates the University's mission including, without limitation, public

5

203709-1

CONFIDENTIAL

USC-BLAND00001110

comments concerning the Pac-12 Conference, the NCAA, its faculty, staff, employees, agents and member institutions or personal conduct that is unreasonably contrary to the positive image and conduct the University expects from its assistant coach, such as charges or conviction of criminal conduct (except minor traffic offenses), personal conduct of a nature that puts Employee and the University in an unreasonably negative light or other conduct that is inconsistent with conduct generally expected of representatives of the University, as determined in the sole judgment of the University;

    i.    as determined in the sole judgment of the University, Employee's provision of false, misleading or incomplete information relevant to the conduct of important University business, including but not limited to information provided by Employee during the interview and hiring process;

    j.    any use of alcohol or any other substance which, as determined in the sole judgment of the University, adversely affects the Employee's ability to effectively perform Employee's duties as set forth herein.

    k.    insubordination by Employee as determined in the sole judgment of the University; or

    l.    any cause adequate to sustain the termination of any other University employee of Employee's classification.

**4.03.  University's Obligations Upon Termination for Cause.**

In the event this Agreement is terminated for cause, all obligations of the University to make further payments and/or to provide any other consideration hereunder shall cease as of the end of the month in which such termination occurs, and the University shall not be liable to Employee for the loss of any collateral business opportunities or any other benefits, perquisites or income resulting from activities such as, but not limited to, camps, clinics, media appearances, apparel or shoe contracts, consulting relationships, or from any other sources.

**4.04.  Termination by University Without Cause.**

As set forth above, the University also shall have the right to terminate this Agreement prior to its normal expiration on the Expiration Date, without cause. Termination "without cause" shall mean termination of this Agreement on any basis other than those set forth in Section 4.02 above. Termination by the University without cause shall be effectuated by delivering to Employee written notice of the University's intent to terminate this Agreement without cause, which notice shall be effective upon the earlier of the date set for termination in such notice or three (3) days after the date of such notice if delivered to Employee via regular mail. If the University exercises its right under this Section 4.04 to terminate this Agreement without cause, Employee shall be entitled to damages only as provided for in Section 4.04(a) below.

6

203709-1

**USC-BLAND00001111**

**CONFIDENTIAL**

a.  Liquidated Damages Upon Termination by University Without Cause. If the University terminates this Agreement without cause prior to its expiration on the Expiration Date, the University shall pay to Employee, as liquidated damages, an amount equal to Employee's base salary only due under Section 3.01 of this Agreement for the remainder of the term of this Agreement or for one year following the termination whichever is shorter.

The University's obligation shall be paid on a monthly basis prorated over the balance of the term of this Agreement, or the one year following the termination, whichever is shorter, and shall be subject to Employee's duty to mitigate the University's obligation, as set forth in Section 4.04(b), below, and the University shall not be liable for the loss of any collateral business opportunities or any other benefits (including fringe benefits), perquisites, or income resulting from activities such as, but not limited to, camps, clinics, media appearances, apparel or shoe contracts, consulting relationship, or from any other sources that may ensue as a result of the University's termination of this Agreement without cause.

The parties have bargained for and agreed to the foregoing liquidated damages provision, giving consideration to the fact that termination of this Agreement by the University without cause prior to the Expiration Date may cause Employee to lose certain benefits, supplemental compensation, and outside compensation relating to Employee's employment at the University, which damages are extremely difficult to determine with certainty or fairly or adequately. The parties further agree that the payment of such liquidated damages by the University and acceptance thereof by Employee shall constitute adequate and reasonable compensation to Employee for the damages and injuries suffered by Employee because of such termination by the University. The foregoing shall not be, nor be construed to be, a penalty.

b.  Mitigation of Damages by Employee if University Terminates Without Cause. Notwithstanding the provisions of Section 4.04(a), Employee agrees to mitigate the University's obligations to pay liquidated damages under Section 4.04(a) and to make reasonable and diligent efforts to obtain comparable employment, such as coaching or providing athletic administration services for any sports team (whether as a head coach, assistant coach, athletic director or assistant athletic director, or consultant), talent evaluation or consulting services to any sports team or athletics programs, (collectively, the "New Position"), all as soon as reasonably possible after the termination of this Agreement by the University without cause. After Employee obtains such new employment, the University's financial obligations under this Agreement, including Section 4.04(a), shall be reduced by the greater of (a) the amount received by Employee from such New Position during the remaining period of the University's obligation under Section 4.04(a) or (b) the "average compensation" for the New Position during the remaining period of the University's obligation under Section 4.04(a).

The term "average compensation" shall mean the amount, projected during the relevant period, that is typically and customarily received by individuals employed, in arm's length transactions, in the New Position. In the event where a determination of "average compensation" for the New Position is required, University shall provide written notice of University's determination of the "average compensation" not later than ninety (90) days after the date upon which University learns that Employee has accepted the New Position or Employee informs University that it has accepted the New Position, whichever is earlier. Employee shall have thirty

7

203709-1

CONFIDENTIAL

USC-BLAND00001112

(30) days ("Employee's Review Period") within which to accept such determination of "average compensation" or to reasonably object thereto in writing. Failure of Employee to so object to the "average compensation" submitted by University in writing within Employee's Review Period shall conclusively be deemed Employee's approval and acceptance thereof. If within Employee's Review Period Employee reasonably objects to the "average compensation" submitted by University, University and Employee will meet together with their respective legal counsel to present and discuss their individual determinations of the "average compensation" and shall diligently and in good faith attempt to negotiate an "average compensation" rate. Such meeting shall occur no later than ten (10) days after the expiration of Employee's Review Period. The parties shall each provide the other with such supporting information and documentation as they deem appropriate. At such meeting, if University and Employee are unable to agree upon the "average compensation," they shall each submit to the other their respective best and final offer as to the "average compensation." If University and Employee fail to reach agreement on such "average compensation" within five (5) business days following such a meeting ("Outside Agreement Date"), University and Employee shall submit the issue of "average compensation" for the New Position to arbitration as set forth in Section 5.06 and Exhibit A of this Agreement. Notwithstanding any contrary provision set forth in Exhibit A, the arbitrator shall be limited solely to determining whether University's or Employee's last proposed (as of the Outside Agreement Date) best and final "average compensation" is the closest to the actual "average compensation" for the New Position, which amount (either the University's or Employee's, as determined by the arbitrator) shall then be used as the "average compensation" for the New Position as set forth herein.

#### 4.05. Termination by Employee.

As set forth in Section 4.01, above, Employee may terminate this Agreement prior to its normal expiration on the Expiration Date, by giving the University thirty (30) days advance written notice of the termination of Employee's employment with the University.

Both Employee and the University understand and agree that if Employee terminates this Agreement pursuant to Section 4.01 prior to its normal expiration on the Expiration Date, the University will suffer material damage, including but not limited to lost revenue from and disruption of ticket sales and/or other promotional activities; additional costs in having to locate, recruit and contract with a replacement coach; disruption within the Team and of recruiting activities; and other damages. Because of the difficulty of quantifying these damages, Employee and University agree that if Employee terminates this Agreement prior to the Expiration Date, to assume an assistant men's basketball coach position at another Division I school, Employee shall pay to the University, as liquidated damages, an amount equal to One Hundred Thousand Dollars ($100,000). Such payment shall be due within thirty (30) days after Employee gives the advance notice of the termination. Employee and University agree that the liquidated damages payment is a reasonable estimate of the University's actual damages for the termination of this Agreement by Employee prior to the end of the term.

Employee agrees that before terminating this Agreement to assume any other employment opportunity which has been offered to Employee, Employee shall notify the Athletic Director of such employment opportunity offered to Employee.

8

203709-1

**CONFIDENTIAL**

**4.06.**  **Automatic Termination Upon Death or Disability of Employee.**

This Agreement shall terminate automatically if Employee dies, or if Employee becomes permanently disabled. "Permanently disabled" shall mean physical or mental incapacity of a nature which prevents Employee, in the sole judgment of the University, from satisfactorily performing Employee's duties under this Agreement for a cumulative period of four (4) months within a rolling twelve (12) month period.

If this Agreement is terminated pursuant to this section because of Employee's death, Employee's salary and all other benefits shall terminate as of the calendar month in which death occurs, except that Employee's personal representatives or other designated beneficiary shall be paid all such death benefits, if any, as may be contained in any benefit plan now in force or hereafter adopted by the University and due to Employee thereunder.

If this Agreement is terminated pursuant to this section because Employee becomes permanently disabled, Employee shall continue to receive the salary and any other benefits only to the extent provided by, and in accordance with, University policy.

**4.07**  **After Termination.**

a.      For a period of two (2) years after expiration or termination of this Agreement, with or without cause, Employee shall not, without the prior written consent of the University, directly, indirectly, or through any other party solicit or entice any employee, contractor, student or prospective student of the University to work for or attend any other competing university or organization.

b.      After the termination of this Agreement for any reason, Employee shall, on request by the University, furnish the University with information and assistance as may reasonably be required in connection with any pending or threatened litigation or dispute in which the University, any of its subsidiaries or affiliates or any of the officers, directors, administrators, employees, agents or insurers of any of them may be involved. The obligations in this Section shall survive the termination of this Agreement for five (5) years from the date of termination.

**ARTICLE V - MISCELLANEOUS**

**5.01.**  **Choice of Law.**

It is the intent of the parties hereto that this Agreement shall be governed by and construed in accordance with the laws of the State of California, and the laws of the State of California shall govern the validity, performance, and enforcement of this Agreement.

**5.02.**  **University Retains All Materials and Records.**

All materials or articles of information, including, without limitation, personnel records, recruiting records, team information, films, statistics, or any other material or data, furnished to

9

203709-1

USC-BLAND00001114

CONFIDENTIAL

Employee by the University or developed by Employee on behalf of the University or at the University's direction or for the University's use or otherwise in connection with Employee's employment hereunder, are and shall remain the sole and confidential property of the University. Within seven (7) days of the expiration of the term of this Agreement, or its earlier termination as provided herein, Employee shall immediately cause any such materials in Employee's possession or control to be delivered to the University.

5.03    **Indemnity.**

Employee agrees to indemnify, defend and hold harmless the University, its officers, employees, trustees and agents and their respective successors, heirs and assigns against all liability, demand, damage, loss, or expense, including attorney's fees, incurred by or imposed upon them in connection with any claims, suits, proceedings, judgments or rulings in connection with Sections 4.02 (d), (e), (f) and (g) above, regardless of whether or not the University terminates Employee.

5.04.    **Severability.**

The invalidity of any provision of this Agreement shall not affect or impair the validity or enforceability of the remainder of this Agreement, which shall continue in force as if such invalid provisions had never been included. The invalidity of any provision in one jurisdiction shall not affect or impair the validity of such provision in any other jurisdiction.

5.05.    **Waiver.**

No waiver by the parties hereto of any default or breach of any covenant, term or condition of this Agreement shall be deemed to be a waiver of any other default of the same or any other covenant, term, or condition contained herein.

5.06    **Arbitration.**

The University and Employee agree to be bound by the Agreement to Arbitrate Claims attached hereto as Exhibit A, which both parties have executed and hereby agree to incorporate into this Agreement by this reference.

5.07.    **Consultation with Attorney.**

Employee understands that Employee has the right to consult with Employee's own attorney concerning this Agreement, and Employee represents that Employee has done so to the extent Employee desires to do so.

5.08.    **Entire Agreement.**

This Agreement contains the entire agreement of the parties in reference to any employment relationship between the parties and in reference to any of the matters or things provided for or discussed herein, and supersedes any prior employment contract between the University and

10

203709-1

USC-BLAND00001115

**CONFIDENTIAL**

Employee except as otherwise specifically referenced herein. This Agreement may not be modified except by express written agreement executed by Employee and the Athletic Director (or his designated representative) and the Senior Vice President, Administration. This Agreement may not be modified by any oral or implied agreement.

**5.09    Counterparts.**

This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed one (1) original, but both of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

TONY BLAND                                          UNIVERSITY OF SOUTHERN CALIFORNIA

By:                                                 By:
                                                        Lynn Swann
                                                        Athletic Director

                                                    By:
                                                        Todd R. Dickey
                                                        Senior Vice President, Administration
                                                        DAte: 5-2-17

203709-1                                 11

USC-BLAND00001116

By **SIGNING AND DATING** this form, you certify that you have reported through the appropriate individuals on your campus to your chancellor/president any knowledge of violations of NCAA legislation involving your institution.

| Name (Print or type) | Title [include sport(s)] | Signature | Date M/D/Y |
|---|---|---|---|
| Sean Miller | Head Men's Basketball Coach | | 8 8 16 |
| Joe Pasternack | Assoc. Men's Basketball Coach | | 8/2/16 |
| Emanuel Richardson | Assistant Men's Basketball Coach | | 8,10,16 |
| Mark Phelps | Assistant Men's Basketball Coach | | 8/2/16 |
| Ryan Reynolds | Director of Men's Basketball Operations | | 8/2/16 |
| Austin Carroll | Asst. Director of Men's Basketball Operations | | 8/2/16 |
| Marissa Elias-Castaneda | Administrative Assoc. | | 8/2/16 |
| Ben Tucker | Asst. Director of Men's Basketball Operations | No longer at UofA | 6/1/16 |

**What to do with this form:**

1.  Attach completed form to Form 16-1 (Certification of Compliance for Institutions) no later than September 15 and keep on file in the office of the director of athletics. **It is not to be sent to the NCAA national office.**

2.  Contact the NCAA academic and membership services staff at the national office if you have questions regarding Forms 16-1 and 16-2.

**GOVERNMENT EXHIBIT 904**
S1 17 Cr. 684 (ER)

By **SIGNING AND DATING** this form, you certify that you have reported through the appropriate individuals on your campus to your chancellor/president any knowledge of violations of NCAA legislation involving your institution.

| Name (Print or type) | Title [include sport(s)] | Signature | Date M/D/Y |
|---|---|---|---|
| Sean Miller | Head Men's Basketball Coach | | 7 /31 /17 |
| Lorenzo Romar | Assoc. Men's Basketball Coach | | 7 /31 /17 |
| Emanuel Richardson | Assistant Men's Basketball Coach | | 7 /31 /17 |
| Mark Phelps | Assistant Men's Basketball Coach | | 7 /31 /17 |
| Ryan Reynolds | Director of Men's Basketball Operations | | 7 /31 /17 |
| Austin Carroll | Asst. Director of Men's Basketball Operations | | 7 /31 /17 |
| Marissa Elias-Castaneda | Administrative Assoc. | | 7 /31 /17 |
| Joe Pasternack | Assoc. Men's Basketball Coach | No longer at UofA | 5 /22/17 |

**What to do with this form:**

1. Attach completed form to Form 17-1 (Certification of Compliance for Institutions) no later than September 15 and keep on file in the office of the director of athletics. **It is not to be sent to the NCAA national office.**

2. Contact the NCAA academic and membership services staff at the national office if you have questions regarding Forms 17-1 and 17-2.

**SA-289**

University of South Carolina Athletics

**Office of Compliance Services**      **Form 10.1 Ethical Conduct & Certification of Compliance**



| **For:** | All Athletics Department Staff Members |
|---|---|
| **Due Date:** | To be completed no later than September 1, 2014 |
| **Required by:** | NCAA Bylaws 10.1 and 18.4.2 |

Print Name (Last, First): *Evans, Lamont*      Sport/Department *Mens Basketball*

As an employee of the University of South Carolina Athletics Department, I understand that I am required to adhere to all NCAA, Southeastern Conference and institutional rules, policies and procedures. Per NCAA Bylaw 10.1, I am also aware that unethical conduct by a prospective or enrolled student-athlete or a current or former institutional staff member may include, but is not limited to:

    1. Withholding information from the NCAA or the institutional compliance office or senior staff members, relevant to a violation of NCAA or Southeastern Conference regulations.

    2. Refusal to furnish information relevant to an investigation of a possible violation of an NCAA regulation when requested to do so by the NCAA or the individual's institution.

    3. Knowing involvement in arranging for fraudulent academic credit or false transcripts for a prospective or enrolled student-athlete.

    4. Knowing involvement in offering or providing a prospective or an enrolled studentathlete an improper inducement or extra benefit or improper financial aid.

    5. Knowingly furnishing the NCAA or the individual's institution false or misleading information concerning the individual's involvement in or knowledge of matters relevant to a possible violation of an NCAA regulation.

    6. Receipt of benefits by an institutional staff member for facilitating or arranging a meeting between a student-athlete and an agent, financial advisor or representative of an agent or advisor (e.g., runner).

By signing below, I agree to uphold all ethical principles and applications of NCAA ethical conduct rules.

Further, **I certify that I have reported** (through the appropriate individuals on my campus including, but not limited to USC President, Harris Pastides; USC Athletic Director, Ray Tanner; Faculty Athletic Representative, Dr. Zach Kelehear; or the Office of Compliance Services) **any knowledge of violations of NCAA legislation involving the University of South Carolina that occurred during the 2013-14 academic year through the time I signed this form.**

Signature of Athletic Staff Member      Date *8/13/14*

    **Please sign, date, and return** to the Office of Compliance Services no later than September 1, 2014.

    **Per NCAA rules, incomplete forms could result in loss of the institution's eligibility for NCAA championships.**

**GOVERNMENT EXHIBIT 1001**
S1 17 Cr. 684 (ER)

**SA-290**

University of South Carolina Athletics

Office of Compliance Services | Form 10.1 Ethical Conduct & Certification of Compliance



| **For:** | All Athletics Department Staff Members |
|---|---|
| **Due Date:** | To be completed no later than September 1, 2015 |
| **Required by:** | NCAA Bylaws 10.1 and 18.4.2 |

Print Name (Last, First):  **Evans, Lamont**     Sport/Department:  **Men's Basketball**

As an employee of the University of South Carolina Athletics Department, I understand that I am required to adhere to all NCAA, Southeastern Conference and institutional rules, policies and procedures. Per NCAA Bylaw 10.1, I am also aware that unethical conduct by a prospective or enrolled student-athlete or a current or former institutional staff member may include, but is not limited to:

1. Withholding information from the NCAA or the institutional compliance office or senior staff members, relevant to a violation of NCAA or Southeastern Conference regulations.

2. Refusal to furnish information relevant to an investigation of a possible violation of an NCAA regulation when requested to do so by the NCAA or the individual's institution.

3. Knowing involvement in arranging for fraudulent academic credit or false transcripts for a prospective or enrolled student-athlete.

4. Knowing involvement in offering or providing a prospective or an enrolled student-athlete an improper inducement or extra benefit or improper financial aid.

5. Knowingly furnishing the NCAA or the individual's institution false or misleading information concerning the individual's involvement in or knowledge of matters relevant to a possible violation of an NCAA regulation.

6. Receipt of benefits by an institutional staff member for facilitating or arranging a meeting between a student-athlete and an agent, financial advisor or representative of an agent or advisor (e.g., runner).

By signing below, I agree to uphold all ethical principles and applications of NCAA ethical conduct rules.

Further, **I certify that I have reported** (through the appropriate individuals on my campus including, but not limited to USC President, Harris Pastides; USC Athletic Director, Ray Tanner; Faculty Athletic Representative, Dr. Zach Kelehear; or the Office of Compliance Services) **any knowledge of violations of NCAA legislation involving the University of South Carolina that occurred during the 2014-15 academic year through the time I signed this form.**

| Signature of Athletic Staff Member | Date 8/17/15 |
|---|---|

**Please sign, date, and return** to the Office of Compliance Services no later than September 1, 2015.

**Per NCAA rules, incomplete forms could result in loss of the institution's eligibility for NCAA championships.**

Distribution: *Original* – Office of Compliance Services       Form 10.1 Ethical Conduct & Certification of Compliance  2015_07_13

STATE OF SOUTH CAROLINA )
)                                   **EMPLOYMENT AGREEMENT**
COUNTY    OF    RICHLAND   )

This Employment Agreement is made and entered into as of April 4, 2012 by and between the University of South Carolina, an educational institution and an agency of the State of South Carolina ("University"), and Lamont Evans ("Employee").

## WITNESSETH:

In consideration of the mutual covenants and conditions contained herein, the parties mutually agree as follows:

1.    **Employment Status.**

 1.01: <u>Position</u>.  Employee shall be employed to perform the duties of Assistant Men's Basketball Coach as assigned by the Head Men's Basketball Coach.

 1.02: <u>Unclassified State Employee</u>.  Employee shall be an unclassified state employee with the terms of his employment restricted solely to this Employment Agreement.

 1.03: <u>Grievance Rights</u>.  Employee is exempt from the provisions of the South Carolina State Employee Grievance Procedure Act pursuant to Section 8-17-370 of the *Code of Laws of South Carolina* (1986) and hereby waives any and all grievance rights under the University's grievance procedure.  Employee's grievance rights shall be solely as set forth in Paragraph 8.01(b) herein.

 1.04: <u>Employee Not Entitled to Tenure</u>.   Employee's employment under this Employment Agreement is not a tenure track position and will not lead to tenure.

2.    **Duties.**

 2.01: <u>Recognition of Duties</u>.  Employee agrees to devote his best efforts full time to the proper and efficient performance of the duties Assistant Men's Basketball Coach as assigned by the Head Men's Basketball Coach.  Employee acknowledges that the Head Men's Basketball Coach may reassign his duties during the term of this Employment Agreement.

 2.02: <u>Compliance with University Rules</u>.  Employee agrees to be a loyal employee of the University, to comply with all rules, regulations, policies and decisions established or issued by the University, and to adhere to, respect and follow the academic standards and requirements of the University in regard to the recruiting and eligibility of prospective and current student-athletes for the men's basketball program.  In the event Employee becomes aware, or has reasonable cause to believe, that violations of such rules, regulations, policies and decisions may have taken place, he shall report the same promptly to the Athletics Director or his designee.

1

**GOVERNMENT
EXHIBIT
1004**
S1 17 Cr. 684 (ER)

2.03:  Compliance with NCAA and SEC Rules.  Employee agrees to abide by and comply with the constitution, bylaws, rules, regulations and interpretations (collectively "Legislation") of the National Collegiate Athletic Association ("NCAA") and the Southeastern Conference ("SEC") relating to the conduct and administration of the men's basketball program, including recruiting and eligibility rules, as now constituted or as any of the same may be amended during the term hereof.  In the event Employee becomes aware, or has reasonable cause to believe, that violations of such Legislation may have taken place, he shall report the same promptly to the Associate Athletics Director for Compliance Services.

3.    **Term of Employment.**

3.01:  Term.  The term of this Employment Agreement shall begin on April 4, 2012 and shall terminate without further notice from the University on March 31, 2013, subject to prior termination in accordance with the provisions of Paragraphs 7 and 8 herein.

3.02:  Extension of Term.  The term of this Employment Agreement may be extended for additional periods upon such written terms and conditions as may be mutually agreed upon by the parties.  In the event the term of Employee's employment with the University is so extended, this Employment Agreement shall continue in full force and effect to the extent it is not inconsistent with such subsequent written agreements.

4.    **Compensation and Benefits.**

4.01:  Base Salary.  In consideration for services and satisfactory performance of the terms and conditions of this Employment Agreement, Employee shall be paid an annual base salary of One Hundred Forty Thousand Dollars ($140,000.00) payable in accordance with customary University payroll procedures.  The base salary shall be subject to normal deductions and withholdings for state, local and federal taxes, and for any retirement or other benefits to which Employee is entitled or in which he participates.

4.02:  Fringe Benefits.  Employee shall be entitled to participate in those state benefits programs which are available to all unclassified University personnel including, but not limited to, annual leave, sick leave, insurance programs, deferred compensation programs, and the state retirement program.  If any benefit is based in whole or in part upon the salary paid to Employee, such consideration shall be made based exclusively upon Employee's base salary.

4.03:  Incentive-Based Supplemental Compensation.  If the men's basketball team participates in the NCAA post-season tournament while Employee is employed under this Employment Agreement, Employee shall receive incentive-based supplemental compensation from the University in an amount equal to one (1) month of his base salary as set forth in Paragraph 4.01 herein.  Such incentive-based supplemental compensation shall be paid to Employee within forty-five (45) days after the conclusion of the men's basketball team's final game in such basketball season.  In no event shall any supplemental compensation paid to Employee pursuant to Paragraph 4.03 herein be considered part of Employee's base salary.

4.04:   <u>Moving Expenses</u>.  The University shall pay the reasonable and customary out-of-pocket expenses incurred by Employee in moving to Columbia, South Carolina, excluding personal motor vehicles, upon presentation of appropriate documentation, in accordance with University policy and procedure.

4.05:   <u>Temporary Housing</u>.  The University shall provide Employee with temporary housing for a period of up to ninety (90) days or until Employee locates permanent housing, whichever occurs first.   The temporary housing provided pursuant to this Employment Agreement shall be selected by the University in its sole discretion.  Employee understands and agrees that the provision of temporary housing is a taxable event and will be reported to the Internal Revenue Service by the University.

5.   **Automobile.**

The University may provide to Employee on a loan basis one (1) automobile for his use; provided, however, it is understood and agreed that such automobile shall not be construed to be part of the consideration of this Employment Agreement, and such use may be terminated at any time at the exclusive option of the University.  In the event the University provides Employee with the use of an automobile, reasonable and ordinary maintenance of the vehicle, taxes (as related to the business use of the vehicle), and appropriate liability and comprehensive automobile insurance covering the use and operation of the vehicle shall also be provided by the University.   Employee will be reimbursed for business-related mileage in accordance with University policy and procedure.

6.   **Outside Income.**

6.01:   <u>General</u>. While Employee is employed under this Employment Agreement, he shall have the opportunity to earn outside income and benefits by entering into agreements with other parties to provide services not included within this Employment Agreement, but only upon the following terms and conditions:

(a)   <u>University Obligations are Primary</u>.  Outside activities shall not interfere with the full and complete performance by Employee of his duties and responsibilities as a University employee, recognizing always that Employee's primary obligations lie with the University.

(b)   <u>NCAA, SEC and University Rules Control</u>.  In no event shall Employee accept or receive directly or indirectly any monies, benefits or any other gratuity whatsoever from any person, corporation, booster club or alumni association or other benefactor if such action would violate NCAA or SEC Legislation, University rules and regulations, or South Carolina law, as now or hereafter enacted.  Changes in such Legislation, rules and regulations, or laws shall automatically apply to this Employment Agreement without necessity of a written modification.

(c)   <u>Advance Approval Required</u>.  Employee shall obtain the advance written approval of the Athletics Director before accepting or entering into any agreement to earn

outside income or benefits, athletically-related or otherwise.  The Athletics Director's decision in response to any request for approval of an outside activity shall be final.

(d)     Annual Report.  Pursuant to NCAA Bylaw 11.2.2, Employee shall provide to the President annually on or before January 15 a written detailed account of all athletically related income and benefits received by Employee from sources outside the University during the previous twelve (12) month period, including but not limited to the following sources: income from annuities; sports camps; housing benefits; country club memberships; complimentary ticket sales; television and radio programs; and endorsement or consultation contract with athletics shoe, apparel or equipment manufacturers.  The University shall have access to all records of Employee necessary to verify such report.

(e)     University Not Liable.  Outside income activities are independent of Employee's employment at the University, and the University shall have no responsibility or liability for any claims arising therefrom.  Employee agrees to indemnify and hold harmless the University, its officers, agents and employees, from any and all suits, claims, demands, damages, liability, costs and expenses, including reasonable attorney's fees, arising from Employee's outside income activities.

(f)     Trademarks, Service Marks and Trade Names.  Employee shall not have the right to use any trademark, service mark or trade name associated with the University for his or any third party's personal benefit without the express written consent of the University.

(g)     Employee Retains All Revenues.  Employee shall be entitled to retain all revenue generated by approved outside activities.  Employee accepts full responsibility for any and all tax obligations arising from these revenues.

6.02:   Team Equipment and Apparel.  Notwithstanding the above, it is understood and agreed that the University reserves the exclusive right to enter into contracts with equipment, apparel and shoe manufacturers to provide equipment, uniforms, shoes, hats, jackets, gloves and other apparel to be worn by the men's basketball team and coaches.

6.03:   Internet Web Site.  The University reserves the exclusive right to create, manage and market or contract for the creation, management and marketing of an internet web site regarding University athletics programs, including but not limited to the men's basketball program.  Notwithstanding anything contained in this Employment Agreement to the contrary, Employee agrees that he shall not create, operate, manage, market or otherwise participate in any internet web site regarding or featuring intercollegiate athletics, including but not limited to University athletics programs, analysis and contest results, without the prior written consent of the University, which consent may be withheld in the University's sole discretion.

7.      **NCAA Enforcement Procedures.**

Pursuant to NCAA Bylaw 11.2.1, Employee understands and agrees that if he is found in violation of NCAA Legislation, he shall be subject to disciplinary or corrective action as set forth in the provisions of the NCAA enforcement procedures, including suspension without pay or termination of employment for significant or repetitive violations.  Any such disciplinary or

corrective actions shall be in addition to and in no way limit or restrict any actions the University may take pursuant to Paragraph 8 herein.

8.    **Termination.**

8.01:    Termination by University for Cause.

(a)    University May Terminate for Cause. The University shall have the right to terminate this Employment Agreement prior to its expiration date if there is cause for terminating Employee's employment. In addition to and as examples of its normally-understood meaning in employment contracts, the term "termination for cause" shall be understood to include, but not be limited to, any of the following:

(1)    substantial neglect of any duty or responsibility outlined in this Employment Agreement or otherwise properly assigned, or refusal or unwillingness to perform any such duty or responsibility in good faith and to the best of Employee's abilities;

(2)    conduct of Employee seriously prejudicial to the interests of the University and its mission and/or that is seriously adverse to or has a significantly negative impact upon the University or its athletics department;

(3)    conviction of or entry into pre-trial intervention as a result of a criminal act that constitutes a felony or a misdemeanor;

(4)    committing a major violation of NCAA Legislation, or a series or pattern of secondary violations of NCAA Legislation, while at the University; or knowingly committing any violation of NCAA Legislation;

(5)    failing to report to the Associate Athletics Director for Compliance Services in a timely manner any violation of NCAA Legislation of which Employee is aware;

(6)    failing to report to the Athletics Director or his designee any violation of University rules and regulations of which Employee is aware;

(7)    substantial physical or mental incapacity lasting in excess of forty-five (45) consecutive days which cannot reasonably be accommodated by the University and which interferes with Employee's ability to perform essential functions of the duties and responsibilities of his position;

(8)    violation of any material provision of this Employment Agreement not corrected by Employee within ten (10) days following receipt of written notification of such violation from the University; or failure to take immediate and reasonable action to remedy within a reasonable period of time any such violation which is incapable of correction within ten (10) days after written notification from the University;

(9)    violation of any material University rule, regulation, policy or procedure sufficient to sustain the for cause termination of any other University employee.

(b)    Pre-Termination Meeting.    Any termination of this Employment Agreement for cause must be preceded by a pre-termination meeting held by the President or his designee after not less than five (5) days prior written notice to Employee, which notice shall include a statement of the University's reasons for the termination. The meeting shall consist of an explanation of the University's cause for termination and an opportunity for Employee to present the reasons he believes termination is not justified. Present at the meeting shall be the President or his designee, Athletics Director, General Counsel and/or any other persons deemed appropriate by the President. Employee shall be permitted to have an attorney present to represent him if he so desires. The decision of the President or his designee following such meeting shall be the final University decision. Employee may waive his right to the meeting by so notifying the President in writing.

(c)    University's Obligation Upon Termination for Cause.    In the event this Employment Agreement is terminated for cause, the University's sole obligation to Employee shall be to pay his base salary as set forth in Paragraph 4.01 herein until the effective date of termination. Payment shall be made no later than fifteen (15) days after the effective date of termination. In no case shall the University be liable to Employee for the loss of any collateral business opportunities or any other benefits, perquisites, income, supplemental compensation, or any form of consequential damages, resulting from or associated with Employee's employment or termination.

(d)    Employee's Right to Challenge Termination for Cause Decision.    In the event this Employment Agreement is terminated for cause, Employee may challenge such decision by asserting a claim for actual damages only in a state or federal court of competent jurisdiction in Richland County, State of South Carolina; provided, however, if the court determines that the University breached this Employment Agreement by terminating Employee without cause, then the liquidated damages provision set forth in Paragraph 8.02(b) herein shall apply and shall be Employee's sole and exclusive remedy for any cause of action based on this Employment Agreement.

8.02:    Termination by University Without Cause.

(a)    University May Terminate Without Cause.    The University shall have the right to terminate this Employment Agreement prior to its expiration date without cause upon five (5) days written notice to Employee.

(b)    University's Obligation Upon Termination Without Cause.    In the event this Employment Agreement is terminated by the University without cause, the University shall pay to Employee, as his exclusive remedy in lieu of any and all other legal remedies or equitable relief available to Employee, liquidated damages in an amount equal to Employee's base salary as set forth in Paragraph 4.01 herein, pro rata, for the remaining term of this Employment Agreement. The University shall pay such liquidated damages either in lump sum within sixty (60) days of the effective date of termination, or in equal monthly installments over the

6

remaining term of this Employment Agreement until paid in full. The payment of liquidated damages shall be subject to applicable withholdings and deductions as may be required by law. Notwithstanding anything contained herein to the contrary, the University's obligation to pay liquidated damages pursuant to Paragraph 8.02(b) herein shall be subject to Employee's duty to mitigate, as follows: In the event the University terminates this Employment Agreement without cause, Employee agrees to mitigate the total amount of liquidated damages to which he is entitled pursuant to Paragraph 8.02(b) herein and to make reasonable and diligent efforts to obtain other employment as soon as reasonably possible after termination of this Employment Agreement. After Employee accepts any such new employment, the total amount of liquidated damages the University is obligated to pay and Employee is entitled to receive as specified in Paragraph 8.02(b) herein shall be decreased by an amount equal to the total compensation received by Employee from such new employment until the expiration date of the term of this Employment Agreement as set forth in Paragraph 3.01 herein.

(c)     Acknowledgement of Parties.  The parties have bargained for and agreed to the foregoing liquidated damage provision, giving consideration to the fact that termination of this Employment Agreement by the University without cause prior to its natural expiration may cause Employee to lose certain income, supplemental compensation, fringe benefits, perquisites, and collateral business opportunities to earn outside compensation relating to his employment at the University, or to incur other consequential damages, which losses and damages are extremely difficult to determine fairly or with certainty.  The parties further agree that such liquidated damages shall constitute adequate and reasonable compensation to Employee for the damages and injury suffered by him because of such termination by the University.  The parties acknowledge that the foregoing is not, nor should it be construed to be, a penalty.

9.     **Miscellaneous.**

9.01:  Merger Clause.  Upon the effective date hereof, this Employment Agreement constitutes the sole, full and complete understanding and agreement of the parties with respect to the employment of Employee by the University and supersedes all prior understanding and agreements, oral or written, regarding such matters.

9.02:  Amendments to Employment Agreement.  No amendments, changes, additions, deletions or modifications to or of this Employment Agreement shall be valid unless reduced to writing, signed by the parties and attached hereto.

9.03:  Governing Law.   This Employment Agreement shall be governed by and construed in accordance with the laws of the State of South Carolina, and the laws of the State of South Carolina shall govern the validity, performance and enforcement of this Employment Agreement.

9.04:  Jurisdiction; Venue.  Any cause of action, suit or proceeding brought by the University or Employee with respect to, concerning, relating or affecting this Employment Agreement shall be filed only in a state or federal court of competent jurisdiction located in Richland County, State of South Carolina, and each party hereby irrevocably waives any objection which it may now or hereafter have to the personal jurisdiction or venue of any suit,

action, or proceeding arising out of, or relating to, this Employment Agreement being in Richland County. The parties further irrevocably waive any claim that such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

9.05: Sovereign Immunity. Any act by the University regarding this Employment Agreement is not a waiver of either the University's sovereign immunity or the University's immunity under the Eleventh Amendment of the United State's Constitution.

9.06: Assignment. Employee's rights and interests under this Employment Agreement may not be assigned, pledged or encumbered by Employee.

9.07: Severability. In the event one or more words, phrases, clauses or provisions in this Employment Agreement are determined to be invalid, illegal, void or otherwise unenforceable, in whole or in part, in a court of law, the parties agree that the remaining portions of the Employment Agreement shall be deemed valid and remain in full force and effect.

9.08: No Waiver of Default. No waiver by the parties hereto to any default or breach of any covenant, term or condition of this Employment Agreement shall be deemed to be a waiver of any other default or breach of the same or any other covenant, term or condition contained herein.

9.09: Acknowledgment. Employee acknowledges that he has read and understands the foregoing provisions of this Employment Agreement, that such provisions are reasonable and enforceable, that he agrees to abide by this Employment Agreement and the terms and conditions set forth herein, and that no other agreement to which he is a party prohibits his execution of and performance under this Employment Agreement.

9.10: University Retains all Materials and Records. All materials or articles of information, including without limitation, personnel records, recruiting records, team information, films, statistics, or any other material or data, furnished to Employee by the University or developed by Employee on behalf of the University or at the University's direction or for the University's use or otherwise in connection with Employee's employment hereunder are and shall remain the sole and confidential property of the University. On or before the expiration of the term of this Employment Agreement or its earlier termination as provided for herein, Employee shall immediately cause any such materials in his possession or control to be delivered to the University.

9.11: Return of University-Issued Property. Not later than the effective date of termination or expiration of this Employment Agreement, Employee shall return to the Athletics Director or his designee any University issued automobile, computer equipment or other equipment, cell phone, cash advance, credit cards, telephone calling cards, University keys and other items, unless otherwise agreed to in writing by the University. Employee agrees that the University shall be authorized to deduct the value of any and all such un-returned items from his final University payroll check, annual leave payment (if any), or liquidated damage payment.

**SA-299**

9.12: <u>Notices</u>. Any notice or other communication which may be or is required to be given under this Employment Agreement shall be in writing and shall be deemed to have been given on the earlier of the day actually received or on the close of business on the fifth (5th) business day next following the day when deposited in the United States Mail, postage prepaid, registered or certified, addressed to the party at the address set forth after its name below or such other address as may be given by such party in writing to the other:

(a)    If to Employee:    Lamont Evans
                                Assistant Men's Basketball Coach
                                Basketball Practice Facility
                                University of South Carolina
                                Columbia, SC 29208

(b)    If to the University:    Director of Athletics
                                    Rice Athletic Center
                                    University of South Carolina
                                    Columbia, SC 29208

**IN WITNESS WHEREOF,** the parties have executed this Employment Agreement on the dates below indicated.

**UNIVERSITY OF SOUTH CAROLINA**         **EMPLOYEE**

By: _Amy E. Stone_                 By: _Lamont Evans_
    Amy E. Stone, Secretary                Lamont Evans
    Board of Trustees                     Assistant Men's Basketball Coach

Date: _8-1-12_                        Date: _7/23/12_

9

**SA-300**

University of South Carolina Athletics
_____
Office of Compliance Services                           Form 11.8 – Annual Outside Income



| For: | All Athletics Department Staff Members |
|---|---|
| Due Date: | To be completed no later than September 1, 2013 |
| Required by: | NCAA Bylaw 11.2.2 |

Print Name (Last, First): _Evans, Lamont_       Sport/Department: _Mens Basketball_

All employees of the Department of Athletics must provide the Director of Athletics and the President of the institution an annual detailed written account of all athletically-related income and benefits from sources outside the institution on a yearly basis. The NCAA specifies athletically-related income including, but not limited to, the following:

- Income from annuities
- Sports Camps (**NON-USC CAMPS** Only)
- Housing benefits (including preferential housing arrangements);
- Country Club memberships;
- Complimentary Ticket Sales*
- Television and radio programs;
- Endorsement or consultation contracts with athletic shoe, apparel, or equipment manufacturers**
- Other income or benefits reported for tax purposes***

**Prior to entering into any contract of this type, the contract must be submitted and approved by USC

***<u>No supplemental income that is PAID or GIVEN BY USC (e.g., camps, clinics, bonuses, athletic tickets etc.) is counted for this form.</u> Only report any income from <u>Non-USC</u> sources. Do not include Under Armour allotment distributed to you by USC.

List all sources of <u>reportable</u> income. **If you did not receive any reportable income <u>you must enter</u> "NONE" under "Source".**

| Source/Provider of Income for Academic Year 2013-2014 (Sept 2013 – August 2014) | Dollar Amount |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

*By signing my name below and in compliance with NCAA Bylaws 11.1.2 and 11.2.1, I acknowledge that, as a condition of my employment with the University of South Carolina Department of Athletics, I am obligated to report all sources of outside income from athletically related sources not affiliated with the University of South Carolina and that I have done so on this form to the best of my knowledge.*

Signature of Athletics Department Staff Member _____    Date _8/13/14_

**Please sign, date, and return** to the Office of Compliance Services no later than September 1, 2013.

GOVERNMENT
EXHIBIT
1006
S1 17 Cr. 684 (ER)

**SA-301**



## University of South Carolina Athletics

Office of Compliance Services          Form 11.8 – Annual Outside Income

| For: | All Athletics Department Staff Members |
|---|---|
| Due Date: | To be completed no later than September 1, 2015 |
| Required by: | NCAA Bylaw 11.2.2 |

Print Name (Last, First): _Evan, Lamont_          Sport/Department: _M. Basketball_

All employees of the Department of Athletics must provide the Director of Athletics and the President of the institution an annual detailed written account of all athletically-related income and benefits from sources outside the institution on a yearly basis. The NCAA specifies athletically-related income including, but not limited to, the following:

- Income from annuities
- Sports Camps (**NON-USC CAMPS** Only)
- Housing benefits (including preferential housing arrangements);
- Country Club memberships;
- Complimentary Ticket Sales*
- Television and radio programs;
- Endorsement or consultation contracts with athletic shoe, apparel, or equipment manufacturers**
- Other income or benefits reported for tax purposes***

**Prior to entering into any contract of this type, the contract must be submitted and approved by USC

***<u>No supplemental income that is PAID or GIVEN BY USC (e.g., camps, clinics, bonuses, athletic tickets etc.) is counted for this form.</u> Only report any income from <u>Non-USC</u> sources. Do not include Under Armour allotment distributed to you by USC.

List all sources of <u>reportable</u> income. **If you did not receive any reportable income <u>you must enter</u> "NONE" under "Source".**

| Source/Provider of Income for Academic Year 2014-2015   (September 2014–August 2015) | Dollar Amount |
|---|---|
| _NA_ | |
| | |
| | |
| | |
| | |
| | |
| | |

*By signing my name below and in compliance with NCAA Bylaws 11.1.2 and 11.2.1, I acknowledge that, as a condition of my employment with the University of South Carolina Department of Athletics, I am obligated to report all sources of outside income from athletically related sources not affiliated with the University of South Carolina and that I have done so on this form to the best of my knowledge.*

| Signature of Athletics Department Staff Member | Date |
|---|---|
| | 8/13/15 |

**Please sign, date, and return** to the Office of Compliance Services no later than September 1, 2015.

Distribution: *Original* – Office of Compliance Services; CC – HR          Form 11.8 – Annual Outside Income   2015_07_13

## ATHLETIC DEPARTMENT POLICIES AND PROCEDURES
## TABLE OF CONTENTS

I.      CREIGHTON UNIVERSITY MISSION STATEMENT                      3

II.     CREIGHTON ATHLETICS MISSION STATEMENT                       4

III.    CREIGHTON ATHLETICS PHILOSOPHY                              6
        A.  Statement of Philosophy
        B.  Philosophical Direction
        C.  Objectives
            1.  Ongoing
            2.  Annual
        D.  Organization
            1.  Program
            2.  Sports Tiering
            3.  Addition and Deletion of Sports
            4.  Committees
                a.  University Athletics Board
                b.  Student-Athlete Advisory Committee (SAAC)
        E.  Personnel
        F.  Athletics Staff Directory

IV.     ADMINISTRATIVE POLICIES and PROCEDURES                      14
        A.  Communication
        B.  Head Coaches Administrative Duties
        C.  Administrative Support Services
        D.  Student Workers
        E.  Absence Policies (includes holiday, vacation, sick leave)
        F.  Tuition Remission
        G.  Hiring Policies
        I.  Organizational Memberships
        J.  General Office Policies and Procedures

V. STAFF CONDUCT AND ETHICS                                         25
        I.      Governing Authorities
        II.     Business Ethics
        III.    Personal Conduct
        IV.     Professional Responsibilities
        V.      Sportsmanlike Conduct
        VI.     Gambling and Bribery

VI.     COMPLIANCE POLICIES                                         28
        -   Philosophy
        -   Enforcement
                o   Interpretations
                o   Reporting and Investigating Violations
                o   Hearings and Appeals
                o   Violations

GOVERNMENT
EXHIBIT
**1101**
S1 17 Cr. 684 (ER)

1

o   Head Coach Responsibility
- NCAA Requirements
- University Compliance Committee
- Rules Education
- Personnel
- Amateurism & Athletic Eligibility
- Recruiting
- Academic Eligibility
- Financial Aid
- Awards & Benefits
- Playing and Practice Seasons

VII.    CAMPS AND CLINICS POLICIES AND PROCEDURES                        50
        1.  Athletic Facilities Policies (CAMPS)                         59
        2.  SOP Background Checks                                        65

VIII.   COACHES ATHLETIC TRAINING POLICIES                               68

IX.     TRADE OUT POLICIES                                               74

X.      TICKETING POLICIES                                               75

XI.     TRAVEL POLICIES                                                  77
        A.  Staff Travel                                                 78
        B.  Team Travel                                                  83
        C.  Prospective Student-Athlete Travel                           87
        D.  Missed Class Policy                                          88

XII.    STUDENT-ATHLETE HANDBOOK/POLICY EXCERPTS:                        89
        A.  Student-Athlete Conduct and Ethics                           89
        B.  Student-Athlete Support Services                             95
            1.  Academics                                                95
            2.  Athletic Medicine Services                              117
                a.  Summer Workout Medical Policy- NEW Student-Athletes  120
                b.  Insurance                                           122
                c.  Privacy                                             124
                d.  Drug Screening                                      127
            3.  Athletic Performance                                    133
            4.  Internet Ethics                                         136

XIII.   GENDER EQUITY POLICY—REVISION OUT FOR OEI/GC APPROVAL

XIV.    APPLICABLE UNIVERSITY POLICIES                                  137
        A.  Athletic Board Bylaws                                       137
        B.  Sexual Violence, Harassment, Discrimination and Grievances Policy   142
        C.  Children and Vulnerable Adults Policy                       152
        D.  Mandatory Reporters Policy                                  158
        E.  Diversity and Inclusion Policy                              163

**SA-304**

## I.     CREIGHTON UNIVERSITY MISSION STATEMENT

Creighton is a Catholic and Jesuit comprehensive university committed to excellence in its selected undergraduate, graduate and professional programs.

As Catholic, Creighton is dedicated to the pursuit of truth in all its forms and is guided by the living tradition of the Catholic Church.

As Jesuit, Creighton participates in the tradition of the Society of Jesus, which provides an integrating vision of the world that arises out of a knowledge and love of Jesus Christ.

As comprehensive, Creighton University's education embraces several colleges and professional schools and is directed to the intellectual, social, spiritual, physical and recreational aspects of students' lives and to the promotion of justice.

Creighton exists for students and learning.  Members of the Creighton community are challenged to reflect on transcendent values, including their relationship with God, in an atmosphere of freedom of inquiry, belief and religious worship.  Service to others, the importance of family life, the inalienable worth of each individual, and appreciation of ethnic and cultural diversity are core values of Creighton.

Creighton faculty members conduct research to enhance teaching, to contribute to the betterment of society, and to discover new knowledge.  Faculty and staff stimulate critical and creative thinking and provide ethical perspectives for dealing with an increasingly complex world.

## II.   CREIGHTON UNIVERSITY ATHLETICS MISSION STATEMENT

Intercollegiate athletics is a vital part of the University, and like all parts of the University, should reflect a concern for intellectual, moral, and spiritual values, and for pursuit of excellence which is faithful to the Jesuit tradition and to the educational mission of the University.

Intercollegiate athletics is of value to the University, and the program ensures that the student-athlete is first a student.  It is of utmost importance to the University that student-athletes are protected from risk of injury, that there is a commitment to the principles of fair play and amateur athletic competition, and that the rules of the NCAA are adhered to.  Additionally, the University places equal importance on justice and equity in the distribution of resources, the idea that competitive excellence is the goal but not at the risk of institutional ideals, and that outside supporters of athletics are valued for their financial support when they are sensitive to the integrity of the University. Lastly, the University insists that unity exists between the athletic program and all elements of the University.

In addition, Creighton University subscribes to the principles of the Knight Foundation Commission on Intercollegiate Athletics (1992) and these are:

PREAMBLE:  Creighton University is committed to a philosophy of firm institutional control of athletics, to the unquestioned academic and financial integrity of our athletics program, and to the accountability of the athletics department to the values and goals befitting higher education.  In support of that commitment, the board, officers, faculty and staff of Creighton University have examined and agreed to the following general principles as a guide to our participation in intercollegiate athletics:

I.     The educational values, practices and mission of Creighton University determine the standards by which we conduct our intercollegiate athletics program.

II.    The responsibility and authority for the administration of the athletics department, personnel and finances, are vested in the president.

III.   The welfare, health and safety of student-athletes are primary concerns of athletics administration on this campus.  Creighton University will provide student-athletes with the opportunity for academic experiences as close as possible to the experiences of their classmates.

IV.   Every student-athlete -- male and female, majority and minority, in all sports -- will receive equitable and fair treatment.

V.    The admission of student-athletes -- including junior college transfers -- will be based upon their showing reasonable promise of being successful in a course of study leading to an academic degree.  That judgment will be made by admissions officials.

VI.   Continuing eligibility to participate in intercollegiate athletics will be based on students being able to demonstrate each academic term that they will graduate within five years of enrolling.  Students who do not pass this test will not play.

4

**SA-306**

VII.    Student-athletes, in each sport, will be graduated in at least the same proportion as non-athletes who have spent comparable time as full-time students.

VIII.    All funds raised and spent in connection with inter-collegiate athletics programs will be channeled through Creighton University's general treasury, not through independent groups, whether internal or external.  The athletics department budget will be developed and monitored in accordance with general budgeting procedures on campus.

IX.    All athletics-related income from non-university sources for coaches and athletics administrators will be reviewed and approved by the university.   In cases where the income involves the university's functions, facilities or name, contracts will be negotiated with the institution.

X.    Annual academic and fiscal audits of the athletics program will be conducted.  Moreover, Creighton University intends to seek NCAA certification that its athletics program complies with the principles herein.   Creighton University will promptly correct any deficiencies and will conduct its athletics program in a manner worthy of this distinction.

## III.   CREIGHTON UNIVERSITY ATHLETICS STATEMENT OF PHILOSOPHY

I. STATEMENT OF PHILOSOPHY

Since education is the primary purpose of the University, the governance of intercollegiate athletics will be the responsibility of the faculty as required by the NCAA.   Participation in intercollegiate athletics requires, as a prerequisite, certain levels of academic achievement.  The educational experience for the student-athlete will be stressed at all times.   The University recognizes an athletic program as a substantial adjunct to the accomplishments of University objectives in education, research and service.  Further, a University offering a well-rounded program of intercollegiate athletics is a more attractive place to many prospective students, while increasing the chance of  retaining students  it admits.   The quality of the University's intercollegiate athletic program either enhances or diminishes the Institution as a whole.

Intercollegiate athletics provides enjoyment for participants and spectators, and fosters a spirit of unity for the student body.  The intercollegiate athletics program is also beneficial to the university by providing a bond among the University, its alumni, and the Creighton University regional community.   Furthermore, the program is considered to be an integral part of the community service of the University as it provides the surrounding region with opportunities to attend University level sports events.

While the will to win is essential for honest competition, the development of the athletes and spectators as participants in striving for excellence is more important than winning per se.  Pressures on athletes, coaches and athletic administrators to win at all costs will be resisted.

The physical welfare, academic success and adherence to fair play and amateur athletic competition, as defined by the NCAA rules, will rule all decisions and policies governing student-athletes at Creighton University.  Appropriate resources to ensure adherence to this principle will be provided.

II. PHILOSOPHICAL DIRECTION

The following guidelines provide direction for the successful implementation of the philosophy of Creighton University athletics:

 A.   The University shall strive for excellence in a balanced program of intercollegiate athletics which achieves a close integration of education and athletic competition for those directly involved.   The athletics program shall seek to complement and supplement the values and aims of the general education objectives of the University.   A close cooperation between intercollegiate athletics, academics and student affairs programs of the University shall at all times be encouraged.

B.  Creighton University Athletics is an equal opportunity institution and does not discriminate on the basis of gender, race, religion, age, national origin, or physical or mental disabilities.  In endorsing the beneficial opportunities provided by a strong intercollegiate athletics program, Creighton Athletics remains ever mindful of the resources necessary to attain its academic and athletic goals.   Although funding may vary among the intercollegiate sports, Creighton Athletics strives to be of uniform excellence for all intercollegiate

6

**SA-308**

sports in the areas of provision of equipment, facilities, medical services, academic support services, coaching, travel and dining arrangements, publicity, recruitment, scheduling of games and practices, administrative staff support, and the like, regardless of the sport's own revenue producing capabilities. To assure these goals are met, it is the responsibility of all members within the athletics department to comply with all federal and state laws, including Title IX of the Education Amendments of 1972, and its implementing regulations and policies.

C. Minority representation on all of Creighton's athletics teams is strongly encouraged and through deliberate effort, to the degree possible, will reflect the minority population of the University as a whole.

D. The intercollegiate athletics program shall strive to achieve maximum social and safety benefits to participants, spectators and to the University and local communities.

E. The University will continue to provide, as athletics income and other funds permit and as authorized by the University, BIG EAST Conference and the NCAA, financial assistance for the education of students who can contribute to the success of the teams, and at the same time meet the prescribed scholastic standards.

F. The intercollegiate athletic contests which shall be harmonious with campus life, shall observe a proper relationship to student body convenience, to academic pursuits, and especially to scheduled examination periods. The contests shall always be conducted in the best possible environment, regarding facilities, conditions, ceremony and spirit.

G. The administrators, coaches, and support staff in intercollegiate athletics shall strive:

- to achieve appropriate University level competition in all sports;

- to maintain the highest and most honorable conduct in recruiting contacts;

- to recognize, with appreciation, the support of friends in the University region, but to make it implicit that financial support always be channeled through the appropriate university offices;

- to ensure that the institution is committed to following all regulations of the athletic conferences and the NCAA;

Note: staff, student-athletes, boosters and all other persons associated with athletics are encouraged to report violations or rumors of violations.

- to make intercollegiate athletics a positive educational experience which complements that provided in the classroom; and

- to ensure that all student-athletes are treated with dignity and respect while being informed of their rights concerning due process in all matters pertaining to their welfare.

7

III. OBJECTIVES FOR CREIGHTON ATHLETICS

The objectives for Creighton Athletics are organized in two categories; ongoing and annual.

A. ONGOING OBJECTIVES

1. To provide a broad program of intercollegiate athletic competition consistent with educational aims and objectives.

2. To provide a strong program of intercollegiate athletic competition based upon the needs, interests and capacities of the students.

3. To provide a program that encourages excellence.

4. To provide equitable opportunities for male and female athletes.

5. To maintain the spirit of play within competitive sports events so that concomitant educational values of such an experience are emphasized.

6. To increase public understanding and appreciation of the importance and value of sports and athletics as they contribute to the enrichment of the life of the student.

7. To provide information and assistance to area coaches and athletes.

8. To provide the University community and the civic community an opportunity to observe quality performances by student-athletes.

9. To promote sport by conducting camps, workshops and clinics in coaching, officiating and skill development.

B. ANNUAL OBJECTIVES

Each year the Senior Staff proposes specific objectives for the department. These specific objectives are then presented and discussed with the staff at their first meeting of the fall semester and with the students when the Athletics Director meets with each team at the beginning of the fall semester.

IV. ORGANIZATION

A. PROGRAM

Sports - Creighton University Athletics sponsors fourteen (14) intercollegiate sports (6 for men and 8 for women). These sports and corresponding grants permitted are:

| MEN | GRANTS | WOMEN | GRANTS |
|---|---|---|---|
| Baseball | 11.7 | Basketball | 15.0 |
| Basketball | 13.0 | Crew | 1.33 |
| Cross Country | 1.33 | Cross Country | 1.33 |
| Golf | 1.33 | Golf | 1.33 |

8

**Creighton University**
**Men's Basketball Staff Questionnaire**
**Men's Basketball Eligibility Review**
**October 30, 2018**

On September 26, 2017, federal criminal complaints were unsealed that alleged wrongdoing involving third-parties and individuals affiliated with NCAA member institutions that may have jeopardized student-athletes eligibility to compete at NCAA institutions. On October 11, 2017, the NCAA Division I Board of Directors directed Division I institutions to examine their men's basketball programs for possible NCAA rules violations, including violations related to offers, inducements, agents, extra benefits and other similar issues. On October 24, 2018, in the first of three criminal trials related to collegiate men's basketball, three defendants were found guilty of defrauding NCAA member institutions. On October 26, 2018, NCAA Executive Vice President for Regulatory Affairs Stan Wilcox sent a memo to all Division I institutions reminding them of their obligation to "monitor your basketball programs and to review the eligibility of all basketball student-athletes."

The following request for attestation from Creighton University is made consistent with the NCAA Division Board of Directors requirement and in fulfillment of its obligations as an NCAA Division I member institution.

**NCAA Bylaw 10.1 requires that I provide truthful and complete information regarding my knowledge of, or involvement in, matters relevant to a possible violation of NCAA regulation.**

**I.    Shoe Company Camps, Events and Tournaments**

      1.    Aside from University sponsored events and non-scholastic recruiting events (April and July events), did you attend any events sponsored by shoe companies (e.g. Nike sponsored golf outing) during the past year, January 2017 to present?

           YES    /    ( NO )

           How many / when / where?

**GOVERNMENT**
**EXHIBIT**
**1103**
S1 17 Cr. 684 (ER)

1

38133.1 10/30/2018

2.      Have you ever requested employees from Nike to speak with prospective
        student-athletes or their families on behalf of Creighton University about a
        prospect's college decision?

        YES        /         NO

        If yes, please provide the date of the conversation and what was said.

3.      Who is your specific contact for Nike?

4.      What benefits do you receive from Nike?

5.      Have you ever requested any other shoe company employee to
        communicate with a prospective student-athlete or their family about
        Creighton University?

        YES        /         NO

        If yes, please provide the date of the conversation and what was said:

2                                                    38133.1 10/30/2018

6. Have you ever been introduced to, or spoken with, any of the following individuals:

- Jim Gatto?                YES        /        NO
- Merl Code?                (YES)      /        NO
- Christian Dawkins?        (YES)      /        NO
- Brad Augustine?           (YES)      /        NO
- Rashan Michel?            YES        /        NO
- Munish Sood?              YES        /        NO

If yes, please provide the date / location that you were first introduced/spoke to the individual and the duration of your relationship:

- Jim Gatto:
- Merl Code:    – First met at At Nike teachson not sure of date
- Christian Dawkins:    – Known for over 20 yrs
- Brad Augustine:  – First met at a high School Bball in 2016
- Rashan Michel:
- Munish Sood:

7. Have you ever requested any of the following individuals to provide anything of value to a prospective student-athlete, current student-athlete or their families?



- Jim Gatto?                YES        /        NO
- Merl Code?                YES        /        NO
- Christian Dawkins?        YES        /        NO
- Brad Augustine?           YES        /        NO
- Rashan Michel?            YES        /        NO
- Munish Sood?              YES        /        NO

3

If yes, please describe the circumstances:

8. Have you ever requested any of the following individuals to provide anything of value to a prospective student-athlete's nonscholastic basketball team, scholastic basketball team, coach or individual associated with a prospect (e.g. uncle, cousin, friend, girlfriend, etc.)?

- Jim Gatto?            YES        /        NO
- Merl Code?            YES        /        NO
- Christian Dawkins?    YES        /        NO
- Brad Augustine?       YES        /        NO
- Rashan Michel?        YES        /        NO
- Munish Sood?          YES        /        NO

If yes, please describe the circumstances:

9. Have you accepted anything of value from anyone who identified themselves as an agent, financial advisor or apparel representative?

YES        /        NO

If yes, please describe:

10. Have you provided anything, or directed a third party to provide anything, of value to a prospective student-athlete or family of a prospective student-athlete in exchange for them committing to participate in men's basketball at Creighton University?

YES        /        NO

4                                            38133.1 10/30/2018

If yes, please describe:

11.    Have you provided anything of value to a current student-athlete or family of a student-athlete on behalf of an agent, financial advisor, apparel provider or any other individual?

       YES        /      (NO)

If yes, please describe:

12.    Have you ever accepted anything of value from an agent, financial advisor, apparel provider or other individual in exchange for an agreement to steer a prospective student-athlete or student-athlete to that individual's service?

       YES        /      (NO)

If yes, please describe:

13.    Have you ever paid a prospective student-athlete or anyone in the prospect's family, to attend Creighton University?

       YES        /      (NO)

If yes, please describe:

14.    Have you ever *offered* to provide a prospective student-athlete or the prospect's family, with any benefits or gifts (e.g. employment opportunities) to attend Creighton University?

       YES        /      (NO)

5                                            38133.1 10/30/2018

**SA-315**

If yes, please describe:

15. Have you ever paid or provided benefits to a nonscholastic or scholastic coach to direct a prospective student-athlete to attend Creighton University?

YES / (NO)

If yes, please describe:

**I certify and affirm that the answers provided are truthful and complete, and fulfill my obligations pursuant to NCAA Bylaw 10.1.**

_____          11/5/18
Signature                                 Date

Preston Murphy
Name (printed)

38133.1 10/30/2018



**Form 16-2**                                                       **Academic Year: 2016-17**

**Certification of Compliance for Staff
Members of Athletics Departments**

| | |
|---|---|
| **For:** | NCAA member institutions. |
| **Action:** | Complete and keep on file in the office of the director of athletics. |
| **Due date:** | To be completed not later than **September 15.** |
| **Required by:** | NCAA Bylaw 18.4.2. |
| **Purpose:** | To certify compliance with NCAA rules. |

## TO: RETURNING STAFF MEMBERS OF THE ATHLETICS DEPARTMENT

Name of institution: *Creighton University*

Sign this form:

- If you were a staff member of the athletics department (including part-time staff members, graduate assistants and clerical staff) at this institution during the 2015-16 academic year and if you are returning for the 2016-17 academic year.

Do **not** sign this form:

- If you are a new employee for the 2016-17 academic year.

**[Note: Forms incomplete as of September 15 will result in loss of eligibility for NCAA championships.]**

**By signing and dating this form, you certify that you have reported through the appropriate individuals on your campus to your chancellor/president any knowledge of violations of NCAA legislation involving your institution.**

| Name (Print or type) | Title [include sport(s)] | Signature | Date MM/DD/YY |
|---|---|---|---|
| Bruce Rasmussen | Director of athletics | | 7/25/16 |
| Mark Burgers | Assoc. Director of Athletics | | 7/26/16 |
| Brad Abramson | Ticket Manager | | 7/26/16 |
| Rob Anderson | Sports Information Director | | 7/25/16 |
| Tommy Anderson | Asst Dir of Ath Development | | 8/15/16 |
| Dan Bailey | Head Strength & Conditioning | | 8/17/16 |
| Angie Behrens | Asst. Volleyball Coach | | 8/10/16 |
| Deb Belik | Asst. Athletic Trainer | | 7/26/16 |
| Margaret Bennett | Admin. Asst. | | 8/19/16 |
| Elmar Bolowich | Head Men's Soccer Coach | | 7/25/16 |
| Kirsten Bernthal Booth | Head Volleyball Coach | | 8/16/16 |
| JJ Borecky | Asst. Facilities Manager | | 8/4/16 |

**GOVERNMENT EXHIBIT 1104** S1 17 Cr. 684 (ER)

N a t i o n a l  C o l l e g i a t e  A t h l e t i c  A s s o c i a t i o n
*Supporting student-athlete success on the field, in the classroom and for life*
Equal Opportunity/Affirmative Action Employer

**SA-317**

Certification of Compliance for Staff
  Members of Athletics Departments
Form 16-2
Page No. 2

| Name (Print or type) | Title [include sport(s)] | Signature | Date MM/DD/YY |
|---|---|---|---|
| Steve Brace | Assoc. AD/Internal | | 7/26/16 |
| Tim Callahan | Director of Sales | | 8/25/16 |
| Alexis Cantu | Asst. Softball Coach | | 7/28/16 |
| Dan Chipps | Head Women's Rowing Coach | | 8/5/16 |
| Lisa Chipps | Academic Coordinator | | 7/25/16 |
| Debbie Conry | Head Women's Golf Coach | | 8/4/16 |
| Darian DeVries | Asst. Men's Basketball Coach | | 8/16/16 |
| Joy Dobrauc | Asst Women's Rowing Coach | | 8/8/16 |
| Jim Dorsey | Academic Advisor | | 7/25/16 |
| Adrian Dowell | Asst Athletic Director/Dev. | | 7/29/16 |
| Jim Flanery | Head Women's Basketball Coach | | 7/26/16 |
| Matt Fritsche | Asst. Women's Basketball Coach | | 7/26/16 |
| Patty Galas | Men's Basketball Secretary | | 7/26/16 |
| Sydney Goodnight | Ticketing | | 8/12/16 |
| Len Gordy | Diversity/Inclusion Officer | | 7/28/16 |
| Ray Griggs | Volunteer Women's Rowing | | 8/30/16 |
| Rachel Grosvenor | Asst. Marketing/Events | | 9/10/16 |
| Aaron Haselhorst | Asst. Athletic Trainer | | 8/15/16 |
| Chevelle Herring | Asst. Women's Basketball Coach | | 7/26/16 |
| John Huebscher | Proctor/Asst. Academic Adv. | | 8/1/16 |
| Kristen Jansen | Student Worker | | 8/30/16 |
| Jill Koegel | Nutritionist | | 8/29/16 |
| Chris Kokotajlo | Asst. Cross Country Coach | | 7/25/16 |
| Jean Lilly | Asst. Tennis Coach | | 8/6/16 |
| Tom Lilly | Head Tennis Coach | | 8/6/16 |
| Steve Lutz | Asst. Men's Basketball Coach | | 7/26/16 |
| Tim MacAllister | M. Basketball Video Coord. | | / / |
| Brandon McCarville | Facilities Manager | | 7/25/16 |
| Greg McDermott | Head Men's Basketball Coach | | 7/26/16 |
| Andre McIntyre | Student Worker/Strength/Cond. | | 9/26/16 |

**What to do with this form:**

1. Attach completed form to Form 16-1 (Certification of Compliance for Institutions) not later than September 15 and keep on file in the office of the director of athletics. **It is not to be sent to the NCAA national office.**

2. Contact the NCAA academic and membership affairs staff at the national office if you have questions regarding Forms 16-1 and 16-2.

Certification of Compliance for Staff
  Members of Athletics Departments
Form 16-2
Page No. 2
_____

| Name (Print or type) | Title [include sport(s)] | Signature | Date MM/DD/YY |
|---|---|---|---|
| John McKew | Men's Basketball Admin. Asst. | | 7/26/16 |
| Ben McNair | Head Athletic Trainer | | 8/11/16 |
| Madison McNary | Compliance | | 8/31/16 |
| Justin McQuistan | Asst. Ticket Manager | | 7/28/16 |
| Brandy Menaugh | Asst. AD/Compiance/SWA | | 7/29/16 |
| Steve Merfeld | Director of Player Development | | 7/26/16 |
| Ralph Merritt | Volunteer W. Rowing | | 8/30/16 |
| Lauren Miltenberger | Development | | 7/26/16 |
| Mike Murakami | Asst. Dir. of Marketing/Communications | | / / |
| Preston Murphy | Asst. Men's Basketball Coach | | 7/24/16 |
| Chris Newhouse | Asst. Marketing/Video Graphics | | 7/26/16 |
| Neil Norton | NCAA Faculty Rep | | 8/12/16 |
| Ross Paule | Head Women's Soccer Coach | | 7/26/16 |
| Michelle Potts | Vol. Baseball ops | | 8/8/16 |
| Adrian Rider | Asst. AD/Marketing | | 7/26/16 |
| Stephanie Rigamat | Asst. Women's Soccer Coach | | 8/7/16 |
| Matt Rogers | Head Cross Country Coach | | 7/24/16 |
| Kevin Sarver | Assoc AD/External | | 7/25/16 |
| Linda Sayavongchanh | Asst. Women's Basketball Coach | | 7/25/16 |
| Brad Schmidt | Asst. Strength & Conditioning | | 8/2/16 |
| Chris Schroeder | Senior Financial Analyst | | 7/25/16 |
| Samantha Schumann | Grad. Asst. Trainer | | 8/15/16 |
| Craig Scriven | Asst. W. Soccer Coach | | 8/7/16 |
| Curtis Self | Asst Athletic Trainer | | 7/25/16 |
| Ed Servais | Head Baseball Coach | | 8/2/16 |
| Renae Sinkler | Asst. Softball Coach | | 8/9/16 |
| Glen Sisk | Asst. Sports Information | | 7/25/16 |
| Mike Steele | Volunteer M. Basketball | | / / |
| Johnny Torres | Asst. Men's Soccer Coach | | 8/15/16 |
| Carli Tritz | W. Basketball/Video Coord. | | 8/15/16 |

**What to do with this form:**

1.   Attach completed form to Form 16-1 (Certification of Compliance for Institutions) not later than September 15 and keep on file in the office of the director of athletics. **It is not to be sent to the NCAA national office.**

2.   Contact the NCAA academic and membership affairs staff at the national office if you have questions regarding Forms 16-1 and 16-2.

**SA-319**

Certification of Compliance for Staff
  Members of Athletics Departments
Form 16-2
Page No. 2
_____

| Name<br>(Print or type) | Title<br>[include sport(s)] | Signature | Date<br>MM/DD/YY |
|---|---|---|---|
| Jeff Vanderloo | M. Basketball/Dir. of Ops | | 7/28/16 |
| Jenny Vickers | W. Basketball/Dir. of Ops | | 8/16/16 |
| Brent Vigness | Head Softball Coach | | 8/19/16 |
| Rich Wallace | Asst. Baseball Coach | | 7/26/16 |
| Chris Wiemers | Head Men's Golf Coach | | 8/16/16 |
| Joe Willman | Director of Marketing | | 7/27/16 |
| Cameron Wilson | Vol. Facilities | | 8/16/16 |
| Alynne Wize | Dance Team Coordinator | | 8/19/16 |
| Eric Wordekemper | Asst. Baseball Coach | | 8/16/16 |
| Luke Baxter | Vol. W. Soccer | | 8/23/16 |
| | | | / / |
| | | | / / |
| | | | / / |
| | | | / / |
| | | | / / |
| Scott Bankers | New Employee | | / / |
| Zach Barnes | New Employee | | / / |
| Rhonda Behrens | New Employee | | / / |
| Tim Breen | New Employee | | / / |
| Mike Gabb | New Employee | | / / |
| Ryan Meek | New Employee | | / / |
| Casey Northcraft | New Employee | | / / |
| Micah Rhodes | New Employee | | / / |
| Molly Trevathan | New Employee | | / / |
| Chris Simos | New Employee | | / / |
| | | | / / |
| | | | / / |

**What to do with this form:**

1. Attach completed form to Form 16-1 (Certification of Compliance for Institutions) not later than September 15 and keep on file in the office of the director of athletics. **It is not to be sent to the NCAA national office.**

2. Contact the NCAA academic and membership affairs staff at the national office if you have questions regarding Forms 16-1 and 16-2.

**SA-320**

Certification of Compliance for Staff
  Members of Athletics Departments
Form 16-2
Page No. 2

_____

| **Name**<br>(Print or type) | **Title**<br>[include sport(s)] | **Signature** | **Date**<br>MM/DD/YY |
|---|---|---|---|
| Rafa Amaya, Jr | _____ | Not Returning | ___/___/___ |
| TJ Burns | _____ | Not Returning | ___/___/___ |
| Michael Eade | _____ | Not Returning | ___/___/___ |
| Barb Epps | _____ | Not Returning | ___/___/___ |
| Brian Furlong | _____ | Not Returning | ___/___/___ |
| Tyler Glidden | _____ | Not Returning | ___/___/___ |
| Megan Hoeft | _____ | Not Returning | ___/___/___ |
| Brian Hoie | _____ | Not Returning | ___/___/___ |
| Tom Mendoza | _____ | Not Returning | ___/___/___ |
| Martha Miller | _____ | Not Returning | ___/___/___ |
| Katie Neisler | _____ | Not Returning | ___/___/___ |
| Lance Rinker | _____ | Not Returning | ___/___/___ |
| Courtney Sawle | _____ | Not Returning | ___/___/___ |
| Emily Skeen | _____ | Not Returning | ___/___/___ |
| Kyle South | _____ | Not Returning | ___/___/___ |
| Tracy Whitfield | _____ | Not Returning | ___/___/___ |
| Rachel Vaca | _____ | Not Returning | ___/___/___ |
| Adam Klupp | _____ | Not Returning | ___/___/___ |
| Cody Kottich | _____ | Not Returning | ___/___/___ |
| Bryan Sova | _____ | Not Returning | ___/___/___ |
| Jack Rogalla | _____ | Not Returning | ___/___/___ |
| Hannah Portis | _____ | Not Returning | ___/___/___ |
| Analese Snyder | _____ | Not Returning | ___/___/___ |
| Ale Blackburn | _____ | Not Returning | ___/___/___ |
| Vicente Cafaro | _____ | Not Returning | ___/___/___ |
| Liz Dike | _____ | Not Returning | ___/___/___ |
| Derek Edholm | _____ | Not Returning | ___/___/___ |
| Justin Hughes | _____ | Not Returning | ___/___/___ |
| Catherine Saavela-Irvin | _____ | Not Returning | ___/___/___ |
| Margo Huggins | _____ | Not Returning | ___/___/___ |
| Leslie Dill | | Not Returning | |

**What to do with this form:**

1.   Attach completed form to Form 16-1 (Certification of Compliance for Institutions) not later than September 15 and keep on file in the office of the director of athletics. **It is not to be sent to the NCAA national office.**

2.   Contact the NCAA academic and membership affairs staff at the national office if you have questions regarding Forms 16-1 and 16-2.

# Creighton University Athletics

ATHLETICALLY RELATED INCOME AND BENEFITS FROM SOURCES OUTSIDE THE INSTITUTION

| Employee Name: | Preston Murphy |
|---|---|

Fiscal Year: January 1, 2016—December 31, 2016

| SOURCE | INCOME 2016 |
|---|---|
| 1. Speaking Engagements | |
| 2. Salary Supplement (outside Athletic Department, i.e. club team) | |
| 3. Endorsement or Consultation Contracts, including<br>a) athletics shoes<br>b) apparel<br>c) equipment | NIKE $2500 |
| 4. TV or Radio Appearances or Commercials | |
| 5. Automobile or Car Allowance | |
| 6. Income from Corporations in Exchange for Charitable Work | |
| 7. Annuities | |
| 8. Sports Camps/Clinics/Private Lessons | $6500 |
| 9. Housing Benefits | |
| 10. Country Club Memberships | |
| 11. Complimentary Ticket Sales (NOT Creighton tickets) | |
| 12. Other (please specify) | |

*I hereby certify that I am in compliance with all NCAA, Big East Conference and Creighton University regulations governing outside income. I promise that I will notify the compliance office of any new information or sources of income that may affect this agreement.*

7/7/17

**Signature of Athletic Department Staff Member**          **Date**

GOVERNMENT
EXHIBIT
1105
S1 17 Cr. 684 (ER)

## Creighton University Athletics

ATHLETICALLY RELATED INCOME AND BENEFITS FROM SOURCES OUTSIDE THE INSTITUTION

| Employee Name: | PReston Murphy |
|---|---|

Fiscal Year: **January 1, 2017—December 31, 2017**

| SOURCE | INCOME 2017 |
|---|---|
| 1. Speaking Engagements | N/A |
| 2. Salary Supplement (outside Athletic Department, i.e. club team) | |
| 3. Endorsement or Consultation Contracts, includes: <br> a) athletics shoes <br> b) apparel <br> c) equipment | 3K Nike |
| 4. Automobile or Car Allowance | Dealer: <br><br> Year/Make/Model of Vehicle: <br> Dodge Durango 2017 |
| 5. Camps/Clinics/Private Lessons | N/A $5000 pm |
| 6. Housing Benefits | N/A |
| 7. Country Club Memberships | Name of Club(s): <br> Shadow Ridge <br> Type of Membership: (e.g. golf, social) |
| 8. Clothing Allowance | Provider: 1K <br> Solry Ryan <br> Cash or Trade? |
| 9. Other (please specify) | |

*I hereby certify that I am in compliance with all NCAA, Big East Conference and Creighton University regulations governing outside income. I promise that I will notify the compliance office of any new information or sources of income that may affect this agreement.*

Signature of Athletic Department Staff Member

Date 8/6/20118

**GOVERNMENT EXHIBIT 1106**
S1 17 Cr. 684 (ER)

**SA-323**

FOIA Confidential Treatment Requested

TEXAS CHRISTIAN UNIVERSITY

2016-17 Athletics Department Outside Income

**TCU**
ATHLETICS
COMPLIANCE

*Note: This form is to be used by athletic department staff members or full-time coaches (head or assistant) as a means of reporting athletically related income and benefits received from sources outside the institution, which are not already contained in an employee's contract. This is to be completed after receiving any athletically related outside income from: **August 1, 2016 to July 31, 2017** as a result of your position in the athletic department.

Name: Corey Barker          Department/Title: MBB / ASSISTANT Coach

## Athletically Related Income
**Please indicate the amount of income that you earned from August 1, 2016 through July 31, 2017.**

| Choose: | • | Speaking Engagements. If Yes, enter amount: |
| Choose: | • | Sport Camps or Clinics. If Yes, enter amount: |
| Choose: | • | Complimentary Ticket Sales. If Yes, enter amount: |
| Choose: | • | Endorsement or Consultation Contracts. |

|   | • | Athletics Shoes-If Yes, enter amount: |
| Nike Elite | • | Apparel-If Yes, enter amount: $1,000 |
|   | • | Equipment-If Yes, enter amount: |

| Choose: | • | Television appearances or commercials. If Yes, enter amount: |
| Choose: | • | Radio appearances or commercials. If Yes, enter amount: |
| Choose: | • | Income from corporations in exchange for charitable work. If Yes, enter amount: |
| Choose: | • | Annuities. If Yes, enter amount: |
| Choose: | • | Salary Supplement (from outside the athletics department). If Yes, enter amount: |
| Choose: | • | Housing Benefits. If Yes, enter amount: |
| Choose: | • | Country-club Membership. If Yes, enter amount: |
| Choose: | • | Other. (MUST SPECIFY) |

☐ Check here if **NO OUTSIDE INCOME WAS EARNED** during the 2016-17 academic year.

I hereby certify that the above listed information is my actual outside income for the 2016-17 academic year.

_____          8-18-17
Athletic Staff Member/Coach Signature          Date

**The Chancellor of the University signs off on a compilation of the information posted on this form.**


**GOVERNMENT EXHIBIT 1203**
S1 17 Cr. 684 (ER)

TCU-DOJ-0000044

**SA-324**

FOIA Confidential Treatment Requested

TEXAS CHRISTIAN UNIVERSITY

2017-18 Athletics Department Outside Income

**TCU**
**ATHLETICS**
**COMPLIANCE**

*Note: This form is to be used by athletic department staff members or full-time coaches (head or assistant) as a means of reporting athletically related income and benefits received from sources outside the institution, which are not already contained in an employee's contract. This is to be completed after receiving any athletically related outside income from: <u>August 1, 2017 to July 31, 2018</u> as a result of your position in the athletic department.

**Name:** Corey Barker

**Department/Title:** Athletics / Asst Coach

### Athletically Related Income

Please indicate the amount of income that you earned from August 1, 2017 through July 31, 2018.

Choose: NO — Speaking Engagements. If Yes, enter amount: 0

Choose: NO — Sport Camps or Clinics. If Yes, enter amount: 0

Choose: NO — Complimentary Ticket Sales. If Yes, enter amount: 0

Choose: NO — Endorsement or Consultation Contracts.

- Athletics Shoes-If Yes, enter amount: 0
- Apparel-If Yes, enter amount: 0
- Equipment-If Yes, enter amount: 0

Choose: NO — Television appearances or commercials. If Yes, enter amount: 0

Choose: NO — Radio appearances or commercials. If Yes, enter amount: 0

Choose: NO — Income from corporations in exchange for charitable work. If Yes, enter amount: 0

Choose: NO — Annuities. If Yes, enter amount: 0

Choose: NO — Salary Supplement (from outside the athletics department). If Yes, enter amount: 0

Choose: NO — Housing Benefits. If Yes, enter amount: 0

Choose: NO — Country-club Membership. If Yes, enter amount: 0

Choose: NO — Other. (MUST SPECIFY)

☑ Check here if **NO OUTSIDE INCOME WAS EARNED** during the 2017-18 academic year.

I hereby certify that the above listed information is my actual outside income for the 2017-18 academic year.

_____
Athletic Staff Member/Coach Signature

Date: 8-27-18

**The Chancellor of the University signs off on a compilation of the information posted on this form.**

TCU-DOJ-0000045

Case 19-3623, Document 87, 05/26/2020, 2847061, Page169 of 188

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is to be effective on the 2nd day of May, 2016, between **TEXAS CHRISTIAN UNIVERSITY** ("University") and Corey Baker ("Employee").

## ARTICLE I - PURPOSE

University and Employee have entered into this Agreement because University desires to hire Employee for a period of years with Employee's assurance that he will serve the entire term of this Agreement, a long-term commitment by Employee being critical to University's desire to run a stable athletics program. University and Employee agree that coaches of intercollegiate athletic teams at University conduct their professional activities under circumstances unique in the family of university employees, including evaluation and scrutiny of team performance by the public and the media and control by external rules and regulations. Employee desires to obtain the opportunities of employment with University which are set forth in this Agreement. For these reasons, University has agreed to employ Employee as at the assistant coach ("Assistant Coach"), of its intercollegiate Men's Basketball team (the "Program") and Employee has promised to be employed by University, all as hereinafter provided.

## ARTICLE II - CONFIDENTIALITY

It is the desire of the parties that the terms and conditions of this Agreement shall be kept strictly confidential. Each party agrees to keep the terms and conditions of this Agreement confidential and to refrain from disclosing the terms and conditions of this Agreement or giving access to this Agreement to anyone without the advance written permission of the other party (except such party's attorneys, accountants, or other advisors, immediate family, officers, employees, and trustees who have agreed to these non-disclosure provisions), unless disclosure by either party is required by law. It is agreed, however, that University and Employee may issue a joint press release or statement and respond to press questions concerning this Agreement which may describe the terms and conditions hereof in general terms (or in other terms agreed to by the parties).

## ARTICLE III - POSITION

**3.01    Description of Employee's Responsibilities.**

    a.    **Employment.** Subject to the terms and conditions stated in this Agreement, University employs Employee as Assistant Coach, and Employee agrees to and accepts the terms and conditions for employment outlined in this Agreement.

    b.    **Recognition of Duties.** Employee agrees to be a loyal employee of University and to devote all of his energy and best efforts on a full-time basis to the performance of his duties for University, and for the promotion of the Program. Employee also agrees that notwithstanding the provisions of Section 5.03 hereof, during the term of this Agreement he will not engage, directly or indirectly, in any business which would detract from his ability to apply all of his energy and best efforts to the performance of his duties hereunder.

    c.    **General Duties and Responsibilities of Employee.** During the period in which University employs Employee as Assistant Coach, Employee agrees to undertake and perform properly, efficiently, and to the best of his ability, all duties and responsibilities attendant to the position of Assistant Coach as set forth in this Article III and elsewhere in this Agreement. Employee shall assist in the performance, supervision, evaluation and management of the day-to-day operations of the Program, including, but not limited to, recruiting, training, supervising, evaluating and coaching student-athletes and shall perform such other duties as the Head Coach of the Program ("Head Coach"), and the Director of



GOVERNMENT
EXHIBIT
1206
S1 17 Cr. 684 (ER)

SDNY_00034811

Case 19-3623, Document 87, 05/26/2020, 2847061, Page170 of 188

Intercollegiate Athletics ("Director") may assign in order to successfully compete against major colleges in a quality program which will reflect the values and high standards of University.

   d. <u>Specific Duties and Responsibilities While Employed as Assistant Coach</u>. As of the beginning of this Agreement, the duties and responsibilities assigned to Employee in connection with his position as Assistant Coach are as set forth below. The following list of specific duties and responsibilities supplements and is not exclusive of the other general duties and responsibilities provided for elsewhere in this Agreement and may be changed from time to time at the sole option of University.

- Performing all duties reasonably assigned to Employee by the Head Coach and/or the Director.

- Know, recognize, assure, monitor and be responsible for compliance by student-athletes with and enforcement of (i) the constitution, bylaws, rules, regulations, requirements, policies, procedures and interpretations of the National Collegiate Athletic Association (the "NCAA") and any other governing or sanctioning body having authority over University and/or the Program, the Big 12 Conference, and any other athletic conference with which University is affiliated with from time to time (the "Conference") and (ii) all policies, rules, regulations, requirements, procedures and decisions promulgated by University from time to time (subparagraphs (i) and (ii) above are hereinafter referred to collectively as the "Governing Regulations").

- Assist the Head Coach in administering, managing and leading the Program in such a manner as to reflect positively on the image and reputation of University at all times in accordance with University's mission and to support the goals and objectives of University's Department of Intercollegiate Athletics (the "Department") as stated in the Department's Mission Statement and as otherwise promulgated by the Department from time to time.

- Assist Head Coach in the recruitment and selection of players for the Program.

- Participate in the instruction and coaching of student-athletes.

- Assist in the development and implementation of programs and procedures for the evaluation, recruitment, training and coaching of student-athletes in the Program to enable them to compete successfully while ensuring the welfare of student-athletes.

- Promote an environment in which admissions, financial aid, academic services for student athletes and recruiting can be conducted consistently with University's mission and the Department's Mission Statements and work in cooperation with and support of University's faculty and administrative officials to aid student-athletes to meet academic requirements, perform to their highest academic potential, and graduate.

- Assist Head Coach in projecting facilities, equipment and supply requirements.

- Assist Head Coach in evaluating the performance of the team and team members.

- Keep the Head Coach and Director informed at all times of important matters affecting the Program and review progress and problems with the Head Coach and Director on a timely basis.

SDNY_00034812

Case 19-3623, Document 87, 05/26/2020, 2847061, Page171 of 188

- Notify the Head Coach and Director in the event any student-athlete is arrested, questioned or investigated by any local, state or federal agency or department.

- Maintain an effective relationship with governing boards, associations, conferences, committees, the media and University's alumni, students, faculty and staff in accordance with the instructions of the Head Coach and Director.

- Provide leadership for public relations programs and develop campus and community support for the Program in accordance with the instructions of the Head Coach and the Director.

- Participate in development and fund raising activities in cooperation with the Chancellor of University (the "Chancellor"), Vice Chancellor for University Advancement, the Director and Trustees of University in accordance with the instructions of the Head Coach and Director.

- Promote the Program by speaking to civic groups, University support groups and attending booster club meetings in accordance with the instructions of the Head Coach and the Director.

- Implement policy directives from University, the Conference, accrediting associations and athletic associations.

- Encourage and support student-athletes in the Program in regard to personal, physical, and intellectual development, activities, and achievements, including an emphasis on each student-athlete's completion of an undergraduate degree program. Engage in fair, safe, and responsible treatment of student-athletes and avoiding behavior that could, in any way, jeopardize a student-athlete's health, safety, welfare, or that could otherwise cause harm or risk causing harm to a student-athlete. Engage in reasonable and appropriate supervision of student-athletes in the Program to promote behavior that is consistent with Governing Regulations.

- Dedication of focused, ongoing attention, enthusiasm and efforts to coaching duties, team members, and the success and furtherance of the Program.

- Dedication to the academic excellence of the student-athletes by ensuring student-athletes are in maximum pursuit of degree programs and in compliance with NCAA academic standards, including, but not limited to, the NCAA Division I Academic Reform Initiatives.

- Reporting suspected rules violations of assistant coaches and other personnel. Development of programs and procedures with respect to the evaluation, recruitment, training and coaching of student-athletes that both foster successful competition and promote the welfare and academic achievement, including degree completion, of student-athletes.

- Fulfillment of all job responsibilities in a timely, thorough, constructive, cooperative and positive manner, including responsibility for appraisals, administrative processes, and attendance at all meetings specified by the Director or the Director's designee.

The foregoing list of specific duties and responsibilities supplements and is not exclusive of the other general duties and responsibilities provided for elsewhere in this Agreement.

Case 19-3623, Document 87, 05/26/2020, 2847061, Page172 of 188

**3.02    University and Governing Body Compliance.**  Employee agrees to abide by, comply with and cause those under his supervision to comply with (i) the Governing Regulations, and (ii) the ideals, principles, rules and regulations of University applicable to personal conduct as stated in the current Handbook for Faculty & University Staff and Personnel Policies Manual, which may be amended from time to time.  In the event that Employee becomes aware, or has reasonable cause to believe, that violations of the Governing Regulations may have taken place, he shall report the same promptly to the Head Coach, the Chancellor and the Director.  Employee shall cooperate fully in any investigation of possible NCAA violations conducted or authorized by University or the NCAA at any time.  Employee agrees to know, to adhere to, to respect, to follow and to champion the academic principals, standards, requirements and policies of University with regard to the recruiting and eligibility of prospective and current student-athletes of the Program.  All academic standards, requirements and policies of University shall also be known and observed by Employee at all times, and those under his supervision, and should not be compromised or violated at any time.  In the event Employee becomes aware, or has reasonable cause to believe, that violations of such academic standards, requirements and policies of University have taken place, he shall report the same promptly to the Head Coach, the Chancellor and the Director.

**3.03    NCAA Required Disciplinary Terms.**  In addition to any right or remedy of University provided for elsewhere in this Agreement, if Employee is found in violation of NCAA regulations, Employee shall be subject to disciplinary or corrective action as set forth in the provisions of the NCAA enforcement procedures, including suspension without pay, or termination of employment for significant or repetitive violations.

**3.04    Reporting Relationship.**  Employee shall report specifically to the Head Coach and generally to the Director and the Chancellor or to such other person as may be designated from time to time by the Chancellor as Employee's reporting superior.  Employee's job duties and responsibilities may be reviewed, revised and assigned from time to time by Employee's reporting superior.

**3.05    Institutional Control.**  The parties recognize that the Director is responsible to the Chancellor for the operation, review, and periodic evaluation of the entire athletic program at the University, including the Program.  Employee recognizes and acknowledges the importance of the maintenance and observance of the principles and institutional control over every aspect of such Program.  Employee agrees to recognize and respect those relationships and the organizational structure of the University.  Within that structure, the Director and Employee shall mutually cooperate to implement the purposes of this Agreement, and Employee shall support and comply with the Director's efforts and instructions regarding any such review of the athletic program.

**3.06    Reassignment.**  The performance of Employee will be subject to periodic review by the Head Coach and the Director and, at the discretion of the Director; Employee may be removed from the duties and responsibilities as Assistant Coach and reassigned to other duties and responsibilities within the Department of Intercollegiate Athletics or University for the remaining term of this Agreement. In the event of such reassignment, the compensation for the performance of such reassigned duties and responsibilities shall be the Base Salary until the expiration of this Agreement or resignation by the Employee.

## ARTICLE IV - TERM OF EMPLOYMENT

Employee's employment hereunder shall commence May 2, 2016 and shall continue until this Agreement terminates at 11:59 pm on May 31, 2018, unless earlier terminated in accordance with Article VI hereof.

## ARTICLE V - COMPENSATION

In consideration for the promises he has made in entering into this Agreement, Employee shall be entitled to the following forms of compensation described below (all payments from University are subject to normal deductions and withholding for local, state and federal taxes and for any retirement or other benefits to which Employee is entitled or in which he participates, and are subject to the terms and conditions of Article VI hereof concerning termination of this Agreement):

SDNY_00034814

**SA-329**

5.01   <u>Base Salary</u>.  The Base Salary paid by University to Employee for services and satisfactory performance under this Agreement shall be Two Hundred Ten Thousand and 00/100 Dollars ($210,000.00) for each year of this Agreement.  The Base Salary shall be payable each year by University in twelve (12) equal installments at the same time as other professional staff of University. Employee shall be eligible for merit raises in Base Salary from time to time at the discretion of the University.

5.02   <u>Additional Benefits</u>.  During the term of this Agreement, University will provide Employee with the additional benefits described in this Section 5.02, and no others.

a.   <u>Standard University Additional Benefits</u>.  Employee shall be entitled to the Standard University Additional Benefits appropriate to Employee's classification, including, but not limited to, group life insurance, vacation with pay and family medical coverage in accordance with University policies promulgated from time to time, and participation in University's retirement plan, save and except Employee shall not be paid by University, or otherwise eligible for accrued vacation time upon termination of his employment under Section 4 of University Policy No. 6.001 or otherwise.  Employee hereby waives and releases any claims against University for payment of accrued vacation upon his termination under Chapter 61, Texas Labor Code, 40 T.A.C. §821.25, or any other law or regulation with respect to Employee's employment.  If any benefit is based in whole or in part upon salary paid to Employee, such consideration shall be made with reference to Base Salary only.

b.   <u>Expenses</u>.  University will reimburse Employee for all necessary travel and out-of-pocket expenses reasonably incurred by him for the purpose of and in connection with the performance of his duties under this Agreement.  All reimbursements shall be made in accordance with the standard procedures of University.

c.   <u>Automobile/Allowance</u>.  Subject to and conditioned upon Employee's initial and continuing eligibility under University's policies, rules, regulations, requirements, procedures and decisions regarding the use of motor vehicles in effect from time to time (together, the "<u>Automobile Policy</u>"). University, as additional compensation to the Employee, shall make arrangements for, and provide to Employee, on a loan basis a suitable automobile for his use while employed under the terms of this Agreement. So long as Employee remains eligible under the Automobile Policy, University further agrees to pay for reasonable operating and maintenance expenses associated with such automobile and shall provide appropriate liability and comprehensive automobile insurance to cover the Employee in the use and operation of said vehicle during the term of this Agreement.  Employee agrees to comply with all applicable State laws and the Automobile Policy when having possession of and/or operating said automobile. Additionally, Employee agrees to (i) notify the Director immediately of any driving violation or accident involving the automobile, (ii) use and maintain the automobile in accordance with manufacturer standards and specifications, and (iii) use and maintain the automobile in accordance with requirements and policies of any dealership making the automobile available to the University for use University, at its sole election, may provide to Employee an automobile allowance in the amount of Five Hundred and 00/100 Dollars ($500.00) per month in lieu of providing the use of an automobile.

d.   <u>Moving Expenses</u>.  Subject to University's advance approval, University shall reimburse Employee for all reasonable and standard out-of-pocket expenses incurred by Employee in the moving of Employee's (and immediate family's) personal and professional property to Fort Worth, Texas. Such reimbursement shall be made in accordance with the standard procedures of University.  Employee shall procure and submit to University for consideration three (3) bids for the cost of moving.

5.03   <u>Opportunities to Earn Outside Income and Benefits</u>.  While University employs Employee under this Agreement, he shall have the opportunity to earn outside income and benefits, but only upon the following terms and conditions:

a.   <u>General Provisions Concerning Outside Income and Benefits</u>.  The following general terms and conditions shall apply to each case in which Employee seeks to or makes arrangements to earn outside income or receive benefits as a result of him being Assistant Coach:

EMPLOYMENT AGREEMENT
**COREY BARKER**
I:\09700\0005\1101150.DOCXI:\09700\0005\1101150.DOCX

Page 5

SDNY_00034815

Case 19-3623, Document 87, 05/26/2020, 2847061, Page174 of 188

      **(i)**    <u>University Obligations Are Primary</u>.  Such outside activities shall not interfere with the full and complete performance by Employee of his duties and obligations as a University employee, recognizing always that Employee's primary obligations lie with University.

      **(ii)**    <u>Governing Regulations Control</u>.  In no event shall Employee accept or receive directly or indirectly any monies, benefits or any other gratuity whatsoever from any person, corporation, booster club or alumni association or other benefactor if such action would violate the Governing Regulations.  Changes of Governing Regulations shall automatically apply to this Agreement without the necessity of a written modification.

      **(iii)**    <u>University Approval is Required</u>.  Employee shall obtain annually the <u>advance</u> written approval of the Chancellor before accepting, or entering into any agreement to earn outside income or receive benefits, athletically or otherwise.  Employee's request for approval shall also be in writing and shall include the amount and sources of the income.  The granting or denial of such approval shall be in accordance with the provisions of this Agreement in addition to the general policy of University regarding outside employment.  The Chancellor's action in such regard shall be final.

      **(iv)**    <u>University's Exempt Status</u>.  In no event shall Employee accept or receive directly or indirectly any monies or benefits by virtue of his outside activities if such, in the reasonable judgment of University, would have the effect of jeopardizing University's exempt status under IRC §501(c)(3).

      **(v)**    <u>University is not Liable</u>.  Such activities are independent of Employee's University employment, and University shall have no responsibility or liability for any claims arising therefrom.

      **(vi)**    <u>Employee Retains All Revenues</u>.  Except for the limitations on such outside compensation as established by or set forth in this Agreement and in the Governing Regulations, Employee shall be entitled to retain all revenue generated by such outside activities.  Employee accepts full responsibility for any and all tax obligations arising from these revenues.

      **(vii)**    <u>Trademarks, Service Marks and Trade Names</u>.  Under no circumstances shall Employee have the right to use any trademark, service mark or trade name associated with University for his or any third party's personal benefit without the written permission of University.

    **b.**    <u>Accounting of Outside Athletically-Related Income</u>.  In addition to the other requirements of University's general policy on outside employment, Employee shall provide a written detailed account annually to the Chancellor for all athletically and non-athletically related income and benefits from sources outside University.  The approval of all athletically and non-athletically related income and benefits shall be consistent with University's policy related to outside income and benefits.  With respect to athletically related income, sources shall include, but are not limited to, the following:

      **(i)**    income from annuities;

      **(ii)**    sports camps;

      **(iii)**    housing benefits (including preferential housing arrangements);

      **(iv)**    country club memberships;

      **(v)**    complimentary ticket sales;

      **(vi)**    television and radio programs; and

Case 19-3623, Document 87, 05/26/2020, 2847061, Page175 of 188

(vii)    endorsements or consultation contracts with athletic shoe, apparel or equipment manufacturers.

Employee shall provide University with reasonable access to all records of Employee necessary to verify such accounting.

c.    **Commercial Endorsements.**    Employee shall not undertake commercial endorsements of products and services during the term of this Agreement.

5.04    **Post Season Bonus.**  During his employment as Assistant Coach, Employee shall have the opportunity to receive a bonus for the Program's participation in post season tournaments, as made available by the University from time to time and as provided to other assistant coaches in the Program.

## ARTICLE VI - TERMINATION

6.01    **Termination by University.**  University recognizes that its promise to employ Employee during the entire term of this Agreement is of the essence of this Agreement to Employee; however, certain circumstances may make it appropriate for University to terminate this Agreement prior to the completion of its entire term.

a.    **Automatic Termination Upon Death or Disability.**  This Agreement shall terminate automatically if Employee dies, or, if Employee suffers "total disability" within the meaning of University's group long term disability policy in effect from time to time for employees of Employee's classification.

If this Agreement is terminated pursuant to this Section 6.01a because of the Employee's death, Employee's salary and all other benefits shall terminate as of the calendar month in which death occurs, except that Employee's personal representative or other designated beneficiary shall be paid all such death benefits, if any, as may be contained in any benefit plan now in force or hereafter adopted by University and due to Employee thereunder.

If this Agreement is terminated pursuant to this Section 6.01a because of Employee's total disability, Employee shall continue to receive the salary and any other benefits then applicable for the time period (the "Benefits Period") specified in University's Sick Leave Policy or such other policy as may be in effect from time to time.  At the end of the Benefits Period, all salary and other benefits shall terminate, except that Employee shall be entitled to receive any disability benefits to which he is entitled under any disability program in which he is enrolled.

b.    **Suspension or Termination by University for Cause.**  University shall have the right to (i) suspend Employee for a period of time without pay for cause, or (ii) terminate this Agreement for cause prior to May 31, 2018.  The term "cause" shall include but is not limited to:

(i)    breach by Employee of any of the material duties, responsibilities, terms or agreements provided for in this Agreement or repeated breach by Employee of any other of the duties, responsibilities, terms or agreements provided for in this Agreement;

(ii)    conduct of Employee (a) which is unlawful or results in arrest, charges being filed or conviction for a crime or (b) which is adverse or seriously prejudicial to the interests of University and its mission or (c) which displays a continual or serious disrespect or disregard for the character of University or (d) which causes notorious or public scandal or would tend to bring public disrespect, contempt or ridicule to University or (e) that constitutes moral turpitude or (f) involving dishonesty, willful misconduct, insobriety, illegal drug use or (g) that breaches the high moral and ethical standards applicable to Employee as a visible representative of University;

SDNY_00034817

Case 19-3623, Document 87, 05/26/2020, 2847061, Page176 of 188

    (iii)  violation by Employee, of any of the Governing Regulations (including NCAA violations with respect to previous employers) or failure to report same;

    (iv)  condone a violation of the Governing Regulations and criminal law (any of which shall be referred to in this subsection as a "Violation") by a member of the Program's coaching staff or any person under Employee's supervision and direction, including a student-athlete. For purposes of this subsection, "condone" shall mean: (a) Employee's actual knowledge of and complicity in a Violation by a member of the Program's coaching staff or any person under Employee's supervision and direction, including a student-athlete; or (b) Employee's failure to report a known Violation by a member of the Program's coaching staff or any person under Employee's supervision and direction, including a student-athlete, to the Director promptly. For purposes of this subsection, a "known Violation" shall mean a Violation the Employee becomes aware of, or has reasonable cause to believe, is taking place or may have taken place;

    (v)  significant or recurring failure of Employee to administer, operate, maintain or control all material aspects of the Program, including, but not limited to, the actions of representatives of athletic interests in a manner consistent with the Governing Regulations;

    (vi)  Employee interviewing or applying for employment elsewhere without prior notice to the Director;

    (vii)  an action involving willful and deliberate malfeasance or gross negligence in the performance of duties;

    (viii)  prolonged absence from duties without University's consent;

    (ix)  any cause adequate to sustain the termination of any other University employee of Employee's classification.

    c.  **Other Disciplinary Action for Cause.** University shall have the right for cause, in lieu of suspension and/or termination as provided for in Section 6.01b above, to fine, reprimand, place on probation, or take other appropriate disciplinary action against Employee as University deems appropriate.

    d.  **Determination of Cause and Employee's Right to Hearing.** "Cause" sufficient to satisfy the provisions of Sections 6.01b or 6.01c hereof shall be determined by the Director (other than as hereinafter provided). Once such determination is made by the Director, the Director shall have the administrative authority to take one or more of the following disciplinary actions: disciplinary action as provided in Section 6.01c above, suspension of Employee from Employee's duties, salary and benefits, and/or termination of Employee's employment (separately or collectively an "Employment Action"), provided that notice of any such Employment Action, shall be provided to Employee in writing by Director. Employee shall have the procedural right to a review of any Employment Action by the Director by providing a written request for review to the Chancellor, specifying the facts and reason(s) for the request. If Employee fails to provide this written request for review to the Chancellor within five (5) days after receipt of notice of the contested Employment Action, then the action of the Director is final. Upon receipt of a timely request for written review under hereunder, the Chancellor shall oversee such investigation as the Chancellor deems appropriate, and the action by the Chancellor on Employee's request is final. In the event of an Employment Action by the Director, any appeal or challenge is limited to appeal solely to the Chancellor, and Employee may not appeal, challenge or otherwise address the Employment Action by the Director through any appeal, mediation, panel or process under any of Employer's policies (including but not limited to Texas Christian University Policy No. 2.015 Conflict Resolution Policy).

    Notwithstanding anything contained in the forgoing to the contrary (i) Employer may take all actions with respect to Employee allowed in Texas Christian University Policy 1.005 Discrimination, Harassment, Sexual Misconduct and Retaliation, as amended from time to time ("Policy 1.005"), through

SDNY_00034818

Case 19-3623, Document 87, 05/26/2020, 2847061, Page177 of 188

the representatives therein designated with respect to the matters which are the subject of Policy 1.005 (including those pertaining to appeal) and (ii) in the event that Employee is found to have violated Policy 1.005 under the procedures provided for in such policy, such shall constitute "Cause" sufficient to satisfy the provisions of Sections 6.01b and 6.01c hereof. In such event, the Director is not limited to or restricted by any employment action taken under Policy 1.005, and the Director has the discretion to issue separate, concurrent and/or more severe Employment Action, provided that notice of such action shall be provided to Employee in writing.

References to the "Director" or "Chancellor" in this Section shall also include any Employer representative appointed by the Director or the Chancellor.

     e.    **University's Obligations Upon Termination for Cause.**  In the event this Agreement is terminated for cause in accordance with the provisions of Section 6.01b hereof, all obligations of University to make further payments and/or to provide any other consideration hereunder shall cease as of the end of the day in which such termination occurs. In no case shall University be liable to Employee for the loss of any collateral business opportunities or any other benefits, perquisites or income resulting from such activities or from any other sources that may ensue as a result of University's termination of this Agreement with cause.

     f.    **Termination by University Without Cause.**  University shall have the right to terminate this Agreement prior to its expiration without cause. Termination "without cause" shall mean termination of this Agreement on any basis other than those set forth in or contemplated by Section 6.01a and 6.01b above. Termination by University without cause shall be effectuated by delivering to Employee written notice of University's intent to terminate this Agreement without cause, which notice shall be effective upon the date set forth for termination in such notice. If University exercises its rights under this Section 6.01f to terminate this Agreement without cause, Employee shall be entitled to damages only as provided for in Section 6.01g below as his sole and exclusive remedy against University.

     g.    **Liquidated Damages and Forfeiture of Benefits Upon Termination by University Without Cause.**  If University terminates this Agreement without cause prior to May 31, 2018, in accordance with the provisions of Section 6.01f hereof, University shall, pay to Employee, as liquidated damages, the total of the remaining Base Salary hereunder and nothing more, payable, at University's option, monthly or in a lump sum. In no case shall University be liable for the loss of any collateral business opportunities or any other benefits, perquisites or income resulting from such activities or from any other sources that may ensue as a result of University's termination of this Agreement without cause.

The parties have bargained for and agreed to the foregoing liquidated damages provision, giving consideration to the fact that termination of this Agreement by University without cause prior to its stated expiration may cause Employee to lose certain benefits, supplemental compensation or outside compensation relating to his employment at University, which damages are extremely difficult to determine with certainty or fairly or adequately. Employee hereby acknowledges and understands that any benefits, remuneration or perquisites obtained pursuant to Section 5.03 hereof flowing from Employee's status as Assistant Coach of the Program are not contemplated by the parties as being material to this Agreement and are not in any way guaranteed by University. Should this Agreement be terminated for any reason, Employee agrees and understands that University shall have no responsibility to continue, maintain or compensate Employee for the loss of any such benefits, remuneration or perquisites whether this Agreement is terminated for cause or without cause. The parties further agree that the payment of such liquidated damages by University and acceptance thereof by Employee shall constitute adequate and reasonable compensation to Employee for the damages and injury suffered by Employee because of such termination by University. The foregoing shall not be, nor be construed to be, a penalty.

Employee covenants and agrees to accept the liquidated damages provided for herein as full and complete satisfaction of any obligations of the University of any nature whatsoever. Employee further covenants and agrees that any exercise of ownership or control by him over any partial or total payment of the liquidated damages provided for hereunder (including, but not limited to, accepting, depositing or

SDNY_00034819

Case 19-3623, Document 87, 05/26/2020, 2847061, Page178 of 188

exercising any act of ownership over any partial or full payments) shall constitute an act of ratification and/or sufficient and valuable consideration which absolutely and unconditionally forever releases, discharges and waives any and all alleged liability of the University, its Trustees, officials, representatives, and employees, in both their official and individual capacities, from and against any and all claims of any nature whatsoever (including, but not limited to, any and all claims arising from or relating to any Federal or state constitutions, laws, regulations, common law, or any other provision of law) relating to or arising out of this Agreement, Employee's employment by University, and Employee's termination without cause by the University and for any and all such claims which arise or may have arisen between Employee's initial date of employment, and the date of Employee's termination without cause; provided, however, that the scope of the release, discharge and waiver granted by Employee herein shall not include a release, discharge, or waiver of any claims arising from the failure to pay all sums due hereunder.

Without limiting the generality and applicability of the foregoing release and waiver, Employee further covenants and agrees that the University's offer and his acceptance of any future salary increase or renewal or extension of the term of this Agreement shall be sufficient and valuable consideration which shall operate as an automatic, absolute and unconditional release, discharge and waiver of any and all claims of any nature whatsoever (including, but not limited to, any and all claims arising from or relating to any Federal or state constitutions, laws, regulations, common law, or any other provision of law) which Employee has or might have asserted prior to accepting any salary increase or renewal or extension of the term of this Agreement.

If Employee files suit against the University because of any termination without cause as provided for in this Agreement and/or regarding his Employment by University, then all amounts of liquidated damages provided for herein shall be waived by Employee and Employee shall not be entitled to any liquidated damages as specified herein. If Employee has already received a portion of or the entire amount of liquidated damages specified in this Agreement then he shall immediately repay said amounts and if he does not timely repay said amounts, then the University shall be entitled to a judgment for the amounts he has received plus interest at the highest rate allowed by law.

**h.** **Other Employment of Employee if University Terminates Without Cause**. Employee shall use his best efforts to secure employment promptly upon termination without cause in a comparable position. If Employee is re-employed outside University (regardless of the field of endeavor), University's financial obligations to Employee under this Agreement shall be reduced by the total amount of compensation and benefits paid to Employee from any subsequent employment(s) or consulting on an annualized basis for a term equal to the then remainder of the stated term of this Agreement. Employee will use best efforts to mitigate damages and find other employment. Employee agrees that no financial agreements shall be structured in a manner such as to frustrate the purposes or intent of this provision. Employee will provide access to all financial information relative to subsequent employment or consulting, including providing copies of all tax returns, K-1's and W2's to University upon request in order to verify income and benefits paid to Employee.

**6.02** **Termination by Employee.** Employee recognizes that his promise to work for University for the entire term of this Agreement is of the essence of this Agreement to University. Employee also recognizes that University is making a highly valuable investment in his continued employment by entering into this Agreement and that its investment would be lost were he to resign or otherwise terminate his employment with University prior to the expiration of the stated term of this Agreement. While recognizing these agreements and this entire Agreement, the parties agree that Employee may, nevertheless, terminate this Agreement prior to its normal expiration, but only upon the following conditions:

**a.** **Written Notice By Employee.** Employee may terminate this Agreement during its term by giving University thirty (30) calendar days advance written notice of the termination of his employment with University. Simultaneously with such notice, Employee shall inform University in writing of employment plans following the termination of employment with University. The obligations of Employee under this Agreement and, particularly, under Section 6.02b below concerning liquidated damages shall continue in full force and effect for all purposes notwithstanding the termination of Employee's employment pursuant to this Section 6.02.

Case 19-3623, Document 87, 05/26/2020, 2847061, Page179 of 188

**b.  Liquidated Damages and Forfeiture of Benefits Upon Termination By Employee.**  If Employee terminates this Agreement prior to May 31, 2018 in accordance with the provisions of Section 6.02a hereof, Employee, shall, on the effective date of termination (1) pay to University as liquidated damages Two Hundred Ten Thousand and No/100's Dollars ($210,000) for any termination prior to June 1, 2017, and for any termination thereafter through the last game of the 2017-2018 season (regular and post season) One Hundred Five Thousand and No/100's Dollars ($105,000), and (2) forfeit any unpaid bonus to which he may be entitled, if any.  The foregoing requirement to pay liquidated damages shall not apply in the event Employee terminates his employment hereunder during the off-season in order to accept (i) employment as a head men's basketball coach at a Division I institution, or (ii) any other position, excluding an employment or consulting position with another NCAA Division I basketball program (other than as provided in (i) of this subsection) or an NBA team..

The parties have bargained for and agreed to the foregoing liquidated damages provision, giving consideration to the fact that University will incur administrative, recruiting, resettlement and other attendant costs in obtaining a replacement for Employee in addition to potentially increased compensation costs, loss of ticket or other revenues, lost talents of resigning assistant coaches, broken promises and relationships with participants, lost recruits and future recruiting opportunities, reduced membership in athletic clubs and alumni support, decline in donations to the athletic program, redesigning publicity, media guides, logos and uniforms and the like if Employee terminates this Agreement while serving as Assistant Coach, which damages are extremely difficult to determine with certainty or fairly or adequately.  The parties further agree that the payment of such liquidated damages by Employee and acceptance thereof by University shall constitute adequate and reasonable compensation to University for the damages and injury suffered by it because of such termination by Employee.  The foregoing shall not be, nor be construed to be, a penalty.

## ARTICLE VII - UNIVERSITY'S EDUCATIVE PURPOSE AND SUPPORT OF PROGRAM

The parties agree that, although this Agreement is sports-related, the primary purpose of University and, accordingly, of all its legal arrangements, including this Agreement, is educative.  Thus, the educative purposes of the University shall have priority in the various provisions of this Agreement.

## ARTICLE VIII - PUBLICITY RIGHTS

Employee specifically recognizes and agrees that as a material part and of the essence of this Agreement and in consideration of all compensation| provided to Employee by University, that Employee hereby irrevocably GRANTS to University the royalty-free, assignable, transferable and sublicensable right and license to utilize Employee's name, image, likeness and all other of Employee's publicity rights for any and all advertising/promotional purposes associated with the University and/or the Department during the term of Employee's employment, including but not limited to, those in connection with my participation in any University-sponsored or endorsed sporting event or any other activities related to participation in University's educational or intercollegiate sports activities, and the advertisement, promotion, sale and distribution of University's products or services, or the Program or other University-related products and services. Upon expiration or termination of Employee's employment, Employee specifically and irrevocably grants University a royalty-free, perpetual, assignable, transferable and sublicensable right and license to utilize his name, image, likeness and all other of Employee's publicity rights derived from or relating to any documents material, photographs, audio or visual media of Employee related to his employment at the University for historical purposes or as otherwise agreed in writing by Employee.

## ARTICLE IX - MISCELLANEOUS

**9.01  Employee Not Entitled to Tenure.**  The parties hereby confirm their understanding that Employee's employment under this Agreement in the position of Assistant Coach is not a tenure-track position, and will not lead to tenure.

SDNY_00034821

Case 19-3623, Document 87, 05/26/2020, 2847061, Page180 of 188

**9.02    Conference Affiliation.**  University is presently affiliated with the Conference.  During the term of this Agreement, from time to time, University may terminate conference affiliations and establish conference affiliations without the consent of Employee and without affecting the obligations, responsibilities and agreements of Employee hereunder.

**9.03    University Property.**  All materials or articles of information, including, without limitation, personnel records, Employee's records, statistics or any other material or data in any form or medium furnished to Employee by University, or developed by Employee on behalf of University, or at University's or Employee's direction or supervision, are and shall remain the sole, proprietary and confidential property of University.  Within ten (10) days of the expiration or termination of this Agreement with or without cause by either party, Employee shall immediately cause any such materials in his possession, custody or control to be returned and delivered to University.

**9.04    Choice of Law.**  It is the intent of the parties hereto that this Agreement shall be governed by and construed in accordance with the laws of the State of Texas and the laws of the State of Texas shall govern the validity, performance and enforcement of this Agreement.

**9.05    Venue.**  Any cause of action brought by University or Employee with respect to, concerning, relating, affecting or touching upon this Agreement shall be filed only in a Federal or State District Court located in Tarrant County, Texas.

**9.06    Assignment of Agreement.**  Employee's rights and interests under this Agreement may not be assigned, pledged or encumbered by Employee.

**9.07    Merger Clause.**  This Agreement constitutes the full and complete understanding and agreement of the parties with respect to the employment of Employee by University and supersedes all prior understandings and agreements, oral or written, regarding such matters.

**9.08    Amendments to Agreement.**  This Agreement may be amended at any time only by a written instrument duly approved by University through its designated representative and accepted by Employee, such approval and acceptance to be acknowledged in writing.

**9.09    Severability.**  If any provision or provisions hereof shall be deemed invalid or unenforceable, either in whole or in part, this Agreement shall be deemed amended to delete or modify, as necessary, the offending provision or provisions or to alter the bounds thereof in order to render it valid and enforceable.

**9.10    No Waiver of Default.**  No waiver by the parties hereto of any default or breach of any covenant, term or condition of this Agreement shall be deemed to be a waiver of any other default or breach of the same or any other covenant, term or condition contained herein.

**9.11    Acknowledgment.**  Employee acknowledges that he has read and understands the foregoing provisions of this Agreement, that such provisions are reasonable and enforceable, that he agrees to abide by this Agreement and the terms and conditions set forth herein, and that no other agreement to which he is a party prohibits his execution of and performance under this Agreement.

**9.12    University Retains All Materials and Records.**  All materials or articles of information, including, without limitation, personnel records, recruiting records, team information, films, statistics or any other material or data, furnished to Employee by University or developed by Employee on behalf of University or at University's direction or for University's use or otherwise in connection with Employee's employment hereunder are and shall remain the sole and confidential property of University.  Within three (3) calendar days of the expiration of the term of this Agreement or its earlier termination as provided herein, Employee shall immediately cause any such materials in his possession or control to be delivered to University.

SDNY_00034822

Case 19-3623, Document 87, 05/26/2020, 2847061, Page181 of 188

**9.13    Employee Will Not Make Investments Inconsistent With University's Objectives.** During the period of employment hereunder, Employee shall not knowingly make or continue to hold any investment in or be associated with any enterprise which could be deemed to be inconsistent with University's objectives and philosophies without having first obtained the written approval of the Chancellor.

**9.14    Tax Advice.** The University will not provide tax advice to Employee regarding the tax effects of this agreement. The University encourages Employee to consult with his own tax advisors concerning the federal, state and local tax effects of this agreement.

**9.15    Notices.** Any notice or other communication which may be or is required to be given under this Agreement shall be in writing and shall be deemed to have been given on the earlier of the day actually received or on the close of business on the fifth business day next following the day when deposited in the United States Mail, postage prepaid, registered or certified, addressed to the party at the address set forth after its name below or such other address as may be given by such party in writing to the other:

If to Employee:

Texas Christian University
TCU Box 297600
Fort Worth, Texas 76129

If to University:

Chancellor
Texas Christian University
TCU Box 297080
Fort Worth, Texas 76129

With a copy to:

Director of Intercollegiate Athletics
Texas Christian University
TCU Box 297620
Fort Worth, Texas 76129

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed to be effective the day and year first stated above, intending to be legally bound by its provisions.

UNIVERSITY:

**TEXAS CHRISTIAN UNIVERSITY**

Date: 03232017

By: _____
Victor J. Boschini, Chancellor

EMPLOYEE:

Date: 3-13-17

_____
Corey Barker

SDNY_00034823

**FOIA Confidential Treatment Requested**

TEXAS CHRISTIAN UNIVERSITY

*Department of Athletics Interview Questions*



TCU
ATHLETICS
COMPLIANCE

**TCU Men's Basketball Staff Member:** Corey Barker

### Financial Advisors/Agents

- Have you ever accepted (or been promised) money or anything else of value from anyone in exchange for access to (prospective or current) student-athletes?

    o Or their families?

    o For example, a financial advisor or agent?

- Are you aware of anyone affiliated with the team receiving (or being promised) cash or anything of value in exchange for access to (prospective or current) student-athletes? No

- Are you aware of any financial advisors or agents who represent (prospective or current) student-athletes? No

    o Or their families? No

### Apparel Companies

- Do you know who the team's Nike representatives are? Yes

- Do you have regular contact with them? No

- Have you ever been asked to put student-athlete or family in direct contact with a Nike rep?

    o Or convey any offer? No

    o Other apparel rep? No

- Are you aware of a student-athlete ever receiving cash or anything of value from a Nike rep?
    o Other apparel rep? No

14005709.1

**GOVERNMENT EXHIBIT 1207**
S1 17 Cr. 684 (ER)

**TCU-DOJ-0000042**

FOIA Confidential Treatment Requested

**General**

- Have you ever observed or heard of anyone giving a (prospective or current) student-athlete cash or something of value?

    o Or families? No.

    o If so, who?

    o If so, what were the circumstances?

**Criminal Case**

- After hearing about the investigations involving coaches at Auburn, USC, Arizona, Oklahoma State, Louisville, and Miami, has there been any situation or occurrence that you've been involved with that you feel should be disclosed?

I hereby certify that the above answers are true and correct to the best of my knowledge. _____

_____          10-2-17
_Signature_                                                    _Date_

14005709.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA           :        **STIPULATION**

        - v. -                     :        S1 17 Cr. 684(ER)

                                   :

CHRISTIAN DAWKINS,
MERL CODE,                         :

        Defendants.                :

- - - - - - - - - - - - - - - - -x

        IT IS HEREBY STIPULATED AND AGREED by and between the
United States of America, by Geoffrey S. Berman, United States
Attorney, Robert L. Boone, Noah Solowiejczyk, and Eli J. Mark,
Assistant United States Attorneys, of counsel, CHRISTIAN
DAWKINS, the defendant, by and with the consent of his attorney,
Steven Haney, Sr., Esq., and MERL CODE, the defendant, by and
with the consent of his attorneys, Mark Moore, Esq., Andrew A.
Mathias, Esq., Allen Chaney, Esq., and Darren Haley, Esq., that:

        1.  During each year from 2016 through 2017, the University
of South Carolina, Oklahoma State University, the University of
Arizona,  the  University  of  Southern  California,  Creighton
University, and Texas Christian University each received funds
from the federal government in excess of $10,000 under a federal
program.

GOVERNMENT
EXHIBIT
1901
S1 17 Cr. 684 (ER)

IT IS FURTHER STIPULATED AND AGREED that this Stipulation may

be received into evidence as a Government Exhibit at trial.

Dated:   New York, New York
         April 22, 2019

                    GEOFFREY S. BERMAN
                    United States Attorney for the
                    Southern District of New York

         By:  _____
                    Robert L. Boone
                    Noah Solowiejczyk
                    Eli J. Mark
                    Assistant United States Attorneys


              _____
                    Steven Haney, Sr.
                    Counsel for Christian Dawkins


              _____
                    Mark Moore/Andrew Mathias
                    Allen Chaney/Darren Haley
                    Counsel for Merl Code

**SA-342**

JA3KDAWS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          17 CR 684 (ER)

5   CHRISTIAN DAWKINS,

6              Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           October 3, 2019
9                                          2:30 p.m.

10  Before:

11                   HON. EDGARDO RAMOS,

12                                         District Judge

13
                          APPEARANCES
14

15  GEOFFREY S. BERMAN,
         United States Attorney for the
16       Southern District of New York
    ROBERT BOONE
17  ELI J. MARK
    NOAH SOLOWIEJCZYK
18       Assistant United States Attorneys

19  STEVEN A. HANEY, SR.
         Attorney for Defendant
20

21

22

23

24

25

**SA-343**

JA3KDAWS

1  convincing the jury that he did not want to pay college

2  coaches.  We introduced several elements of evidence that

3  showed he in fact did want to pay college coaches, and had a

4  history of doing so, we introduced recordings in which he

5  stressed the importance and what was so great about paying

6  college coaches, which clearly stood in contrast to his

7  testimony, that included the sort of lie about how he actually

8  was sort of pretending to pay college coaches.

9          And, based on the jury's verdict, it's clear they also

10  believed that was a lie, as it seems implausible they could

11  find him guilty of committing bribery based on his testimony

12  that he did not commit bribery.

13          THE COURT:  Thank you.  Yes, I do find that the

14  enhancement for obstruction of justice is appropriate in this

15  case.  Obviously, although the jury did not hear this, I did,

16  and there were several coaches, again, that came before me and

17  pled guilty and admitted that they received bribes from,

18  amongst others, Mr. Dawkins and Mr. Dawkins' coconspirators.

19  Mr. Dawkins clearly and materially denied that he had done so.

20  I find that that testimony was false, and that it was meant to

21  deceive the jury, so I do find that.

22          And the other instances that we discussed, including

23  the Phillips/Foster dichotomy, I do not find that the

24  explanation that has been provided for it is colorable.  I do

25  find that he perjured himself with respect to that testimony as

**SA-344**

JA3KDAWS

1    well, as well as the testimony concerning the deposits that

2    were made at the ATMs.

3            So, for those reasons, I do find that the enhancement

4    for obstruction of justice is appropriate.

5            Accordingly, the total offense level, in this case,

6    will be 22 because, again, there was a base offense level of

7    12; two levels were added because there was more than one

8    bribe; six levels are added because the amount of the bribes

9    was at least $40,000; and two levels are added for obstruction

10   of justice.

11           Now, with respect to criminal history category:  The

12   government and probation recommend that, or suggest, that he is

13   in criminal history category II because of the sentence that

14   was imposed on him by Judge Kaplan in the related case.

15           Mr. Haney, did you wish to be heard?

16           MR. HANEY:  Thank you, your Honor.

17           Your Honor, obviously, we do not agree that the

18   two-level enhancement in the criminal history calculation

19   should be included, and that previous conviction of the Gatto

20   case is relevant conduct to the instant offense, for not only

21   purposes of the sentencing guidelines but also for purposes of

22   concurrent sentencing, which, of course, the Court has

23   discretion.

24           Your Honor, we really rely -- I rely -- upon the

25   argument that this and the Gatto case were really one common